**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| **ROBBIE AUTERY and SHANE** | ) | |
| **FULMER,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **CIVIL ACTION NO.:** |
| **v.** | ) | **2:08-CV-41-WC** |
| | ) | |
| **KEVIN DAVIS, in his official capacity** | ) | |
| **as Sheriff of Chilton County, Alabama,** | ) | |
| **and individually,** | ) | |
| | ) | |
| **Defendant.** | ) | |


## DEFENDANT KEVIN DAVIS' BRIEF IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT

COMES NOW the Defendant, Kevin Davis, in his official capacity as Sheriff of Chilton County, Alabama, and individually, (hereinafter "Sheriff Davis"), and submits this Brief in Support of his Motion for Summary Judgment, and states as follows:

## I. INTRODUCTION

This is an action for relief under 42 U.S.C. § 1983, for alleged violations of Plaintiffs' employment rights. Plaintiff Shane Fulmer was hired to work as a Chilton County Deputy Sheriff on January 19, 1999. He was hired by former Chilton County Sheriff Billy Wayne Fulmer, who is Plaintiff Fulmer's father. Plaintiff Robbie Autery was hired as a part-time Chilton County Deputy Sheriff on October 3, 2005, and became a full-time employee June 19, 2006. He was also hired by former Chilton County Sheriff Fulmer, whom Plaintiff Autery describes as a family member.

Billy Wayne Fulmer was defeated in the Chilton County November 2006 general election, and defendant Kevin Davis was elected as the new Chilton County Sheriff. Both Plaintiffs actively campaigned for Billy Wayne Fulmer and against Sheriff Davis in the election. Despite having supported his opponent, Sheriff Davis did not immediately terminate the Plaintiffs after he was elected. Instead, he attempted to work with them, and utilize their experience. During their employment, however, Sheriff Davis encountered numerous problems with both of the Plaintiffs. They did not approve of his work methodology, and were critical of him to other employees in the department, both above and below their chain of command, as well as members of the community.

Based upon the Plaintiffs' actions in attempting to undermine his authority, Sheriff Davis terminated their employment on September 10, 2007. The Plaintiffs were not given a post-termination hearing. Plaintiffs claim that they were terminated in violation of their First, Fifth and Fourteenth Amendment Rights under the United States Constitution. They allege that they were terminated in retaliation for exercising their rights of free speech, and that their due process rights were violated when they were not given a post-termination hearing.

The Defendant denies the allegations of Plaintiffs' Complaint and submits that the Plaintiffs were terminated for cause. Defendant denies that Plaintiffs can establish causes of action for liability against him. The state legislation allegedly establishing a merit system board for employees of the Sheriff's Office is an unconstitutional act because it allows members of the Chilton County Commission, a legislative body, to decide whether the Sheriff, an executive officer of the State, can discipline or fire his employees. In addition, the technical requirements for passage of the bill were not followed, thus

making it unconstitutional. Finally, the Sheriff has the right to expect loyalty from the officers that serve under him. The closeness and cooperation required between Sheriffs and their Deputies necessitates the Sheriff's absolute authority over their appointment and/or retention.

Defendant further asserts that he is entitled to immunity on these claims. Defendant submits that Summary Judgment is, therefore, due to be entered in his favor on all the Plaintiffs' claims.

## II. NARRATIVE SUMMARY OF UNDISPUTED FACTS

Plaintiff Shane Fulmer was hired to work as a Chilton County Deputy Sheriff on January 19, 1999. (Ex. "A", Depo of Fulmer, p. 15, lines 5-8). The former Chilton County Sheriff Billy Wayne Fulmer, is Plaintiff Fulmer's father. (Ex. "B", Affidavit of Shane Mayfield, ¶ 4). Plaintiff Robbie Autery was hired as a part-time Chilton County Deputy Sheriff on October 3, 2005, and became a full-time employee June 19, 2006. (Ex. "C", Depo.of Autery, p. 18, lines 8-23). He was also hired by former Chilton County Sheriff Billy Wayne Fulmer, whom Plaintiff Autery describes as a family member. (Ex. "C", Depo.of Autery, p. 9, lines 6-15; p. 21, line 17 to p. 22, line 3).

Kevin Davis was elected Sheriff of Chilton County in 2006. (Ex. "D", Depo.of Davis, p. 26, line 23 to p. 27, line 9). He has over ten years of law enforcement experience, having served as the Chief of Police of the City of Maplesville, as a Narcotics K9 officer, as a Chilton County Deputy Sheriff, and as a Maplesville police officer. (Ex. "D", Depo.of Davis p. 7, line 9, to p. 10, line 6). Sheriff Davis defeated former Chilton County Sheriff Billy Wayne Fulmer. (Ex. "D", Depo.of Davis, p. 27, line 23 to p. 28, line 9). Both Plaintiffs actively campaigned for Billy Wayne Fulmer and against Sheriff

Davis in the election. (Ex. "A", Depo. of Fulmer, p. 81, line 11-23; depo of Autery, p. 150, line 14 to p. 151, line 14).

Shane Mayfield served as Chief Deputy for prior Sheriff Billy Wayne Fulmer. (Ex. "B", Affidavit of Shane Mayfield, ¶ 2). He was re-employed in that position by Sheriff Davis. (Id). When Sheriff Davis took office, he and Chief Deputy Mayfield began to assess, review, and evaluate employees in the office. (Ex. "B", Affidavit of Shane Mayfield, ¶ 3). Chief Deputy Mayfield advised Sheriff Davis of strengths, weaknesses, and other relevant information based on his personal knowledge of having worked with the existing employees in the Sheriff's office. (Id).

When advising Sheriff Davis about various employees, Chief Deputy Mayfield told Sheriff Davis that Shane Fulmer was not adequately performing his job duties as supervisor of the Investigations Unit. (Ex. "B", Affidavit of Shane Mayfield, ¶ 4). Chief Deputy Mayfield had worked with Shane Fulmer in Investigations when they both worked for former Sheriff Fulmer. (Id). In that capacity, he had the opportunity to observe the work habits of Shane Fulmer. (Id). He noted that Shane Fulmer did not assume responsibility nor initiate investigations as he would have preferred. (Id). Chief Deputy Mayfield had, however, very little control over Shane Fulmer since his father, Billy Wayne Fulmer, was the then Sheriff. (Id). He warned Sheriff Davis that he could expect difficulties in trying to manage the former Sheriff's relatives, such as Shane Fulmer, because he had heard that Billy Wayne Fulmer intended to seek re-election to his former position as Sheriff of Chilton County in the year 2010. (Id).

After Sheriff Davis took office in January of 2007, Chief Deputy Mayfield received numerous reports about conduct that was creating dissention and mistrust among

employees in the Sheriff's office.  (Ex. "B", Affidavit of Shane Mayfield, ¶ 5).  On several occasions, Sergeant Mike Poe told Chief Deputy Mayfield that Shane Fulmer was not carrying his weight in terms of actively working cases.  (Ex. "E", Affidavit of Poe, ¶ 4; Ex. "B", Affidavit of Shane Mayfield, ¶ 5).  Sergeant Poe asked Chief Deputy Mayfield to assign someone to the Investigations Unit who would actually assist with the investigations and do his or her share of work. (Id).  Chief Mayfield conveyed this to Sheriff Davis.  (Ex. "D", Depo.of Davis p. 40, line 19 to p. 41, line 10).

In addition, Sheriff Davis learned that Shane Fulmer complained about the way he performed his job duties (Ex. "F", Affidavit of Tate, ¶ 3; Ex. "E", Affidavit of Poe, ¶ 5).  Shane Fulmer told others in the Sheriff's office that Sheriff Davis "did not know what he was doing as Sheriff and even went as far as calling Sheriff Davis a 'dumbass'".  (Ex. "E", Affidavit of Poe, ¶ 5).  Shane Fulmer was critical of Sheriff Davis, and testified as follows:

> "Q.    So the question is, had you badmouthed Sheriff Davis.
>
> Mr. Yaghmai: Object to the form. You can answer.
>
> A.    Not to the extent that he was insinuating.
>
> Q.    In other words, you had been critical of Sheriff Davis to people on the street?
>
> A.    Not to the extent he was insinuating."

(Ex. "A", Depo. of Fulmer p. 57, line 15 to p. 58, line 2)

Fulmer's conduct created a hostile, intense working environment and inhibited the ability of the Sheriff's employees to operate efficiently and productively.  (Ex. "E", Affidavit of Poe, ¶ 6; Ex. "F", Affidavit of Tate, ¶ 4 and 5).  His conduct created a

disruption that destroyed morale in the Sheriff's office.  (Ex. "F", Affidavit of Tate, ¶ 4). His comments about Sheriff Davis were not constructive in nature, nor were they aimed at improving the Investigations Unit.  (Ex. "E", Affidavit of Poe, ¶ 7).  Instead, his comments were a personal attack on Sheriff Davis and the way he operated the office of Sheriff of Chilton County (Id).

Sheriff Davis and Chief Deputy Mayfield also discussed and evaluated Robbie Autery.  (Ex. "B", Affidavit of Shane Mayfield, ¶ 6).  Robbie Autery preferred patrolling the Interstate Highway that runs through Chilton County rather than patrolling the entire county.  (Ex. "B", Affidavit of Shane Mayfield, ¶ 6).  Sheriff Davis had campaigned on the platform that the entire county needed to be patrolled and not just the Interstate Highway. (Id. ; Depo.of Davis p. 32, line 6 to p. 33, line 4).  As a result, Chief Deputy Mayfield recommended to Sheriff Davis that Robbie Autery be directed to patrol the entire county rather than merely the Interstate Highway. (Id).  Sheriff Davis authorized Chief Deputy Mayfield to instruct Robbie Autery to cease patrolling only the Interstate. (Id).  Robbie Autery did not agree with Sheriff Davis's decision to limit his ability to patrol the Interstate.  (Ex. "B", Affidavit of Shane Mayfield, ¶ 8).

Chief Deputy Mayfield had also received complaints from citizens that Robbie Autery was driving his patrol car back and forth to his home, which was located in the city of Alabaster, which is in the adjacent county.  (Ex. "B", Affidavit of Shane Mayfield, ¶ 7).  Chief Deputy Mayfield recommended that this practice be eliminated because the citizens of Chilton County did not want to see their tax dollars being used to maintain and fuel patrol cars in another county.  (Id).  Autery was advised to cease using the Sheriff's patrol car to drive back and forth to work.  (Ex. "B", Affidavit of Shane Mayfield, ¶ 7).

He continually complained about Sheriff Davis's decision not to allow him to drive his patrol car back and forth.  (Ex. "B", Affidavit of Shane Mayfield, ¶ 8).

Both Shane Fulmer and Robbie Autery continued to complain about Sheriff Davis's decisions with regard to their employment.  (Ex. "B", Affidavit of Shane Mayfield, ¶ 8 and 9; Ex. "C", Depo.of Autery p. 46, line 4 to p.47, l. 17, p.55 , lines 1-23, p.102, lines 4-6, p.121, lines 1-18; Ex. "D", Depo.of Davis p. 241, line 11 to p. 244, line 21, p. 248, line 5, to p. 251, line 21, p. 254, lines 1-16).  Based upon the repeated complaints by Shane Fulmer and Robbie Autery, Chief Deputy Mayfield reported their conduct to Sheriff Davis.  (Ex. "B", Affidavit of Shane Mayfield, ¶ 9).  Chief Deputy Mayfield was concerned due to the repetitive nature of the complaints, that there was morale problems in the office. (Id).  Sheriff Davis wanted to work with both of the officers, however, if possible. (Id).

In law enforcement, closeness and cooperation are vital and necessitate that a Sheriff have absolute authority over implementation of goals, policies, and procedures. (Id).  In addition, it is important for officers to be able to rely upon one another and, when called upon, to back up their fellow officers. (Id).  There was concern by Chief Deputy Mayfield and Captain Steve Tate that these employees might not be loyal and appropriately back up their fellow officers.  (Ex. "F", Affidavit of Tate, ¶ 4; Ex. "B", Affidavit of Shane Mayfield, ¶ 9).

Based upon the conduct of both Robbie Autery and Shane Fulmer, Chief Deputy Mayfield recommended to Sheriff Davis that they both be terminated due to their negative affect on the morale in the office as well as concern over the safety of other

officers who supported Sheriff Davis. (Ex. "B", Affidavit of Shane Mayfield, ¶ 9). Sheriff Davis terminated their employment on September 10, 2007. (Compliant ¶ 10).

Following their termination, neither Robbie Autery nor Shane Fulmer were given a post-termination due process hearing, because there was not a merit system board in place. (Ex. "D", Depo.of Davis p. 111, lines 7-12; p.154, line 20 to p. 155, line 6). Sheriff Davis was advised, therefore, by the County Attorney that he had the authority to fire employees in the Sheriff's Office. (Ex. "D", Depo.of Davis p.111, lines 14-19, p. 126, line 21 to p. 127, line 5). Sheriff Davis believed that it was appropriate for him to have the authority to fire a deputy. (Ex. "D", Depo.of Davis p. 130, line 23 to p. 132, line 12). He testified as follows:

"Q.    And to you that's a bad thing, right?

Mr. Sheehan:  Object to the form.

A.    No, I don't think it's a bad thing. I made a stance all along that I don't think someone just should come in and fire. But at the same time, I don't think that a merit board dictating to the Sheriff how to run his department is a good thing. Because like I said, the liability and the responsibility to the County and the people of the County is not going to fall back on these members of this board. It's going to fall back on the Sheriff.

Q.    Why do you say that?

A.    It's obvious. The deputies are an arm of the Sheriff's office and me. And when it comes to liability or responsibility or what the County requires us to do, then this board is not going to be the one held liable for it. It's going to be me. So why should I be trying to direct and send my department in a

> direction because somebody don't like it and they look at me and say I
> don't have to do it because I got a merit board."

(Id.).

State of Alabama House Bill 69 (hereinafter HB 69), Act No. 2002-90) purportedly created a civil service merit system for certain employees of the office of the Sheriff. (See Exhibit 1 to Plaintiff's Complaint). Specifically, the Act provided for a board to govern dismissals, suspensions, lay-offs, and terminations. (See Exhibit 1 to Plaintiff's Complaint). The board was to be comprised of one member appointed by the Chilton County Commission, one member appointed by the Chilton County Sheriff, and one member appointed jointly by the Chilton County Commission and Chilton County Sheriff. (See Exhibit 1 to Plaintiff's Complaint).

HB 69 was a "local law," pertaining only to Chilton County, and as such, triggered the protections of the notice and proof requirements of Article IV, § 106 of the Constitution of Alabama of 1901. HB 69 was first introduced into the Alabama House of Representatives on January 8, 2002. (Ex. "G", Affidavit of Pappas, ¶ 7). *See* Exhibit 1 to Plaintiff's Complaint. HB 69 was passed by the House on January 15, 2002 and subsequently by the Senate on February 19, 2002. (See Exhibit 1 to Plaintiff's Complaint). HB 69, was published in the *Clanton Advertiser*, a newspaper of general circulation in Chilton County, Alabama on June 3, 10, 17, and 24, 2002. (Ex. "G", Affidavit of Pappas, ¶ 3). A copy of the affidavit of Michael R. Kelly, publisher of the *Clanton Advertiser* at the time of the advertisements, is attached hereto as Exhibit H. Since HB 69's passage in early 2002, no action has been taken by any Chilton County

Sheriff or Chilton County Commission member to implement the civil service merit system.  See Plaintiffs' Complaint, ¶ 8.

On December 10, 2007, Plaintiffs Robbie Autery and Shane Fulmer filed a Complaint for Declaratory Judgment and Injunctive Relief and Damages in the Circuit Court of Chilton County, Alabama, Civil Action No. CV-2007-900130 seeking a judgment declaring Sheriff Davis to immediately appoint merit board members pursuant to HB 69.  See, State Court Complaint, Exhibit "I" Additionally, the Plaintiffs sought an injunction requiring Sheriff Davis to comply with HB 69, and sought back pay and other benefits for their alleged wrongful termination.  See State Court Complaint, Exhibit "I"

Finally, on January 17, 2008, Plaintiffs Autery and Fulmer filed this Complaint for Relief Under 42 U.S.C. § 1983 in the United States District Court For The Middle District of Alabama, Northern Division, alleging wrongful termination and violations of their constitutional rights under the First, Fifth and Fourteenth Amendments.   See Plaintiffs' Complaint.

### III. ARGUMENT

Plaintiffs' Complaint alleges three counts.   In Count I, Plaintiffs allege a 42 U.S.C. § 1983 claim against Sheriff Davis in his individual and official capacities for violations of the Plaintiffs' rights under the First, Fifth, and Fourteenth Amendments to the United States Constitution.  In Count II, Plaintiffs allege a 42 U.S.C. § 1983 claim against Sheriff Davis for retaliation against Plaintiffs for exercising their constitutional rights under the First, Fifth, and Fourteenth Amendments.  Finally, in Count III, Plaintiffs allege a 42 U.S.C. § 1983 claim seeking injunctive relief against Sheriff Davis.   These

three counts all essentially allege the same claims. As a result, they will be analyzed by subject matter rather than by count number.

Defendant submits that the Act creating the Chilton County Civil Service Merit Board is unconstitutional.  Even if it is found to be constitutional, however, Defendant submits that Plaintiffs cannot substantively establish a violation of their Constitutional Rights.  Finally, if this Court finds that a genuine issue of material fact exists on the plaintiff's substantive claims, the Defendant is entitled to qualified immunity. For the reasons set forth below, Defendant submits that Summary Judgment is due to be entered in favor of the Defendant and against the Plaintiffs on all counts as a matter of law.

A.    **HOUSE BILL 69 IS UNCONSTITUTIONAL BECAUSE IT VIOLATES THE SEPARATION OF POWERS DOCTRINE OF THE CONSTITUTION OF ALABAMA OF 1901.**

It is well established under the Constitution of Alabama 1901, that a separation of powers is to exist between the respective branches of government.  Specifically, Article III, § 42 reads as follows:

> "The powers of the government of the State of Alabama shall be divided into three distinct departments, each of which shall be confided to a separate body of magistracy, to wit:  Those which are legislative, to one; those which are executive, to another; and those which are judicial, to another."

Constitution of Alabama 1901, Article III, § 42

> Additionally, Article III, § 43 holds that :

> "In the government of this state, except in the instances in this Constitution hereinafter expressly directed or permitted, the legislative department shall never exercise the executive and judicial powers, or either of them; the executive shall never exercise the legislative and judicial powers, or either of them; the judicial shall never exercise the legislative and executive powers, or either of them; to the end that it may be a government of laws and not of men."

Constitution of Alabama 1901, Article III, § 43.

Finally, Article V, Section 112, makes it clear that a county sheriff is a member of the executive branch of the state government:

> "The executive branch shall consist of a governor, lieutenant governor, attorney-general, state auditor, secretary of state, state treasurer, superintendent of education, commissioner of agriculture and industries, and a sheriff for each county"

Constitution of Alabama 1901, Article V, § 112.  Case law also makes it clear that a county sheriff is member of the executive department of the State of Alabama---not the county in which he or she is elected.  "A sheriff is not a county employee; he is a member of the executive branch of state government and, thus, a state official."  Mack v. Arnold, 929 So.2d 480 (Ala.Civ.App., 2005).

In Santana v. Calderon, 342 F.3d 18 (1st Cir. 2003), the court examined the power of an executive officer, the Governor of Puerto Rico, to terminate an executive employee. Both parties to the case agreed that the Governor's power was analogous to that of the United States President's power under federal law.  Under the Constitution, the President has the power to nominate, and with the advice and consent of the Senate, to appoint officers of the United States.  Although the Constitution is silent on his power of removal, the First Circuit found that it was "well established that 'in the absence of any specific provision to the contrary, the power of appointment to executive office carries with it, as a necessary incident, the power of removal.'"  Id., at 26, quoting Myers v. United States, 272 U.S.52, 126, 47 S.Ct., 71 L.Ed 160 (1926).  The implicit constitutional power to remove executive officers derives from the President's constitutional obligations to assure that the laws are faithfully executed. Id.

Similarly, in this case, the Sheriff, as an Executive Officer of the State has the power to hire employees in his Office and should have the power to remove employees

who work under him.  The legislation in the instant action seeks to have members of a legislative body infringe upon the power of removal of an executive officer.  Although there is no similar constitutional power of appointment, Defendant submits that the anlaysis is the same.  Because the Sheriff, as an executive officer of the State of Alabama has the power to appoint his deputies, he should also have the power of removal.  Just as the President has the obligation to see that laws are faithfully executed, a Sheriff has the duty to see that the laws are upheld.  Because of this duty, he should have the right to remove an employee in his office.

This legislation is in violation of the above Alabama constitutional sections because it authorizes the Chilton County Commission, a local legislative branch, to exercise power in the realm of an executive office of the State of Alabama---that of the Chilton County Sheriff.  Specifically, Section five (5) of HB 69 reads:

> "(a) There is created a merit system board for the Office of the Sheriff of Chilton County, which shall become effective upon passage of this act and shall be composed of three members appointed as follows:
>
> (1) One member appointed by the Chilton County Commission.
>
> (2) One member appointed by the Chilton County Sheriff.
>
> (3) One member appointed by agreement of the Chilton County Commission and the Chilton County Sheriff."

Allowing the Chilton County Commission to freely appoint one merit board member and agree on the appointment of another would thereby give unconstitutional

power of appointment to the Chilton County Commission.     According to the Commission's website, the duties and responsibilities of the Chilton County Commission are:  overseeing budgets, accounts payable, accounts receivable, grants, inventory and purchasing for all county departments, as well as payroll, retirement, and insurance for 180        full        and        part        time        employees.        See, Http://www.chiltoncounty.org/web/commission.swf.  Additionally, there is no authority contained in the Constitution of Alabama or elsewhere that would permit the Chilton County Commission to exercise the power of appointment purportedly granted it in HB 69.

Allowing the Chilton County Commission to have a hand in selecting merit board members is an unconstitutional usurpation of state executive branch authority by a local legislative entity.  As such, it contravenes the Separation of Powers doctrines of the Constitution of Alabama, 1901, specifically, Article III, § 42, Article III, § 43, and Article V, Section 112.  Based on the foregoing, HB 69, purporting to create a Civil Service Merit System for certain employees of the office of sheriff is due to be found void and unconstitutional.

**B.  HOUSE BILL 69 IS VOID AND UNCONSTITUTIONAL BECAUSE IT WAS NOT TIMELY INTRODUCED IN THE ALABAMA LEGISLATURE**

Article IV, §106 of the Constitution of Alabama of 1901 reads as follows:

"No special, private, or local law shall be passed on any subject not enumerated in section 104 of this Constitution, except in reference to fixing the time of holding courts, unless notice of the intention to apply therefore shall have been published , without cost to the state, in the county or counties where the matter or thing to be affected  may be situated, which notice shall state the substance of the proposed law and be published at least once a week for four consecutive weeks in some newspaper published in such county or counties or if there is no newspaper published therein, then by posting the said notice for two consecutive weeks in at five different places in the county or counties prior to the introduction of the bill;

and proof that said notice has been given shall be exhibited to each house of the legislature through a certification by the clerk of the house or secretary of the senate that notice and proof was attached to the subject local legislation and the notice and proof shall be attached to the original copy of the subject bill and shall be filed in the department of archives and history where it shall constitute a public record. The courts shall pronounce void every special, private, or local law which the journals do not affirmatively show was passed in accordance with the provisions of this section."

Article IV, §106, Constitution of Alabama of 1901.

In the Opinion of the Justices, 469 So.2d 108 (Ala., 1985), the Alabama Supreme Court entertained a question from the Alabama State Legislature on the constitutionality of the notice provided on a piece of proposed legislation. Originally, the proposed legislation was advertised in May 1984 and slated to be introduced in the Regular session of 1984. However, the bill at issue was not introduced until the regular session of 1985. Additionally, at the time it was introduced into the 1985 regular session, the wording "1984 Regular Session" contained at various places on the bill had been changed to read "1985 Regular Session." One of two specific questions posed to the Court was as follows:

> "1. For introduction in the 1985 Regular Session, did the May, 1984 advertisement of the bill meet the notice requirements of Amendment No. 341 to the Constitution of Alabama 1901 ?"

In answering the question in the negative, the Alabama Supreme Court set out Article 4, § 106, of the Constitution of Alabama of 1901, as amended (No. 341). The Court noted that the purpose of § 106, as amended, was the prevention of deception and surprise as well as to relay the substance of the proposed legislation to all those immediately affected so that they may have a fair opportunity to protest or otherwise express their views. The Court cited Town of Dutton v. Tigue, 290 Ala. 357, 276 So.2d

15

600 (1973), which held that the omission in the published notice of the intent to apply to the legislature for passage of the advertised bill was a fatal defect, and that the bill subsequently passed was void because of that constitutional defect.  Based on <u>Town of Dutton</u>, the Court went on to note that if the failure to include in the notice an intent to apply for passage was fatal, it followed that the inclusion in the notice of an incorrect date of intent to apply to the legislature for passage was likewise fatal.

Finally, the Court stated that the constitutional requirement of notice to the people of the intent to apply to the legislature for passage of a local bill was satisfied only when the published notice accurately informed the people as to the legislative session when passage would be applied for.  The basic purpose of the constitutional requirement of notice is defeated where the people are misinformed, albeit inadvertently, as to which legislative session the bill will be introduced in.  <u>Id</u>.

Since <u>Opinion of the Justices</u>, <u>supra</u>, was released, the Alabama Supreme Court has addressed the issue of whether courts may look behind information contained in the legislative journals to determine whether proper notice under § 106 was given.  <u>St. Elmo Irvington Water Authority v. Mobile County Commission</u>, 728 So.2d 125 (Ala. 1998); <u>Etowah County Civic Center Authority v. Hotel Services, Inc.</u>, 974 So.2d 964 (Ala. 2007).  In <u>St.Elmo</u>, the Court held that beginning in 1999, the judiciary will not look behind acts in which the legislature has evidenced compliance with the mandate of §106 by including, "in the appropriate journal, the date and the manner of publication of the notice of the proposed bill." <u>Id.</u> at 127.   Although these cases indicate that there may be some limitation on a court's ability to question whether notice was proper, neither case cites to the <u>Opinion of the Justices</u> case, and how the rulings affected its holding.  There

has been no overturning of the <u>Opinion of the Justices</u> case, and Defendant submits that if it is not still good law, then it should be reinstated.

In the instant case, the notice in the <u>Clanton Advertiser</u> reads as follows:

> "NOTICE is hereby given that a bill substantially as follows will be introduced in the first session of the Legislature of Alabama commencing after the fourth consecutive week of publication of this notice, and application for its enactment will be made…"

While the advertisement did not specify a legislative session for introduction by a specific date, it did indicate that the bill would be introduced in the ***FIRST*** session of the Legislature of Alabama commencing after the fourth consecutive week of publication.

The Clerk of the House of Representatives of the Alabama Legislature, Greg Pappas, has testified that there were three (3) Special Sessions of the legislature that convened after the fourth consecutive week of publication of the notice. Specifically, the second Special Session of 2001 began on June 25, 2001 and ended on July 2, 2001. The third Special Session began on August 28, 2001 and ended on September 19, 2001. Finally, the fourth Special Session of 2001 began on December 4, 2001 and ended on December 21, 2001. (See Pappas Affidavit, Exhibit G). While Special Sessions of the legislature primarily cover specific topics that the Governor has enumerated, other legislation not specified by the governor may be addressed by a two-thirds majority vote. The Chilton County Merit System bill at issue, HB69, was not introduced until January 8, 2002, the first day of the 2002 regular session of the legislature, which was not the first session following publication. (See Exhibit 1 to Plaintiff's Complaint).

Based on the stringent guidelines set forth in the <u>Opinion of the Justices</u>, 469 So.2d 108 (Ala., 1985), and the notice in the <u>Clanton Advertiser</u>, the bill should have

17

been introduced in the second Special Session of the 2001Alabama Legislature which commenced on June 25, 2001.  Instead of introducing the bill when it was advertised, three sessions of the legislature passed without introduction of the Chilton County Merit System proposal.  As such, the Act is fatally flawed and due to be found void and unconstitutional.

## C.   PLAINTIFFS CANNOT ESTABLISH A SUBSTANTIVE DUE PROCESS CLAIM.

Although Plaintiffs' Complaint is unclear as to whether they are asserting procedural or substantive due process claims, Plaintiffs are unsuccessful in asserting a substantive due process claim.  Employment law is one area that remains outside the scope of substantive due process jurisprudence.  McKinney v. Pate, 20 F. 3d 1550, 1556 (11th Cir. 1994) (citing Bishop v. Wood, 426 U.S. 341, 350, 96 S.Ct. 2074, 2080, 48 L.Ed. 2d 684 (1976) and Board of Regents v. Roth, 408 U.S. 564, 577-78, 92 S.Ct. 2701, 2709-10, 33 L.Ed. 2d 548 (1972)).  As such, areas in which substantive rights are created only by state law, as is the case with employment law, are not subject to substantive due process protection under the Due Process Clause because "substantive due process rights are created only by the Constitution."  McKinney, 20 F. 3d at 1556 citing and quoting Regents of Univ. of Mich. v. Ewing, 474 U.S. 214, 229, 106 S.Ct. 507, 515, 88 L.Ed. 2d 523 (1983).  As a result, state law based rights, such as employment rights, may constitutionally be rescinded so long as the elements of procedural-not substantive-due process are observed.  McKinney, 20 F. 3d at 1556.  As a result, an employees' right to employment may be abridged so long as the procedures used to abrogate that right meet minimum constitutional safeguards.  McKinney, 20 F. 3d at 1562.  See also Bussinger v.

<u>City of New Smyrna Beach, Florida</u>, 50 F. 3d 922, 925 (11th Cir. 1995) (An employee with a protected interest in his job may not maintain a substantive due process claim arising out of his termination).

**D.    PLAINTIFFS CANNOT ESTABLISH A DUE PROCESS CLAIM**

Plaintiffs allege that their Fifth and Fourteenth Amendment rights were violated when Sheriff Davis failed to appoint a member to the Chilton County Merit Board, thus denying them the right to a post-termination hearing (Complaint ¶ 12).    Because Plaintiffs are not employees of the Federal government, the Fifth Amendment does not apply to them, and Plaintiffs' Fifth Amendment claims are, therefore, due to be dismissed. <u>Bartkus v. Illinois</u>, 359 U.S. 121, 124, 79 S.Ct. 676, 3 L.Ed.2d 684 (1959); <u>Riley v. Camp</u>, 130F.3d 958, 972 (11th Cir. 1997).

As concerns Plaintiffs' Fourteenth Amendment due process claim, the Eleventh Circuit, following United States Supreme Court precedent, has held that the due process clause of the Fourteenth Amendment is not violated by unauthorized actions of State officials, if the State makes available a meaningful post-deprivation remedy.  <u>Lumpkin v. City of Lafayette, Alabama</u>, 24 F.Supp. 2d 1259, 1265 (M.D. Ala. 1998), citing <u>Parratt v. Taylor</u>, 451 U.S. 527, 101 S.Ct 1908, 68 L.Ed. 2d 420 (1981).  In <u>Lumpkin</u>, the plaintiff, a former Public Safety Director brought suit against the City, its Mayor, and City Council Members in their individual and official capacities, alleging violation of his procedural due process rights under the Fourteenth Amendment.   A City of Lafayette ordinance established the full-time position of Public Safety Director.   Under the ordinance, the Public Safety Director was a Merit System employee who was afforded the same rights

and benefits given to employees serving classified positions designated by the City's personnel manual. At a City Council meeting, a motion was made to abolish the plaintiff's position of Public Safety Director. The motion was unanimously passed, and the plaintiff's job position was eliminated. The plaintiff subsequently made a written request for a hearing before the City Council, which was denied. The plaintiff then filed suit. Following suit, the defendants moved for Summary Judgment.

In reaching its decision on Summary Judgment, this Court examined the parameters of procedural due process in the context of employment rights. The Court cited the <u>Parratt</u> opinion and found that the Due Process Clause of the Fourteenth Amendment is not violated by unauthorized actions of State officials if the State makes available a meaningful post-deprivation remedy. As a result, this Court examined Plaintiff Lumpkin's complaint to determine whether he was alleging that a deprivation of his property interest resulted from an established State procedure or whether he alleged that the actions of the City officials directly contravened the City's established procedure. This Court found that the plaintiff's claim resulted from unauthorized actions of City officials that allegedly deprived him of his property in violation of his due process rights. As a result, his claim fell within the rules set forth in <u>Parratt</u>, supra. As a result, the plaintiff was required to demonstrate the absence of a meaningful State post-deprivation remedy to make out a procedural due process violation.

This Court noted that the Eleventh Circuit has found that Alabama courts reviewing employment termination proceedings determine both whether they are supported by substantial evidence and whether the proceedings comport with procedural due process. <u>Lumpkin</u>, 24 F.Supp.2d at 1265 quoting <u>Bell v. City of Demopolis</u>, 86 F.3d

191, 192 (11th Cir. 1996).  As a result, Alabama courts were available to hear Plaintiff

Lumpkin's claim that the City officials failed to follow established procedures requiring

notice and a hearing before his termination.  This Court found Plaintiff had not

established a constitutional violation and Summary Judgment was granted in favor of the

defendants.

In Hill v. Manning, 236 F.Supp.2d 1292 (M.D. Ala. 2002), a terminated State

Trooper filed suit against the Alabama Department of Public Safety and other individuals

alleging violation of his procedural due process rights under 42 U.S.C. § 1983.  Plaintiff

Hill was employed as an Alabama State Trooper for five years.  During his employment,

he was instructed to submit written reports regarding two separate incidents in which he

was involved.  Plaintiff refused to abide by those requests, and a recommendation was

made to terminate his employment.  Plaintiff subsequently appealed his termination

recommendation to the State Personnel Director.  A recommendation was again made

that his employment be terminated.  Two weeks later, the Public Safety Director notified

Plaintiff that his employment was terminated.

Following Plaintiff's termination, he filed suit in United State District Court for

the Middle District of Alabama.  The defendants filed a Motion for Summary Judgment.

In examining Plaintiff's due process claim, this Court again examined rules set forth in

Parratt v. Taylor, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed. 2d 420 (1981), and Hudson v.

Palmer, 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed. 2d 393 (1984).

> "Under the rules gleaned from these two cases, an
> unauthorized intentional or negligent deprivation of
> property by a State employee does not constitute a violation
> of the procedural due process requirements of the Due
> Process Clause of the Fourteenth Amendment if the State

> provides a meaningful post-deprivation remedy for the loss.
> Tinney v. Shores, 77 F.3d 378, 381-82 (11th Cir. 1996)."

Just as this Court found in Lumpkin, supra, a distinction is drawn between cases in which a State process itself is challenged, and cases in which the procedures as applied are challenged. Hill, 236 F.Supp.2d at 1298.

> "The significance of the distinction is that when a State actor takes unauthorized action, the procedural due process violation does not become complete until the State refuses to provide due process. McKinney v. Pate, 20 F.3d 1550, 1563 (11th Cir. 1994). The rationale for this distinction rests with the fact that once the State has established procedures for the termination of a Merit System employee - which Alabama undisputedly has - it cannot predict whether or not, in a given situation, those procedures will be followed or ignored. See Tinney, 77 F.3d at 382 n. 1. Therefore, when a State official takes the intentional unauthorized action that was not preventable beforehand by the State, no procedural due process violation occurs unless the State fails to provide the opportunity to redress the situation after the fact. id."

Based upon that reasoning, this Court once again found the facts of the case to fall within the parameters of Parratt and Hudson. Plaintiff argued that those who made the decision to fire him did not have the authority to terminate his employment, and that unauthorized act violated his procedural due process rights. As such, Plaintiff was required to establish the absence of a meaningful post-deprivation remedy to survive Summary Judgment. This Court found the Plaintiff had, in fact, availed himself of various post-termination administrative remedies provided to public employees. He filed an appeal with the State Personnel Department, and that appeal was currently pending at the time of the Federal action. Because the plaintiff only challenged the unauthorized actions of State officials, he could not establish a procedural due process violation

22

because the State provided him with a meaningful post-deprivation remedy.  Summary Judgment was, therefore, granted on Plaintiff's § 1983 procedural due process claim.

In Boggan v. McLendon, 2005 WL 1618550 (M.D. Ala. 2005), this Court again addressed the ability of a plaintiff to establish a Fourteenth Amendment procedural due process claim in the context of employment rights.  Plaintiff Boggan was an employee of the Water Board of the City of Greenville.  He was accused of stealing another employee's wallet and submitted to a polygraph examination to clear the charge.  During the polygraph examination, he was found to have truthfully testified as to his lack of knowledge or involvement in the theft of the employee's wallet.  He admitted, however, that he consumed alcohol while on duty on numerous occasions.  Because of his consumption of alcoholic beverages which was in contravention of the Water Board's alcohol and drug policy, his employment was terminated.

The Water Board had an appeal process in place, of which the plaintiff was advised.  He did not file a formal appeal, but did request a reinstatement.  His request was treated as a grievance, and a hearing was held by the grievance committee which unanimously decided that Plaintiff's employment should not be reinstated.

Plaintiff subsequently filed suit against the Water Board and the Mayor of the City of Greenville alleging violation of his First and Fourteenth Amendment rights.  Among his claims were alleged violations of his procedural due process rights.   In examining Plaintiff's procedural due process claim, this Court once again turned to the doctrine applicable to procedural due process claims set forth in Parratt, supra and later extended in Hudson.

Based upon a review of those cases, this Court found that the facts of the <u>Boggan</u> case also fell within the parameters of <u>Parratt</u> and <u>Hudson</u>. Plaintiff Boggan alleged that the defendants deviated from the established disciplinary procedure rather than alleging or establishing the absence of a meaningful post-deprivation remedy. Because Plaintiff only challenged the alleged unauthorized actions of the defendants, he could not establish a procedural due process violation. The Water Board provided such a remedy in the form of its grievance process. Summary Judgment was granted on Plaintiff's procedural due process claim.

Similarly, in this case, Plaintiffs have alleged that Sheriff Davis deviated from established procedures by not appointing a member to the Chilton County Merit Board. (Complaint ¶ 10). They do not allege in their Complaint that the Sheriff has failed to provide them with a meaningful post-deprivation remedy. In fact, to the contrary, Plaintiffs allege the existence of an adequate post-deprivation remedy in the form of an appeal process which goes to the Merit Board and then ultimately on to Chilton County Circuit Court. (Complaint ¶ 8, see Exhibit 1 to Plaintiff's Complaint). Confirming the adequacy of the existence of post-deprivation remedies, Plaintiffs allege that they have been active in canvassing members of the Chilton County Commission to set in place the board and regulations specified in the Act establishing the Merit Board. (Complaint ¶ 12).

Defendant submits that Plaintiff does not challenge the underlying applicability of the procedures or the constitutionality of the procedures. Instead, Plaintiffs argue that State post-deprivation remedies are adequate because the Act provides for an appeals process, which ultimately results in the ability to file in State Court, which they have

done in this case. Defendant submits, therefore, that Summary Judgment is due to be entered in his favor on Plaintiffs' procedural due process claim.

**E.     PLAINTIFFS CANNOT ESTABLISH A FIRST AMENDMENT CLAIM.**

The United States Supreme Court has held that the practice of dismissing an employee based upon his political patronage clearly infringes the First Amendment. Elrod v. Burns, 427 U.S. 347, 359-60, 96 S.Ct. 2673, 49 L.Ed. 2d 547 (1976). Although the practice of patronage dismissals infringe First Amendment interests, restraints are permitted for appropriate reasons. Elrod, 427 U.S. at 360. An employee's support of certain political positions, can survive constitutional challenge if it "further[s] some vital government end by a means that is least restrictive of freedom of belief and association in achieving that end, and the benefit gained…outweigh[s] the loss of constitutionally protected rights." Elrod, 427 U.S. at 363, 96 S.Ct. at 2685. In general, dismissing an employee is not the least restrictive means for fostering government efficiency and effectiveness. Id, 427 U.S. at 373, 96 S.Ct. at 2689. Constitutional interests can be fully satisfied, however, by limiting patronage dismissals to policymaking positions. Id.

In Terry v. Cook, 866 F.2d 373 (11th Cir. 1989), the Eleventh Circuit applied the Elrod, supra, analysis to law enforcement positions. In Terry, the current Sheriff of Lawrence County campaigned on a platform of change in administration. He publicly declared his intention to replace all of the prior Sheriff's employees with persons who supported his election. The plaintiffs were all relieved of their duties in accordance with his plan. They then sued the Sheriff and Chief Deputy, as well as the Lawrence County Commissioners alleging that their termination was in violation of their First and

Fourteenth Amendments. The defendants moved to dismiss the plaintiffs' complaint, and the motion was granted by the trial Court. Plaintiffs appealed.

On appeal to the Eleventh Circuit, the Court found that public employment may not be conditioned upon requirements that violate constitutionally-protected interests. Terry, 866 F.2d at 375, citing Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed. 2d 570 (1972); Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed. 2d 811 (1968). The Court noted, however, that a public employee's protection is not absolute. Terry, 866 F.2d at 375. The interest of the employee as a citizen in commenting upon matters of public concern and the interest of the employer in promoting the efficiency of public services must be balanced. Id, quoting Pickering, 391 U.S. at 568, 88 S.Ct. at 1734. The Court then went on to find that under Alabama law a Deputy Sheriff is a general agent of and empowered to enter into business transactions for the Sheriff. Terry, 866 F.2d at 377.

> "Any transaction within the scope of the sheriff's duties may be acted upon by his deputy. Ramsey v. Strobach, 52 Ala. 513, 515 (1875). The deputy sheriff is the alter ego of the sheriff, Mosely v. Kennedy, 245 Ala. 448, 17 So.2d 536, 537 (1944) (citations omitted), and the sheriff is civilly liable for actions committed by a deputy done in the performance of his duty. Taylor v. Gibson, 529 F.2d 709, 716 (5th Cir. 1976; Salter v. Tillman, 420 F.Supp. 5,8 (S.D. Ala. 1975); Perkins v. Hopkins, 14 Ala. 536, 537 (1848). Terry, 866 F.2d at 377.

The Eleventh Circuit held that "[t]o mandate that a Sheriff must accept the Deputies that he finds in office simply because they belong to another political party even though he is totally responsible for all their acts is incredible, and beyond the bounds of common sense . . . the closeness and cooperation required between Sheriffs and their Deputies necessitates the Sheriff's absolute authority over their appointment and/or

retention . . . loyalty to the individual Sheriff and the goals and policies he seeks to implement through his office is an appropriate requirement for the effective performance of a Deputy Sheriff." Id.

Based upon Eleventh Circuit analysis, requiring such loyalty strikes at the heart of the constitutionally least restrictive means test which balances First Amendment rights of the Deputies and the need for efficient and effective delivery of public services. The Eleventh Circuit found, therefore, that there was no less restrictive means for meeting the needs of public service in the case of a Sheriff's Deputy than to acknowledge "a Sheriff's absolute authority of appointment and to decline to reinstate those who did not support him." See also Epps v. Watson, 492 F.3d 1240 (11th Cir. 2007) (citing Terry v. Cook with approval).

It is also axiomatic that "a state may not demote or discharge a public employee in retaliation for *protected* speech." Tindal v. Montgomery County Commission, 32 F.3d 1535, 1539 (11th Cir. 1994); *quoting* Morgan v. Ford, 6 F.3d 750, 753-754 (11th Cir. 1993). A public employee's protection is not absolute, however. The court must balance the interests of the employee, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Id. at

In Tindal, a communications dispatcher in the Montgomery County Sheriff's department sued the incumbent sheriff and former sheriff in their individual capacities, alleging violation of due process and retaliation for testifying in a sex and race discrimination suit. The United States District Court for the Middle District of Alabama denied the sheriffs' joint motion for summary judgment and the sheriffs appealed.

On appeal, the Eleventh Circuit articulated its use of a four part test from Bryson v. City of Waycross, 888 F.2d 1562 (11th Cir. 1989), originally presented in Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, (1968), to determine whether an employer's action (such as dismissal) constitutes an illicit retaliation for protected speech in violation of the First Amendment.

In cases where the state denies discharging the employee because of speech, a four-stage analysis has evolved. At the first stage, the court determines whether the employee's speech may be "fairly characterized as constituting speech on a matter of public concern." Bryson at 1565. Second, if the speech addresses a matter of public concern, the court then applies a balancing test, weighing the employee's first amendment interests against "the interest of the state, as an employer, in promoting the efficiency of the public services it performs through its employees." Id. If the public employee prevails on the balancing test, the fact-finder determines whether the employee's speech played a "substantial part" in the government's decision to demote or discharge the employee. Id. Fourth, if the employee prevails by showing that the speech was a substantial motivating factor in the state's employment decision, the state must prove by a preponderance of the evidence that "it would have reached the same decision … even in the absence of the protected conduct." Id. at 1566.

While it may be that certain points of the Plaintiffs speech would be considered protected, a great portion of the speech exhibited by Autery and Fulmer was nothing more than voicing displeasure and complaining about the way that Sheriff Davis operated the Sheriff's department. During work hours, Autery and Fulmer voiced their displeasure

to other members of the Sheriff's department, such that it affected the morale and cohesion within the Chilton County Sheriff's department.

The <u>Bryson</u> court also examined <u>Morales v. Stierheim</u>, 848 F.2d 1145 (11th Cir. 1988) in analyzing a plaintiffs wrongful employment action for allegedly protected speech. In <u>Morales</u>, the plaintiff was the principal planner for the Office of Community and Economic Development (OCED) in the Melrose area of Dade County, Florida. After making statements about the OCED chairman, Raymundo Barrios, Morales was reassigned to another area. Specifically, Morales had referred to Barrios as a "saboteur, a hypocrite, and a Machiavellian politician who used the community." <u>Id</u>. at 1146. A second heated exchange also occurred at an OCED board meeting at which Morales accused Barrios of lying. Additionally, in a memo to the OCED director, Morales stated that Barrios was known for using disruptive tactics, lying and distorting the facts. He alleged that Barrios' behavior was part of a personal vendetta which originated when Morales refused Barrios' requests for kickbacks and a political campaign contribution. <u>Id</u>. at 1150.

After being transferred, Morales filed a 42 U.S.C. §1983 action, claiming that the reassignment infringed upon his First Amendment right to freedom of speech. The district court found as a matter of law that his statements touched upon matters of public concern. The United States District Court for the Southern District of Florida granted a permanent injunction and awarded compensatory and punitive damages and the county manager and Chairman Barrios appealed.

On Appeal, the Court considered several factors in balancing the State's interest in efficient provision of public services against Morales' speech interest, including: (1)

whether the speech impedes the government's ability to perform its duties efficiently, (2) the manner, time and place of the speech, and (3) the context within which the speech was made.  The court noted that "State interests weigh heavily where an employee's speech thwarts the mission of the agency or impedes the performance of the speaker's duties.  Also, where an employee's speech has a detrimental impact on close working relationships or destroys harmony among coworkers, a wide degree of deference to the employer's judgment is appropriate."  Id. at 1149; *quoting* Connick v. Myers, 461 U.S. 138 at 151-152 (1983).

With respect to Morales' speech impeding the government's ability to perform its duties efficiently, the Court held that his speech frustrated the pursuit of community development goals by effectively cutting off communication between the Melrose board and the OCED.  Additionally, the Court found that Morales' statements shifted the focus from OCED business topics to personal animosity between Morales and Barrios.  Because Morales' duty as a principle planner for the Melrose area required that he maintain a regular and close working relationship with Barrios, the effect of his statements was to bring the community development process in Melrose to a halt.  Id. at 1150.

The Court also held that the time place and manner in which Morales' remarks were uttered further contributed to the disruption of the community development process.  The Court noted that Morales' choice of words might be less significant in a private context, when spoken at public meetings however, the remarks could not be seen merely as Morales' opinion as an individual citizen.

Finally, the Court looked to the context of Morales' remarks in weighing his speech interests against the interest of the OCED. While noting that speech critical of office policy or personnel may warrant greater First Amendment protection when based solely on an interest in improving the performance of the office, the Court also recognized that where an employee's speech arises out of his own ongoing personnel dispute, "additional weight must be given to the supervisor's view that the employee has threatened the authority of the employer to run the office." Id. at 1150.

Based on the above analysis, the Court tilted the balance in favor of the OCED and held that Morales' speech impeded the OCED in fulfilling its responsibilities in the Melrose area and undermined Morales' effectiveness in his job. The necessarily close working relationship between Morales and Barrios was destroyed. As such, Morales' statements so severely impeded his own effectiveness of the OCED in the Melrose area that the governmental interest at stake clearly outweighed Morales' speech interest. Id. at 1151.

In this case, Plaintiffs were not fired simply because they supported Billy Wayne Fulmer, the candidate who opposed Sheriff Davis in the election. Their comments, however, about Sheriff Davis and their actions and intention to undermine his authority clearly indicate their allegiance to the former Sheriff and their efforts to undermine the current Sheriff. Defendant submits that the comments and actions of the Plaintiffs have interfered with the efficient and effective delivery of public services. They have not exhibited loyalty to Sheriff Davis and his goals and policies. As a result, Defendant submits that he should be entitled to have absolute authority of appointment and termination over these employees. Defendant submits, therefore, that Plaintiffs cannot

establish a First Amendment claim.  Summary Judgment is, therefore, due to be entered in favor of Sheriff Davis on this claim.

**F. THE DEFENDANT IS ENTITLED TO ELEVENTH AMENDMENT IMMUNITY ON THE OFFICAL CAPACITY CLAIMS**

Defendant is entitled to Eleventh Amendment immunity on plaintiff's §1983 claims against him in his official capacity.    A state official may not be sued in his official capacity unless the state has waived its Eleventh Amendment immunity or Congress has abrogated the state's immunity.  Lancaster v. Monroe County, 116 F.3d 1419, 1429 (11th Cir.1997)(citing Pennhurst State School & Hospital v. Holgerman, 465 U.S. 89, 100 (1984), and Seminole Tribe v. Florida, 116 S.Ct. 1114, 1125 (1996)).  Alabama has not waived its Eleventh Amendment immunity and Congress has not abrogated Alabama's immunity.  Carr v. City of Florence, 916 F.2d 1521, 1525 (11th Cir.1990).  Therefore, Alabama state officials are immune from claims brought against them in their official capacities.  Lancaster, 116 F.3d at 1429.

It is well established in Alabama that sheriffs act as State Officials.  See Turquitt v. Jefferson County, 137 F.3d 1285, 1289 (11th Cir. 1998).  Under Alabama law, sheriffs and deputies sheriffs are state officials entitled to Eleventh Amendment immunity when sued in their official capacities.  Carr, 916 F.2d at 1526.

Further, the United States Supreme Court has held that "a state is not a person within the meaning of § 1983."  Will v. Michigan Depart. Of State Police, 491 U.S. 58 (1989).  The Court held that "§ 1983 provides a federal forum to remedy many deprivations of civil liberties, but it does not provide a federal forum for litigants who seek a remedy against a state for alleged deprivations of civil liberties."  Id.  The court

went on to note that "suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the officials office."    Id.    The Court, therefore, held that "neither a state nor its officials acting in their official capacities are persons under § 1983."    Id.    Because the Sheriff is a State Official acting in his official capacity, he is not subject to liability pursuant to § 1983.

## G. THE DEFENDANT IS ENTITLED TO QUALIFIED IMMUNITY ON THE INDIVIDUAL CAPACITY CLAIMS.

Even if the court finds that plaintiff has established a First and/or Fourteenth Amendment claim, the defendant is entitled to qualified immunity on the claims brought against him in his individual capacity.    Qualified immunity is designed to allow government officials sued under §1983 to avoid the expense and disruption of trial. Williams v. Gold Allison, 4 F.Supp.2d 1112, 1122 (M.D. Ala.1998)(citing Ansley v. Heinrich, 925 F.2d 1339, 1345 (11th Cir.1991)).    Officials performing discretionary functions that do not violate clearly established law are entitled to qualified immunity. Williams, 4 F.Supp.2d at 1122 (citing Lancaster v. Monroe County, Alabama, 116 F.3d 1419, 1424 (11th Cir.1997).    Determining the applicability of qualified immunity requires a two-part analysis:  (1) the defendant must first show he was performing an act within his discretionary authority, and (2) plaintiff must show that defendant violated clearly established law.  Williams, 4 F.Supp.2d at 1122.

The first step of the analysis is usually an uncontested issue which courts skip over.  Williams, 4 F.Supp.2d at 1123 (citing Lassiter v. Alabama A&M University, 28 F.3d 1146, 1149 (11th Cir.1994) and others).  An official need only show that (1) acts were undertaken pursuant to the official performance of his duties, and (2) that such acts

were within the scope of the official's authority.  <u>Williams</u>, 4 F.Supp.2d at 1122 quoting <u>Jordan v. Doe</u>, 38 F.3d 1559, 1566 (11th Cir.1994).  Discretionary authority means "all actions of the government official that (1) were undertaken pursuant to the performance of his duties, and (2) were within the scope of his authority."  <u>Jordan v. Doe</u>, 38 F.3d at 1566(internal quotations omitted)(citing <u>Rich v. Dollar</u>, 841 F.2d 1558, 1564 (11th Cir. 1988).    Noting the breadth of qualified immunity, the Eleventh Circuit stated that "protection of qualified immunity extends to all but the plainly incompetent or those who knowingly violate the law."  <u>Jordan</u>, 38 F.3d at 1565 (internal quotations omitted)(citing <u>Malley v. Briggs</u>, 475 U.S. 335 (1986)).

In this case, it is undisputed that all acts taken by the defendant were pursuant to performance of his duties and within the scope of his authority.  As such, the allegations are that the defendant, in the performance of his duties, engaged in improper conduct.  Such an allegation meets the first step of a qualified immunity analysis.

Once defendant has established this element of qualified immunity analysis, then plaintiffs must prove the defendant violated clearly established law.  <u>Williams</u>, 4 F.Supp.2d at 1122.  In order to determine whether the law was clearly established, "the relevant, dispositive inquiry…is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  <u>Calhoun v. Thomas</u>, <u>supra</u>. at *9(citing <u>Saucier v. Katz</u>, 533 U.S. 194, 201 (2001)).  The United States Supreme Court established that a law is clearly established if it gives officials reasonable warning that their conduct constituted a deprivation of a constitutional right.  See <u>Hope v. Pelzer</u>, 536 U.S. 730 (2002).

In this case, Defendant first submits that the law was not clearly established that a Sheriff did not have sole authority to terminate his Deputy Sheriffs. As is stated above, Defendant submits that the Alabama Constitution indicates that the power of the Executive branch is separate and distinct from that of the Legislative branch. It was not clearly established that it is Constitutional, under the Alabama Constitution, for a legislative body to have the power to influence personnel decisions of an Executive Officer. Indeed, the language in <u>Terry v. Cook</u>, <u>supra</u>, that the closeness and cooperation required between Sheriffs and their Deputies necessitates the Sheriff's absolute authority over their appointment and/or retention, is in contradiction to the idea that someone other than the Sheriff would have authority to overturn his decision not to retain someone.

Second, Defendant submits, that the law in the Eleventh Circuit was not clearly established that it was a violation of the First Amendment for the Defendant to terminate the Plaintiffs for their conduct. On the contrary, law was established in support of Defendant's right to terminate the Plaintiffs for their conduct, both in supporting his opponent, and in making negative comments about his policies and administration to other officers and members of the public. This conduct affected the morale and cohesion within the Sheriff's department. The comments and actions of the Plaintiffs interfered with the efficient and effective delivery of public services. For the reasons stated above in Section "E", such comments are not protected under the First Amendment.

Finally, the law was not clearly established that it was a violation of the Fourteenth Amendment Due Process Clause for the Defendant to fail to provide a post termination hearing. On the contrary, Eleventh Circuit law indicates that that the Due Process Clause of the Fourteenth Amendment is not violated by unauthorized actions of

Case 2:08-cv-00041-MEF-WC    Document 19    Filed 05/30/2008    Page 36 of 37

State officials if the State makes available a meaningful post-deprivation remedy.  <u>Parratt v. Taylor</u>, 451 U.S. 527, 101 S.Ct. 1908, 68 L. Ed. 2d 420 (1981), and <u>Hudson v. Palmer</u>, 468 U.S. 517, 104 S.Ct. 3194, 82 L. Ed. 2d 393 (1984).  Although Defendant does not admit that he engaged in unauthorized actions when he did not make an appointment to the board, even if he did, existing law indicates that there was no due process violation because the Plaintiffs had a right to appeal that decision, which they have exercised by filing suit in State court.

## CONCLUSION

For all of the reasons stated herein, Defendant submits that Summary Judgment is due to be entered in his favor and against the Plaintiffs on all counts as a matter of law.

/s/ C. Winston Sheehan, Jr.
C. WINSTON SHEEHAN    (SHE 013)
Attorneys for Defendant Kevin Davis


/s/ Allison Alford Ingram
ALLISON ALFORD INGRAM  (ALF005)
Attorneys for Defendant Kevin Davis


/s/ John W. Marsh
JOHN W. MARSH  (MAR173)
Attorneys for Defendant Kevin Davis


<u>OF COUNSEL:</u>
**BALL, BALL, MATTHEWS & NOVAK, P.A.**
2000 Interstate Park Drive, Suite 204
Post Office Box 2148
Montgomery, Alabama  36102-2148
Phone:  (334) 387-7680
Fax:     (334) 387-3222

## <u>CERTIFICATE OF SERVICE</u>

      I hereby certify that on May 30, 2008, I electronically filed the foregoing with the Clerk of the Court, using the CM/ECF system which will send notification of such filing to the following registered persons and that those persons not registered with the CM/ECF system were served by U.S. mail:

Hon. William E. Rutledge
Hon. Gregory F. Yaghmai
RUTLEDGE & YAGHMAI
3800 Colonnade Parkway, Suite 490
Birmingham, Alabama 35243
williamerutledge@aol.com
yaghmai@rylaw.net

                           /s/ C. Winston Sheehan, Jr.
                           OF COUNSEL

                           /s/ Allison Alford Ingram
                           OF COUNSEL

                           /s/ John W. Marsh
                           OF COUNSEL