**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| **ROBBIE AUTERY and SHANE FULMER,** | ) | |
| | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **CIVIL ACTION NO.:** |
| **v.** | ) | **2:08-CV-41-WC** |
| | ) | |
| **KEVIN DAVIS,  in his official capacity** | ) | |
| **as Sheriff of Chilton County, Alabama,** | ) | |
| **and individually,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**DEFENDANT'S EVIDENTIARY SUBMISSION**
**IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

COMES NOW the Defendant, Kevin Davis, in his official capacity as Sheriff of Chilton County, Alabama, and individually, and make the following Evidentiary Submission in support of the Motion for Summary Judgment contemporaneously filed herein.

1        Exhibit "A",  Deposition excerpts of Shane Fulmer

2        Exhibit "B", The Affidavit of Shane Mayfield

3        Exhibit "C",  Deposition excerpts of Robbie Autery

4.        Exhibit "D",  Deposition excerpts of Kevin Davis

5.        Exhibit "E", The Affidavit of Michael Poe

6.        Exhibit "F", The Affidavit of Steve Tate

7.        Exhibit "G", The Affidavit of Greg Pappas

8.        Exhibit "H", The Affidavit of Clanton Advertiser Publisher

9.        Exhibit "I", State Court Complaint

/s/ C. Winston Sheehan, Jr.
C. WINSTON SHEEHAN    (SHE 013)
Attorneys for Defendant Kevin Davis


/s/ Allison Alford Ingram
ALLISON ALFORD INGRAM  (ALF005)
Attorneys for Defendant Kevin Davis


/s/ John W. Marsh
JOHN W. MARSH  (MAR173)
Attorneys for Defendant Kevin Davis


OF COUNSEL:
**BALL, BALL, MATTHEWS & NOVAK, P.A.**
2000 Interstate Park Drive, Suite 204
Post Office Box 2148
Montgomery, Alabama  36102-2148
Phone:  (334) 387-7680
Fax:      (334) 387-3222

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 30, 2008, I electronically filed the foregoing with the Clerk of the Court, using the CM/ECF system which will send notification of such filing to the following registered persons and that those persons not registered with the CM/ECF system were served by U.S. mail:

Hon. William E. Rutledge
Hon. Gregory F. Yaghmai
RUTLEDGE & YAGHMAI
3800 Colonnade Parkway, Suite 490
Birmingham, Alabama 35243
williamerutledge@aol.com
yaghmai@rylaw.net

/s/ C. Winston Sheehan, Jr.
OF COUNSEL


/s/ Allison Alford Ingram
OF COUNSEL



/s/ John W. Marsh
OF COUNSEL

# EVIDENTIARY SUBMISSION

# EXHIBIT
# A

FREEDOM COURT REPORTING

Page 1

          IN THE CIRCUIT COURT OF
          CHILTON COUNTY, ALABAMA
        CIVIL ACTION NO.:  CV-2007-900130

ROBBIE AUTERY and
SHANE FULMER,

        Plaintiffs,

              VS.

KEVIN DAVIS, in his
official capacity as
Sheriff of Chilton County,
Alabama, and individually;

        Defendant.

_____

     IN THE UNITED STATES DISTRICT COURT
      FOR THE MIDDLE DISTRICT OF ALABAMA
              NORTHERN DIVISION
        CIVIL ACTION NO.:  2:08-CV-41-WC

ROBBIE AUTERY and
SHANE FULMER,

        Plaintiffs,

              VS.

KEVIN DAVIS, in his
official capacity as
Sheriff of Chilton County,
Alabama, and individually;

        Defendant.


          DEPOSITION OF SHANE FULMER


             STIPULATIONS

             IT IS STIPULATED AND



EXHIBIT
A

4e47edf1-e062-4cc4-b139-cc4d826fa0bd

FREEDOM COURT REPORTING

Page 2

1    AGREED, by and between the parties,

2    through their respective counsel,

3    that the deposition of SHANE FULMER

4    may be taken before Karen Davis, CCR,

5    Commissioner, State of Alabama at

6    Large, at the Chilton County

7    Courthouse, 200 2nd Avenue North,

8    Clanton, Alabama, on the 16th day of

9    May, 2008, commencing at or about

10   11:40 a.m.

11              IT IS FURTHER STIPULATED

12   AND AGREED that the reading and

13   signature to the deposition by the

14   witness is waived, said deposition to

15   have the same force and effect as if

16   full compliance had been had with all

17   laws and rules of court relating to

18   taking of depositions.

19              IT IS FURTHER STIPULATED

20   AND AGREED that it shall not be

21   necessary for any objections to be

22   made by counsel as to any questions,

23   except as to form or leading

FREEDOM COURT REPORTING

Page 3

1    questions, and that counsel for the

2    parties may make objections and

3    assign grounds at the time of the

4    trial, or at the time said deposition

5    is offered in evidence, or prior

6    thereto.

7            IT IS FURTHER STIPULATED

8    AND AGREED that notice of filing of

9    the deposition by the Commissioner is

10   waived.

11

12

13

14

15

16

17

18

19

20

21

22

23

FREEDOM COURT REPORTING

Page 15

1    Q.    Who did you work for

2    prior to Jemison Police Department?

3    A.    Chilton County Sheriff's

4    Department.

5    Q.    And when did you go to

6    work for the Chilton County Sheriff's

7    Department?

8    A.    January 19th, 1999.

9    Q.    When did you, or did you,

10   apply for any positions other than

11   the Jemison Police Department?

12   A.    Between my termination

13   and--- and employment with Jemison or

14   any time?

15   Q.    Even before your

16   termination.  After your father was

17   not elected sheriff.

18   A.    I have applied for a

19   special agent job with the state of

20   Alabama in the Finance Commission

21   Agency, and I have applied for an

22   investigations position with the

23   Alabama Power Company.

Page 57

1        A.        You're not going to go

2   all over town talking about me.

3   Badmouthing me.  Undermining me or my

4   department.

5        Q.        Had you done any of that?

6        A.        No, sir.

7        Q.        Had you spoken critically

8   of Sheriff Davis?

9        A.        There were things said

10  and--- and I even told Sheriff Davis.

11  He asked me or told me that he knew

12  things that had been said, naturally,

13  before the election, after the

14  election.

15        Q.        So the question is, had

16  you badmouthed Sheriff Davis.

17                  MR. YAGHMAI:  Object to

18  the form.  You can answer.

19        A.        Not to the extent that he

20  was insinuating.

21        Q.        In other words, you had

22  been critical of Sheriff Davis to

23  people on the street?

FREEDOM COURT REPORTING

Page 58

1    A.    Not to the extent he was
2    insinuating.
3    Q.    Well, what if any
4    criticisms had you expressed of
5    Sheriff Davis before you were
6    terminated?
7    A.    That he was being
8    vindictive to me.  I didn't
9    appreciate it.  I took pride in my
10   job, in my career.
11   Q.    Who did you tell that to?
12   A.    I know I did to Deputy
13   Autery.
14   Q.    Who else did you talk to
15   about Sheriff Davis in a critical
16   vein?
17   A.    I'm expressing my
18   personal experiences.  I don't
19   consider them to be critical.
20   Q.    Had you complained to
21   anyone about Sheriff Davis before
22   your termination?
23   A.    Myself and Mike Poe

FREEDOM COURT REPORTING

Page 81

1        A.      Yes, sir.  Yes, sir.

2        Q.      And he took office in

3    January of 2007?

4        A.      That's correct.

5        Q.      Did Mr. Autery seek

6    employment anywhere?

7        A.      I don't recall.  I don't

8    have any knowledge of that.

9        Q.      Do you attend church?

10       A.      No, sir.

11       Q.      All right.  Have you---

12   did you contribute to your father's

13   campaign?

14       A.      Yes, sir.

15       Q.      And how much?

16       A.      You mean financially?

17       Q.      Please.

18       A.      No, sir.  If you want to

19   count gas money, yeah.

20       Q.      Did you campaign for your

21   father door to door as did Mr.

22   Autery?

23       A.      Yes, sir.

4e47edf1-e062-4cc4-b139-cc4d826fa0bd

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

ROBBIE AUTERY and SHANE     )
FULMER,                            )
                                   )
      Plaintiffs,             )
                                   )     CIVIL ACTION NO.:
v.                             )     2:08-CV-41-WC
                                   )
KEVIN DAVIS, in his official capacity   )
as Sheriff of Chilton County, Alabama,  )
and individually,                 )
                                   )
      Defendant.            )

### AFFIDAVIT OF SHANE MAYFIELD

Before me, the undersigned authority, on this day personally appeared Shane Mayfield, who being by me first duly sworn, deposed and stated upon his oath the following:

1. My name is Shane Mayfield. I am over the age of 21 years, and I have personal knowledge of the information contained in this Affidavit.

2. I have been in the law enforcement field for approximately fourteen and one half (14.5) years. At all material times hereto, I was the Chief Deputy in the Office of the Sheriff of Chilton County. Prior to serving as Chief Deputy for Sheriff Kevin Davis, I served as Chief Deputy under former Sheriff Billy Wayne Fulmer.

3. Sheriff Davis charged me as the Chief Deputy with the responsibility of maintaining good order and discipline in the Sheriff's office. Upon Sheriff Kevin Davis' taking office, he and I met to assess, review and evaluate the Office of the Sheriff of Chilton County and its employees. Sheriff Kevin Davis and I reviewed all employees and I advised him of their strengths and weaknesses, and other relevant information based on my personal knowledge.



EXHIBIT

B

4.  I advised Sheriff Davis of reports that Captain Shane Fulmer was not adequately performing his job duties as supervisor of the Investigations Unit under the former Sheriff. I had worked with Shane Fulmer in investigations when he worked for former Sheriff Fulmer, and had observed his work habits. I noted that Shane Fulmer did not assume responsibility nor initiate investigations as I would have preferred, but his father was the then Sheriff, and I had very little, if any, control over Shane Fulmer. I warned Sheriff Davis that he could expect difficulties in trying to manage the former Sheriff's relatives given the reports that Billy Wayne Fulmer intended to seek election to his former position as Sheriff of Chilton County in 2010.

5.  After Sheriff Kevin Davis took office in January of 2007, I received numerous reports about conduct that was creating dissention and mistrust among our employees. On several occasions, Sergeant Mike Poe, an investigator, told me that Captain Shane Fulmer was not working cases in the Investigations Unit. Sergeant Poe asked me as Chief Deputy to assign someone who would actually assist with the day-to-day operations of the Investigations Unit. I relayed this information to Sheriff Kevin Davis.

6.  After he took office, Sheriff Davis and I also discussed Deputy Robbie Autery, who was related to former Sheriff Billy Wayne Fulmer. I explained that Robbie Autery had been given preferential treatment by Sheriff Billy Wayne Fulmer. I noted that Robbie Autery preferred patrolling the Interstate highway which runs through Chilton County rather than patrolling the entire county. Sheriff Davis told me that he had campaigned for Sheriff of Chilton County on the platform that the entire county needed to be patrolled and not just the Interstate highway. I recommended to Sheriff Davis that Robbie Autery be directed to patrol the entire county rather than merely the Interstate highway. Sheriff Davis authorized me to instruct Deputy Robbie Autery to cease patrolling only the Interstate, which I did.

7. I also advised Sheriff Davis that there had been complaints from citizens that Robbie Autery was driving his Sheriff's patrol car home to Alabaster, Shelby County, and I recommended that this practice be eliminated because the citizens of Chilton County did not want to see their tax dollars being used to maintain and fuel patrol cars in another county. I met with Robbie Autery on several occasions and directed Robbie Autery to cease patrolling only the interstate and to cease using the Sheriff's patrol car to drive back and forth to work.

8. I advised Sheriff Kevin Davis that Deputy Robbie Autery had continued to complain about Sheriff Davis' decision not to allow Deputy Autery to drive his patrol car back and forth from his home in Alabaster, AL (Shelby County) to work in Chilton County. In addition, I told Sheriff Davis of Autery's repeated disdain for Sheriff Davis' policy of not allowing a deputy to patrol only Interstate 65 in Chilton County. Sheriff Davis and I determined that the Office of Sheriff should be responsible for covering the entirety of Chilton County and that all deputies should share this responsibility equally.

9. After issuing these directives to Robbie Autery and Shane Fulmer, I repeatedly heard of complaints by both officers. I reported to Sheriff Davis that I was concerned that due to the repetitive nature of the complaints, that there was a morale problem in the office. Sheriff Davis told me that he wanted to work with both of these officers, if possible. In law enforcement, however, closeness and cooperation between a sheriff and his deputies is vital and necessitates that a sheriff have absolute authority over implementation of goals, policies and procedures. In addition, in the business of law enforcement, it is important for officers to be able to rely upon one another and, when called upon, to back up their fellow officers. Deputy Robbie Autery's constant complaints about his displeasure with Sheriff Davis' interstate policy were affecting his performance on the job and had a negative impact on the morale in and efficiency of the Office

3

of Sheriff of Chilton County. I was concerned based upon the actions of both Robbie Autery and

Shane Fulmer that there would be a security problem as long as they were employed by Sheriff

Davis. I recommended to Sheriff Davis that both Robbie Autery and Shane Fulmer be

terminated due to their negative effect on morale in the office as well as my concern for the

safety of other officers who supported Sheriff Davis.


SHANE MAYFIELD


**STATE OF ALABAMA**                    )
                                        )
**CHILTON COUNTY**                      )


SWORN TO and SUBSCRIBED before me on this the 28th day of May, 2008.


NOTARY PUBLIC
My Commission Expires: 9/29/08

4

# EXHIBIT
# C

FREEDOM COURT REPORTING

Page 1

IN THE CIRCUIT COURT OF
CHILTON COUNTY, ALABAMA
CIVIL ACTION NO.:  CV-2007-900130

ROBBIE AUTERY and
SHANE FULMER,

     Plaintiffs,

        VS.

KEVIN DAVIS, in his
official capacity as
Sheriff of Chilton County,
Alabama, and individually;

     Defendant.

_____

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION
CIVIL ACTION NO.:  2:08-CV-41-WC

ROBBIE AUTERY and
SHANE FULMER,

     Plaintiffs,

        VS.

KEVIN DAVIS, in his
official capacity as
Sheriff of Chilton County,
Alabama, and individually;

     Defendant.

DEPOSITION OF ROBBIE AUTERY

STIPULATIONS

IT IS STIPULATED AND



EXHIBIT
C

FREEDOM COURT REPORTING

Page 2

1    AGREED, by and between the parties,

2    through their respective counsel,

3    that the deposition of ROBBIE AUTERY

4    may be taken before Karen Davis, CCR,

5    Commissioner, State of Alabama at

6    Large, at the Chilton County

7    Courthouse, 200 2nd Avenue North,

8    Clanton, Alabama, on the 16th day of

9    May, 2008, commencing at or about

10   9:03 a.m.

11          IT IS FURTHER STIPULATED

12   AND AGREED that the reading and

13   signature to the deposition by the

14   witness is waived, said deposition to

15   have the same force and effect as if

16   full compliance had been had with all

17   laws and rules of court relating to

18   taking of depositions.

19          IT IS FURTHER STIPULATED

20   AND AGREED that it shall not be

21   necessary for any objections to be

22   made by counsel as to any questions,

23   except as to form or leading

fc5df9a8-7c7d-4dbf-b461-18d541d382f8

FREEDOM COURT REPORTING

Page 3

1    questions, and that counsel for the

2    parties may make objections and

3    assign grounds at the time of the

4    trial, or at the time said deposition

5    is offered in evidence, or prior

6    thereto.

7                IT IS FURTHER STIPULATED

8    AND AGREED that notice of filing of

9    the deposition by the Commissioner is

10   waived.

11

12

13

14

15

16

17

18

19

20

21

22

23

FREEDOM COURT REPORTING

Page 9

1          A.       October the 14th, 2007.

2          Q.       And your supervisor?

3          A.       I guess that would be my

4     corporal or--- my immediate

5     supervisor would be Corporal Martin.

6          Q.       And how did you find out

7     about the position at the Alabama

8     Department of Public Safety?

9          A.       Through a family member.

10         Q.       Who was?

11         A.       Billy Fulmer.

12         Q.       And that's Billy Wayne

13    Fulmer?

14         A.       Yes, sir.  Billy Wayne

15    Fulmer, Jr.

16         Q.       And when did you find out

17    about the position?

18         A.       He had been talking to me

19    for awhile about maybe coming to the

20    state troopers, so probably---

21         Q.       Approximately.

22              MR. YAGHMAI:  Nobody

23    wants you to guess, but to the best

fc5df9a8-7c7d-4dbf-b461-18d541d382f8

FREEDOM COURT REPORTING

Page 18

1           MR. SHEEHAN:   I'll mark

2   that.

3           MR. YAGHMAI:   Okay.   That

4   will be Exhibit No. 1.

5           (Whereupon the document

6   is marked D-1 for identification by

7   the reporter).

8      Q.     Let me show you what's

9   been marked Defendant's Exhibit No. 1

10  and ask you, can you tell me what

11  that is?

12     A.     This is a letter from the

13  Personnel Manager, Ms. Brasher, and

14  it's saying that I was hired, I

15  believe part time, October the 3rd,

16  2005.  I began to work full time with

17  the Sheriff's Department on June the

18  19th, when I was terminated on

19  September the 10th, 2007.

20          MR. YAGHMAI:   June 19th

21  was 2006?

22     A.     June 19th was 2006.  I'm

23  sorry.

fc5df9a8-7c7d-4dbf-b461-18d541d382f8

Page 21

1    I wasn't employed.

2              MR. YAGHMAI:  Are you

3    asking at any point did he work for

4    Sheriff Fulmer?

5              MR. SHEEHAN:  Yes.

6    That's a good question.

7              MR. YAGHMAI:  At any

8    point did you work for Sheriff

9    Fulmer?

10             THE DEPONENT:  Not on the

11   payroll.  I was a reserve deputy

12   before I came on the payroll.

13             MR. YAGHMAI:  Sorry.  I

14   didn't mean to interrupt.

15             MR. SHEEHAN:  That's a

16   good question.

17        Q.     So the first time you

18   worked for the Chilton County

19   Sheriff's Department was under

20   Sheriff Kevin Davis?

21        A.     No, sir.  Billy Wayne

22   Fulmer.

23        Q.     When did you go to work

fc5df9a8-7c7d-4dbf-b461-18d541d382f8

FREEDOM COURT REPORTING

Page 22

1   with Billy Wayne Fulmer as Sheriff?

2        A.        October the 3rd, 2005 as

3   a part-time position.

4        Q.        What did you do while

5   working under Sheriff Fulmer?

6        A.        As a part-time position,

7   would fill in vacancies.

8        Q.        And what were your duties

9   and responsibilities?

10       A.        Regular routine patrol.

11  Answering calls and assisting

12  citizens.

13       Q.        The same thing you did

14  when you went to work for Sheriff

15  Davis.

16       A.        Yes.

17       Q.        Fair enough.  So that I'm

18  clear then, your duties did not

19  change after Sheriff Davis took

20  office?

21       A.        My overall job

22  description, no, sir.

23       Q.        I think I'm

fc5df9a8-7c7d-4dbf-b461-18d541d382f8

FREEDOM COURT REPORTING

Page 46

1      A.      Yes, sir.

2      Q.      And to whom?

3      A.      Deputy Chief Mayfield.

4      Q.      You told us about what he

5   had to say about your complaint about

6   Shane Fulmer.

7      A.      No, sir.  This is--- this

8   is on the complaint to where I wasn't

9   able to drive my patrol car home.

10     Q.      I'm sorry.  Did you take

11  the complaint about Shane Fulmer

12  being courthouse security to Captain

13  Tate?

14     A.      No, sir.  I never did

15  formally take that anywhere.  That

16  was just a conversation among

17  coworkers.

18     Q.      You've identified those

19  coworkers that you discussed that

20  complaint with?

21     A.      Yes, sir.  I mean

22  everybody was--- was basically just

23  saying that they saw that--- they

FREEDOM COURT REPORTING

Page 47

1    felt like it was a political reason.

2            Q.      Who was it that said that

3    they felt it was political reasons?

4            A.      Mike Poe.   Champ Benson.

5    Charlie Sanders.   Gerald Purvis.

6    Shane Aldridge.   Steve Tate.   Who

7    else?   That's all I can recall

8    amongst my coworkers.

9            Q.      So that I'm clear then,

10   you didn't take the complaint about

11   Shane Fulmer going to Courthouse

12   Security up the chain of command.

13           A.      No, sir.

14           Q.      I'm sorry, did you take

15   your concern about Shane Fulmer up

16   the chain of command?

17           A.      No, sir.

18           Q.      The only complaint you

19   took up the chain of command was

20   about---

21           A.      The patrol vehicle.

22           Q.      Thank you.   So now you've

23   told us--- help me:   What did you

fc5df9a8-7c7d-4dbf-b461-18d541d382f8

FREEDOM COURT REPORTING

Page 55

1    Q.    Okay.  Did you bring the
2 issue back up with anyone?
3    A.    I'm sure I did.  I don't
4 recall who all I talked to about it
5 but I'm sure I did.
6    Q.    Who was the next person
7 you spoke with?
8    A.    I don't even recall.
9    Q.    Okay.  What was the next
10 thing that happened?
11    A.    I'm trying to think.
12    MR. YAGHMAI:  When we get
13 to a good stopping point, can we take
14 a quick break?
15    MR. SHEEHAN:  Sure.
16 Let's just finish this line of
17 questioning.
18    A.    When you say the last
19 thing that happened, in regards to
20 what?
21    Q.    This issue about you not
22 being able to drive your car.  And
23 the follow-up about---

FREEDOM COURT REPORTING

Page 102

1          A.      Yes, sir.

2          Q.      And that's all you did?

3          A.      Yes, sir.

4          Q.      You didn't work through

5     the chain of command?

6          A.      No, sir.

7          Q.      Other than Sherry Tate,

8     did you tell anyone else about this

9     unethical conduct by Kevin Davis?

10         A.      There was several

11    employees that discussed I guess

12    purchasing the dogs through Central

13    Alabama K9.

14         Q.      Who was that, sir?

15         A.      Mike Poe.  I even

16    mentioned it to Captain Steve Tate.

17    All these were like--- there wasn't

18    no meeting or anything like that.  It

19    was just like informal, like just a

20    group of guys.

21         Q.      When did you have this

22    discussion with Mike Poe?

23         A.      It will be sometime

FREEDOM COURT REPORTING

Page 121

1    come outside.  Before I could say

2    anything to him, he said I need to

3    see you.  He and I come up here to

4    the courthouse in his office and he

5    told me that he had heard I was

6    talking about him on the street, and

7    he wasn't going to tolerate it no

8    more.  And I told him, I said, well,

9    the issue at hand was I couldn't get

10   out on my radio and I told them that

11   I was going to come talk to you.  He

12   said yeah, they told me you said

13   that.  I said yes, sir, that's why I

14   come down here, to talk to you,

15   because we've got to do something

16   about the radio system.  And he said,

17   well, if you would have just asked, I

18   would have told you.  And he threw me

19   a piece of paper that had a quote or

20   something where they were trying to

21   get an RF-repeater.  And he said

22   there again, you know, somebody from

23   the fire department or somewhere up

Page 150

1    basically.

2        Q.      Have you now told me

3    everything that was said at that

4    meeting on September the 10th?

5        A.      Basically an overview.

6        Q.      Is there anything else?

7        A.      I can't say word for word

8    exactly what was--- but that's

9    basically the way it is.

10       Q.      Have you spoken to

11   Sheriff Davis since?

12       A.      Since I've been fired?

13   No, sir.

14       Q.      Who did you support in

15   the election for the Sheriff of

16   Chilton County?

17       A.      Billy Wayne Fulmer.

18       Q.      And why?

19       A.      He's family.  Also, he

20   had been doing a good job.  And I

21   explained to the sheriff, when

22   Sheriff Davis told me that he was

23   going to run for sheriff, I told him

fc5df9a8-7c7d-4dbf-b461-18d541d382f8

FREEDOM COURT REPORTING

Page 151

1    then I was going to support Billy

2    Wayne.

3         Q.      Did you contribute any

4    money to Sheriff Fulmer's campaign?

5         A.      No, sir.

6         Q.      Did you work in his

7    campaign to have Sheriff Fulmer

8    elected --

9         A.      Yes, sir.

10        Q.      -- Sheriff?  How did you

11   work on behalf of Sheriff Fulmer?

12        A.      One day I went door to

13   door just asking for support to

14   re-elect Billy Wayne Fulmer.

15        Q.      What day was that, sir?

16        A.      During the election.  I

17   can't recall what month or what day.

18        Q.      Was it a full day?

19        A.      I guess it was from that

20   morning until lunchtime.

21        Q.      What area did you go to?

22        A.      It was here in Clanton.

23        Q.      Which area in Clanton?

fc5df9a8-7c7d-4dbf-b461-18d541d382f8

# EXHIBIT D

Page 1

```
            IN THE CIRCUIT COURT OF
            CHILTON COUNTY, ALABAMA
         CIVIL ACTION NO.:  CV-2007-900130

ROBBIE AUTERY and
SHANE FULMER,

        Plaintiffs,

            VS.

KEVIN DAVIS, in his
official capacity as
Sheriff of Chilton County,
Alabama, and individually;

        Defendant.
```

---

```
      IN THE UNITED STATES DISTRICT COURT
       FOR THE MIDDLE DISTRICT OF ALABAMA
                NORTHERN DIVISION
        CIVIL ACTION NO.:  2:08-CV-41-WC

ROBBIE AUTERY and
SHANE FULMER,

        Plaintiffs,

            VS.

KEVIN DAVIS, in his
official capacity as
Sheriff of Chilton County,
Alabama, and individually;

        Defendant.


        DEPOSITION OF KEVIN DAVIS


            STIPULATIONS

        IT IS STIPULATED AND AGREED,
```



EXHIBIT
D

FREEDOM COURT REPORTING

1    by and between the parties, through

2    their respective counsel, that the

3    deposition of KEVIN DAVIS may be

4    taken before Karen Davis, CCR,

5    Commissioner, State of Alabama at

6    Large, at the Chilton County

7    Courthouse, 200 2nd Avenue North,

8    Clanton, Alabama, on the 16th day of

9    May, 2008, commencing at or about

10   2:15 p.m.

11                IT IS FURTHER STIPULATED

12   AND AGREED that the reading and

13   signature to the deposition by the

14   witness is waived, said deposition to

15   have the same force and effect as if

16   full compliance had been had with all

17   laws and rules of court relating to

18   taking of depositions.

19                IT IS FURTHER STIPULATED

20   AND AGREED that it shall not be

21   necessary for any objections to be

22   made by counsel as to any questions,

23   except as to form or leading

FREEDOM COURT REPORTING

Page 3

1    questions, and that counsel for the

2    parties may make objections and

3    assign grounds at the time of the

4    trial, or at the time said deposition

5    is offered in evidence, or prior

6    thereto.

7            IT IS FURTHER STIPULATED

8    AND AGREED that notice of filing of

9    the deposition by the Commissioner is

10   waived.

11

12

13

14

15

16

17

18

19

20

21

22

23

85147b3a-fa37-484e-8951-c5cc6036d517

FREEDOM COURT REPORTING

Page 7

1       A.      Kevin Davis.

2       Q.      What's your address?

3       A.      It's 430 County Road 909,

4   Clanton, Alabama, 35046.

5       Q.      And where are you

6   currently employed?

7       A.      I'm the Sheriff of

8   Chilton County.

9       Q.      Prior to being the

10  Sheriff of Chilton County, where did

11  you work?

12      A.      I worked at Maplesville

13  Police Department.

14      Q.      And what was your

15  position there?

16      A.      I was Chief of Police.

17      Q.      How long were you the

18  Chief out there at Maplesville?

19      A.      Somewhere between a year

20  and a year and a half.

21      Q.      Were you in a different

22  position at Maplesville before

23  becoming the Chief?

85147b3a-fa37-484e-8951-c5cc6036d517

FREEDOM COURT REPORTING

Page 8

1    A.    Yes, sir.

2    Q.    And what was that?

3    A.    I was a Narcotics K9

4    Officer.

5    Q.    How long were you a

6    Narcotics K9 Officer?

7    A.    Somewhere between three

8    and four years.

9    Q.    Prior to being a

10    Narcotics K9 Officer at Maplesville,

11    did you occupy another position while

12    you were there at Maplesville?

13    A.    I helped out some with

14    the Volunteer Fire Department there,

15    but that's---

16    Q.    Prior to working at

17    Maplesville, were you involved in law

18    enforcement?

19    A.    Yes, sir.

20    Q.    Where was that?

21    A.    At the Sheriff's Office

22    here in Chilton County.

23    Q.    And what time frame are

85147b3a-fa37-484e-8951-c5cc6036d517

Page 9

1    we talking about then?

2        A.      More than four years ago.

3        Q.      All right.  Well, how

4    long were you involved at Chilton

5    County the first time you were here?

6        A.      Approximately six years.

7        Q.      And what was your job

8    with Chilton County then?

9        A.      I was a Deputy Sheriff.

10       Q.      So when did you start

11   working for Chilton County?

12       A.      Probably around--- it was

13   in January of either--- January of

14   '97, I think it was.  Either '96 or

15   '97.  I know it was January of '96 or

16   '97.

17       Q.      And prior to working in

18   Chilton County in '96 or '97, were

19   you in law enforcement?

20       A.      Yes, sir.

21       Q.      And where was that?

22       A.      At Maplesville Police

23   Department.

85147b3a-fa37-484e-8951-c5cc6036d517

FREEDOM COURT REPORTING

1      Q.      At where?

2      A.      Maplesville.

3      Q.      And when was that from?

4      A.      From the time I graduated

5    the Academy until I took the job at

6    the Sheriff's Office.

7      Q.      When did you graduate the

8    Academy?

9      A.      '94?  Around the summer

10   of '94.

11     Q.      All right.  So prior to

12   going to the Academy, what was your

13   educational background?

14     A.      High school education.

15     Q.      Where did you graduate

16   from high school?

17     A.      Isabella High School.

18     Q.      While you were in high

19   school, were you employed or involved

20   with law enforcement?

21     A.      I worked for the town of

22   Maplesville, but it was not law

23   enforcement then.

85147b3a-fa37-484e-8951-c5cc6036d517

Page 26

1      them, no, sir.

2           Q.      Did you have any

3      communications when you first came

4      into office in '07 with the Chief

5      Deputy about the personnel in the

6      Sheriff's Department?

7           A.      Yes, sir.

8           Q.      And when would that have

9      been; before you actually got sworn

10     in or after you got sworn in?

11          A.      It would have been,

12     probably, if I remember right, it was

13     right before I was sworn in.

14          Q.      All right.  Can you tell

15     me what the time frame is when your

16     victory was actually certified?  Do

17     you remember what date that was?

18          A.      I don't remember.

19          Q.      Do you remember what

20     month it was?

21          A.      It was all over in

22     December.

23          Q.      All right.  So in

85147b3a-fa37-484e-8951-c5cc6036d517

FREEDOM COURT REPORTING

Page 27

1    December of '06, your victory had

2    been certified, correct?

3          A.      Right.

4          Q.      And when did you actually

5    get sworn in?

6          A.      I think it was January

7    the 17th.  It may be a day or two

8    off, but I think it was the 17th of

9    January '07.

10         Q.      Somewhere in that time

11   frame from December '06 to January

12   17th of '07, that's when you talked

13   with Chief Deputy Mayfield --

14         A.      Right.

15         Q.      -- about personnel

16   decisions?

17         A.      Right.

18         Q.      Where did this

19   conversation take place?

20         A.      In the chief's office, or

21   in the--- it was Sheriff Fulmer's

22   office at the time, at the jail.

23         Q.      After you had been

Page 28

1    certified as the victor to Sheriff

2    Fulmer, did y'all talk anything about

3    your transition of becoming sheriff?

4           A.      Yes, sir.

5           Q.      Tell me about those

6    conversations.

7           A.      Me and Sheriff Fulmer

8    talked several times about, you know,

9    just make--- making transition.

10          Q.      I mean he wasn't being

11   bitter or difficult, was he, about

12   the transition?

13          A.      No, sir.

14          Q.      In your opinion, was he

15   trying to be helpful about you coming

16   in to be the Sheriff?

17          A.      I think it went very

18   well, the transition.

19          Q.      And did he make a

20   recommendation or suggestion to you

21   to meet with Chief Deputy Mayfield

22   and discussion whatever issues you

23   may deem necessary?

85147b3a-fa37-484e-8951-c5cc6036d517

FREEDOM COURT REPORTING

1      A.     No, sir.  I knew the

2  quality of Robbie's work for myself.

3      Q.     So it was good quality,

4  correct?

5      A.     Yes.

6      Q.     And at that point you

7  didn't have any issue with Robbie

8  working the Interstate?

9      A.     Yes, sir.  I had a

10  problem with it.

11      Q.     As soon as you walked in

12  the door you did?

13      A.     Yes, sir.

14      Q.     Why is that?

15      A.     Because in our county,

16  one of the things that I campaigned

17  on is that we would be a--- a

18  countywide law enforcement agency,

19  not just the Interstate.  And that I

20  had--- that, you know, we were going

21  to patrol the whole county, not just

22  stay on the Interstate and catch

23  calls from the Interstate.  And that

85147b3a-fa37-484e-8951-c5cc6036d517

FREEDOM COURT REPORTING

Page 33

1    was my issue.  It didn't have

2    anything personal to do with Robbie.

3    It wasn't just Robbie on the

4    Interstate.  It was multiple people.

5         Q.     Who else was on the

6    Interstate that you had a problem

7    with?

8              MR. SHEEHAN:  Object to

9    the form.

10        A.     I mean anyone that was

11   out there.

12        Q.     Well, who else was out

13   there that you were having the issues

14   with?  You identified Robbie Autery

15   as having an issue with him when you

16   first walked through the door.

17             MR. SHEEHAN:  Excuse me.

18        A.     My alarm went off.  Sorry

19   about that.

20        Q.     Do you need to check on

21   it?

22        A.     No.

23        Q.     Who else did you have an

85147b3a-fa37-484e-8951-c5cc6036d517

FREEDOM COURT REPORTING

Page 40

1      A.      No.  It was before that.

2      Q.      Were they there at that

3  meeting?

4      A.      Yes, sir.

5      Q.      Both of them?

6      A.      Yes, sir.

7      Q.      When you were going down

8  this list with Chief Deputy Mayfield,

9  did you all discuss Shane Fulmer?

10      A.      Yes, sir.

11      Q.      Tell me about that

12  discussion.

13      A.      We just--- he was one of

14  the guys that we discussed.  You

15  know, we were going down the names.

16  A list of--- he was basically telling

17  me what everybody does at the

18  Sheriff's Office.

19      Q.      What did he tell you that

20  Shane Fulmer did?

21      A.      He told me he was over

22  the General Investigations and the---

23  and the Task Force.

85147b3a-fa37-484e-8951-c5cc6036d517

FREEDOM COURT REPORTING

Page 41

1    Q.    He didn't say anything
2  bad about the way he did his job, did
3  he?
4    A.    He said he didn't work.
5    Q.    He said he didn't work?
6    A.    Yes, sir.
7    Q.    How did he not work?
8    A.    He don't carry his work
9  load, is what the chief had
10 explained.
11   Q.    And did you ask him to
12 elaborate on how he didn't keep his
13 work load?
14   A.    He just said he, you
15 know, he was in General
16 Investigations, didn't work no cases
17 in Investigations and was on the Task
18 Force and didn't work no drug cases.
19   Q.    So according to Chief
20 Deputy Mayfield, said he had actually
21 zero cases that he worked on.
22   A.    He didn't say zero.
23   Q.    Well, if he's not no case

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

85147b3a-fa37-484e-8951-c5cc6036d517

FREEDOM COURT REPORTING

Page 111

1  sure that everything is done properly

2  to follow what you wanted to follow,

3  which was the merit bill, correct?

4            MR. SHEEHAN:   Object to

5  the form.

6       A.    Yes, sir.

7       Q.    And what did the County

8  Attorney tell you?

9       A.    The County Attorney told

10 me that there was not a merit system

11 for the County until that board was

12 put in place.

13      Q.    And did he explain to you

14 why?

15      A.    He said there was no

16 merit board.  He said without a merit

17 board, it went back to the state law

18 that says the deputy sheriff works at

19 the sheriff's discretion.

20      Q.    Did you ask him how do we

21 go about getting the board appointed?

22      A.    Yes, sir.

23      Q.    You told him, I want to

85147b3a-fa37-484e-8951-c5cc6036d517

FREEDOM COURT REPORTING

Page 126

1     A.     Not to my knowledge.

2     Q.     And why is that?

3     A.     I felt like I had done

4 went and asked.

5     Q.     Was it also the thought

6 that in your mind that gave you the

7 green light to fire whoever you

8 wanted to without following this

9 merit bill?

10     A.     That's not correct.

11     Q.     You started people that;

12 didn't you?  You started telling some

13 of the sheriff's deputies, hey, there

14 is no merit board, there is no merit

15 bill, I can fire whoever I want to.

16     MR. SHEEHAN:  Object to

17 the form.

18     A.     No, I didn't go around

19 threatening that I was going to fire

20 everybody.

21     Q.     You already told us---

22     A.     I said we just don't have

23 a merit board in place.  Yeah,

85147b3a-fa37-484e-8951-c5cc6036d517

FREEDOM COURT REPORTING

Page 127

1    according to what John Hollis

2    Jackson, the County Attorney, told

3    me, that I did have the authority to

4    fire, but I mean--- because this

5    board wasn't in place.

6         Q.    But you already told us

7    you didn't go back to the Commission

8    and discuss it.  You already told us

9    you didn't go back to the County

10   Attorney and discuss it.  What you

11   ended up doing was you told Shane

12   Fulmer at least on one occasion that

13   there was no merit board and you

14   could fire him if you wanted to,

15   correct?

16                MR. SHEEHAN:  Object to

17   the form.

18        A.    Correct.

19        Q.    And you told Robbie

20   Autery that there's no merit board

21   and you could fire him if you wanted

22   to, correct?

23                MR. SHEEHAN:  Object to

85147b3a-fa37-484e-8951-c5cc6036d517

FREEDOM COURT REPORTING

Page 130

1          A.       Now?  No.

2          Q.       Now you wouldn't?

3          A.       No.

4          Q.       You would want the

5     sheriff to come in and do whatever he

6     wanted to and fire you?

7          A.       It's better than this

8     bill.

9          Q.       You wouldn't want--- if

10    you were a sheriff's deputy, you

11    wouldn't want any protection of

12    somebody new coming in and firing

13    you?

14         A.       Not if this is the way it

15    is.

16         Q.       Well, the way this is, is

17    it ensures that there's due process,

18    that you can't just randomly fire

19    people, correct?

20              MR. SHEEHAN:  Object to

21    the form.

22         A.       If this is in place.

23         Q.       And to you that's a bad

85147b3a-fa37-484e-8951-c5cc6036d517

FREEDOM COURT REPORTING

Page 131

1    thing, right?

2           MR. SHEEHAN:    Object to

3    the form.

4        A.      No, I don't think it's a

5    bad thing.  I made a stance all along

6    that I don't think someone just

7    should just come in and fire.  But at

8    the same time, I don't think that a

9    merit board dictating to the Sheriff

10   how to run his department is a good

11   thing.  Because like I said, the

12   liability and the responsibility to

13   the County and the people of the

14   County is not going to fall back on

15   these members of this board.  It's

16   going to fall back on the Sheriff.

17       Q.      Why do you say that?

18       A.      It's obvious.  The

19   deputies are an arm of the Sheriff's

20   Office and me.  And when it comes to

21   liability or responsibility or what

22   the County requires us to do, then

23   this board is not going to be the one

1    held liable for it.  It's going to be

2    me.  So why should I be trying to

3    direct and send my department in a

4    direction because somebody don't like

5    it they look at me and say I don't

6    have to do it because I got a merit

7    board.

8         Q.     So it's your opinion that

9    if that merit bill or merit board is

10   in place, that deputies can just say,

11   I don't have to do what you tell me.

12        A.     Yes, sir.

13        Q.     And why is that?

14        A.     Because that's some of

15   the attitudes that people have.

16        Q.     Well, who has had that

17   attitude?

18        A.     Just deputies feel like

19   that they can, you know, before you

20   can do anything or take any actions

21   or do anything, that you got to---

22   you've got to have it approved and

23   done by this board before you do

85147b3a-fa37-484e-8951-c5cc6036d517

FREEDOM COURT REPORTING

Page 154

1  didn't have--- you didn't know of any

2  reason that would allow you from---

3  to refuse to appoint somebody,

4  correct?

5             MR. SHEEHAN:  Object to

6  the form.

7        A.     Before the lawsuit--- ask

8  that again.

9        Q.     Before the lawsuit---

10 well, strike that.

11            Let me ask it this way:

12 If Plaintiff's Exhibit No. 1 is

13 constitutional, would you agree that

14 you violated the merit board when you

15 fired Shane Fulmer?  The merit bill,

16 when you fired Shane Fulmer.

17            MR. SHEEHAN:  Object to

18 the form.

19       A.    No.  I wouldn't say that.

20       Q.     All right.  Tell me how

21 you didn't violate the merit bill

22 when you fired Shane Fulmer.

23       A.     Because there was not a

FREEDOM COURT REPORTING

Page 155

1    board in place.

2         Q.      Tell me how you didn't

3    violate the merit bill when you fired

4    Robbie Autery.

5         A.      Because the merit board

6    wasn't in place.

7         Q.      But that was you not

8    putting somebody on the merit board,

9    correct?  As one of the bodies not

10   putting somebody on the merit board,

11   correct?

12              MR. SHEEHAN:  Object to

13   the form of the question.

14        A.      That was based on mine

15   and Mr. Jackson's conversation saying

16   until that board is put in place,

17   then there's not a merit system for

18   Chilton County.

19        Q.      And you understood it at

20   that point, hey, I don't have to

21   follow this piece of legislation

22   until I do something to effectuate

23   the board, correct?

85147b3a-fa37-484e-8951-c5cc6036d517

FREEDOM COURT REPORTING

Page 241

1        A.      I don't know if I am.

2        Q.      You don't know?

3        A.      I never studied the

4    website, to be honest.  She ain't had

5    the website out but a short period of

6    time.

7        Q.      Who puts it up; she does?

8        A.      She did.

9        Q.      She did it from scratch?

10       A.      Right.

11       Q.      Did anybody tell you that

12   Robbie Autery was out there

13   badmouthing you on the street?

14       A.      I don't remember hearing

15   a whole lot as far as Robbie

16   badmouthing me on the street.  Just

17   from officers is all.

18       Q.      Who did you hear from?

19       A.      I heard from--- from

20   Captain Tate.

21       Q.      What did Captain Tate

22   tell you that Robbie Autery was out

23   there badmouthing you about?

85147b3a-fa37-484e-8951-c5cc6036d517

Page 242

1          A.      The biggest thing that

2    Robbie had was over the Interstate

3    deal.  And then later on over--- over

4    his car.

5          Q.      So Captain Tate told you

6    that Robbie said he was upset about

7    it?

8          A.      Right.

9          Q.      Robbie had told you he

10   was upset about those two issues

11   himself; didn't he?

12         A.      Right.

13         Q.      Who else told you that

14   Robbie Autery was out there

15   badmouthing you?

16         A.      Eric Smitherman had

17   mentioned it.  Mike Poe.

18         Q.      What did Eric Smitherman

19   tell you that Robbie Autery had said

20   about you?

21         A.      He just said that Robbie

22   was upset and mad because he didn't

23   get to stay on the Interstate and

85147b3a-fa37-484e-8951-c5cc6036d517

FREEDOM COURT REPORTING

Page 243

1   work the Interstate like he, you

2   know, he liked, and he didn't like

3   working the areas, just like Robbie

4   said earlier.  And, you know, he

5   just--- that he didn't like the way

6   things I was doing in the Sheriff's

7   Office.

8        Q.     Now, are you saying that

9   your employees shouldn't be able to

10  voice to other employees if they're

11  not happy about an issue, such as the

12  car?

13       A.     Not---  I don't think

14  they should.

15       Q.     So if they're unhappy

16  about some issue, for example, the

17  patrol car, they should just keep

18  their mouth shut and go on?

19       A.     Well, for the two

20  sheriffs I worked for, I mean the

21  sheriffs got to make decisions in the

22  direction he wants the department to

23  go in.  And, you know, us as deputies

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

85147b3a-fa37-484e-8951-c5cc6036d517

FREEDOM COURT REPORTING

Page 244

1    had to go in that direction.  And I

2    don't think what happened was--- just

3    because we don't like the decisions

4    that's made, we can't keep morale

5    beat down and knocked down and try to

6    get other people to go in that

7    direction with us.

8        Q.    You're not saying Robbie

9    Autery beat down morale because he

10   complained about the car issue and

11   the Interstate interdiction; are you?

12       A.    Yes, sir.

13       Q.    He was able to beat down

14   the entire Chilton County Sheriff's

15   Department morale complaining about

16   these two issues?

17       A.    I'm not saying he beat

18   down the whole Chilton County

19   Sheriff's Department.  I said it

20   affected the morale in the

21   department.

22       Q.    Wasn't there other people

23   complaining besides Robbie Autery and

85147b3a-fa37-484e-8951-c5cc6036d517

FREEDOM COURT REPORTING

Page 248

1    remember folks saying that Robbie

2    complained about; Interstate, the car

3    and the zones, correct?

4         A.      To my knowledge.

5         Q.      What about Shane Fulmer;

6    who came to you and said Shane Fulmer

7    was out there badmouthing you?

8         A.      Mike Poe.

9         Q.      What did Mike Poe say

10   that Shane was out there talking

11   about?

12        A.      Shane just said--- it was

13   the same morale issues, saying that

14   the department, you know, is going

15   to, you know, just going down the

16   drain, that, you know, I was going to

17   shut the Task Force down because it

18   was something that Sheriff Fulmer

19   started and I was, you know, against

20   it.

21        Q.      Does the Task Force still

22   exist?

23        A.      Yes, sir.

85147b3a-fa37-484e-8951-c5cc6036d517

FREEDOM COURT REPORTING

Page 249

1      Q.      Has it been reduced in
2    number?  Has the---
3            MR. SHEEHAN:  Do you want
4    him to answer the question?
5            MR. YAGHMAI:  I'm trying
6    to ask the question.
7            MR. SHEEHAN:  I just want
8    the record to be clear that you
9    interrupted him.
10           MR. YAGHMAI:  The only
11   person interrupting is you.  I'm
12   trying to get through this.  I didn't
13   interrupt you when you were
14   questioning.
15           MR. SHEEHAN:  Object to
16   the form.
17           MR. YAGHMAI:  Great.
18   Object to the form.
19     Q.      Mike Poe came to you on
20   how many occasions about Shane Fulmer
21   out there supposedly badmouthing you?
22     A.      Half a dozen, at least.
23     Q.      Did anybody come to you

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

85147b3a-fa37-484e-8951-c5cc6036d517

FREEDOM COURT REPORTING

Page 250

1    and tell you Mike Poe is out there

2    complaining about the way that the

3    department was being run when you

4    took over?

5         A.    Not that I recall.

6         Q.    Has anybody else told you

7    that anybody other than Robbie or

8    Shane was out there complaining about

9    things?

10        A.    When I first come into

11   the office, everybody had a general

12   concern.  I knew that.  Anytime a new

13   sheriff comes into office, there was

14   a concern about what's going to be

15   different, what's going to be

16   changed, you know.

17        Q.    On the Task Force, how

18   much has it been reduced since you

19   took over as the Sheriff?

20        A.    I don't know that it has

21   been reduced.  I don't know how many

22   was on it prior to me being there.  I

23   mean I know some people had one job

Page 251

1    but they assisted with the Task Force

2    and, you know, different things.  So

3    I don't know how much, you know.

4         Q.      Other than Mike Poe, who

5    came to you about Shane Fulmer

6    supposedly badmouthing you?

7         A.      Chief Mayfield.

8         Q.      What did Chief Mayfield

9    tell you?

10        A.      We can't do nothing with

11   morale because Shane comes into---

12   and he was over Investigations and

13   investigators.  All they want to do

14   is their job, and Shane wants to come

15   in every day setting off things and

16   complaining about the Sheriff.

17        Q.      When did Mayfield come to

18   tell you that?

19        A.      Several different

20   occasions over the course of the

21   early part of '07.

22        Q.      Did you ever go to Shane

23   and say, look, people are complaining

85147b3a-fa37-484e-8951-c5cc6036d517

FREEDOM COURT REPORTING

Page 254

1      Q.      Who else besides

2    Mayfield?

3      A.      Well, Mr. Caton said, you

4    know, he come to me about the meeting

5    that they had.

6      Q.      About the merit bill?

7      A.      Right.

8      Q.      What did Caton tell you?

9      A.      He said that Shane was

10   just complaining that what all was

11   going on in the department and

12   griping that he had worked hard, you

13   know, and he was being done wrong,

14   and, you know, just on and on about

15   how I was tearing down the Sheriff's

16   Office.

17     Q.      And you had a problem

18   with him going to Caton to express

19   his own personal feelings on his off

20   time?

21             MR. SHEEHAN:   Object to

22   the form.

23     A.      Well, a deputy is 24

# EXHIBIT
# E

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| ROBBIE AUTERY and SHANE FULMER, | ) ) ) | |
| Plaintiffs, | ) ) | CIVIL ACTION NO.: |
| v. | ) ) | 2:08-CV-41-WC |
| KEVIN DAVIS, in his official capacity as Sheriff of Chilton County, Alabama, and individually, | ) ) ) ) | |
| Defendant. | ) ) | |

## <u>AFFIDAVIT OF MICHAEL POE</u>

Before me, the undersigned authority, on this day personally appeared Michael Poe, who being by me first duly sworn, deposed and stated upon his oath the following:

1. My name is Michael Poe. I am over the age of 21 years, and I have personal knowledge of the information contained in this Affidavit.

2. At all material times hereto, I was a Sergeant in the Investigations Unit of the Office of the Chilton County Sheriff.

3. Shane Fulmer was my supervisor for approximately 6 (six) months after Sheriff Kevin Davis took office in January of 2007. At that time, the Investigations Unit consisted of myself, Lieutenant John Shearon and Captain Shane Fulmer.

4. During the time that Shane Fulmer was my supervisor, Captain Fulmer was not carrying his weight in terms of actively working cases. I reported to Sheriff Kevin Davis and Chief Deputy Mayfield on approximately three to four different occasions that Captain Shane


EXHIBIT

E

Fulmer was not doing his share of the work and that the Investigations Unit needed someone who would investigate and assist with the case work.

5. Captain Shane Fulmer's comments about Sheriff Kevin Davis were also a constant source of disruption in the Investigations Unit. On at least 15 different occasions, Captain Shane Fulmer came into my office and voiced his belief that Sheriff Davis did not know what he was doing as sheriff, and even went as far as calling Sheriff Davis a "dumbass" during several conversations.

6. Captain Shane Fulmer's conduct created a hostile and tense working environment and there were many times that I felt uncomfortable working with and under Captain Fulmer. Captain Fulmer's complaining about Sheriff Kevin Davis inhibited our Unit's ability to operate efficiently and productively.

7. Captain Shane Fulmer's comments about Sheriff Davis were not constructive in nature, nor were they aimed at improving the Investigations Unit. Rather, Captain Fulmer's comments were a personal attack on Sheriff Kevin Davis and the way he operated the Office of Sheriff of Chilton County.


_____
MICHAEL POE


**STATE OF ALABAMA**          )
                              )
**CHILTON COUNTY**            )


SWORN TO and SUBSCRIBED before me on this the 2 8 TH day of May, 2008.


_____
NOTARY PUBLIC
My Commission Expires: _____


MY COMMISSION EXPIRES JAN. 9, 2009

# EXHIBIT
# F

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

ROBBIE AUTERY and SHANE  )
FULMER,        )
            )
  Plaintiffs,     )
            )  CIVIL ACTION NO.:
v.           )  2:08-CV-41-WC
            )
KEVIN DAVIS, in his official capacity )
as Sheriff of Chilton County, Alabama, )
and individually,     )
            )
  Defendant.     )

## AFFIDAVIT OF STEVE W. TATE

Before me, the undersigned authority, on this day personally appeared Steve Tate, who

being by me first duly sworn, deposed and stated upon his oath the following:

1. My name is Steve Tate. I am over the age of 21 years, and I have personal knowledge

of the information contained in this Affidavit.

2. At all material times hereto, I was a Captain in the Office of the Sheriff of Chilton

County and served as the Supervisor over the Patrol Unit.

3. Ever since Sheriff Kevin Davis defeated Billy Wayne Fulmer in the 2006 election,

Captain Shane Fulmer's complaints about Sheriff Davis were a continuous disruption in our unit.

After Captain Fulmer was transferred to Courthouse security duty, Captain Fulmer voiced his

displeasure with his job situation to me approximately 5-6 times.

4. On one particular trip to Talladega, Al, Captain Shane Fulmer continued to complain

about his job duties. Upon returning to Clanton, I reported this conversation to Sheriff Kevin

Davis. I told Sheriff Davis that Captain Fulmer's conduct was creating such a disruption that it



EXHIBIT

F

was destroying the morale in the office. I informed Sheriff Kevin Davis that there were loyalty issues among the deputies, some still supporting former Sheriff Billy Wayne Fulmer. If the problem was not resolved, a deputy could be injured if a request for backup assistance was ignored by a fellow deputy.

5. I was present in Sheriff Davis' office when Captain Shane Fulmer was relieved of his duties. On that occasion, Sheriff Davis asked Captain Fulmer several times what could be done to resolve the problems between them. Sheriff Davis also attempted to address the reports that Captain Fulmer had been voicing displeasure with his job duties and the way the office was being run by Sheriff Davis. During this conference, Captain Fulmer dodged many of Sheriff Davis' questions and blatantly refused to answer other questions asked by Sheriff Davis. At the conclusion of the meeting, Sheriff Davis asked Captain Shane Fulmer to turn in his badge.

_____
STEVE W. TATE

STATE OF ALABAMA          )
                          )
CHILTON COUNTY            )


SWORN TO and SUBSCRIBED before me on this the 28th day of May, 2008.

_____
NOTARY PUBLIC
My Commission Expires: 9/22/08

(SEAL)

# EXHIBIT
# G

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| ROBBIE AUTERY and SHANE FULMER | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CIVIL CASE No. 2:08-CV-41-WC |
| | ) | |
| KEVIN DAVIS in his official capacity | ) | |
| as Sheriff of Chilton County, Alabama, | ) | |
| and individually | ) | |
| | ) | |
| Defendant. | ) | |

## AFFIDAVIT OF GREG PAPPAS

Before me, the undersigned authority, on this day personally appeared Greg Pappas, who being by me first duly sworn, deposed and stated upon his oath the following:

My name is Greg Pappas. I am over the age of 21 years, and I have personal knowledge of the information contained in this Affidavit.

I was elected Clerk of the State of Alabama House of Representatives in May of 1991. At all material times hereto, I am and have been the Clerk of the Alabama House of Representatives.

I have reviewed HB69 and the Publisher's Certificate of Publication from the Clanton Advertiser, which was presented to me as the Clerk of the Alabama House of Representatives. The Certificate states that the proposed bill was advertised on 6/3/01, 6/10/01, 6/17/01 and 6/24/01.

The Second Special Session of the 2001 Alabama Legislature met from June 25, 2001 to July 2, 2001.



EXHIBIT

G

The Third Special Session of the 2001 Alabama Legislature met from August 28, 2001 through September 19, 2001.

The Fourth Special Session of the 2001 Alabama Legislature met from December 4, 2001 through December 21, 2001.

House Bill 69 was not introduced in the first Session of the Legislature of Alabama commencing after the fourth consecutive week of publication of the notice as stated in the notice published in the Chilton County newspaper

_____
GREG PAPPAS
Clerk, Alabama House of Representatives


STATE OF ALABAMA       )
                        )
MONTGOMERY COUNTY   )


SWORN TO and SUBSCRIBED before me on this the 4th day of April, 2008.

_____
NOTARY PUBLIC
My Commission Expires: 10|5|10

(SEAL)

2

# EXHIBIT
# H

# Publisher's Certificate of Publication

## The State of Alabama
## Chilton County

# A True Copy
# Appears Below:

Personally appeared before the undersigned Notary Public in and for said county and state. Michael R. Kelley, Publisher of The Clanton Advertiser, a newspaper published at Clanton, County of Chilton, State of Alabama, who, being duly sworn, states on oath that the advertisement, a true copy of which hereto attached, was published in said newspaper in the issues of:

_3_ day of _June_, _2001_

_10_ day of _June_, _2001_

_17_ day of _June_, _2001_

_24_ day of _June_, _2001_

___ day of _____, ____

___ day of _____, ____

___ day of _____, ____

___ day of _____, ____

_Michael R Kelley_

Publisher, The Clanton Advertiser

Sworn to and subscribed before me this _25_ day of _____, _2001_

Notary Public, State of Alabama at Large My Commission expires 3-15-03

Notice is hereby given that a bill substantially as follows will be introduced in the first session of the Legislature of Alabama commencing after the fourth consecutive week of publication of this notice, and application for its passage and enactment will be made:

A BILL TO BE ENTITLED AN ACT

Relating to Chilton County; providing for a civil service merit system for certain employees of the office of the sheriff.

BE IT ENACTED BY THE LEGISLATURE OF ALABAMA:

Section 1. As used in this act, the following words have the following meanings.

(a) BOARD. The merit system board created by this act.

(b) COUNTY. Chilton County.

(c) EMPLOYEE. Any law enforcement officer, radio operator, jailer, and law enforcement support personnel, not excepted by Section 3 of this act, who is employed by the sheriff.

(d) MERIT EMPLOYEE. Any employee who shall have completed one year of probationary employment.

Section 3. This act applies to all law enforcement officials and employees employed by the Office of Sheriff of Chilton County except the chief deputy.

Section 4. All employees to whom this act applies shall be governing dismissals, suspensions, lay-offs, terminations, adopted and administered by the board. Presently employed persons shall remain in their respective employments, but nothing herein shall be construed to prevent or preclude the removal of an employee for cause as provided herein.

Section 5. (a) There is created a merit system board for the Office of Sheriff of Chilton County, which shall become effective upon passage of this act and shall be composed of three members appointed as follows:

(1) One member appointed by the Chilton County Commission.

(2) One member appointed by the Chilton County Sheriff.

(3) One member appointed by agreement of the Chilton County Commission and the Chilton County Sheriff.

(b) The original members shall serve for terms of one, two, and four years, as determined by the drawing of lots. Thereafter, all members shall serve for a period of four years. No person shall be appointed to the board unless he or she is a resident and qualified elector of Chilton County and over the age of 21 years.

(c) Members of the board shall take the constitutional oath of office, which shall be filed in the office of the probate judge. Vacancies on the board shall be filled for the unexpired term of the vacant position in the same manner as original appointments. The members of the board shall elect a chair and secretary from among their members. Any member of the board who becomes a candidate for, or is elected or appointed to, another public office of profit must vacate his or her office as a member of the board. No board member shall be an elected official, appointed employee, or employee of the county or any municipal government.

(d) Each member of the

EXHIBIT
H

H. 69

board shall serve without pay. Section 5. (a) The board shall fix the times for its regular meetings and it may hold special, adjourned, or called meetings at any time. A majority of the members of the board shall constitute a quorum for the transaction of business. All meetings of the board shall be held in the Chilton County Courthouse. The board may prescribe rules governing its procedure provided the rules are not inconsistent with this act.

(b) The board shall keep minutes of its meetings and a record of all business transacted by it. Its records, except those which the rules of the board require to be held confidential for reasons of public policy, shall be open for inspection by any resident of the county at all reasonable times.

Section 7. The Chilton County Commission shall provide the board with materials and secretarial help when needed during its meetings and shall assign an area from time to time for the board meetings. It shall also provide filing cabinets and storage space for the board and shall pay all expenses incurred by the board from the general fund of the county when a claim therefore is submitted and approved by the Chilton

County Commission.

Section 8. (a) All appointments of all employees to which this act applies, other than temporary appointments, shall be probationary for one year from the date of appointment. A probationary employee may be so charged by the sheriff to his or her pleasure at any time before the expiration of one year from his or her appointment. After the employee has served for one year in the position to which he or she was originally appointed or employed, the employee shall become merit employee.

Section 9. Whenever a new sheriff is elected or appointed, he or she may appoint any person as his or her chief deputy sheriff, provided the person meets the minimum standards for law enforcement officers as prescribed by the general laws of the state. The person holding the position of chief deputy sheriff immediately preceding the appointment of a chief deputy may be terminated without benefit of the provisions of this act. Section 10. The sheriff may suspend, without pay, a merit employee for

any personal misconduct or fact affecting or concerning his or her fitness or ability to perform his or her duties in the public interest. In the event a merit employee is suspended without pay for more than 10 days in any one year, her or she shall be entitled to a public hearing by the board upon written demand filed within five days from the date of the order of suspension. If, after hearing, the board determines that the action of the appointing authority was not with good cause, the suspension shall be revoked.

Section 11. (a) The sheriff may remove, discharge or demote any merit employee, who is directly under the sheriff, provided that within five days a report in writing of the action is made to the board, giving the reason for the removal, discharge, or demotion. The employee shall have 10 days which to appeal to the board from the time of his or her notification of removal, discharge, or demotion. If an appeal is filed, the board shall thereupon order the charges or complaint to be filed forthwith in writing, if not already filed, and shall hold a hearing de novo on the charges. No merit employee shall be removed, discharge, or demoted, except for some personal misconduct or fact rendering his

her further tenure harmful to the public interest, or for some cause affecting or concerning his or her fitness or ability. If the employee's removal, discharge, or demotion is appealed to the board, then the same will become final only upon affirmation by the board after a hearing where the employee has been given an opportunity to face his or her accusers and be heard in his or her own defense. Pending a hearing, the affected employee may be suspended and after the hearing the board may order the employee reinstated, demoted, removed, discharged, or suspended, or take any other disciplinary action as in their judgment is warranted by the evidence and under the law. In all cases, the decision of the board shall be reduced to writing and entered in the record of the case and shall include the board's findings of facts upon which its decision is based.

(b) The board may administer oaths, take depositions, certify official acts, and issue subpoenas to compel the attendance of witnesses and production

of papers necessary as evidence in connection with any hearing, investigation, or proceeding within the purview of this act. The sheriff or some other law enforcement officer of the county shall serve all processes of the board. In the case a person refused, to obey a subpoena, the board may invoke the aid of the Circuit Court of Chilton County, to order that the testimony or evidence be produced. Upon proper showing, the court shall issue an subpoena or order requiring the person to appear before the board and produce all evidence and give all testimony relating to the matter at issue. A person who fails to obey a subpoena or order may be punished by the court for contempt. The fees of witnesses for attendance and travel shall be the same as fees for witnesses in the Circuit Court of Chilton County, and the fees shall be paid from the treasury or the county in a case involving an employee of the sheriff's department.

(c) In all proceedings before the board, the board may employ an attorney to appear before the board and prosecute all charges instituted by the sheriff when requested or directed to do so and to give any legal advice and legal assistance to the board as may be requested. The county attorney of Chilton County, or the attorney for the attorney

for the appointing authority that is removing, discharging, demoting, or firing the employee may serve in this capacity.

(d) Any person aggrieved by the decision of the board may appeal that decision to the Circuit Court of Chilton County within 30 days from the rendition of the decision by the board. Review by the Circuit Court shall be without a jury and be confined to the record and a determination of the questions of law presented. The board's findings of fact shall be final and conclusive.

Section 12. Each employee may exercise his or her right as a citizen to express his or her opinion and to cast his or her vote. No employee shall receive any appointment or advancement as a reward for his or her support of a candidate for office of a political party nor shall he or she be dismissed, suspended, or reduced in rank or pay as punishment for his or her failure to support any candidate for political office. Section 13. Any merit em-

ployee who willfully violates any provisions of this act, or any rule or regulation issued in pursuance hereof, shall be dismissed from service under the system and shall not be appointed or reemployed for two years.

Section 14. All employees to which this act applies shall be under the merit system under any merit system law which is in effect on the effective date of this act.

Section 15. The provisions of this act are severable. If any part of this act is declared invalid or unconstitutional, that declaration shall not affect the part which remains.

Section 16. All laws or parts of laws which conflict with this act are repealed.

Section 17. This act shall become effective upon its adoption of a local constitutional amendment to the Constitution of Alabama of 1901, relating to Chilton County and authorizing a civil service merit system for employees in the Office of Sheriff.

63, 610, 617, 9/24/2001

# EXHIBIT
# I



ELECTRONICALLY FILED
12/10/2007 4:25 PM
CV-2007-900130.00
CIRCUIT COURT OF
CHILTON COUNTY, ALABAMA
GLENN MCGRIFF, CLERK

IN THE CIRCUIT COURT OF CHILTON COUNTY, ALABAMA

ROBBIE AUTERY and SHANE    )
FULMER,          )
           )
   Plaintiffs,      )
           )    CIVIL ACTION NO.
v.           )
           )    _____
KEVIN DAVIS, in his official capacity )
as Sheriff of Chilton County, Alabama )
and individually;       )
           )
   Defendant.     )

## COMPLAINT FOR DECLARATORY JUDGMENT, INJUNCTIVE RELIEF, AND DAMAGES

### I. Parties

1.   The Plaintiff, Robbie Autery ("Autery"), is an adult resident of Shelby County,

Alabama and a former Deputy Sheriff in Chilton County, Alabama.

2.   The Plaintiff, Shane Fulmer ("Fulmer"), is an adult resident of Chilton County,

Alabama and a former Deputy Sheriff in Chilton County, Alabama.

3.   Kevin Davis ("Sheriff Davis") is the duly elected Sheriff of Chilton County,

Alabama, and held the office of Sheriff at all times relevant hereto.

### II. Facts

4.   On January 15, 2002, the Alabama House of Representatives passed HB69,

local legislation affecting Chilton County, Alabama. The Senate passed the act on February

19, 2002, and it thereafter became law. A copy of the Act is attached hereto as Exhibit 1

and made a part hereof as if fully set out herein ("hereinafter "Act").



**EXHIBIT**
I

5.    In November, 2006, Kevin Davis was elected Sheriff of Chilton County, Alabama and took office in January, 2007.

6.    The Act provides for a civil service merit system for certain employees of the Office of the Sheriff of Chilton County, Alabama, said employees including the Plaintiffs in this case. Section 4 provides as follows:

> All employees to whom this act applies shall be governed by merit system rules and regulations governing dismissals, suspensions, lay-offs, and terminations, adopted and administered by the board. Presently employed persons shall remain in their respective employments, but nothing herein shall be construed to prevent or preclude the removal of an employee for cause as provided herein.

7.    Section 5(a) creates a merit system board for the Office of the Sheriff of Chilton County which is to become effective upon the passage of the Act and is to be composed of three members, one appointed by the Chilton County Commission, one appointed by the Chilton County Sheriff, and one appointed jointly by the Commission and the Sheriff.

8.    Sheriff Davis has failed and refused since his election as Sheriff to perform the duties required of him by the Act. Sheriff Davis has failed to appoint a member of the board as required by Section 5(a)(2) and has failed to cooperate with the Chilton County Commission in jointly naming another member of the board as required by Section 5(a)(3).

9.    The Plaintiffs aver that Sheriff Davis has failed and refused to make the appointments required by the Act because he desires to make personnel decisions for the Office of Sheriff without any interference by the said board or compliance with the requirements of Section 4 of the Act. On September 10, 2007, Sheriff Davis fired Shane

2

Fulmer and Robbie Autery. The Plaintiffs were fired by the Sheriff without cause and without compliance with the merit system rules and regulations governing dismissals and termination which were to be adopted and administered by the board.

10.     Plaintiffs further aver that Sheriff Davis has taken arbitrary and adverse personnel actions in the Office of Sheriff of Chilton County affecting certain employees of the Sheriff's office intended by the Act to be protected from such actions.

11.     Plaintiffs aver that unless this Court grants a declaratory judgment holding that Sheriff Davis is required by state law to appoint the board members referred to above and issuing an injunction requiring him to do so, that Sheriff Davis will continue to ignore the Act and will continue to make decisions which are adverse to those employees of the Sheriff's Department intended to be protected by the Act without compliance with the Act.

12.     Plaintiffs claim damages for their wrongful termination and restoration to their former jobs with back pay and benefits as the result of their unlawful discharge and termination by Sheriff Davis.

### III.  Causes of Action

### Count One

13.     Plaintiff adopts all of the allegations of this Complaint as a part of this Count One as if fully set out herein.

14.     Plaintiffs pray that pursuant to Rule 57, *Alabama Rules of Civil Procedure*, the Plaintiff is entitled to a declaratory judgment declaring that Sheriff Davis is required by state

law to immediately and forthwith act on the appointment of the board members referred to above arising from the said Act.

## Count Two

15.    Plaintiffs adopt all of the allegations of this Complaint as a part of this Count Two as if fully set out herein.

16.    Plaintiffs claim that pursuant to Rule 65, *Ala.R.Civ.P.*, they are entitled to a permanent injunction ordering and requiring Sheriff Davis to immediately and forthwith act on the obligation to appoint the above-referenced board members as prescribed by Section 5 of the Act and that following the trial of this case this Court will issue such a permanent injunction.

## Count Three

17.    Plaintiffs adopt all of the allegations of this Complaint as a part of this Count Three as if fully set out herein.

18.    Plaintiffs aver that they are entitled to damages in the form of back pay and benefits for their said wrongful termination and discharge and for such other damages as the jury may determine.

Respectfully submitted,

s/*William E. Rutledge*
William E. Rutledge (RUT001)
williamerutledge@aol.com

s/*Gregory F. Yaghmai*
Gregory F. Yaghmai (YAG001)
yaghmai@rylaw.net

Attorneys for Plaintiffs

4

OF COUNSEL:

RUTLEDGE & YAGHMAI
3800 Colonnade Parkway
Suite 490
Birmingham, AL 35243
T:  (205) 969-2868
F: (205) 969-2862


**PLAINTIFFS DEMAND A TRIAL BY JURY OF ALL ISSUES TRIABLE BY JURY.**

_s/William E. Rutledge_
William E. Rutledge

PLAINTIFFS' ADDRESSES:

Robbie Autery
158 Belvedere Place
Alabaster, AL 35007

Shane Fulmer
115 County Road 941
Clanton, AL 35045

DEFENDANT'S ADDRESS:

Sheriff Kevin Davis
Chilton County Sheriff's Department
500 2nd Avenue North
Room 204
Clanton, AL 35045

**SERVE DEFENDANT BY CERTIFIED MAIL**

5

EXHIBIT "1"

1       HB69

2       39947-2

3       By Representative Martin (N & P)

4       RFD: Local Legislation

5       First Read: 08-JAN-2002

6       PFD 01/07/2002

HB69

1
2    Enrolled, An Act,

3             Relating to Chilton County; providing for a civil

4    service merit system for certain employees of the office of

5    the sheriff.

6    BE IT ENACTED BY THE LEGISLATURE OF ALABAMA:

7             Section 1. This act shall apply only in Chilton

8    County.

9             Section 2. As used in this act, the following words

10   have the following meanings:

11            (a) BOARD. The merit system board created by this

12   act.

13            (b) COUNTY. Chilton County.

14            (c) EMPLOYEE. Any law enforcement officer, radio

15   operator, jailer, and law enforcement support personnel, not

16   excepted by Section 3 of this act, who is employed by the

17   sheriff.

18            (d) MERIT EMPLOYEE. Any employee who shall have

19   completed one year of probationary employment.

20            Section 3. This act applies to all law enforcement

21   officials and employees employed by the Office of Sheriff of

22   Chilton County except the chief deputy.

23            Section 4. All employees to whom this act applies

24   shall be governed by merit system rules and regulations

25   governing dismissals, suspensions, lay-offs, and terminations,

Page 1

HB69

1    adopted and administered by the board. Presently employed

2    persons shall remain in their respective employments, but

3    nothing herein shall be construed to prevent or preclude the

4    removal of an employee for cause as provided herein.

5        Section 5. (a) There is created a merit system board

6    for the Office of the Sheriff of Chilton County, which shall

7    become effective upon passage of this act and shall be

8    composed of three members appointed as follows:

9        (1) One member appointed by the Chilton County

10    Commission.

11        (2) One member appointed by the Chilton County

12    Sheriff.

13        (3) One member appointed by agreement of the Chilton

14    County Commission and the Chilton County Sheriff.

15        (b) The original members shall serve for terms of

16    one, two, and four years, as determined by the drawing of

17    lots. Thereafter, all members shall serve for a period of four

18    years. No person shall be appointed to the board unless he or

19    she is a resident and qualified elector of Chilton County and

20    over the age of 21 years.

21        (c) Members of the board shall take the

22    constitutional oath of office, which shall be filed in the

23    office of the probate judge. Vacancies on the board shall be

24    filled for the unexpired term of the vacant position in the

25    same manner as original appointments. The members of the board

HB69

1   shall elect a chair and secretary from among their members.

2   Any member of the board who becomes a candidate for, or is

3   elected or appointed to, another public office of profit must

4   vacate his or her office as a member of the board. No board

5   member shall be an elected official, appointed employee, or

6   employee of the county or any municipal government.

7       (d). Each member of the board shall serve without

8   pay.

9       Section 6. (a) The board shall fix the times for its

10  regular meetings and it may hold special, adjourned, or called

11  meetings at any time. A majority of the members of the board

12  shall constitute a quorum for the transaction of business. All

13  meetings of the board shall be held in the Chilton County

14  Courthouse. The board may prescribe rules governing its

15  procedure provided the rules are not inconsistent with this

16  act.

17      (b) The board shall keep minutes of its meetings and

18  a record of all business transacted by it. Its records, except

19  those which the rules of the board require to be held

20  confidential for reasons of public policy, shall be open for

21  inspection by any resident of the county at all reasonable

22  times.

23      Section 7. The Chilton County Commission shall

24  provide the board with materials and secretarial help when

25  needed during meetings and shall assign an area from time to

HB69

1    time for the board meetings. It shall also provide filing

2    cabinets and storage space for the board and shall pay all

3    expenses incurred by the board from the general fund of the

4    county, when a claim therefor is submitted and approved by the

5    Chilton County Commission.

6          Section 8. All appointments of employees to which

7    this act applies, other than temporary appointments, shall be

8    probationary for one year from the date of appointment. A

9    probationary employee may be discharged by the sheriff at his

10    or her pleasure at any time before the expiration of one year

11    from his or her appointment. After the employee has served for

12    one year in the position to which he or she was originally

13    appointed or employed, the employee shall become a merit

14    employee.

15          Section 9. Whenever a new sheriff is elected or

16    appointed, he or she may appoint any person as his or her

17    chief deputy sheriff, provided the person meets the minimum

18    standards for law enforcement officers as prescribed by the

19    general laws of the state. The person holding the position of

20    chief deputy sheriff immediately preceding the appointment of

21    a chief deputy may be terminated without benefit of the

22    provisions of this act.

23          Section 10. The sheriff may suspend, without pay, a

24    merit employee for any personal misconduct or fact affecting

25    or concerning his or her fitness or ability to perform his or

HB69

1    her duties in the public interest. In the event a merit

2    employee is suspended without pay for more than 10 days in any

3    one year, he or she shall be entitled to a public hearing by

4    the board upon written demand filed within five days from the

5    date of the order of suspension. If, after hearing, the board

6    determines that the action of the appointing authority was not

7    with good cause, the suspension shall be revoked.

8        Section 11. (a) The sheriff may remove, discharge or

9    demote any merit employee who is directly under the sheriff,

10   provided that within five days a report in writing of the

11   action is made to the board, giving the reason for the

12   removal, discharge, or demotion. The employee shall have 10

13   days which to appeal to the board from the time of his or her

14   notification of removal, discharge, or demotion. If an appeal

15   is filed, the board shall thereupon order the charges or

16   complaint to be filed forthwith in writing, if not already

17   filed, and shall hold a hearing de novo on the charges. No

18   merit employee shall be removed, discharged, or demoted except

19   for some personal misconduct or fact rendering his or her

20   further tenure harmful to the public interest, or for some

21   cause affecting or concerning his or her fitness or ability.

22   If the employee's removal, discharge, or demotion is appealed

23   to the board, then the same will become final only upon

24   affirmation by the board after a hearing where the employee

25   has been given an opportunity to face his or her accusers and

HB69

1    be heard in his or her own defense. Pending a hearing, the

2    affected employee may be suspended and after the hearing the

3    board may order the employee reinstated, demoted, removed,

4    discharged, or suspended, or take any other disciplinary

5    action as in their judgment is warranted by the evidence and

6    under the law. In all cases, the decision of the board shall

7    be reduced to writing and entered in the record of the case

8    and shall include the board's findings of facts upon which its

9    decision is based.

10        (b) The board may administer oaths, take

11   depositions, certify official acts, and issue subpoenas to

12   compel the attendance of witnesses and production of papers

13   necessary as evidence in connection with any hearing,

14   investigation, or proceeding within the purview of this act.

15   The sheriff or some other law enforcement officer of the

16   county shall serve all processes of the board. In the case a

17   person refuses to obey a subpoena, the board may invoke the

18   aid of the Circuit Court of Chilton County, to order that the

19   testimony or evidence be produced. Upon proper showing, the

20   court shall issue a subpoena or order requiring the person to

21   appear before the board and produce all evidence and give all

22   testimony relating to the matter in issue. A person who fails

23   to obey a subpoena or order may be punished by the court for

24   contempt. The fees of witnesses for attendance and travel

25   shall be the same as fees for witnesses in the Circuit Court

HB69

1    of Chilton County, and the fees shall be paid from the
2    treasury or the county in a case involving an employee of the
3    sheriff's department.
4         (c) In all proceedings before the board, the board
5    may employ an attorney to appear before the board and
6    prosecute all charges instituted by the sheriff when requested
7    or directed to do so and to give any legal advice and legal
8    assistance to the board as may be requested. The county
9    attorney of Chilton County or the attorney for the appointing
10   authority that is removing, discharging, demoting, or firing
11   the employee may serve in this capacity.
12        (d) Any person aggrieved by a decision of the board
13   may appeal that decision to the Circuit Court of Chilton
14   County within 30 days from the rendition of the decision by
15   the board. Review by the Circuit Court shall be without a jury
16   and be confined to the record and a determination of the
17   questions of law presented. The board's findings of fact shall
18   be final and conclusive.
19        Section 12. Each employee may exercise his or her
20   right as a citizen to express his or her opinion and to cast
21   his or her vote. No employee shall receive any appointment or
22   advancement as a reward for his or her support of a candidate
23   for office of a political party nor shall he or she be
24   dismissed, suspended, or reduced in rank or pay as punishment

Page 7

HB69

1    for his or her failure to support any candidate for political
2    office.

3          Section 13. Any merit employee who willfully
4    violates any provision of this act, or any rule or regulation
5    issued in pursuance hereof, shall be dismissed from service
6    under the system and shall not be appointed or reemployed for
7    two years.

8          Section 14. All employees to which this act applies
9    shall be covered by the merit system within one year from the
10   effective date of this act.

11         Section 15. The provisions of this act are
12   severable. If any part of this act is declared invalid or
13   unconstitutional, that declaration shall not affect the part
14   which remains.

15         Section 16. All laws or parts of laws which conflict
16   with this act are repealed.

17         Section 17. This act shall become effective upon the
18   adoption of a local constitutional amendment to the
19   Constitution of Alabama of 1901, relating to Chilton County
20   and authorizing a civil service merit system for employees in
21   the Office of Sheriff.

Page 8

HB69

1

2

3
4
_____
Speaker of the House of Representatives

5
6
_____
President and Presiding Officer of the Senate

7                     House of Representatives

8           I hereby certify that the within Act originated in
9    and was passed by the House 15-JAN-2002.
10
11                          Greg Pappas
12                          Clerk
13

14
15
16    Senate              19-FEB-2002                        Passed
17