IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| ROBBIE AUTERY and SHANE FULMER, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. |
| | ) | |
| KEVIN DAVIS in his official capacity as | ) | 2:08-CV-41-WC |
| Sheriff of Chilton County, Alabama, and | ) | |
| individually, | ) | |
| | ) | |
| Defendant. | ) | |

**EVIDENTIARY SUBMISSION IN SUPPORT OF PLAINTIFFS'
RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Come now the Plaintiffs, Robbie Autery and Shane Fulmer, and in support of Plaintiffs' response to Defendant's motion for summary judgment file the following evidence:

Plaintiffs' Exhibit 1:    Excerpts from the deposition or Robbie Autery

Plaintiffs' Exhibit 2:    Entire deposition of Robbie Autery for the convenience of the Court

Plaintiffs' Exhibit 3:    Excerpts from the deposition or Shane Fulmer

Plaintiffs' Exhibit 4:    Entire deposition of Shane Fulmer for the convenience of the Court

Plaintiffs' Exhibit 5:    Excerpts from the deposition or Kevin Davis

Plaintiffs' Exhibit 6:    Entire deposition of Kevin Davis for the convenience of the Court

Respectfully submitted,

 s/*William Eugene Rutledge*
WILLIAM EUGENE RUTLEDGE
ASB-7707-r67w
Attorney for Plaintiffs

OF COUNSEL:

RUTLEDGE & YAGHMAI
3800 Colonnade Parkway
Suite 490
Birmingham, AL 35243
T:  (205) 969-2868
F: (205) 969-2862
williamerutledge@aol.com

### CERTIFICATE OF SERVICE

I hereby certify that on June 17, 2008, I filed the foregoing with the Clerk of the Court using the CM/ECF System which will send notification of such filing to the following:

C. Winston Sheehan, Jr., Esq.
Allison Alford Ingram, Esq.
John W. Marsh, Esq.
Ball, Ball, Matthews & Novak, P.A.
P. O. Box 2148
Montgomery, AL 36102-2148

 /s/*William Eugene Rutledge*
OF COUNSEL

# EXHIBIT 1

```
 1           IN THE CIRCUIT COURT OF
           CHILTON COUNTY, ALABAMA
 2     CIVIL ACTION NO.:  CV-2007-900130

 3   ROBBIE AUTERY and
     SHANE FULMER,
 4
          Plaintiffs,
 5
                VS.
 6
     KEVIN DAVIS, in his
 7   official capacity as
     Sheriff of Chilton County,
 8   Alabama, and individually;

 9        Defendant.

10   _____

     IN THE UNITED STATES DISTRICT COURT
11    FOR THE MIDDLE DISTRICT OF ALABAMA
             NORTHERN DIVISION
12     CIVIL ACTION NO.:  2:08-CV-41-WC

13   ROBBIE AUTERY and
     SHANE FULMER,
14
          Plaintiffs,
15
                VS.
16
     KEVIN DAVIS, in his
17   official capacity as
     Sheriff of Chilton County,
18   Alabama, and individually;

19        Defendant.

20
          DEPOSITION OF ROBBIE AUTERY
21

22           STIPULATIONS

23           IT IS STIPULATED AND
```

```
 1    AGREED, by and between the parties,

 2    through their respective counsel,

 3    that the deposition of ROBBIE AUTERY

 4    may be taken before Karen Davis, CCR,

 5    Commissioner, State of Alabama at

 6    Large, at the Chilton County

 7    Courthouse, 200 2nd Avenue North,

 8    Clanton, Alabama, on the 16th day of

 9    May, 2008, commencing at or about

10    9:03 a.m.

11              IT IS FURTHER STIPULATED

12    AND AGREED that the reading and

13    signature to the deposition by the

14    witness is waived, said deposition to

15    have the same force and effect as if

16    full compliance had been had with all

17    laws and rules of court relating to

18    taking of depositions.

19              IT IS FURTHER STIPULATED

20    AND AGREED that it shall not be

21    necessary for any objections to be

22    made by counsel as to any questions,

23    except as to form or leading
```

**Freedom Court Reporting, Inc**    3

1    questions, and that counsel for the

2    parties may make objections and

3    assign grounds at the time of the

4    trial, or at the time said deposition

5    is offered in evidence, or prior

6    thereto.

7              IT IS FURTHER STIPULATED

8    AND AGREED that notice of filing of

9    the deposition by the Commissioner is

10   waived.

11

12

13

14

15

16

17

18

19

20

21

22

23

```
1

2                      I N D E X

3

4    EXAMINATION BY:              PAGE NO.

5    Mr. Sheehan                     8

6    Mr. Yaghmai                    153

7

8                  E X H I B I T S

9    PLAINTIFF'S EXHIBIT NO.      MARKED

10   No. 1 - copy of e-mail        153

11

12   DEFENDANT'S EXHIBITS         MARKED

13   No. 1 - letter                18

14   No. 2 - typewritten notes    116

15   No. 3 - typewritten notes    116

16

17

18

19

20

21

22

23
```

```
 1   BEFORE:    Karen Davis, CCR

 2              Commissioner

 3

 4

 5   APPEARING ON BEHALF OF THE PLAINTIFF:

 6         Mr. Gregory F. Yaghmai

 7         Rutledge & Yaghmai

 8         3800 Colonnade Parkway

 9         Suite 490

10         Birmingham, Alabama   35243

11         (205) 969-2868

12

13   APPEARING ON BEHALF OF THE DEFENDANT:

14         Mr. C. Winston Sheehan, Jr.

15         Ball, Ball, Matthews &

16         Novak, P.A.

17         2000 Interstate Park Drive

18         Suite 204

19         Montgomery, Alabama   36109

20         (334) 387-7680

21

22   Also Present:   Shane Fulmer

23              Sheriff Kevin Davis
```

```
 1              I, Karen Davis,

 2   Certified Shorthand Reporter and

 3   Commissioner, State of Alabama at

 4   Large, acting as commissioner,

 5   certify that on this date, in

 6   accordance with Rule 30 of the

 7   Alabama Rules of Civil Procedure and

 8   the foregoing stipulations of

 9   counsel, there came before me at the

10   Chilton County Courthouse, 200 2nd

11   Avenue North, Clanton, Alabama, on

12   the 16th day of May, 2008, ROBBIE

13   AUTERY, Plaintiff in the above cause

14   for oral examination, whereupon the

15   following proceedings were had:

16

17              COURT REPORTER:  Usual

18   stipulations?

19              MR. YAGHMAI:  That's

20   fine.  I'm going to put something on

21   the record first.

22              In supplementing our

23   initial disclosures, I've talked to
```

 1    Mr. Sheehan before the deposition.

 2    There is an e-mail from the

 3    Plaintiff, Robbie Autery, that he

 4    sent to the Attorney General's office

 5    dated August 21st, 2007 making---

 6    reporting allegations against the

 7    Defendant in this particular case.

 8              My understanding is

 9    there's still an ongoing

10    investigation by the Attorney

11    General's office, but in the interest

12    of full disclosure, I went ahead and

13    produced this e-mail this morning to

14    Mr. Sheehan as a supplemental to our

15    initial disclosures.  Obviously I'm

16    not involved in any Attorney

17    General's investigation, but I

18    thought that it would be the proper

19    thing to do to produce to Mr. Sheehan

20    and we can discuss afterwards what we

21    need to do with the particular

22    e-mail.  But here's a copy of it

23    dated August 21st, 2007 from Robbie

```
 1    Autery to the Attorney General's

 2    Office, which is an online contact

 3    form that you can e-mail a complaint

 4    to the Attorney General's Office.

 5

 6         R O B B I E    A U T E R Y,

 7    Having been duly sworn according to

 8    law testifies as follows:

 9

10    EXAMINATION BY MR. SHEEHAN:

11         Q.    Your full name, please,

12    sir.

13         A.    Robbie Michael Autery.

14         Q.    And your date of birth,

15    sir?

16         A.    6--- well, June 30th,

17    1971.

18         Q.    And by whom are you

19    employed?

20         A.    Alabama Department of

21    Public Safety.

22         Q.    And when did you go to

23    work for them, sir?
```

```
 1      A.      October the 14th, 2007.

 2      Q.      And your supervisor?

 3      A.      I guess that would be my

 4   corporal or--- my immediate

 5   supervisor would be Corporal Martin.

 6      Q.      And how did you find out

 7   about the position at the Alabama

 8   Department of Public Safety?

 9      A.      Through a family member.

10      Q.      Who was?

11      A.      Billy Fulmer.

12      Q.      And that's Billy Wayne

13   Fulmer?

14      A.      Yes, sir.  Billy Wayne

15   Fulmer, Jr.

16      Q.      And when did you find out

17   about the position?

18      A.      He had been talking to me

19   for awhile about maybe coming to the

20   state troopers, so probably---

21      Q.      Approximately.

22      MR. YAGHMAI:  Nobody

23   wants you to guess, but to the best
```

1   of your judgment.

2       A.      Probably around--- early

3   part of '07, maybe.

4       Q.      All right, sir.  And did

5   you apply for the position?

6       A.      Yes, sir.

7       Q.      And when did you submit

8   your application?

9       A.      Let's see.  It would

10  probably be back in--- I want to say

11  maybe February or March of '07.  I'm

12  not sure on the exact month.

13      Q.      And do you like your

14  current position?

15      A.      Yes, sir.

16      Q.      What do you do in your

17  position?

18      A.      I'm a State Trooper,

19  regular routine patrol.

20      Q.      And what area do you

21  have, sir?

22      A.      Shelby County is what I'm

23  assigned to, but sometimes they put

1    me out throughout the post.  We have

2    five counties.

3        Q.    How much of your time do

4    you spend in Shelby County

5    patrolling, just approximately?

6        A.    We have 8-hour shifts.

7        Q.    So the majority of your

8    time is in Shelby County?

9        A.    Yes, sir.  I work more

10   Shelby County I do the other

11   counties.

12       Q.    And where do you live,

13   sir?

14       A.    I live at 158 Belvedere

15   Place, Alabaster.  And the zip

16   code--- it's Alabama, but the zip

17   code is 35007.

18       Q.    And how long have you

19   lived there, sir?

20       A.    Approximately eleven

21   years.

22       Q.    And who lives with you at

23   that address?

1    A.    It would be my wife, Pam

2  Autery.

3    Q.    Her maiden name?

4    A.    Panel.

5    COURT REPORTER:  Can you

6  spell that for me?

7    THE DEPONENT:  P-A-N-E-L.

8  I believe that's right.

9    Q.    And what does she do for

10  a living, sir?

11    A.    She works for CRC.  They

12  do insurance.  She is like a

13  technical assistant.  T.A.,  I

14  believe is her title.

15    Q.    And they're out of?

16    A.    Over there by Brookwood

17  Hospital.  I'm assuming that's

18  Homewood, maybe.

19    Q.    And who did you work for

20  immediately before going to work for

21  the Alabama Department of Public

22  Safety as a State Trooper?

23    A.    I worked part-time for

```
1   the City of Jemison.

2          Q.      Who was your supervisor

3   there?

4          A.      I guess that would be

5   Chief Brian Stilwell.

6          Q.      And what were your---

7   what did you do there?

8          A.      Fill in part-time shifts.

9   If they had somebody that was out, I

10  would fill in for them.

11         Q.      And how long did you work

12  with them?

13         A.      I had been working with

14  them probably for--- probably about a

15  year, if not longer.

16         Q.      When did you last work

17  for them in the City of Jemison?

18  Just approximately.

19         A.      I would say probably the

20  week before I went to the state

21  trooper academy.

22         Q.      And when did you begin

23  working there?  Just approximately.
```

1    A.    Approximately--- probably

2  about--- like I said, probably about

3  a year.  Could be more, could be

4  less.  I don't recall actually when I

5  did get hired part-time there.

6    Q.    I mean not an exact date.

7  Just maybe a month and a year.

8    A.    It could be, or it could

9  be less.

10    Q.    As you sit here today,

11  just an approximation.

12    MR. YAGHMAI:  If you

13  know.

14    A.    I mean I don't know.  I

15  mean that's what I'm saying.  I can't

16  remember what day they hired me.

17    Q.    I guess what I'm trying

18  to say is, I don't want you to give

19  me an exact date.  Summer, spring or

20  fall of what year?

21    A.    I'd say probably fourteen

22  months, maybe.

23    Q.    Okay.  So again, just

1    give me a month and a year.

2    Approximate.

3          A.    So 7--- probably--- hmm.

4    I'd say maybe fall of '06.  Like I

5    say, that could be wrong.

6          Q.    That's fair enough.  Just

7    so we kind of get a chronological

8    picture is all I'm trying to do.

9          A.    Right.

10         Q.    And at the same time,

11   were you also working with Chilton

12   County?

13         A.    Yes.

14         Q.    So as I understand it,

15   you currently are working for the

16   Alabama Department of Public Safety.

17   Before that you were working with the

18   City of Jemison.

19         A.    Part time.  Yes, sir.

20         Q.    And then did you also

21   have another job?

22         A.    Yes, sir.

23         Q.    And where was that, sir?

1    A.    Maplesville.

2    Q.    And when did you go work

3 with them?

4    A.    Mr. Davis hired me to

5 work part-time in Maplesville when I

6 come out of the Academy.  I believe

7 it was maybe May of '05.

8    Q.    And how long did you work

9 there, sir?

10    A.    I was on the part-time

11 roster all the way up 'til I left to

12 go to the state trooper academy.

13    Q.    Okay.  And I'm sorry, I

14 guess I was confused.  Did you have a

15 job between working at the Chilton

16 County Sheriff's Office and the State

17 Trooper?

18    A.    I know I worked the City

19 of Jemison part-time and I might have

20 pulled one or two shifts for

21 Maplesville during that time also.

22    Q.    Any other jobs during

23 that time period?

1       A.      No, sir.

2       Q.      So we now have sort of a

3   capsule of your employment prior to

4   going to work for the Chilton County?

5       A.      Before Chilton County, I

6   worked for U.S. Steel.

7       Q.      And I'm sorry, I

8   misunderstood.  We now have gone over

9   your employment history since you

10  came to work at Chilton County.

11      A.      Oh, okay.  Since?

12      Q.      Yes.

13      A.      Yes, sir.  I've worked

14  part-time for Jemison, Maplesville

15  and the Alabama Department of Public

16  Safety.

17      Q.      Fair enough.  Thanks.

18  And how long did you work with the

19  Chilton County Sheriff's Department?

20      A.      I believe--- have you got

21  that?

22          MR. YAGHMAI:  Do you want

23  to see this?  This is just---

1          MR. SHEEHAN:  I'll mark

2    that.

3          MR. YAGHMAI:  Okay.  That

4    will be Exhibit No. 1.

5          (Whereupon the document

6    is marked D-1 for identification by

7    the reporter).

8     Q.     Let me show you what's

9    been marked Defendant's Exhibit No. 1

10   and ask you, can you tell me what

11   that is?

12    A.     This is a letter from the

13   Personnel Manager, Ms. Brasher, and

14   it's saying that I was hired, I

15   believe part time, October the 3rd,

16   2005.  I began to work full time with

17   the Sheriff's Department on June the

18   19th, when I was terminated on

19   September the 10th, 2007.

20          MR. YAGHMAI:  June 19th

21   was 2006?

22    A.     June 19th was 2006.  I'm

23   sorry.

1       Q.      Thanks.  So approximately

2   how many months did you work at the

3   Shelby County Sheriff's Office?

4       A.      Well, if you go October

5   to--- let's see---

6       Q.      And again, Mr. Autery,

7   all I'm trying to do is approximate.

8       A.      Right.  Right.

9       Q.      It doesn't necessarily

10  have to be pinpointed to a day.  I

11  just need an approximate number of

12  months.

13      A.      That's about what---

14              MR. YAGHMAI:  23 months?

15      A.      23?

16      Q.      And during those 23

17  months, what did you do?

18      A.      I was a patrol deputy.

19      Q.      And what were your duties

20  and responsibilities?

21      A.      Regular routine patrol.

22  Answering calls.  Assisting citizens.

23  That was basically about it, I guess.

1    Q.    Did you have the same

2    duties and responsibilities the

3    entire 23 months?

4    A.    Yes, sir.

5    Q.    And what area did you

6    patrol?

7    A.    Some--- most times it

8    would just be the whole county and

9    then we went to a system where we had

10    the north, south, east and west and

11    some days I would work the south,

12    some days I would work north, some

13    days I would work, you know, move me

14    around to where they needed you at.

15    Q.    And who was your

16    supervisor?

17    A.    Sergeant Eric Smitherman.

18    Q.    So if you were there 23

19    months, had you previously worked for

20    Billy Wayne Fulmer while he was

21    Sheriff?

22    A.    No, sir.  I didn't start

23    working for him--- I was a reserve.

```
 1    I wasn't employed.

 2              MR. YAGHMAI:  Are you

 3    asking at any point did he work for

 4    Sheriff Fulmer?

 5              MR. SHEEHAN:  Yes.

 6    That's a good question.

 7              MR. YAGHMAI:  At any

 8    point did you work for Sheriff

 9    Fulmer?

10              THE DEPONENT:  Not on the

11    payroll.  I was a reserve deputy

12    before I came on the payroll.

13              MR. YAGHMAI:  Sorry.  I

14    didn't mean to interrupt.

15              MR. SHEEHAN:  That's a

16    good question.

17       Q.    So the first time you

18    worked for the Chilton County

19    Sheriff's Department was under

20    Sheriff Kevin Davis?

21       A.    No, sir.  Billy Wayne

22    Fulmer.

23       Q.    When did you go to work
```

1    with Billy Wayne Fulmer as Sheriff?

2         A.    October the 3rd, 2005 as

3    a part-time position.

4         Q.    What did you do while

5    working under Sheriff Fulmer?

6         A.    As a part-time position,

7    would fill in vacancies.

8         Q.    And what were your duties

9    and responsibilities?

10        A.    Regular routine patrol.

11   Answering calls and assisting

12   citizens.

13        Q.    The same thing you did

14   when you went to work for Sheriff

15   Davis.

16        A.    Yes.

17        Q.    Fair enough.  So that I'm

18   clear then, your duties did not

19   change after Sheriff Davis took

20   office?

21        A.    My overall job

22   description, no, sir.

23        Q.    I think I'm

1    understanding.  In other words, did

2    what you did on a regular basis

3    change after Sheriff Davis took

4    office?

5         A.      What changed was we went

6    to the--- I guess the districts, or

7    whatever they call the districts.

8    Also, the--- when Sheriff Fulmer was

9    in office, I would be able to get on

10   the Interstate and work what we call

11   interdiction.  And later on, once

12   Sheriff Davis became sheriff, I guess

13   it was toward maybe in the spring, he

14   explained to me that we didn't have

15   enough deputies to be sitting out on

16   the Interstate, that I needed to be

17   out in the county.  So a lot of the

18   patrolling I was doing on the

19   Interstate came to a cease, per him.

20   But even though that was still

21   routine patrol on the Interstate, it

22   was that, you know, the citizens

23   would say that we didn't need to be

1    out there.  So we was out in the

2    county, more or less.

3         Q.     Were there any other

4    changes in your duties after Sheriff

5    Davis took office?

6         A.     In my duties?  No, sir.

7         Q.     Were there any other

8    changes after Sheriff Davis took

9    office?

10        A.     Involving just me?

11        Q.     Yes, sir.

12        A.     Involving just me?

13   Besides being told to stay off the

14   Interstate, no, sir.

15        Q.     Were there any changes to

16   others besides yourself after Sheriff

17   Davis took office?

18             MR. YAGHMAI:  I guess I'm

19   going to just object to the form as

20   far as for clarification, you mean

21   any changes like people being

22   reassigned?  And I don't mean to

23   interrupt your deposition.  I just

1    don't understand your question.  Do

2    you mean any changes?

3              MR. SHEEHAN:  No.  That's

4    a good point.

5         Q.    You seemed to imply that

6    there were some changes, and I was

7    wondering what changes, if not to

8    you, what changes did you observe

9    after Sheriff Davis took office.

10        A.    Dealing with the other

11   employees or---

12        Q.    Please.

13        A.    With the other employees?

14   Let's see.  For one, I noticed he

15   took Shane Fulmer from being a

16   Captain over the Violent Crimes Drug

17   Task Force to Investigations.  And

18   then from Investigations, to the

19   security over here at the courthouse.

20        Q.    Any other changes?

21        A.    No, sir.  Not that I

22   recall.

23        Q.    So that I'm clear, the

1    only changes you observed after

2    Sheriff Davis took office with

3    respect to other employees was with

4    respect to Shane Fulmer.

5         A.    Yes, sir.

6         Q.    So that I'm clear, there

7    were no other changes at the

8    Sheriff's Department after Sheriff

9    Davis took office?

10        A.    Office employees.

11              MR. YAGHMAI:  As far as

12   being reassigned?  I guess that's

13   what we're all missing.

14        A.    That's what I don't

15   understand.  If you're talking about

16   the overall organization, or are you

17   talking about employees or the way he

18   does business or--- I don't--- I

19   don't---

20        Q.    And I appreciate you

21   following up.  Were there any other

22   changes with respect to anything in

23   addition to changes with respect to

```
 1   Shane Fulmer?

 2              MR. YAGHMAI:  Object to

 3   the form.  You can answer if you

 4   understand his question.

 5        A.     As far as the changes

 6   that I saw, was like Mr. Davis doing

 7   business with his wife's canine

 8   place.

 9        Q.     Anything else?

10        A.     Doing some business with

11   HeadCo.

12        Q.     Excuse me?

13        A.     HeadCo gas station.  I

14   guess that's the proper name.  I'm

15   not sure.

16        Q.     Were there any other

17   changes?

18        A.     No, sir.  Not that I

19   recall.

20        Q.     And your point was well

21   taken with respect to the question.

22              You brought up the fact

23   that there were changes with respect
```

1    to I guess policies and philosophies.

2    Did I understand you correctly?

3        A.    Yes, sir.  I believe

4    there was a couple policy changes.

5        Q.    Like what, sir?

6        A.    I can't recall them, sir.

7    I do recall one toward the end

8    because it directly involved me.

9        Q.    Please, sir.

10       A.    And that was not driving

11   the vehicle outside the county more

12   than five miles.

13       Q.    What do you mean by that,

14   sir?

15       A.    The memo stated something

16   to the effect that if you live more

17   than five miles outside the county

18   line, you couldn't drive your patrol

19   car home.

20       Q.    And why?  Why?

21       A.    Mr. Davis explained to me

22   that it was due to maintenance, cost

23   of fuel.

1    Q.     How would that affect

2  maintenance and cost of fuel?

3    A.     I guess he was implying

4  that it would be--- since I lived

5  thirteen miles, it would be further

6  and more wear and tear on the car,

7  and gas.

8    Q.     Were there any other

9  changes?

10   A.     There could have been

11 some organizational changes, more

12 policies.  But like I said, it

13 didn't--- I don't recall it directly

14 affecting me.

15   Q.     Did any of the

16 organizational changes affect others

17 besides yourself?

18   A.     It possibly could have.

19   Q.     And like who?

20   A.     I think he made, if I'm

21 not mistaken, Steve Tate a Captain.

22 I think Deputy Purvis was demoted

23 along with Rocky Mims or--- I can't

1    remember exactly what all changes

2    were exactly made in the department

3    because a lot of it didn't, you know,

4    affect me.

5         Q.     And what happened to

6    Deputy Purvis?

7         A.     I think he was demoted.

8         Q.     To--- from what to what,

9    sir?

10        A.     I think he was demoted

11   from a captain down to--- I'm not

12   sure if it was a sergeant, slick

13   sleeve, or what.

14        Q.     And why was that?

15        A.     I'm not sure.

16        Q.     Did you hear through the

17   grapevine?

18        A.     No, sir.

19        Q.     How many officers--- how

20   many deputies were there at the time?

21        A.     How many deputies did we

22   have?  Oh, let's see.  I don't even

23   know the total count, sir.

```
 1        Q.      But less than thirty?

 2        A.      Patrol deputies?  I'd say

 3   less than thirty, yes, sir.

 4        Q.      Y'all didn't talk about

 5   why somebody went from a captain down

 6   to a sergeant?

 7        A.      No, sir.

 8        Q.      Why not?

 9        A.      I just didn't discuss

10   Purvis's business.

11        Q.      That wasn't discussed

12   among the thirty of you?

13        A.      I don't recall it.  No,

14   sir.

15        Q.      What about Rocky Mims;

16   was that discussed?

17        A.      No, sir.  I believe that

18   was after even I left.

19        Q.      And Steve Tate; was that

20   discussed?  The fact that he went to

21   Captain.

22        A.      Yes, sir.  I talked to

23   Steve Tate.
```

1      Q.      And what did he say?

2      A.      He was saying that, you

3  know, I think--- I think he was more

4  or less just trying to--- when I say

5  justify it or whatever, just try to

6  ease everybody's tensions.  I was

7  like, yeah, he made me Captain, I'm

8  not trying to step on anybody's toes

9  or anything.  But he said he did make

10  a comment that he felt like he was

11  probably going to have to be the

12  lynchman.

13      Q.      What do you mean by that?

14      A.      The one that actually

15  does the discipline and stuff like

16  that.

17      Q.      Why did he feel like he

18  was going to have to be the lynchman?

19      A.      I don't know.

20      Q.      You didn't ask him?

21      A.      No, sir.

22      Q.      Were there any other

23  changes organizationally?

1    A.    I can't recall them.

2    Q.    Were any of these changes

3  discussed among the officers, any of

4  these changes in the organization?

5    A.    I imagine just, you know,

6  somebody talked about it.

7    Q.    But did anybody talk to

8  you about any of the changes from an

9  organizational standpoint?

10    A.    Yes, sir.  I recall after

11  the election I was talking with Mike

12  Poe and he was all bent out of shape

13  because Sheriff Fulmer lost the

14  election and he was making comments

15  like, excuse my language, about

16  Sheriff Davis saying that he didn't

17  want to work for the mother fucker.

18    Q.    I'm sorry, who said that?

19    A.    Mike Poe.

20    Q.    Okay.  Any other

21  conversation about organizational

22  changes after Kevin Davis became

23  Sheriff?

1        A.      Yes, sir.  I recall a

2   time or two when Deputy Charlie

3   Sanders made the comment that this

4   department was like the Titanic, it's

5   sinking.

6        Q.      And when did he make that

7   comment?

8        A.      I guess it was in the

9   summer of '07.

10        Q.      Thank you.  And what was

11   he talking about, the department was

12   sinking?

13        A.      I guess with all the

14   changes that were being made.

15        Q.      And what did you tell

16   him?

17        A.      I probably agreed with

18   him.

19        Q.      What did you tell Mike

20   Poe?

21        A.      I just told Mike Poe he

22   just needed to calm down.  He gets

23   bent out of shape.

1     Q.    Did you tell Mike Poe

2  anything else?

3     A.    Let's see.  He and I

4  talked a couple of times.  Mike Poe

5  was--- was getting upset saying

6  everybody doesn't need to be just

7  nonchalant, whatever he means like

8  that, like nothing is wrong, that

9  things are going to go to hell in a

10  handbasket.  And I told Mike at the

11  time that I had been working for

12  Sheriff Davis at Maplesville and I

13  never had an issue with him, that

14  things, you know, maybe things will

15  just be a smooth sail because Sheriff

16  Davis said that once he took office,

17  there were going to be no changes

18  made.

19     Q.    And what did Mike Poe say

20  to that?

21     A.    Just basically I guess

22  we'll just see with time, I guess.

23     Q.    And what did you say?

1      A.      I said that's all we can

2   do.

3      Q.      Did you have any other

4   conversations with Mike Poe?

5      A.      We talked on a regular

6   basis for awhile.  We was all

7   coworkers, all friends, so I'm sure

8   we did.

9      Q.      What did you tell him

10  about the changes you saw in the

11  department since Kevin Davis had

12  become Sheriff?

13     A.      Basically, like, you

14  know, with Shane.  How did he--- how

15  does he demote somebody when we're

16  under the understanding that we have

17  a merit system?  And it clearly

18  looked political that you take him

19  from the position he was in all the

20  way down to checking for knives and

21  purses and all that at the

22  courthouse.

23     Q.      Any other conversation

37

1    that you had with Mike Poe?

2         A.     No, sir.  That's about

3    it.

4         Q.     Did you discuss with Mike

5    Poe any other officers in the

6    Sheriff's Department?

7         A.     I think there was a

8    conversation or two about hopefully

9    that Chief Mayfield would, you know,

10   standup for the employees, yadda,

11   yadda, yadda.  Back his officers.

12   That's about all I can recall on that

13   one.

14        Q.     Okay.  Did you ever

15   discuss with Chief Mayfield the

16   organization or the changes that were

17   made?

18        A.     Yes, sir.

19        Q.     And how often did you

20   speak to Chief Mayfield?

21        A.     We spoke probably three

22   or four times, I guess.

23        Q.     And when did you first

1   start talking to Chief Mayfield?

2       A.      It was probably in the

3   spring or the summer of '07.

4       Q.      And what was your first

5   conversation with Chief Mayfield

6   about these changes?

7       A.      I asked him how he felt

8   about them.

9       Q.      What did he say?

10      A.      Chief Mayfield basically

11  said his hands was tied, that he was

12  worried about losing his job because

13  his understanding was that the merit

14  board protected everybody but

15  himself.

16      Q.      Was there any discussion

17  with Chief Mayfield about the changes

18  other than the merit system?

19      A.      I talked to him about the

20  policy of me driving my patrol

21  vehicle home.

22      Q.      And what did he say?

23      A.      I told him I went through

39

```
 1   the proper chain of command.  I

 2   talked to my sergeant and I talked to

 3   Captain Steve Tate about going to the

 4   Sheriff, discussing my concern about

 5   not being able to drive my patrol car

 6   home.  And then when I went up to

 7   Chief Deputy Mayfield and discussed

 8   my concerns and I guess just trying

 9   to show him my justification on being

10   able to drive my vehicle home.  I

11   told him I felt like I was being

12   singled out.  And he said well, I

13   don't know what to tell you.  And I

14   said well, you know, the thing about

15   it is if I talk--- you're giving me

16   the blessing to go to the sheriff and

17   once I go to the sheriff and I still

18   don't have my answer or I still feel

19   like I'm being singled out, then I'm

20   going to have to come up with some

21   other type of plan.  And then Chief

22   Deputy Mayfield said well, until

23   somebody presses the merit issue, you
```

1   know, basically nothing is going to

2   be done.

3       Q.      And that was your second

4   conversation with Chief Mayfield?

5       A.      It could have been my

6   third or fourth.

7       Q.      What was your next

8   conversation you had with Chief

9   Mayfield about changes in the---

10      A.      Basically the same thing

11  each time --

12      Q.      And--- I'm sorry.

13      A.      -- on the first

14  conversation.  When we was talking

15  about Shane being dropped down to the

16  courthouse.

17      Q.      So that was the first

18  conversation?

19      A.      Yes, sir.  We probably

20  talked about the same thing over and

21  over three times.

22      Q.      And why did you go to him

23  about Shane being security at the

1    courthouse?

2        A.      Because to myself and the

3    other employees, they just didn't

4    think it was right.  It just looked

5    like Shane Fulmer had a bullseye on

6    his back.

7        Q.      And why did he have a

8    bullseye on his back?

9        A.      The things that we saw or

10   thought about was political reasons.

11   Because who his father was.

12       Q.      Did anyone say they were

13   for political reasons?

14       A.      Let's see.  Champ Benson

15   said the reason Shane got moved to

16   the courthouse was because of who his

17   daddy was.  Let's see.  Who else said

18   that?  Mike Poe.  Charlie Sanders.

19   Myself.  Shane Aldridge.  Basically

20   that's about--- that's the names that

21   I can remember.

22       Q.      Sure.  Did you ever talk

23   to the sheriff about Shane being---

1    Shane Fulmer being transferred to

2    security at the courthouse?

3         A.    No.

4         Q.    Did you talk to Chief

5    Mayfield about Shane Fulmer being

6    transferred to the courthouse

7    security?

8         A.    Yes, sir.

9         Q.    And what did Chief

10   Mayfield say about it?

11        A.    Basically just like I

12   said earlier.  That his hands was

13   tied.  That, you know, until somebody

14   presses the merit issue, that Sheriff

15   Davis could fire him at any time so

16   there wasn't nothing that he could

17   do.

18        Q.    Did he say anything else?

19        A.    No, sir.

20        Q.    What about your

21   supervisor; did you discuss it with

22   your supervisor?

23        A.    Eric Smitherman.  Yes,

1    sir.

2        Q.      What did he say?

3        A.      He just said well, you

4    know how politics are.  And that's

5    all he said.  I mean he never did go

6    one way or the other.

7        Q.      Did you ever discuss with

8    your supervisor any of the changes

9    that had taken place in the

10   department after Sheriff Davis took

11   over?

12       A.      Yes, sir.

13       Q.      What did you discuss with

14   him?

15       A.      I guess the main gripe

16   that I had, or complaint, was being

17   taken--- being told not to patrol the

18   Interstate.

19       Q.      Did you take any other

20   complaints to your supervisor?

21       A.      That goes back to telling

22   Sergeant Smitherman that I didn't

23   think it was right for Shane to get

1    knocked from where he was all the way

2    to the courthouse security, just like

3    I said before.

4        Q.    Any other complaints that

5    you took to your immediate supervisor

6    about changes in the department when

7    Kevin Davis took office?

8        A.    I did tell him about me

9    going through the proper chain of

10   command to discuss the issue about

11   not being able to drive my patrol car

12   home.

13       Q.    Any other?

14       A.    No, sir.  Not that I

15   recall.

16       Q.    And what did your

17   supervisor tell you with respect to

18   these complaints that you had?

19       A.    Basically that, you know,

20   that that was above and beyond him,

21   that, you know, if I felt like

22   something was wrong, I needed to go

23   up the chain of command.

1    Q.      And did you?

2    A.      Yes.

3    Q.      And who did you go up to?

4    A.      From Eric to Captain

5  Steve Tate to Deputy Chief Mayfield.

6    Q.      And Steve Tate, what did

7  he say about your complaints?

8    A.      He said that--- when I

9  told him I felt like I was being

10  singled out and I said that, you

11  know, it's just basically I feel like

12  I'm being singled out because who I'm

13  kin to, he said that he understood

14  that, you know, that he gave me his

15  blessing or whatever, permission, to

16  go up to talk to Chief Deputy

17  Mayfield.

18    Q.      Did he say anything else

19  about these complaints you were

20  bringing to him?

21    A.      No, sir.

22    Q.      And did you then go up

23  the chain of command?

1    A.    Yes, sir.

2    Q.    And to whom?

3    A.    Deputy Chief Mayfield.

4    Q.    You told us about what he

5    had to say about your complaint about

6    Shane Fulmer.

7    A.    No, sir.  This is--- this

8    is on the complaint to where I wasn't

9    able to drive my patrol car home.

10   Q.    I'm sorry.  Did you take

11   the complaint about Shane Fulmer

12   being courthouse security to Captain

13   Tate?

14   A.    No, sir.  I never did

15   formally take that anywhere.  That

16   was just a conversation among

17   coworkers.

18   Q.    You've identified those

19   coworkers that you discussed that

20   complaint with?

21   A.    Yes, sir.  I mean

22   everybody was--- was basically just

23   saying that they saw that--- they

1  felt like it was a political reason.

2      Q.    Who was it that said that

3  they felt it was political reasons?

4      A.    Mike Poe.  Champ Benson.

5  Charlie Sanders.  Gerald Purvis.

6  Shane Aldridge. Steve Tate.  Who

7  else?  That's all I can recall

8  amongst my coworkers.

9      Q.    So that I'm clear then,

10 you didn't take the complaint about

11 Shane Fulmer going to Courthouse

12 Security up the chain of command.

13     A.    No, sir.

14     Q.    I'm sorry, did you take

15 your concern about Shane Fulmer up

16 the chain of command?

17     A.    No, sir.

18     Q.    The only complaint you

19 took up the chain of command was

20 about---

21     A.    The patrol vehicle.

22     Q.    Thank you.  So now you've

23 told us--- help me:  What did you

1  tell Chief Mayfield about your

2  complaint?

3      A.    On the patrol vehicle?

4      Q.    Yes, sir.  Now, let me

5  see if I can clear it.  The only

6  complaint you took up the command was

7  about your patrol vehicle?

8      A.    Yes.

9      Q.    So what did you tell---

10  what did Chief Mayfield tell you with

11  respect to this complaint you had

12  taken up the chain of command?

13      A.    He told me my only option

14  that I had was to talk to Sheriff

15  Kevin Davis.  And until the merit

16  board was pushed, that, you know,

17  couldn't nothing be done.  Because I

18  told Mayfield, I said I just feel

19  like I'm being singled out because

20  even when I was coming to work or

21  going home, on the clock or off the

22  clock, if I saw somebody do something

23  wrong, then I would, you know, react

1    upon it, whether it meant making---

2    excuse me, making an arrest or

3    writing a speeding ticket or whatever

4    I could do to protect the citizens of

5    the county.  And I told Mayfield, I

6    said I just don't understand.  If

7    he's still saying no, we have a merit

8    board but yet we don't have nobody to

9    complain to and then Chief Mayfield

10   said until that issue gets pushed,

11   there is none.  So then he gave me

12   his blessings, permission, to go on

13   and speak with Sheriff Davis.

14        Q.     Did you then go speak to

15   Sheriff Davis?

16        A.     Yes, sir.

17        Q.     And when was that, sir?

18   Just approximately.

19        A.     I think around September

20   the 4th.

21        Q.     And where was that, sir?

22        A.     '07.  At the jail.

23        Q.     And who was present?

1        A.      Just the sheriff and I.

2        Q.      And about what time of

3   day or night?

4        A.      Had it to be in the

5   evening because I was working like 6

6   to 6.  So it had to be sometime in

7   the afternoon.

8        Q.      And what did the sheriff

9   say?

10        A.      I asked him if I could

11   meet with him.  He said sure.  We go

12   down to the jail.  We met in one of

13   the investigator's offices, I believe

14   it was.  I explained to him my

15   concerns and issues about not being

16   able to drive the patrol vehicle home

17   because from day one that I was hired

18   with the Sheriff's Department,

19   everybody knew where I lived.  It

20   wasn't a secret that I lived thirteen

21   miles or fourteen miles outside the

22   county line.  And then Sheriff Davis

23   stated that he couldn't justify me

```
1    running up and down the road on

2    county gas and wear and tear on the

3    county vehicles when he's trying to

4    present some type of motion or issue

5    to the commission about being able to

6    obtain new vehicles.  You know---

7         Q.    New patrol cars?

8         A.    Yes, sir.  New patrol

9    vehicles.  So I discussed the issue

10   with him about, you know, even though

11   I lived thirteen miles outside the

12   county line, that even when I'm off

13   the clock, until I got home or

14   crossed the county line, I was still

15   doing what I could to protect the

16   citizens of the county.  He said he

17   understood but he said that, you

18   know, that that's the way it stood.

19   I said thank you for your time.  He

20   told me sit back down.  He said that

21   he had heard that I was going to

22   press the merit issue, which I guess

23   he got that from Chief Deputy
```

```
 1   Mayfield.  He said let me tell you

 2   that you work for the sole discretion

 3   of the Sheriff, I can fire you any

 4   time I want to.  There are just

 5   several of y'all that are mad and

 6   upset because I whooped Billy Wayne's

 7   ass in the election.  And what else

 8   was said?  That he was tired of

 9   hearing comments made on the street,

10   that we were out on the street

11   insinuating things on him and that if

12   something wasn't changed or if it

13   continued or something like that, he

14   was going to make an example out of

15   somebody.

16       Q.     Did Sheriff Davis say

17   anything else?

18       A.     He said that if I pressed

19   the--- he gave me my answer and that

20   was no that I couldn't drive my

21   patrol car home and that if I pressed

22   the issue, that he would consider

23   that insubordination and terminate
```

1    me.

2        Q.      Did he say anything else?

3        A.      No, sir.

4        Q.      And what did you do?

5        A.      Thanked him for his time

6    and walked out.

7        Q.      And then what did you do?

8        A.      Talked to Shane Fulmer.

9    I told Shane the conversation between

10   the sheriff and I.  I told Shane

11   that, you know, no matter what, we

12   have to try to look into this merit

13   issue because, you know, he along

14   with I felt like he had been done

15   wrong and now I feel like I'm being

16   singled out, that we need to try to

17   talk to somebody about the merit

18   issue.

19       Q.      And what did you do?

20       A.      What did I do?

21       Q.      What did you do then?

22       A.      Just hung up.

23       Q.      This was a telephone

54

1    conversation you had with Shane

2    Fulmer?

3        A.    Yes, sir.  Yes, sir.

4        Q.    When was that telephone

5    conversation?

6        A.    That evening.

7        Q.    The same evening you had

8    spoken to the sheriff?

9        A.    Yes, sir.

10        Q.    And then what did you do?

11        A.    I guess went to work.  I

12    think I was working that evening.

13        Q.    Working that night?

14        A.    Yes, sir.

15        Q.    Probably that afternoon

16    is when you spoke with the sheriff.

17        A.    Yes, sir.

18        Q.    Then you had your

19    telephone conversation with Shane

20    Fulmer?

21        A.    Yes, sir.

22        Q.    And then what happened?

23        A.    Just went to work.

1      Q.     Okay.  Did you bring the

2   issue back up with anyone?

3      A.     I'm sure I did.  I don't

4   recall who all I talked to about it

5   but I'm sure I did.

6      Q.     Who was the next person

7   you spoke with?

8      A.     I don't even recall.

9      Q.     Okay.  What was the next

10  thing that happened?

11     A.     I'm trying to think.

12          MR. YAGHMAI:  When we get

13  to a good stopping point, can we take

14  a quick break?

15          MR. SHEEHAN:  Sure.

16  Let's just finish this line of

17  questioning.

18     A.     When you say the last

19  thing that happened, in regards to

20  what?

21     Q.     This issue about you not

22  being able to drive your car.  And

23  the follow-up about---

1        A.    Oh, I had to start---

2        Q.    The follow-up of the

3   merit system.

4        A.    Well, I had to start

5   leaving my car at the jail and drive

6   back and forth.  And I believe it was

7   the next week, maybe, that Shane

8   spoke to one of the county

9   commissioners about the merit system.

10       Q.    Did you go with him?

11       A.    No, sir.

12       Q.    Did you speak to any of

13  the county commissioners?

14       A.    No, sir.

15       Q.    Did you speak to anyone

16  about the merit board?

17       A.    Yes, sir.  It was brought

18  up amongst--- I guess basically just

19  about all the employees.

20       Q.    When did you first speak

21  to someone about the merit system

22  board after this conversation---

23       A.    Oh, after that particular

1  conversation?

2      Q.    Please, sir.

3      A.    I guess it would probably

4  be, oh, I'm not even sure which

5  coworker it was, but I'm sure I

6  talked to a couple of them about it

7  because I had what I thought to be a

8  legitimate gripe but yet I had

9  nowhere to go with it.

10     Q.    Did you talk to anyone at

11  the County Commission about it?

12     A.    No, sir, I didn't.

13     Q.    Did you ever talk to

14  anyone at the County Commission about

15  the merit board?

16     A.    After I was fired, yes,

17  sir.

18     Q.    But before you were

19  fired, did you ever speak to anyone

20  at the County Commission?

21     A.    No, sir.  I don't recall

22  speaking to anybody at the County

23  Commission before I was terminated.

1        Q.      Did you ever tell anyone

2    other than Shane Fulmer about your

3    conversation with Sheriff Davis that

4    afternoon concerning your vehicle and

5    the merit board?

6        A.      I possibly have.  Could

7    have.  But I mean it's probably

8    somebody on my shift or something

9    like that but I don't remember

10   exactly who it was.  But I'm sure I

11   probably did.

12       Q.      Can you give me the name

13   of anyone you discussed the

14   conversation with Sheriff Davis that

15   you had that afternoon concerning the

16   vehicle and the merit board?

17       A.      I can't.  Honestly I

18   can't recall who it would have been

19   but I'm sure I did.

20       Q.      Did you discuss it with

21   anyone up the chain the command?

22       A.      After I proceeded with

23   the sheriff, not that I recall.

1        Q.      Did you discuss it with

2   anyone at the AG's office?

3        A.      I brought it up at the

4   AG's office.  Yes, sir.

5        Q.      When did you first

6   present it to the Attorney General's

7   office?

8               MR. YAGHMAI:  About the

9   patrol car?

10       Q.      About the patrol car and

11  the conversation you had about the

12  merit board.

13       A.      Oh, when I first met with

14  them, I put that in there about

15  showing what all I thought was wrong

16  and I just told them what all went on

17  in my eyes, anyway.  So I mean that

18  wasn't an actual complaint, about not

19  being able to drive the patrol car

20  home, to the Attorney General's

21  office.

22       Q.      Did you ever tell the

23  Attorney General's office about the

1    patrol car and not being able to use

2    it?

3         A.    Oh, yes, sir.

4         Q.    When did you first tell

5    the Attorney General's office?

6         A.    I guess it was--- I want

7    to say probably two or three weeks

8    after I was terminated that I went---

9         Q.    Before you were

10   terminated, had you spoken to anyone

11   at the Attorney General's office?

12        A.    Yes, sir.

13        Q.    And who was that?

14        A.    I sent the e-mail.  I

15   sent the e-mail to Troy King and in

16   response, Troy King sent me an e-mail

17   back and then he assigned it to I

18   think the Chief Investigator, Chris

19   Browning.

20        Q.    And did you tell Chris

21   Browning about the problem you had

22   with not being able to drive the

23   patrol vehicle back and forth from

1    your home?

2         A.      That really wasn't the

3    issue why I called him.

4         Q.      But did you ever tell

5    Chris Browning that Sheriff Davis had

6    instructed you not to drive the

7    patrol vehicle from your home to the

8    office?

9         A.      I probably did.  I

10   mean---

11        Q.      When did you first tell

12   him about that or anyone at the

13   Attorney General's office?

14        A.      I'm trying to think.  It

15   was probably two weeks after we got

16   terminated.

17        Q.      But before you were

18   terminated, did you ever bring up the

19   fact that you had been advised in

20   this conversation with Sheriff Davis

21   that you could not use your patrol

22   vehicle as you wished?

23        A.      To the AG's office.

1    Q.    Yes.

2    A.    No, sir.

3    Q.    Did you ever tell the

4    Attorney General's office about your

5    conversation in Sheriff Davis's

6    office concerning the merit board?

7    A.    Yes, sir.

8    Q.    When did you first do

9    that?

10    A.    I guess that would be the

11    second week after we was terminated.

12    Q.    Before you were

13    terminated, did you ever tell anyone

14    other than Shane Fulmer about this

15    conversation that you had with

16    Sheriff Davis in his office in which

17    you discussed not being able to use

18    the vehicle as you wished and the

19    merit board?

20    A.    Oh, I'm sure I did.

21    Q.    Who and when?

22    A.    That would be just the

23    group of coworkers.  Just like I said

1    before.

2         Q.     But can you give me the

3    name of anyone that you spoke with

4    other than Shane Fulmer about your

5    problem with not being able to use

6    your vehicle and the merit board?

7         A.     As far as the merit board

8    goes, same--- same people that I

9    brought up before.  Mike Poe.

10   Captain Steve Tate.  Champ Benson.

11   Shane Aldridge.  Gerald Purvis.  I'm

12   sure I even probably discussed it

13   with Eric Price about the merit

14   system.  All of those were concerns

15   with the merit issue because we had a

16   new sheriff coming in also so

17   everybody was wondering, you know,

18   because years in previous past the

19   new sheriff without the merit board

20   would sometimes come in and clean

21   house, so it was weighted on

22   everybody's mind.

23        Q.     What I'm trying to find

1    out is, when did you discuss with

2    anyone this conversation that you had

3    with Sheriff Davis about not being

4    able to use your vehicle as you

5    wished and the merit board?

6        A.      The merit board was

7    before all that.

8        Q.      What I'm trying to find

9    out is, did you discuss this

10   conversation that you had with

11   Sheriff Davis with anyone.

12       A.      I know I did Shane and I

13   may have with another coworker like I

14   said, but I can't recall who that

15   would be but I mean I'm probably sure

16   I did.

17       Q.      And what did they say?

18       A.      I can't recall because I

19   can't recall who it was that I spoke

20   to.

21       Q.      So you've now told me, if

22   I'm clear, that the only person you

23   discussed this meeting with Sheriff

1    Davis about not being able to use

2    your vehicle as you wished and the

3    merit board was Shane Fulmer.

4         A.    No, sir.

5              MR. YAGHMAI:   That's not

6    what he said.  He said a couple of

7    other coworkers that he couldn't

8    remember.

9         Q.    That's what I'm trying to

10   find out.  Who else was it that you

11   discussed this with?

12        A.    Like I said earlier, I

13   don't recall.  Because we all just

14   stand around and, you know, just

15   talk.  It's just amongst all our

16   coworkers.  So I can't actually

17   pinpoint exactly who it was that I

18   said it to.  But like I said before,

19   I'm sure I did.

20        Q.    Can you tell me when you

21   had these discussions?

22        A.    Well, about the merit

23   issue, that's been going on since---

1    Q.    I'm talking about the

2  conversation you had with Sheriff

3  Davis that afternoon.

4    A.    It would be that

5  afternoon and then I guess the next

6  day or two afterwards.

7    Q.    Any other time?

8    A.    Not that I recall.

9    Q.    And you say you got an

10 e-mail back from the Attorney

11 General.

12    A.    Yes, sir.

13        MR. SHEEHAN:  And if you

14 want to take a break, I'll look at

15 that.

16        MR. YAGHMAI:  Is that the

17 letter you're talking about?

18        MR. SHEEHAN:  I think he

19 said an e-mail.

20        THE DEPONENT:  I'm sorry,

21 but that was his reply back.  It come

22 in the mail.  That is the reply back

23 to my e-mail.

```
 1              (Recess, 9:53-10:05 a.m.)

 2       Q.      We've taken about a 10 or

 3  15 minute recess and we're back on

 4  the record.

 5              When did you first learn

 6  that there was a Chilton County Merit

 7  Board to be appointed?

 8       A.      I guess it was--- I guess

 9  right after it got done.  Whatever

10  year that was.  Because Shane was

11  telling me that they was getting that

12  worked out.

13       Q.      I'm sorry, can you give

14  me just an approximate year?

15       A.      I don't remember.

16              MR. YAGHMAI:  If you

17  know.

18       A.      Around '04?  2004.

19       Q.      Fair enough.  And what

20  did Shane Fulmer tell you about the

21  merit board in 2004?

22       A.      He just said that they

23  were--- they had just gotten a bill
```

1    passed where the employees of the

2    county were protected if a new

3    sheriff came in.

4        Q.    What else did Shane

5    Fulmer tell you back in 2004?

6        A.    That's about all I

7    recall.  That was just the main---

8    main point of it.

9        Q.    And did you ever have any

10   discussion with anyone else other

11   than Shane Fulmer after that

12   conversation back in 2004 about the

13   merit board?

14       A.    After 2004?

15       Q.    Please, sir.

16       A.    Yes, sir.

17       Q.    And with whom?

18       A.    There again with the

19   whole group of people there at the

20   Sheriff's Department.

21       Q.    And who at the Sheriff's

22   Department did you have discussion

23   after 2004 about the merit board?

```
 1        A.      After 2004, it would be

 2   there again Chief Deputy Mayfield,

 3   Captain Steve Tate.  Mike Poe.  Champ

 4   Benson.  Shane Aldridge.  And I'm

 5   sure there's other ones that I don't

 6   recall.

 7        Q.      And when did you have

 8   this discussion?

 9        A.      I can't recall particular

10   dates.  It was mainly after Sheriff

11   Davis came in office.

12        Q.      You mean two thousand---

13        A.      When did he come into

14   office?

15              MR. YAGHMAI:  Let him ask

16   you questions.

17        A.      I guess--- I guess he got

18   elected in '07.  For the '07 year.

19        Q.      So between the time that

20   you spoke with Shane Mayfield in 2004

21   until after Kevin Davis was elected,

22   you had no discussion about a merit

23   board?
```

1    A.    I didn't speak with Shane

2  Mayfield in 2004.

3    Q.    I'm sorry, in 2004 you

4  spoke to Shane Fulmer.

5    A.    Yes, sir.

6    Q.    Between 2004 and the time

7  that Kevin Davis took office, had you

8  had any discussion with anyone about

9  the merit board?

10    A.    Yes, sir.

11    Q.    And who?

12    A.    The names I just gave you

13  because with an election coming up,

14  everybody is wondering, you know, is

15  our job secure, you know, that kind

16  of nature.

17    Q.    Who was it that you spoke

18  with?

19    A.    Chief Deputy Mayfield.

20  Mike Poe.  Champ Benson.  Shane

21  Aldridge.  I probably even said

22  something to Sergeant Smitherman.

23  And probably several others that I

1    can't recall the names.

2         Q.       And what did you tell

3    them?

4         A.       Well, you know, a lot of

5    them were just wondering if when the

6    new sheriff is coming, could he, just

7    like previous sheriffs, have

8    everybody, you know, at their

9    disposal.  Everybody was wondering

10   that.  And everybody was like, well,

11   no, there's a merit bill now so we

12   ought to be protected from it.

13        Q.       And did you perform any

14   investigation to determine whether

15   the merit board had been established?

16        A.       Did I?

17        Q.       Yes, sir.

18        A.       No, sir.

19        Q.       Did you have any

20   discussion about whether there was a

21   merit system board in place?

22        A.       I asked Shane Fulmer if

23   there was one and like he said back

1    in 2004, I believe it was, that there

2    was a merit bill passed.

3        Q.    Well, what did Shane

4    Fulmer say when you asked him about

5    whether there was a merit board in

6    place?

7        A.    The merit board, it was

8    basically--- when we say "merit

9    board", it's like the actual board is

10   not created.  But it's like more or

11   less the merit bill, that there is a

12   bill there that protects all the

13   employees of the county but the merit

14   board has not--- wasn't set up.

15       Q.    And why not?

16       A.    Why not?  I couldn't

17   answer that.

18       Q.    Did you try to find out

19   why it had not been set up?

20       A.    No, sir.

21       Q.    Did you talk or did---

22   did you talk to Shane Fulmer as to

23   why the merit system board had not

1    been put in place?

2        A.    I'm sure I did.

3        Q.    What did he say?

4        A.    I don't even recall.

5        Q.    Did you have any

6    understanding as to whether or not a

7    board had been established?

8        A.    The understanding that I

9    had, the board had not been

10   established.

11       Q.    And how did you know the

12   board had not been established?

13       A.    Because we had nobody to

14   go to.

15       Q.    When did you first ask

16   about who to go to?

17       A.    The first time I asked

18   about who to go to on issues

19   concerning me was I guess when I went

20   through the chain of command about

21   the patrol car.

22       Q.    About not being able to

23   use your patrol car to drive back and

1    forth from your home?

2            A.      Yes, sir.  Yes, sir.

3            Q.      Had there been any

4    discussion about whether there was a

5    merit board in place before you got

6    concerned about not being able to use

7    your patrol car as you wished?

8            A.      Yes, sir.

9            Q.      And who was that with?

10           A.      Shane Fulmer.

11           Q.      And when was that?

12           A.      Sometime that late

13   winter, spring, I believe it was,

14   when he got demoted from the Captain

15   down to the Courthouse Security.

16           Q.      And what did he say?

17           A.      I asked him, you know, I

18   said, the way I understand it, that

19   we have a merit system.  Shouldn't

20   that, you know, if you get demoted or

21   anything, shouldn't there be some

22   type of due process.  And Shane said

23   there should be.  He said there

1    should be some type of way to--- I'm

2    trying to remember what was exactly

3    said.  See if there was a way to go

4    and I guess present your disagreement

5    with what's going on.

6        Q.    And what did you say?

7        A.    What did I tell him?  I

8    said yeah, that I would do the same

9    thing.  If I felt like I was doing my

10   job but yet got demoted for no

11   apparent reason, then I would--- I

12   would pursue that.

13       Q.    And what did Shane Fulmer

14   say?

15       A.    I can't recall exactly

16   what was said but I'm sure something

17   to the extent that he would check

18   into it.

19       Q.    And what did you say?

20       A.    I agreed with him.

21       Q.    Agreed with him what?

22       A.    About checking into it.

23       Q.    What did Shane Fulmer

```
1    tell you after he checked into it?

2         A.    I believe it was, you

3    know, there's no board.  No board was

4    created yet, even though the merit

5    bill had passed, but he would talk to

6    the commissioners and see what needed

7    to be done or should be done to

8    implement the merit board since the

9    merit bill had been passed.

10        Q.    What else did Shane

11   Fulmer say?

12        A.    I can't recall.  Just

13   basically along those lines.  Just

14   checking in to see what he needed to

15   do to be able to present his

16   disagreement, I guess, with being

17   demoted.

18        Q.    What did you say?

19        A.    There again, I told him I

20   would do the same thing.

21        Q.    Did Shane Fulmer get back

22   with you?

23        A.    Yes, sir.
```

1    Q.    When?

2    A.    When?  Sometime over the

3  summer, I guess, when he said he

4  checked the merit bill, read the

5  merit bill, and it stated in there

6  something about if you got demoted,

7  fired, terminated or suspended or

8  something, that there's a due process

9  or some type of way if you get

10 disciplined that you can go in front

11 of the board and present your case

12 within so many days or something like

13 that to the effect to they would hear

14 your case and decide on it, I guess.

15    Q.    And what did you say?

16    A.    I don't recall.  I guess

17 I just said okay.

18    Q.    And did you follow up?

19    A.    Follow up on what?

20    Q.    With what Shane Fulmer

21 was telling you.

22    A.    Oh, he would--- I guess

23 he would call.  He and I would talk.

78

1    I guess it was toward the fall when

2    he went and talked to one of the

3    commissioners about the merit system.

4        Q.    And who did he go talk

5    to?

6        A.    I believe it was Wayne

7    Caton and also I think it was John

8    Hollis Jackson.

9        Q.    And where did he have

10   this conversation?

11       A.    I believe it was at their

12   office.  I'm not sure.

13       Q.    Whose office?

14       A.    I believe it was at John

15   Hollis Jackson's office.

16       Q.    And what was your

17   understanding of what took place in

18   that meeting?

19            MR. YAGHMAI:  If you

20   know.

21            MR. SHEEHAN:  That's a

22   good question.  I mean did you have

23   enough interest to follow up on that?

1          MR. YAGHMAI:   Object to

2    the form.  Wait a minute.

3        A.    I mean---

4          MR. YAGHMAI:   We've

5    got---

6          MR. SHEEHAN:  Why don't

7    we do this.  I think under federal

8    rules and state rules, you can object

9    to the form of the question under

10   usual stipulations.  Is that fair?

11         MR. YAGHMAI:   That's fair

12   but you're asking him two different

13   questions and you're asking him the

14   same question ten times, but I'll

15   object properly now.  Let's go ahead.

16       Q.    What was your

17   understanding of what took place in

18   this meeting with Shane Fulmer?

19       A.    All Shane told me was

20   after he had talked with Jackson and

21   Mr. Caton, that Mr. Caton was going

22   to bring up the issue at the next

23   commissioner's meeting.

| | |
|---|---|
| 1 | Q.      Did he say anything else? |
| 2 | A.      No, sir.  Not that I |
| 3 | recall. |
| 4 | Q.      Did you have any other |
| 5 | discussions about the board? |
| 6 | A.      During--- |
| 7 | Q.      During this time when |
| 8 | Shane Fulmer was talking to Wayne |
| 9 | Caton and John Hollis Jackson. |
| 10 | A.      I'm sure I did, probably. |
| 11 | Q.      And what was that about? |
| 12 | A.      Basically what I've been |
| 13 | saying.  I mean just in general, that |
| 14 | we don't--- the merit bill is passed |
| 15 | but we do not have a board to be able |
| 16 | to go to.  So that's why Shane went |
| 17 | to those two people there to see |
| 18 | about what is the next step. |
| 19 | Q.      And why do we not have a |
| 20 | board? |
| 21 | A.      I guess because the |
| 22 | people wasn't appointed to the board. |
| 23 | I know Sheriff Fulmer, he appointed a |

1    board member.

2         Q.    Who was that, sir?

3         A.    Scotty Wells.

4         Q.    And when did he appoint

5    Scotty Wells?

6         A.    I'm not sure on the date.

7         Q.    And who told you this?

8         A.    Scotty himself.

9         Q.    And where was Scotty when

10   he told you this?

11        A.    At the football game in

12   Jemison.

13        Q.    When was this, sir?

14        A.    It was in the fall of

15   '07.

16        Q.    And who was present

17   besides you and Scotty Wells?

18        A.    Just Scotty and I.

19        Q.    And what game was that?

20        A.    The Jemison football

21   game.  I was working a part-time

22   shift that evening.

23        Q.    Who was playing that

```
 1   night?

 2        A.      I wasn't even paying

 3   attention.

 4        Q.      And what did Scotty tell

 5   you?

 6        A.      He asked me what I had

 7   been up to and he had heard that I

 8   had gotten fired and I said yeah.  I

 9   said there ought to be some type of

10   stipulation or something about the

11   merit board being put in place and

12   that's when he said well, when I

13   worked at the Sheriff's Department, I

14   was Sheriff Fulmer's pick about being

15   his part of the merit board.  His

16   pick or whatever.

17        Q.      What else did Scotty

18   Wells say there at that football

19   game?

20        A.      That's basically about it

21   because the game was going on and

22   there was a large crowd and I was on

23   duty that night.
```

1    Q.    Other than this

2   conversation with Scotty Wells, have

3   you had any discussion with anyone

4   else as to who Sheriff Fulmer's pick

5   was?

6    A.    Probably with Shane.  I'm

7   sure I probably told somebody else

8   but I can't recall who I told but I'm

9   sure I probably did.

10    Q.    And when did you have

11   this conversation with Shane Fulmer?

12    A.    I guess it would probably

13   be--- probably around the time that

14   we got terminated.

15    Q.    And what did Shane say?

16    A.    That his daddy had picked

17   somebody for the merit board.

18    Q.    What else did he say?

19    A.    That's basically all that

20   I recall.

21    Q.    And what did you say?

22    A.    I guess my response, I

23   replied back that the County

1    Commission failed on their part.

2        Q.    What did Shane Fulmer

3    say?

4        A.    I don't recall.

5        Q.    Did you say anything

6    else?

7        A.    No, sir.  Not that I

8    recall.

9        Q.    Did you go to anyone at

10   the County Commission about this

11   appointment?

12       A.    No, sir.  No, sir.

13       Q.    How many times have you

14   spoken to anyone at the Attorney

15   General's office?

16       A.    I'd probably say six to

17   ten.  Somewhere up to that

18   neighborhood, maybe.

19       Q.    Where were these

20   conversations taking place?

21       A.    One conversation was at

22   the AG's office.  The other had been

23   by phone.

1    Q.    And when did you meet at

2  the Attorney General's office?

3    A.    I guess it was about two

4  weeks, maybe, after we were

5  terminated.

6    Q.    And who met there?

7    A.    Shane, myself, Chief

8  Investigator Browning, and I can't

9  remember--- I can't recall the other

10  guy's name.

11    Q.    Who was the other guy

12  with?

13    A.    AG's office.

14    Q.    An investigator?

15    A.    Yes, sir.

16    Q.    Where was this meeting

17  actually held?  What location, there

18  in Montgomery?

19    A.    Yes, sir.  At the AG's

20  office.

21    Q.    Did they tape record the

22  meeting?

23    A.    Not that I'm aware of.

1    Q.    Are you aware of any tape

2  recordings or videotapes about any of

3  the issues in this lawsuit?

4    A.    No, sir.

5    Q.    Do you know if anyone has

6  tape recorded any conversations with

7  anyone?

8    A.    No, sir.

9    Q.    I'm sorry, poor question.

10  Has anyone tape recorded anything to

11  your knowledge?

12    A.    To my knowledge, no, sir.

13    Q.    Did you give a written

14  statement to anyone at the Attorney

15  General's office?

16    A.    I sent an e-mail.

17    Q.    We've already looked at

18  that.

19    A.    Yes, sir.  You have the

20  e-mail.

21    Q.    So just one e-mail?

22    A.    Yes, sir.

23    Q.    And that's all?

```
 1        A.      Yes, sir.

 2        Q.      Have you ever sworn to

 3   anything?

 4        A.      No, sir.

 5        Q.      Has anyone ever asked you

 6   to take an oath as to your claims?

 7        A.      No, sir.

 8        Q.      What is it that you are

 9   claiming that Kevin Davis has done

10   illegally?

11        A.      It would be ethics

12   violations.

13        Q.      Anything else?

14        A.      No, sir.  That's

15   basically it.

16        Q.      Okay.  What ethics

17   violations are you claiming that have

18   been committed by Kevin Davis?

19        A.      Doing business with his

20   wife's kennel, and also business with

21   HeadCo.

22        Q.      And what is your claim of

23   unethical conduct with respect to
```

# EXHIBIT 1
# (PART 2)

1    doing business with the kennel?

2         A.    That is a, to my

3    understanding, that is a business

4    that his wife owned.  With he and her

5    being married, if he's doing business

6    through his wife's company,

7    therefore, he's also gaining monies

8    out of the transactions.

9         Q.    What is the unethical

10   conduct?

11              MR. YAGHMAI:  Wait a

12   minute.  I just object to the form.

13   It may call for a legal conclusion.

14              MR. SHEEHAN:  Do we have

15   usual stipulations?

16              MR. YAGHMAI:  Let me

17   finish my objection but then you can

18   say whatever you want to.

19              MR. SHEEHAN:  Let me just

20   say if we have the stipulation, we

21   have the stipulation, and that is not

22   to make any comment other than you

23   can object to the form of the

1  question.  If you want to get the

2  judge on the line, I'll be glad to

3  get the judge on the line.

4          MR. YAGHMAI:  You can do

5  whatever you want to.  I'm trying to

6  state my objection of what the form

7  of the question is.  I'm trying to

8  explain what the form of the question

9  is.

10          MR. SHEEHAN:  That's

11  improper under the rules.

12          MR. YAGHMAI:  Do whatever

13  you want to do.  That's fine.  All

14  I'm saying---

15          MR. SHEEHAN:  We can

16  adjourn and get a ruling from a

17  magistrate and but I think under the

18  usual stipulations, you're entitled

19  to object to the form of the question

20  and that's all.

21          MR. YAGHMAI:  Let me

22  finish my objection and then I'll---

23          MR. SHEEHAN:  I think you

1    stated that you objected to the form.

2    If you want to coach your witness---

3              MR. YAGHMAI:  I'm not

4    trying to coach my witness.  All I'm

5    saying is object to the form of the

6    question because it calls---

7              MR. SHEEHAN:  It's so

8    stated.  It's so stated.

9              MR. YAGHMAI:  I'm not

10   going to let you interrupt me.  If

11   you want to state whatever you want

12   to, that's fine.  I'm objecting to

13   the form because you're asking a

14   question that is not a proper

15   question because you're asking for

16   some sort of legal conclusion.  And

17   you can answer the question.  I'm not

18   trying to coach anybody.  Trust me.

19   There's no coaching going on.  The

20   e-mail says what the e-mail says.  I

21   mean there's no changing that.  You

22   can answer his question.

23             THE DEPONENT:  Can you

1    repeat the question, sir?

2         Q.    Sure.  What unethical

3    conduct do you contend has been

4    committed by Kevin Davis?

5              MR. YAGHMAI:  Object to

6    the form.  You can answer.

7         A.    Using public office for

8    personal gain.

9         Q.    Anything else?

10        A.    No, sir.

11        Q.    How has he used public

12   office for personal gain?

13        A.    There again, doing

14   business transactions from the

15   Sheriff's Department to businesses

16   that his wife owns.

17        Q.    What transactions?

18        A.    Purchases of dogs.

19   Supplies.  And maybe some--- see,

20   dogs, supplies and fuel.

21        Q.    Anything else?

22        A.    Not that I can think of.

23        Q.    The report or statement

```
 1   that you gave the investigator---

 2        A.      Mmm hmm.

 3        Q.      Did it include any of

 4   those items?

 5        A.      Yes, sir.  I got in there

 6   where it's stated that he's doing

 7   business with the dog training

 8   facility, Central Alabama K9, and

 9   also dealings with HeadCo gas station

10   in Clanton.

11        Q.      And what business was he

12   doing with the training facility that

13   was unethical?

14        A.      Purchasing dogs, in my

15   opinion.  And also hiring his wife,

16   which is the owner of the canine

17   place, to do the training.

18        Q.      Anything else?

19        A.      Not that I can think of.

20        Q.      And what dogs did he

21   purchase?

22        A.      When I was here, Eric

23   Smitherman got a new dog and I can't
```

```
 1    even recall the name.  I can't recall

 2    the name of the dog.

 3         Q.     Anything else other than

 4    Eric Smitherman getting a new dog?

 5         A.     Also I think one time

 6    somebody said that when the gas pumps

 7    are messed up at the jail, we had to

 8    get gas at HeadCo.

 9         Q.     Anything else?

10         A.     I think dog supplies and

11    food came through HeadCo.

12         Q.     What dog supplies came

13    through HeadCo?

14         A.     I believe like leashes.

15    Just supplies for the dog.  Training

16    leashes.

17         Q.     What other than training

18    leashes?

19         A.     That I'm aware of?  Dog

20    food.

21         Q.     Anything else?

22         A.     Not that I'm aware of.

23         Q.     What training leashes are
```

1    we talking about?

2         A.    Just a training leash

3    that they, you know, walk the dog

4    with.  It's like a handler's leash, I

5    believe it is.

6         Q.    You're saying that a

7    handler's leash was purchased?

8         A.    Yes, sir.

9         Q.    And that's your

10   complaint?

11        A.    Yes, sir.  Through

12   HeadCo.

13        Q.    And what's your

14   contention with respect to the dog

15   food?

16        A.    It has been bought

17   through HeadCo also.

18        Q.    And what dog food is

19   being purchased?

20        A.    I don't know what brand

21   or whatever.

22        Q.    How is--- when was this

23   dog food purchased?

1      A.      I don't know the actual

2   date.

3      Q.      Just approximate.  As you

4   sit here today, your best

5   recollection.

6      A.      I guess it would be

7   during the summer maybe or close to

8   fall, somewhere through there.

9      Q.      What year?

10     A.      '07.

11     Q.      And when was this

12  handler's leash purchased?

13     A.      Around about the same

14  time.

15     Q.      Anything else improper

16  with respect to dog supplies?

17     A.      Not that I'm aware of.

18     Q.      How much dog food was

19  purchased?

20     A.      I don't know.

21     Q.      Where did you get the

22  information that dog food was

23  purchased?

1       A.      Sherry Tate.

2       Q.      And who is Sherry Tate?

3       A.      She is a--- I guess like

4  a receptionist for the Sheriff's

5  Department.

6       Q.      Is she a friend of yours?

7       A.      Yes, sir.

8       Q.      Is she a friend of Shane

9  Fulmer?

10      A.      Yes, sir.

11      Q.      How long have you known

12 Sherry Tate?

13      A.      I've known Sherry all my

14 life.

15      Q.      Did y'all go to school

16 together?

17      A.      No, sir.

18      Q.      And how do you happen to

19 know her all your life?

20      A.      She's like my mom's first

21 cousin so I guess that would make her

22 my second cousin.

23      Q.      And what did Sherry Tate

1    tell you?

2         A.      I believe I was telling

3    her one day when I was in the office

4    that--- let's see.  I told her that I

5    didn't think it was right that we're

6    buying dogs through Central Alabama

7    K9 and she said well, I don't know

8    but we're getting the food through

9    HeadCo and the leashes through

10   HeadCo.

11        Q.      Who was present during

12   this conversation?

13        A.      No one.

14        Q.      And where was this

15   conversation?

16        A.      Sheriff's Office.

17        Q.      At the jail or here at

18   the courthouse?

19        A.      Courthouse, sir.

20        Q.      And what else did Sherry

21   tell you?

22        A.      There was also some

23   furniture purchased that was sent out

```
 1    to Mr. Davis's residence.

 2         Q.     What furniture was

 3    purchased and sent to Mr. Davis's

 4    residence?

 5         A.     She didn't--- she didn't

 6    name.

 7         Q.     How much furniture was

 8    purchased and sent to Mr. Davis's

 9    residence?

10         A.     She didn't dwell on it.

11         Q.     And did you try to follow

12    up?

13         A.     No, sir.

14         Q.     Why not?

15         A.     Sir?

16         Q.     Why not?

17         A.     I just didn't.

18         Q.     Who did you report this

19    unethical conduct to?

20         A.     Attorney General's

21    office.

22         Q.     Did you go to your

23    supervisor and report it?
```

```
 1        A.      No, sir.

 2        Q.      Did you report it to

 3   Captain Tate?

 4        A.      No, sir.

 5        Q.      Why not?

 6        A.      Why not?

 7        Q.      Please, sir.

 8        A.      Because I wanted to be

 9   quiet about it.  Because I felt like

10   if something was going on, like my

11   e-mail states, I felt like there

12   would be some type of retaliation.

13        Q.      Why did you think that?

14        A.      That's just how the

15   political game plays.

16        Q.      Did you go and tell the

17   sheriff that you thought he was

18   committing unethical acts or illegal

19   acts?

20        A.      No, sir.

21        Q.      Why not?

22        A.      I wasn't going to tell

23   him what I thought was going on
```

```
 1   because if he thought--- I felt like

 2   if he knew that I knew what might be

 3   going on, that he might try to punish

 4   me with some form of retaliation and

 5   I wasn't going to go that route.

 6        Q.     He was your boss; wasn't

 7   he?

 8        A.     Yes, sir.

 9        Q.     Why didn't you go up the

10   chain of command and try to report

11   this unethical conduct?  You were a

12   law enforcement officer, correct?

13        A.     Yes, sir.  Mmm hmm.

14        Q.     So what did you do about

15   it?

16        A.     Sent an e-mail to the

17   Attorney General's office.

18        Q.     Well, why didn't you go

19   through the system?

20        A.     I didn't want to go

21   through the system.

22        Q.     Why not?

23        A.     Because I feared
```

1    retaliation.  That's why.

2        Q.    Was there any basis for

3    your feeling there might be

4    retaliation?

5        A.    Well, he had already took

6    Shane from a Captain down to

7    Security, so there was no telling

8    what I felt like he might do to me.

9        Q.    And why did you feel it

10   was necessary to go to the Attorney

11   General and not the County

12   Commissioner?

13       A.    At the time I didn't

14   think the County Commission could do

15   anything about it.

16       Q.    Did you go to John Hollis

17   Jackson, the County Attorney, and

18   tell him?

19       A.    No, sir, I did not.

20       Q.    Why not?

21       A.    I just didn't.

22       Q.    You just went to the

23   Attorney General's office?

1        A.      Yes, sir.

2        Q.      And that's all you did?

3        A.      Yes, sir.

4        Q.      You didn't work through

5    the chain of command?

6        A.      No, sir.

7        Q.      Other than Sherry Tate,

8    did you tell anyone else about this

9    unethical conduct by Kevin Davis?

10       A.      There was several

11   employees that discussed I guess

12   purchasing the dogs through Central

13   Alabama K9.

14       Q.      Who was that, sir?

15       A.      Mike Poe.  I even

16   mentioned it to Captain Steve Tate.

17   All these were like--- there wasn't

18   no meeting or anything like that.  It

19   was just like informal, like just a

20   group of guys.

21       Q.      When did you have this

22   discussion with Mike Poe?

23       A.      It will be sometime

```
 1    around the summer when the dogs were

 2    purchased.

 3         Q.    And what did Mike Poe

 4    say?

 5         A.    He didn't understand it

 6    either.

 7         Q.    What did you say?

 8         A.    I said yeah, I don't

 9    think it's right.

10         Q.    What did Mike Poe say?

11         A.    Same thing.

12         Q.    What did you say then?

13         A.    I guess it about ended

14    then.  There wasn't no---

15         Q.    What did you say to

16    Captain Tate?

17         A.    I asked him were we

18    getting supplies through HeadCo and

19    he said yes.  And I said well, I

20    don't understand how we can--- how

21    the sheriff can do business with his

22    wife's company because--- in that

23    position, it seems like it's
```

```
 1  unethical because she owns the

 2  business and if she's making money

 3  off the Sheriff's Department, in

 4  turn, he still benefits from it.

 5         Q.    Did you say anything else

 6  to Steve Tate?

 7         A.    Not that I recall.

 8         Q.    What did Steve Tate say?

 9         A.    All he said was he didn't

10  understand.

11         Q.    Did you have a discussion

12  with anyone else other than Mike Poe

13  and Captain Tate?

14         A.    I'm sure I did but I

15  can't recall who it might be.

16         Q.    Did anyone else make any

17  comment about any unethical conduct

18  by Kevin Davis?

19         A.    Shane Fulmer.  That's

20  basically about all I recall.

21         Q.    What did Shane Fulmer

22  say?

23         A.    He felt the same way that
```

```
 1    I did, just doesn't seem right how

 2    you can do business with your wife's

 3    company.  That because of the

 4    position that you're in, you're going

 5    to benefit from it somehow.

 6        Q.      Did Shane Fulmer say

 7    anything else?

 8        A.      Not that I recall.

 9        Q.      What did you tell Shane

10    Fulmer?

11        A.      I just told him I felt

12    the same way.

13        Q.      Did you tell him that you

14    had had a conversation with Ms. Tate?

15    Sherry Tate.

16        A.      Yes, sir.

17        Q.      And what did Sherry

18    Tate---

19        A.      I'm sorry.

20        Q.      What did you say about

21    Sherry Tate?

22        A.      Basically the same thing.

23    If that was going on, there should be
```

1    some type of issue there.

2         Q.     What did he recommend

3    that y'all do?

4         A.     He didn't recommend

5    anything to me.

6         Q.     He was an law enforcement

7    officer; wasn't he?

8         A.     Yes.

9         Q.     What did he recommend

10   y'all do as law enforcement officers?

11        A.     He didn't recommend.   I

12   told him that I was going to shoot

13   the Attorney General's office an

14   e-mail to see if that was ethical or

15   not.

16        Q.     Is that when this

17   conversation with Shane Fulmer took

18   place?

19        A.     Yes, sir.

20        Q.     And what did you do after

21   this conversation with Shane Fulmer?

22        A.     I guess after that took

23   place, I guess that's when I did the

1  e-mail.  Somewhere along the line in

2  that time frame there.

3      Q.     That day?

4      A.     No, sir.  Not that day.

5      Q.     The next day?

6      A.     No, sir.

7      Q.     When?

8      A.     Just like I said, I can't

9  pinpoint.  Just sometime during

10  that--- that late part of summer is

11  when I did it.

12      Q.     Did Shane Fulmer say

13  well, I've also e-mailed the Attorney

14  General's office?

15      A.     No, sir.

16      Q.     Did Shane Fulmer e-mail

17  the Attorney General's office?

18      A.     Not to my knowledge.

19      Q.     Did Shane Fulmer make any

20  written complaint to anyone?

21      A.     Not to my knowledge.

22      Q.     Have you asked him?

23      A.     No, sir.

1       Q.      Have you been present

2   with Shane Fulmer on other occasions

3   when he's discussed this unethical

4   conduct?

5       A.      The Attorney General's

6   office, and then I guess at the

7   house, you know, like visiting.  I go

8   by his house because we're family, or

9   just talking over the phone.

10      Q.      Have you discussed your

11  concerns about unethical conduct or

12  illegal conduct by Kevin Davis with

13  anyone other than Shane Fulmer?

14      A.      I'm sure I have.

15      Q.      Who is that?

16      A.      I don't recall exactly

17  who it would be but I'm sure I have.

18      Q.      I thought you wanted to

19  keep it quiet.

20      A.      Well, that's why I'm

21  saying I probably did.  I ain't going

22  to say that I did or I didn't.  I'm

23  sure I did but I can't---

```
 1        Q.      Who was it you spoke

 2   with?

 3        A.      That's what I'm saying I

 4   can't--- I know I told Mike Poe my

 5   concerns.  I told Steve Tate.  Of

 6   course Shane.  That's about all I can

 7   recall now.

 8        Q.      When did you tell Mike

 9   Poe?

10        A.      I guess after the time

11   the dog was purchased.

12        Q.      How soon after the dog

13   was purchased?

14        A.      I'm not even sure.

15        Q.      Are you talking about

16   days, hours, weeks, months?

17        A.      Probably I would say

18   about a month or two, I guess.

19        Q.      When did you have a

20   conversation with Steve Tate?

21        A.      It would be somewhere in

22   the same--- all those would be along

23   the same line.  Same time frame.
```

1      Q.      When was your

2   conversation with Sherry Tate in

3   reference to when you had your

4   conversation with Mike Poe and Steve

5   Tate?

6      A.      Probably within the

7   month.

8      Q.      Did you do any kind of

9   investigation to determine whether or

10  not there were supplies being sold?

11     A.      No, sir, I did not.

12     Q.      Did you perform any kind

13  of investigation to determine the

14  truth of any of these claims?

15     A.      No, sir, I did not.

16     Q.      Why not?

17     A.      I just did not.

18     Q.      I believe you acknowledge

19  that they're serious charges.

20     A.      Correct.

21     Q.      But you didn't perform

22  any follow-up to check it out before

23  making these serious claims?

1        A.        No, sir.  No, sir.

2        Q.        Why not?

3        A.        Because I didn't want to,

4    I guess like I said earlier, be

5    retaliated against.

6        Q.        Did you have conversation

7    with anybody other than we've already

8    discussed?  Steve Tate, Mike Poe,

9    Sherry Tate and Shane Fulmer.

10        A.        I may have.

11        Q.        Who?

12        A.        I can't recall.  That's

13   what I'm saying.  But I may have.

14        Q.        Is there anything that is

15   going to refresh your recollection at

16   a later time?

17        A.        Not that I know of.

18        Q.        Do you have any notes?

19        A.        I have a note--- I have

20   notes that I wrote down from the

21   discussion I had with Sheriff Davis

22   about the patrol car, and also the

23   notes from when I got fired.

```
 1        Q.      And where are they

 2   located?

 3        A.      I got a copy at home.

 4        Q.      And how many pages of

 5   notes do you have?

 6        A.      It's just one page each.

 7        Q.      One page each.  Who

 8   prepared these notes?

 9        A.      I wrote them down.

10        Q.      And when did you prepare

11   these notes?

12        A.      The day of my meeting

13   with the sheriff.

14        Q.      What did you use to

15   prepare these notes?

16        A.      My computer.

17        Q.      Is it on your computer?

18        A.      Yes, sir.

19        Q.      Are they handwritten are

20   or are they typed in?

21        A.      Typed in.

22        Q.      What type of computer do

23   you have?
```

1       A.      Oh, I guess it's a

2    Hewlett Packard.

3       Q.      How long have you had it?

4       A.      Oh, probably about I

5    guess two years, maybe.

6       Q.      And when did you prepare

7    these notes?  The same day that it

8    happened?

9       A.      I want to say it would be

10   somewhere along either the same day

11   or a day or two afterwards.

12      Q.      And why did you prepare

13   these notes?

14      A.      Why did I prepare them?

15   Because I felt like I was done wrong,

16   in case we could get the merit issue

17   solved.

18      Q.      And how much detail did

19   you go into in these notes?

20      A.      It's just an overview of

21   the conversation between the sheriff

22   and I.

23      Q.      And how many lines are on

1    this page concerning this

2    conversation with the sheriff?

3        A.    I couldn't give you an

4    answer on that.

5        Q.    Does it accurately

6    reflect your conversation with the

7    sheriff?

8        A.    Not word for word, no,

9    sir.  It's just an overview.

10        Q.    Is it more than one

11    paragraph?

12        A.    Yes, sir.  It's one page.

13        Q.    One complete page?

14        A.    Yes, sir.

15        Q.    And the other page that

16    you prepared was concerning what?

17        A.    One was--- one was my

18    termination and then the other one

19    was the conversation I had with the

20    sheriff about my patrol vehicle.

21        Q.    And this page that you

22    prepared concerning your termination,

23    that was on this Hewlett Packard

1    computer?

2         A.    I believe that's what it

3    is.  I could be wrong on the name

4    brand but I believe that's what it

5    is.

6         Q.    Sure.  How long have you

7    had this computer?

8         A.    Like I said, probably

9    about two years.

10        Q.    What kind of software

11   program do you have?

12        A.    I think it's got--- I

13   believe it's Microsoft XP, maybe.

14   Windows XP maybe.

15        Q.    The document that you

16   have concerning the termination, how

17   lengthy is it?

18        A.    About the same.  It's one

19   page.  One page for the termination

20   and one page for the patrol car.

21        Q.    And does this one page

22   accurately reflect what took place in

23   your termination?

1        A.      Not word for word, no,

2   sir.  Just an overview.

3        Q.      Your interpretation of

4   what took place.

5        A.      Yes, sir.

6        Q.      And these pages, they're

7   located on your computer?

8        A.      Correct.

9        Q.      And you could print those

10  off for your attorney?

11       A.      Yes, sir.

12       Q.      Could you do that for us?

13       A.      Yes, sir.

14              MR. SHEEHAN:  Why don't

15  we take a break and we'll mark those

16  as exhibits number 2 and 3 to your

17  deposition.

18              MR. YAGHMAI:  Are you

19  asking him to drive home and print

20  them off?

21              MR. SHEEHAN:  We're going

22  to have a break for lunch.  We'll do

23  it during lunchtime.

```
 1        Q.      This termination; tell me
 2   where that took place.
 3        A.      That took place at the
 4   jail.
 5        Q.      Who was present?
 6        A.      The sheriff and I.
 7        Q.      Anyone else?
 8        A.      No, sir.
 9        Q.      Was Shane Fulmer present?
10        A.      No, sir.
11        Q.      And what time of day or
12   night was it?
13        A.      It was that afternoon
14   around six p.m.
15        Q.      Had you ever met with the
16   sheriff other than this one other
17   occasion when he told you that he
18   didn't want you to use your vehicle
19   to drive back and forth from your
20   home to the office?
21        A.      Yes, sir.  One other time
22   prior to that.
23        Q.      When was that?
```

1      A.      I guess it would be late

2  spring, early summer.  Somewhere

3  through there.

4      Q.      What was that about?

5      A.      I was in an instance

6  where--- well, while I was on patrol

7  working one night, I had two guys run

8  on foot.  I chased them on foot, told

9  them I was foot pursuit.  I called

10  out, I finally got the subjects

11  apprehended, got them back to my car

12  and the--- I could hear all the law

13  enforcement officers running lights

14  and sirens trying to get to me

15  because all they heard is I was foot

16  pursuit, and that was through a

17  neighbor that saw me going through

18  their yard, I believe it was.  She

19  called 911 and said there's a deputy

20  chasing somebody through my yard.

21  They knew I was on a traffic stop so

22  then they gave everybody my location.

23  So everybody is flying up there

```
 1   trying to, you know, help me out or

 2   make sure I'm safe.  I get the two

 3   subjects apprehended and I'm trying

 4   to talk on my lapel, telling dispatch

 5   to tell everybody to slow down

 6   because I had everything under

 7   control.  I had both subjects

 8   detained.  But I couldn't get out.

 9   So I could still hear them, so I got

10   back to my car and I finally called

11   and said, you know, slow everybody

12   down, just send me one unit, I'm

13   okay, I'm 10-4.  So when everybody

14   got there, still there was a couple

15   of people that showed up, I believe

16   it was Robert Fulton--- what's the

17   other guy's name?  Robert Bland.  I

18   know they pulled up.  I told them, I

19   said, yeah, I've been trying to tell

20   y'all that I was 10-4.  I said man,

21   you had me worried because I know I'm

22   okay, but y'all, I could hear y'all

23   in the background, lights and sirens,
```

1    and it's making me nervous.  I said

2    we have to do something about this

3    radio system that we've got.  We

4    can't even get out.  I said I

5    don't--- I don't understand why we're

6    spending money on buying stuff for

7    this special tact team operations,

8    that we need to be investing money in

9    radio systems and patrol vehicles

10   because that's where we're hurting

11   the most at.  I said--- I told them I

12   was going to meet with the sheriff

13   the next day because it scared the,

14   quote, hell out of me because I knew

15   I was all right but I knew everybody

16   else was running to me wide open and

17   I was scared for their safety and the

18   public's safety.  They're trying to

19   get to me when I knew everything was

20   all right but I couldn't get out.

21            The next day, if I ain't

22   mistaken, there was a Commission

23   meeting.  I pulled up, Sheriff Davis

1    come outside.  Before I could say

2    anything to him, he said I need to

3    see you.  He and I come up here to

4    the courthouse in his office and he

5    told me that he had heard I was

6    talking about him on the street, and

7    he wasn't going to tolerate it no

8    more.  And I told him, I said, well,

9    the issue at hand was I couldn't get

10   out on my radio and I told them that

11   I was going to come talk to you.  He

12   said yeah, they told me you said

13   that.  I said yes, sir, that's why I

14   come down here, to talk to you,

15   because we've got to do something

16   about the radio system.  And he said,

17   well, if you would have just asked, I

18   would have told you.  And he threw me

19   a piece of paper that had a quote or

20   something where they were trying to

21   get an RF-repeater.  And he said

22   there again, you know, somebody from

23   the fire department or somewhere up

 1   there told me that you was running

 2   your mouth about me spending money

 3   where I shouldn't be spending money.

 4   And I said I don't recall that.  And

 5   I asked the sheriff if somebody is

 6   insinuating these, I said, you know,

 7   bring them in, let me see who it is,

 8   because I don't recall saying

 9   something that's degrading you.  All

10   I'm doing is forcing my opinion, a

11   comment, at the time when all that

12   stuff is going on, that we need to

13   try to do something about getting an

14   RF-repeater up there before somebody

15   got hurt.  And he said well, I

16   thought about it and I prayed about

17   it to whether I was going to suspend

18   you, give you days off or what I was

19   going to do to you, he said, because

20   what y'all don't understand, and this

21   is where it goes back to the merit

22   thing.  We do not have a merit board,

23   I can discipline you, I can fire you,

1    I can terminate you, I can do

2    everything I can.  He said I've

3    always liked you, I've always got

4    along with you.  I told the sheriff,

5    I said, yeah, prior to you coming to

6    the sheriff, I thought everything was

7    fine, I don't know what is going on

8    but what I hope you understand is the

9    position I'm in and who I'm kin to,

10   there's so many people around here

11   that just try to stab people in the

12   back that they're going to run and

13   tell you things.  And I said all

14   you've got to do is come to me and

15   ask me if I said it or not, or bring

16   them in here and I'll tell you if I

17   did or didn't.  I said even if it was

18   Billy Wayne sitting here, regardless

19   who it is, or Mayfield, we've got to

20   get an RF-repeater in here before

21   somebody gets hurt.  He said well,

22   bottom line is, don't be talking

23   about me on the street because

```
 1    there's not a merit board.  You do a

 2    good job, I can't complain about your

 3    job, but I'm not going to have you

 4    talking about me on the street.  So I

 5    said yes, sir, and I got up and left.

 6         Q.     Have you now told me all

 7    the conversation that took place in

 8    the sheriff's office here at the

 9    courthouse?

10         A.     Not word for word.  Just,

11    you know, as far as I recollect.

12         Q.     Is there anything that is

13    going to refresh your recollection

14    later as to what took place in this

15    meeting with the sheriff --

16         A.     No, sir.

17         Q.     -- in his office?

18         A.     No, sir.  That's pretty

19    much it.

20         Q.     Did you make any notes of

21    it?

22         A.     No, sir.

23         Q.     Have you had any other
```

1    conversations with the sheriff?

2        A.    About the patrol car,

3    yes.  You know---

4        Q.    You told us about that.

5        A.    Yes.

6        Q.    So we don't--- do we need

7    to go back into that?

8        A.    Well, on the patrol car,

9    it was just based on me, you know,

10   telling him that I didn't agree with,

11   you know, the rules that come out

12   and--- and that's when he said, you

13   know, that--- that he was going to

14   make an example out of somebody if

15   all this talking on the street didn't

16   quit, that he wasn't going to put up

17   and tolerate it, that there was no

18   merit system that was put in place.

19   And basically, you know, what I said

20   earlier.  He said that, you know,

21   that he could fire me at any time

22   just because, there again, there's no

23   merit board.  He said if it wasn't

1  for the job that I did do, I would

2  have been fired a long time ago if he

3  wanted to be, you know, vindictive or

4  anything of that nature.

5      Q.    When did this

6  conversation take place?

7      A.    That was the one on the

8  patrol car.  I believe it's around

9  September the 4th.

10     Q.    Of?

11     A.    2007.

12     Q.    So you have now told us

13  about the only two conversations you

14  had with the sheriff?

15     A.    Besides the termination.

16  The termination talk that I had with

17  the sheriff was on September the

18  10th.

19     Q.    And I'm sorry, this

20  occasion about the foot pursuit, when

21  did that conversation take place?

22     A.    Like I said, it was

23  probably late spring, summer,

1    somewhere out there through there.

2         Q.    So is that the only three

3    conversations you have had with the

4    sheriff?

5         A.    Just he and I as far as I

6    recollect, yes, sir.  But just in

7    passing, in general, like at the

8    Sheriff's Department, hey, how you

9    doing, yadda, yadda, we're going to

10   get out there and work interdiction,

11   just talk about job stuff.  That's

12   basically it.

13        Q.    So as far as--- does he

14   have an open door policy?  Sheriff

15   Davis.

16        A.    Yes, sir.

17        Q.    He's easy to get to?

18        A.    Yes, sir.  As far as I

19   know.

20        Q.    Have you ever had any

21   counseling sessions with him where

22   he's called you in and made

23   suggestions to you as to how to do

1    your job, or do your job better?

2         A.    I don't understand what

3    you mean by better.  Are you talking

4    about like policy and procedures?

5    Changes or---

6         Q.    Yes, sir.  Anything where

7    you had a counseling session with

8    Sheriff Davis about your job.

9         A.    Not that I'm aware of.

10   I'm not--- I'm not quite clear on

11   that one, anyway.

12        Q.    In other words, were you

13   ever counseled, in other words,

14   called in and the sheriff would talk

15   to you about maybe what you were

16   saying out in the community on the

17   street to other people.

18        A.    Well, particularly that

19   one, really it wasn't a counseling.

20   I went in there about the complaint.

21   Before I could even talk to him,

22   that's when he said come up here, I

23   need to talk to you.

1      Q.      That's in the spring of

2    2007?

3      A.      Yes, sir.

4      Q.      And that was about your

5    foot pursuit?

6      A.      Yes, sir.

7      Q.      And no one was present?

8      A.      No, sir.  Just he and I.

9      Q.      In the spring of 2007 you

10   had your counseling session.

11     A.      It wasn't really a

12   counseling session.  It was a---

13     Q.      A meeting in his office.

14     A.      Yes, sir.

15     Q.      Was anyone present at

16   your meeting on September the 4th,

17   2007?

18     A.      No, sir.

19     Q.      Was anyone present at

20   your termination?

21     A.      No, sir.

22     Q.      So that I'm clear then,

23   you've had no other counseling

1   sessions where you've been asked not

2   to--- for a better word, badmouth

3   Sheriff Davis.

4        A.    Not that I recollect.

5   No, sir.

6        Q.    You would recollect,

7   wouldn't you --

8        A.    Yeah, but---

9        Q.    -- if you were counseled?

10       A.    Yeah, but I don't recall

11  any, no, sir.

12       Q.    Let me ask you this:  Out

13  on the street, what do you say or

14  what did you say about Sheriff Davis

15  to other people?

16       A.    I never did--- he never

17  told me specifically what was said, I

18  mean, you know---

19       Q.    My question is, when you

20  were out on the street, what did you

21  tell people about Sheriff Davis and

22  the operation of the Sheriff's

23  Department?

1        A.      I guess I was up--- I

2   might have said something about to

3   the extent like, you know, when he

4   was running for sheriff, he and I

5   talked a good bit about interdiction

6   because he liked interdiction as well

7   as I did.  About plans we was going

8   to try to do, doing interdiction.

9   But then again he tells me to stay

10  off the Interstate.  So I told

11  Sergeant Smitherman I didn't feel

12  that was right, that's crazy, you

13  know, drugs run through our county,

14  this is how it gets here.  I probably

15  said that I didn't understand why we

16  wasn't going to be allowed to be on

17  the Interstate, especially when the

18  sheriff said that he liked

19  interdiction as much as we did.  I'm

20  trying to think.

21       Q.      Who did you say that to?

22       A.      Sergeant Smitherman.

23       Q.      Okay.  What else did you

1  say about Sheriff Davis to other

2  people before your termination?

3      A.    I can't recall.

4      Q.    Did you ever say anything

5  critical of Sheriff Davis to anyone

6  while working here at the Chilton

7  County Sheriff's Department?

8      A.    I believe I disagreed,

9  like the Interstate.  We--- we, I

10  guess, forced our opinion on the

11  districts, I guess, because you'll

12  kind of be spaced out whereas on

13  night shift--- on night shift, what

14  we would do, there would probably be

15  two or three of us would be in the

16  Clanton area on the Interstate

17  looking for drugs but yet if we got a

18  call, we could get to any part of the

19  county kind of quick and it would be

20  together.  I knew where he was, he

21  knew where I was.  Whereas, when you

22  go to the district thing, this guy

23  might be up here, this guy might be

```
1    down here, needs---

2           Q.     The question is, what did

3    you say---

4           A.     I probably disagreed with

5    it.

6           Q.     How did you disagree with

7    it?

8           A.     I told him I just feel

9    like that's an officer safety thing.

10   I just don't agree with it.

11          Q.     Who did you tell that to?

12          A.     Eric Price, Eric

13   Smitherman and probably Charlie

14   Sanders.

15          Q.     Did you say anything to

16   other people critical of Sheriff

17   Davis other than these three

18   individuals?  Price, Smitherman and

19   who?

20          A.     Charlie Sanders.

21          Q.     Other than those three

22   individuals, did you say anything

23   critical of Sheriff Davis while
```

1    working here at the Chilton County

2    Sheriff's Department?

3        A.    Besides the interdiction

4    stuff, the district stuff, not that I

5    can recall, no, sir.

6        Q.    And your conversation

7    about the interdiction was with

8    Sergeant Smitherman?

9        A.    Yes, sir.

10        Q.    Anyone else?

11        A.    Probably talked with Eric

12    Smitherman and--- I mean Eric Price.

13    I'm sorry.  Two Erics there.  And

14    Charlie Sanders.  That was our group

15    that worked at night.

16        Q.    And what did they say?

17        A.    They had their concerns

18    with the district thing.  They felt

19    like I did about being spaced so far

20    apart.  Even though we might not have

21    agreed with it, we had to do it.

22        Q.    Did y'all ever go to the

23    sheriff and say we need to change

```
 1    this policy?

 2         A.      No, sir.

 3         Q.      Why not?

 4         A.      Just didn't.

 5         Q.      Have you now told me all

 6    the unethical, illegal activities by

 7    Kevin Davis?

 8         A.      That I'm aware of.

 9              MR. YAGHMAI:   Object to

10    the form.  You can answer.

11         A.      That I'm aware of.

12         Q.      Other than yourself, is

13    anyone aware of these allegations or

14    claims that you've made against

15    Sheriff Fulmer?  Excuse me.  Against

16    Sheriff Davis.

17         A.      Shane Fulmer.  Sherry

18    Tate.

19         Q.      Sherry Tate?

20         A.      Yes, sir.

21         Q.      Anyone else aware of

22    these claims of unethical and illegal

23    conduct of Sheriff Davis that you
```

```
 1   have made?

 2       A.     Mike Poe.   Champ Benson.

 3   Steve Tate.

 4       Q.     Anyone else aware of the

 5   allegations of unethical, illegal

 6   activities that you have made against

 7   Sheriff Davis?

 8       A.     I'm sure there's probably

 9   a couple of more that I can't recall.

10       Q.     And how did Steve Tate

11   learn of these alleged illegal acts?

12       A.     I guess when I asked him

13   how can, you know, as I said earlier,

14   how can we do--- how can the sheriff

15   do business with a company that his

16   wife is on.

17       Q.     How did Champ Benson

18   learn of your complaints or claims of

19   illegal unethical conduct?

20       A.     Same way.  Same way.  You

21   know, how do we do business--- how

22   does the sheriff do business with his

23   wife's company.
```

1    Q.    No.  I guess maybe what

2  I'm--- I guess the same for Mike Poe?

3    A.    Yes, sir.

4    Q.    In other words, you

5  brought it up.

6    A.    Yes, sir.

7    Q.    Did you ever tell anyone

8  that you had made a complaint to the

9  Attorney General's office?

10    A.    I might have told Mike

11  Poe.

12    Q.    Anyone else that you may

13  have told?

14    A.    Not that I'm aware of.

15    Q.    When did you tell Mike

16  Poe that you made a claim with the

17  Attorney General's office of

18  unethical and illegal conduct about

19  Sheriff Davis?

20    A.    It would be after--- it

21  would be late August or early

22  September.  Somewhere up through

23  there.

1    Q.      Where were you when you

2  told Mike Poe?

3    A.      I don't even recall.

4  Might have been over the phone.

5    Q.      And why did you tell Mike

6  Poe?

7    A.      Because Mike Poe would

8  also voice his concern on the issues

9  that were at hand.

10    Q.      Did he say he would join

11  you in your claim of illegal and

12  unethical conduct by Sheriff Davis?

13    A.      No, sir, he did not.

14    Q.      Did you ask him to go

15  with you to the Attorney General's

16  office?

17    A.      No, sir, I did not.

18    Q.      Why not?

19    A.      I just didn't.  Excuse

20  me.  Are we getting close to

21  breaktime?

22            MR. SHEEHAN:  Absolutely.

23  We can take a break.

```
 1              (Recess, 11:08-11:21 a.m.)

 2        Q.    Mr. Autery, we've taken a

 3  15-minute recess and we're back on

 4  the record.

 5        A.    Yes, sir.

 6        Q.    Are you currently on any

 7  kind of medication that would affect

 8  your ability to testify truthfully?

 9        A.    No, sir.

10        Q.    When was the last time

11  you were on any medication?

12        A.    Well, I take Nexium for

13  my heartburn.  I take Synthroid for

14  my thyroid.

15        Q.    And who prescribed that?

16        A.    Dr. Bentley.

17        Q.    Where is he?

18        A.    She's located here in

19  Clanton.

20        Q.    How long have you been

21  seeing her?

22        A.    I'd say about two years,

23  maybe.
```

| | |
|---|---|
| 1 | Q.    And what do you see her |
| 2 | for? |
| 3 | A.    She's just a family |
| 4 | physician. |
| 5 | Q.    Have you ever been |
| 6 | hospitalized? |
| 7 | A.    Yes, sir.  I had hernia |
| 8 | surgery. |
| 9 | Q.    And where was that, sir? |
| 10 | A.    Brookwood. |
| 11 | Q.    And when was that? |
| 12 | A.    I guess it was probably |
| 13 | back in '04, maybe. |
| 14 | Q.    How long were you in the |
| 15 | hospital? |
| 16 | A.    It was in and out. |
| 17 | Q.    Is that the last time you |
| 18 | have been in the hospital or |
| 19 | emergency room? |
| 20 | A.    Yes, sir. |
| 21 | Q.    Where do you have your |
| 22 | prescriptions filled? |
| 23 | A.    CVS in Alabaster. |

```
 1        Q.      How long have you been
 2   using them?
 3        A.      Several years.
 4        Q.      Do you use anyone else
 5   for the prescriptions?
 6        A.      No, sir.  It's right
 7   there by the house.
 8        Q.      Have you sought any
 9   counseling as a result of these
10   incidents?
11        A.      No, sir.
12        Q.      Do you attend church?
13        A.      Yes, sir.
14        Q.      Where?
15        A.      Christ Sanctified Holy
16   Church.
17        Q.      Who is the minister
18   there?
19        A.      It's not really like a
20   minister.  I guess the lead would be
21   Don Roebuck.
22        Q.      Have you sought
23   counseling from him?
```

1        A.      No, sir.

2        Q.      What do you do when

3    you're not working?

4        A.      Work around the house or

5    fish.

6        Q.      Who do you fish with?

7        A.      Just anybody that wants

8    to go.

9        Q.      Who do you normally fish

10   with?

11       A.      I guess like Jason Baxley

12   has been with me.  Shane has been

13   with me.  I took Adam Ezekiel the

14   other day fishing.  Basically just

15   friends.

16       Q.      Who are witnesses to the

17   harm to your reputation?  Are you

18   contending your reputation has been

19   damaged?

20       A.      Yes, sir.  Explain that

21   to me.  I don't quite---

22       Q.      Are you claiming that

23   your reputation has been injured in

```
 1   any way as a result of this incident

 2   for which you filed this lawsuit?

 3        A.     Yes, sir.  Being

 4   terminated for going to the AG's

 5   office.

 6        Q.     Has anyone told you you

 7   were terminated for going to the AG's

 8   office?

 9        A.     Yes, sir.

10        Q.     Who was that?

11        A.     Kevin Davis.

12        Q.     And when did he tell you

13   that?

14        A.     September the 10th.

15        Q.     And what injury have you

16   sustained as a result of that?

17        A.     Having to tell someone

18   I've been fired.

19        Q.     And whom have you told

20   that you've been fired?

21        A.     My wife.  Family.

22        Q.     Who else?

23        A.     Also I had to tell the
```

```
 1    ABI with the Alabama Department of

 2    Public Safety.

 3         Q.     Anyone else?

 4         A.     Not that I recall.

 5         Q.     Has anyone told you that

 6    your reputation has been harmed?

 7         A.    No, sir.

 8         Q.     Are you contending that

 9    you have had any kind of medical

10    condition as a result of this

11    incident for which you filed this

12    lawsuit?

13         A.    No, sir.

14         Q.     Are you contending that

15    your sleep has been affected?

16         A.    No, sir.

17         Q.     That your appetite has

18    been affected?

19         A.    No, sir.

20         Q.     You've had--- have you

21    had any weight loss or weight gain as

22    a result of the incident for which

23    you filed this lawsuit?
```

1          A.       No, sir.

2          Q.       Have you had any problem

3    with vision --

4          A.       No, sir.

5          Q.       -- as a result of this

6    incident of which you filed this

7    lawsuit?

8          A.       No, sir.

9          Q.       Any problems with your

10   taste?

11         A.       No, sir.

12         Q.       Hearing?

13         A.       No, sir.

14         Q.       Hearing, or stamina?

15         A.       No, sir.

16         Q.       Energy, or loss of

17   energy?

18         A.       No, sir.

19         Q.       Exercise?

20         A.       No, sir.

21         Q.       Any illness as a result

22   of this incident?

23         A.       No.

1      Q.      Nausea?

2      A.      No, sir.

3      Q.      Any problem with your

4  reflexes?

5      A.      No, sir.

6      Q.      Any kind of pain, shaking

7  or tremors?

8      A.      No, sir.

9      Q.      When did you first

10  suspect that you would be terminated

11  from employment with the Chilton

12  County Sheriff's Department?

13      A.      I guess when I contacted

14  the AG's office.

15      Q.      And how did you suspect

16  you would be terminated from your

17  position at the Chilton County

18  Sheriff's Department by contacting

19  the AG's office?

20      A.      Because he told me the

21  day he fired me.

22      Q.      What did he say the day

23  he fired you?

```
 1        A.        When he called me in the

 2   office, he said that he didn't have

 3   to explain this but he wanted to

 4   explain it to me, that when he was

 5   Chief of Police at Maplesville, when

 6   he became the Chief of Police at

 7   Maplesville, that he contacted the

 8   Ethics Commission and the Attorney

 9   General's office and got opinions in

10   regards to being able to do business

11   as a police chief with his wife's

12   canine business.  He said that he got

13   opinions from them that there were no

14   wrongdoings of doing business with

15   his wife's businesses in the position

16   that he was in.  And then when he

17   became Sheriff, he did the same thing

18   again.  And therefore, they told him

19   that there wasn't no wrong--- any

20   wrongdoings in that, that he didn't

21   have to explain that to me, but he

22   just wanted me to know all that he

23   had done and doing business with his
```

1  wife's businesses were all legal and

2  that I had no right to make claims to

3  the fact that I thought he was.  Then

4  he asked me who did I talk to at the

5  AG's office.  No, he said did you

6  contact anybody with the AG's office,

7  and I said yes, sir, and he said who

8  was it.  I said that's personal

9  information.  So he said, have you

10  seen or taken any receipts out of the

11  Sheriff's Office.  I said no, sir.

12  He said well, somebody is telling you

13  information out of the Sheriff's

14  Office and I demand to know who it

15  is.  And I said I'm not telling you

16  that because that was, you know, a

17  private conversation.  He said well,

18  you leave me nothing but a choice

19  here.  And he says that, one, I'm not

20  going to have somebody running to the

21  AG's office on me.  Two, I'm not

22  going to have somebody trying to

23  undermine my department.  And three,

1    I'm not going to have somebody that

2    won't answer my questions truthfully.

3    I said, I answered every question you

4    asked truthfully, I just didn't go

5    into details naming names like you

6    want because that's private

7    conversation. He said, well, you can

8    either do one of two things. You can

9    resign or I'm going to fire you. And

10   I said well, you said it many a time

11   that I do a good job while I'm at

12   work. And I try to do the best I

13   can. I know what type of pride I

14   take in my job and I said I hate it

15   had to come to this, and I'm not

16   resigning from anything. And he said

17   well, you leave me no option other

18   than to fire you. And I stood up, I

19   told him could he give me a little

20   time to get all of my stuff out of my

21   car, back at the house, that kind of

22   stuff, and he said yes. And that was

23   the gist of that conversation,

1    basically.

2         Q.      Have you now told me

3    everything that was said at that

4    meeting on September the 10th?

5         A.      Basically an overview.

6         Q.      Is there anything else?

7         A.      I can't say word for word

8    exactly what was--- but that's

9    basically the way it is.

10         Q.      Have you spoken to

11    Sheriff Davis since?

12         A.      Since I've been fired?

13    No, sir.

14         Q.      Who did you support in

15    the election for the Sheriff of

16    Chilton County?

17         A.      Billy Wayne Fulmer.

18         Q.      And why?

19         A.      He's family.  Also, he

20    had been doing a good job.  And I

21    explained to the sheriff, when

22    Sheriff Davis told me that he was

23    going to run for sheriff, I told him

1  then I was going to support Billy

2  Wayne.

3      Q.    Did you contribute any

4  money to Sheriff Fulmer's campaign?

5      A.    No, sir.

6      Q.    Did you work in his

7  campaign to have Sheriff Fulmer

8  elected --

9      A.    Yes, sir.

10     Q.    -- Sheriff?  How did you

11 work on behalf of Sheriff Fulmer?

12     A.    One day I went door to

13 door just asking for support to

14 re-elect Billy Wayne Fulmer.

15     Q.    What day was that, sir?

16     A.    During the election.  I

17 can't recall what month or what day.

18     Q.    Was it a full day?

19     A.    I guess it was from that

20 morning until lunchtime.

21     Q.    What area did you go to?

22     A.    It was here in Clanton.

23     Q.    Which area in Clanton?

```
 1        A.     I want to say it was back

 2   this side.  I guess that's the west

 3   side, maybe.

 4        Q.     Why did you go to that

 5   particular area?

 6        A.     That's just where they

 7   were campaigning at that day.

 8        Q.     Who was campaigning that

 9   day?

10        A.     Brian Stilwell.  Myself.

11   Charlie Sanders.  Jennifer Stilwell.

12   Mike Poe.  That's all I can remember.

13        Q.     And what relation is

14   Sheriff or was Sheriff Fulmer to you

15   at the time?

16        A.     He's no--- he's no

17   relation.

18        Q.     He's not related to you?

19        A.     No, sir.  He was married

20   to my mother's sister years ago.

21        Q.     Other than your lawyer

22   here today, have you spoken to any

23   other attorney about the incidents
```

```
 1    for which you filed this lawsuit?

 2         A.     Not that I'm aware of.

 3              MR. SHEEHAN:  We'll take

 4    about five minutes and then I think

 5    we'll be through.

 6              (5-minute Recess)

 7              MR. SHEEHAN:  Thank you,

 8    sir.

 9

10    EXAMINATION BY MR. YAGHMAI:

11         Q.     Let me show you

12    Plaintiff's Exhibit No. 1.  Is this a

13    true and accurate copy of the e-mail

14    that you sent to Troy King's office

15    regarding the allegations against Mr.

16    Davis?

17         A.     Yes, sir.

18         Q.     All right.  And this

19    e-mail was sent prior to your

20    conversation with Mr. Davis about the

21    issue with the patrol car?

22         A.     Yes, sir.

23         Q.     And it's dated August
```

```
 1   21st, 2007 when you sent the e-mail;

 2   is that accurate?

 3        A.    Yes, sir.

 4        Q.    And your conversation

 5   with Sheriff Davis about the patrol

 6   car was September 4th of 2007,

 7   correct?

 8        A.    Yes, sir.

 9             MR. YAGHMAI:  I don't

10   have anything further.

11             MR. SHEEHAN:  Thank you.

12   If you will get those documents.

13             THE DEPONENT:  He might

14   have them there.

15             MR. YAGHMAI:  Let me see.

16        FURTHER THE DEPONENT SAITH NOT,

17        Deposition concluded 11:30 a.m.

18

19

20

21

22

23
```

```
 1        C E R T I F I C A T E

 2   STATE OF ALABAMA

 3   COUNTY OF JEFFERSON

 4            I, Karen Davis, hereby

 5   certify that the above and foregoing

 6   deposition was taken down by me on

 7   Computerized Stenotype, and the

 8   questions and answers thereto were

 9   transcribed by me, and that the

10   foregoing represents a true and

11   correct transcript of the deposition

12   given by said witness upon said

13   hearing.

14            I further certify that I

15   am neither of counsel nor of kin to

16   the parties in the action, nor am I

17   anywise interested in the result of

18   said cause.

19

20        _____

21            KAREN DAVIS

22            COMMISSIONER

23
```

COMMISSION MEMBERS

DAN AKIN
505 Brookwood Dr., Clanton, AL 35045

BOBBY AGEE
905 Samaria Road, Clanton, AL 35045

Allen Caton
625 Co. Rd 8, Jemison, AL 35085

"HEEDY" LAMAR HAYES
4960 Co. Rd. 73, Randolph, AL 36792

JOE HEADLEY
PO Box 1730, Clanton, AL 35046

TIM MIMS
PO Box 30, Maplesville, AL 36750

Carl Allen Wyatt
1654 Co. Rd 47, Clanton, AL 35045



P.O. BOX 1948
CLANTON, ALABAMA 35046-1948
(205) 755-1551

CATHY B. MARTIN, Administrator
JOHN HOLLIS JACKSON, JR., Attorney

September 14, 2007

**To Whom It May Concern:**

This is an employment status letter regarding Mr. Robbie Autery. Mr. Autery has been employed with Chilton County Commission in the Sheriffs Department. Mr. Autery began working with the Sheriffs Department on October 3, 2005 in a part time position. Mr. Autery was reclassified to a full time position on June 19, 2006 and has remained in that position until September 10, 2007. As of September 10, 2007, Sheriff Kevin Davis fired Mr. Autery, from all his duties, as a deputy with the Chilton County Sheriffs Department.

Sincerely,

Rhonda Brasher
**Personnel Manager**

DEFENDANT'S EXHIBIT

Notes from meeting with Sheriff Davis 09-04-07

On September the 4th 2007 I called and asked Sheriff Davis to meet with me about an issue I had with one of the new rules that directly involve me. The new rule was that anyone that lived outside the County line further than five miles could not drive their patrol vehicle home anymore due to the high cost of fuel and maintenance because he could not justify trying to get more patrol vehicles if he let the employees use them as their own. I told Sheriff Davis that I heard it was all in part because Captain Purvis was driving his vehicle to Birmingham and if that was the case then why wasn't he dealt with instead making the new rule. I told Sheriff Davis that I lived 13 miles from the County line and had wrote numerous tickets for high rates of speed and also made several arrest (drugs and DUI's) and assisted on calls while on my way home not on the clock getting paid but trying to protect the citizens of Chilton County. I told him that I felt like I was being singled out because there are several deputies that drive their County vehicles to other jobs making a paycheck that does not even involve or benefit the County in anyway and also several County vehicles had been seen pulling personal boats and four wheelers. Sheriff Davis stated to me that those issues had been taken care of several months back because he had his supervisors take care of it. I told Sheriff Davis that was not the case and also why wasn't a memo put up about that because the memo that was put out about the five mile rule only affected two employees unlike the other issues that deal with many in the department. Sheriff Davis stated I was not being singled out and that I was one of the top patrol deputies who does a good job but a line had to be drawn. I asked Sheriff Davis again if I could start back driving my County vehicle back home and he stated no because even the County Commissioners would not approve of it. I told Sheriff Davis from day one when I got hired with the Sheriff's Department, they and the County Commissioners knew where my residence was. I stood up and started to leave and said thanks for your time I just wanted to make sure I went through the proper steps. Sheriff Davis said sit back down and that he heard that I was going to push the merit issue if I didn't get me way. Sheriff Davis stated that I and a few others are just mad because he kicked Billy Waynes ass in the election. I reminded Sheriff Davis that he only won by 9 votes and that by a long shot was no ass whooping. Sheriff Davis said that his answer was no and there was no merit system and that myself and others work at the sole discretion of the Sheriff and he could and would fire us anytime he got ready. He also stated he could show me where State law backs it up and if it wasn't for the job that I do he would had fired me long ago. I asked him again if I could drive my county vehicle back home and he said no and that if I pushed the merit issue he would fire me because he said he gave me his answer and that I would be trying to go around him and that would be considered insubordination. I stood up and said thanks for your time and left.



DEFENDANT'S EXHIBIT

Notes from meeting between Sheriff Davis and Deputy Autery on 9-10-07 @ 6PM

On September 10, 2007 around 6:00 P.M., I was called into the office to meet with Sheriff Davis. Sheriff Davis explained to me that he had heard that I was trying to dig up dirt on him dealing with ethic violations. Sheriff Davis stated that he has done no wrong by doing business with HeadCo and Central Alabama K-9 in which his wife a Sweet Davis owns. Sheriff Davis stated before he had bought canines or did any business dealing with Central Alabama K-9 or HeadCo, he checked with the AG's office and he stated they advised him it would not be an ethics violation in doing business with those businesses even though he has interest in them just as he had done when he was Chief of Police in Maplesville. Sheriff Davis said he didn't have to explain that to me but he wanted to prove to me that I was wrong and that no ethic violations had been committed. He also stated that the County Commission had come to him and was asking about HeadCo supplying all the gas for the Sheriff's Department vehicles because it was not in any way an ethic violation. Sheriff Davis stated that I was one of his best patrol Deputies and he could not argue that fact but he was tired of people telling him that I was talking bad things about him and trying to dig stuff up on him because I was mad about not being able to drive my patrol vehicle home. I told Sheriff Davis that many of the Deputies had complained around me about him and the department but I knew it was only venting because of the stressful job we have. I also told him the reason I didn't run down to his office and tell him on who was saying what because we should be able to vent but it's a shame if I say anything I get called into the office and get threatened by him that we do not have a merit system and he could fire me anytime he got ready to. Sheriff Davis asked me if I had contacted the AG's office about ethic issues and I stated yes. He then asked me what did the conversation entailed and I replied that was my business and I didn't have to answer that. Sheriff Davis asked if I had seen any receipts outside the courthouse or had I taken any out of the courthouse in dealings with Central Alabama K-9 or HeadCo and I replied no. Sheriff Davis then advised me that I had to know somehow and he wanted to know who the employee was telling me this information and that my job depended on me telling him who it was. I then replied again that was my privilege and I didn't have to and would not answer that question. Sheriff Davis then stated that he was not going to have an employee try to under mind his authority, someone who calls the AG's office on him and one who doesn't answer all the questions that he ask, he then told me I had two choices, one being for me to resign or two He fires me. I told Sheriff Davis since I do my job that I would not be resigning and he stated that I didn't leave him any other choice but for him to fire me. I then left the office.


DEFENDANT'S EXHIBIT



Tuesday, August 21

- About the Office
  - o About the AG/History
  - o Office Divisions/Profiles
- Contacting Us
  - o Address/Phone/Online
  - o Online Contact
  - o FAQs and Tips
  - o Employment Ops
- News Releases
  - o Past 90 Days
  - o News Archive
- Official Opinions
  - o Help and Opinion FAQs
  - o Search Opinions
- Consumer Affairs
  - o About the Division
  - o File a Complaint
  - o Consumer Alerts
  - o Consumer FAQs
  - o Consumer Law & Info
  - o Consumer Charities
  - o Consumer Links
  - o Meet our Staff
- Victim Assistance
  - o About Division/Victim Law Info
  - o Victim Notification Form
  - o Crime Victims' Rights
  - o Victim Links
  - o Victim Service Officers
  - o Meet our Staff
- Publications & Forms
- Home

This section » Contacting Us
Your page choices » Contacting Us Online

# Online Contact Form (not Consumer Complaint)

Thank you for contacting the Alabama Attorney General's Office.

You should be receiving an email copy of the information you submitted. Also, an automatic message has been sent to the appropriate division, and you should be hearing something in the near future unless you sent a message to the 'No Reply Expected' section. If you are not contacted or do not receive assistance, please contact the Attorney General's Office and appropriate division by telephone in order to check on the status of your request.

**PLEASE PRINT THIS PAGE FOR YOUR RECORDS.**

Date: 8/21/2007 @ 8:18 PM
Robbie M Autery
36 (Age)
158 Belvedere Place
Alabaster, AL 35007
205-685-0499 (Home Phone)
205-351-1293 (Work Phone)
rmautery@yahoo.com (E-Mail Address)

---Division of Attorney General form is directed to---
General

---Details---
Description:
Mr. King, I am writing to you today because I am not sure which way to turn with this matter. The matter at hand is violations of ethics here in Chilton County by our newly elected Sheriff, Kevin Davis. Not only is it wrong to use public office for personal gain, it is against the law. Since Sheriff Davis has been in office, he has committed several ethics violations. One of the major problems at hand is his wife, Sweet Davis along with Sheriff Davis own a drug dog training facility called Central Alabama K-9 and also a gas station called HeadCo in Clanton. Since Sheriff Davis has been in office we use his wife's drug dog training facility for all our training for our dogs and the Deputy handlers. We even purchase dog food and supplies from her (example- two training leashes were $200). Sheriff Davis sponsors several events for area K-9 competition partnered along with his wife's canine business to help her build their business. We also from time to time use their gas station. Sheriff Davis has also purchased office furniture that he keeps at his personal residence. These are just a few of the many things that are going on at the Chilton County Sheriff Office. The State auditor has been by

checking on things but when she was told of some of the stuff that is going on, she ignored them. Also some of the money that is being spent by Sheriff Davis will not show up till the next audit. This is a serious matter because you have a man that is supposed to up hold the law, not

break them and should be held to a higher standard. I am not a disgruntled employee but one that fights law breakers everyday and this is one that should be thoroughly looked into. Please do not use my name because it would bring sever hardship to me but if you or someone from your office needs to contact me, you can reach me by e-mail (rmautery@yahoo.com). Thanks for your hard work and taking time to look into this matter.

God Bless, Robbie Autery

**Click HERE to continue.**

---

©1998-2007 State of Alabama Attorney General's Office · http://www.ago.alabama.gov
11 South Union Street, Third Floor · Montgomery, AL 36130
Website comments only to the Webbie

# EXHIBIT 2

## EXCERPTS FROM THE DEPOSITION OF ROBBIE AUTERY

Q.    What was your next you had with Chief Mayfield about changes in the---

A.    Basically the same thing  each time --

Q.    And--- I'm sorry.

A.     -- on the first conversation.  When we was talking about Shane being dropped down to the courthouse.

Q.    So that was the first conversation?

A.    Yes, sir.  We probably talked about the same thing over and over three times.

Q.    And why did you go to him about Shane being security at the courthouse?

A.    Because to myself and the other employees, they just didn't think it was right. It just looked like Shane Fulmer had a bullseye on  his back.

Q.    And why did he have a bullseye on his back?

A.    The things that we saw or thought about was political reasons.  Because who his father was.

Q.    Did anyone say they were for political reasons?

A.    Let's see.  Champ Benson said the reason Shane got moved to the courthouse was because of who his daddy was.  Let's see.  Who else said that?  Mike Poe. Charlie Sanders.  Myself.  Shane Aldridge.  Basically that's about--- that's the names that  I can remember.

(Autery Depo., p. 40, l. 7 - p. 41, l. 21).

Q.    And what did the sheriff say?

A.    I asked him if I could meet with him.  He said sure.  We go down to the jail. We met in one of the investigator's offices, I believe it was.  I explained to him my and issues about not being able to drive the patrol vehicle home because from day one that I was hired with the Sheriff's Department,  everybody knew where I lived.  It wasn't a secret that I lived thirteen miles or fourteen miles outside the county line.  And then Sheriff Davis stated that he couldn't justify me running up and down the road on gas and wear and tear on the county vehicles when he's trying to present some type of motion or issue to the commission about being able to obtain new vehicles.  You know---

Q.    New patrol cars?

A.    Yes, sir.  New patrol vehicles.  So I discussed the issue with him about, you know, even though I lived thirteen miles outside the line, that even when I'm off the clock, until I got home or crossed the county line, I was still doing what

1

I could to protect the citizens of the county. He said he understood but he said that, you know, that that's the way it stood. I said thank you for your time. He told me sit back down. He said that he had heard that I was going to press the merit issue, which I guess he got that from Chief Deputy Mayfield. He said let me tell you that you work for the sole discretion the Sheriff, I can fire you any time I want to. There are just several of y'all that are mad and upset because I whooped Billy Wayne's ass in the election. And what else was said? That he was tired of hearing comments made on the street, that we were out on the street insinuating things on him and that if something wasn't changed or if it continued or something like that, he was going to make an example out of somebody.

Q.    Did Sheriff Davis say anything else?

A.    He said that if I pressed the--- he gave me my answer and that was no that I couldn't drive my patrol car home and that if I pressed the issue, that he would consider that insubordination and terminate me.

(Autery Depo., p. 50, l.8 - p. 53, l. 1).

Q.    Before you were terminated, had you spoken to anyone at the Attorney General's office?

A.    Yes, sir.

Q.    And who was that?

A.    I sent the e-mail. I sent the e-mail to Troy King and in response, Troy King sent me an e-mail back and then he assigned it to I think the Chief Investigator, Chris Browning.

(Autery Depo., p. 60, ll. 9-19).

Q.    How many times have you spoken to anyone at the Attorney General's office?

A.    I'd probably say six to ten. Somewhere up to that neighborhood, maybe.

Q.    Where were these conversations taking place?

A.    One conversation was at the AG's office. The other had been by phone.

Q.    And when did you meet at the Attorney General's office?

A.    I guess it was about two weeks, maybe, after we were terminated.

Q.    And who met there?

A.    Shane, myself, Chief Investigator Browning, and I can't remember--- I can't recall the other guy's name.

2

(Autery Depo., p. 84, l. 13 - p. 85, l. 10).

Q. What is it that you are claiming that Kevin Davis has done illegally?
A. It would be ethics violations.
Q. Anything else?
A. No, sir. That's basically it.
Q. Okay. What ethics violations are you claiming that have been committed by Kevin Davis?
A. Doing business with his wife's kennel, and also business with HeadCo.
Q. And what is your claim of unethical conduct with respect to doing business with the kennel?
A. That is a, to my understanding, that is a business that his wife owned. With he and her being married, if he's doing business through his wife's company, therefore, he's also gaining monies out of the transactions.

(Autery Depo., p. 87, l. 8 - p. 88, l. 8).

Q. Sure. What unethical conduct do you contend has been committed by Kevin Davis?
A. Using public office for personal gain.

(Autery Depo., p. 91, ll. 2-8).

Q. How has he used public office for personal gain?
A. There again, doing business transactions from the Sheriff's Department to businesses that his wife owns.
Q. What transactions?
A. Purchases of dogs. Supplies. And maybe some--- see, dogs, supplies and fuel.

(Autery Depo., p. 91, ll. 11-20).

Q. Who did you report this unethical conduct to?
A. Attorney General's office.
Q. Did you go to your supervisor and report it?
A. No, sir.
Q. Did you report it to Captain Tate?

3

A.    No, sir.

Q.    Why not?

A.    Why not?

Q.    Please, sir.

A.    Because I wanted to be quiet about it.  Because I felt like if something was going on, like my e-mail states, I felt like there would be some type of retaliation.

Q.    Why did you think that?

A.    That's just how the political game plays.

Q.    Did you go and tell the sheriff that you thought he was committing unethical acts or illegal acts?

A.    No, sir.

Q.    Why not?

A.    I wasn't going to tell him what I thought was going on because if he thought--- I felt like if he knew that I knew what might be going on, that he might try to punish with some form of retaliation and I wasn't going to go that route.

(Autery Depo., p. 98, l. 18 - p. 100, l. 5).

Q.    Did you ever tell anyone that you had made a complaint to the Attorney General's office?

A.    I might have told Mike Poe.

Q.    Anyone else that you may have told?

A.    Not that I'm aware of.

Q.    When did you tell Mike Poe that you made a claim with the Attorney General's office of unethical and illegal conduct about Sheriff Davis?

A.    It would be after--- it would be late August or early September.  Somewhere up through there.

Q.    Where were you when you told Mike Poe?

A.    I don't even recall.  Might have been over the phone.

Q.    And why did you tell Mike Poe?

A.    Because Mike Poe would  also voice his concern on the issues that were at hand.

(Autery Depo., p. 137, l. 7 - p. 138, l. 9).

4

Q.    When did you first suspect that you would be terminated employment with the Chilton County Sheriff's Department?

A.    I guess when I contacted the AG's office.

Q.    And how did you suspect you would be terminated from your position at the Chilton County Sheriff's Department by contacting the AG's office?

A.    Because he told me the day he fired me.

Q.    What did he say the day he fired you?

A.    When he called me in the office, he said that he didn't have to explain this but he wanted to explain it to me, that when he was Chief of Police at Maplesville, when he became the Chief of Police at Maplesville, that he contacted the Ethics Commission and the Attorney General's office and got opinions in regards to being able to do business as a police chief with his wife's canine business. He said that he got opinions from them that there were no wrongdoings of doing business with his wife's businesses in the position that he was in. And then when he became Sheriff, he did the same thing again. And therefore, they told him that there wasn't no wrong--- any wrongdoings in that, that he didn't have to explain that to me, but he just wanted me to know all that he done and doing business with his wife's businesses were all legal and that I had no right to make claims to the fact that I thought he was. Then he asked me who did I talk to at the AG's office. No, he said did you anybody with the AG's office, and I said yes, sir, and he said who was it. I said that's personal information. So he said, have you seen or taken any receipts out of the Sheriff's Office. I said no, sir. He said well, somebody is telling you information out of the Sheriff's Office and I demand to know who it is. And I said I'm not telling you that because that was, you know, a private conversation. He said well, you leave me nothing but a choice here. And he says that, one, I'm not going to have somebody running to the AG's office on me. Two, I'm not going to have somebody trying to undermine my department. And three, I'm not going to have somebody that won't answer my questions truthfully. I said, I answered every question you asked truthfully, I just didn't go into details naming names like you want because that's private conversation. He said, well, you can either do one of two things. You can resign or I'm going to fire you. And I said well, you said it many a time that I do a good job while I'm at work. And I try to do the best I can. I know what type of pride I take in my job and I said I hate it had to come to this, and I'm not resigning from anything. And he said well, you leave me no option other than to fire you. And I stood up, I told him could he give me a little time to get all of my

5

stuff out of my car, back at the house, that kind of stuff, and he said yes. And that was the gist of that conversation, basically.

(Autery Depo., p. 146, l. 9 - p. 150, l. 1).

Q.    Who did you support in the election for the Sheriff of Chilton County?
A.    Billy Wayne Fulmer.
Q.    And why?
A.    He's family. Also, he had been doing a good job. And I explained to the sheriff, when Sheriff Davis told me that he was going to run for sheriff, I told him then I was going to support Billy Wayne.
Q.    Did you contribute any money to Sheriff Fulmer's campaign?
A.    No, sir.
Q.    Did you work in his campaign to have Sheriff Fulmer elected --
A.    Yes, sir.
Q.    -- Sheriff? How did you work on behalf of Sheriff Fulmer?
A.    One day I went door to door just asking for support to re-elect Billy Wayne Fulmer. Q.    What day was that, sir?
A.    During the election. I can't recall what month or what day.
Q.    Was it a full day?
A.    I guess it was from that morning until lunchtime.
Q.    What area did you go to?
A.    It was here in Clanton.
Q.    Which area in Clanton?
A.    I want to say it was back this side. I guess that's the west side, maybe.
Q.    Why did you go to that particular area?
A.    That's just where they were campaigning at that day.
Q.    Who was campaigning that day?
A.    Brian Stilwell. Myself. Charlie Sanders. Jennifer Stilwell. Mike Poe. That's all I can remember.
Q.    And what relation is Sheriff or was Sheriff Fulmer to you at the time?
A.    He's no--- he's no relation.
Q.    He's not related to you?
A.    No, sir. He was married to my mother's sister years ago.

(Autery Depo., p. 150, l. 14 - p. 152, l. 20).

6

# EXHIBIT 3

```
 1            IN THE CIRCUIT COURT OF
            CHILTON COUNTY, ALABAMA
 2       CIVIL ACTION NO.:  CV-2007-900130

 3   ROBBIE AUTERY and
     SHANE FULMER,
 4
          Plaintiffs,
 5
               VS.
 6
     KEVIN DAVIS, in his
 7   official capacity as
     Sheriff of Chilton County,
 8   Alabama, and individually;

 9        Defendant.

10   _____

     IN THE UNITED STATES DISTRICT COURT
11    FOR THE MIDDLE DISTRICT OF ALABAMA
            NORTHERN DIVISION
12      CIVIL ACTION NO.:  2:08-CV-41-WC

13   ROBBIE AUTERY and
     SHANE FULMER,
14
          Plaintiffs,
15
               VS.
16
     KEVIN DAVIS, in his
17   official capacity as
     Sheriff of Chilton County,
18   Alabama, and individually;

19        Defendant.

20
          DEPOSITION OF SHANE FULMER
21

22           STIPULATIONS

23           IT IS STIPULATED AND
```

1   AGREED, by and between the parties,

2   through their respective counsel,

3   that the deposition of SHANE FULMER

4   may be taken before Karen Davis, CCR,

5   Commissioner, State of Alabama at

6   Large, at the Chilton County

7   Courthouse, 200 2nd Avenue North,

8   Clanton, Alabama, on the 16th day of

9   May, 2008, commencing at or about

10  11:40 a.m.

11              IT IS FURTHER STIPULATED

12  AND AGREED that the reading and

13  signature to the deposition by the

14  witness is waived, said deposition to

15  have the same force and effect as if

16  full compliance had been had with all

17  laws and rules of court relating to

18  taking of depositions.

19              IT IS FURTHER STIPULATED

20  AND AGREED that it shall not be

21  necessary for any objections to be

22  made by counsel as to any questions,

23  except as to form or leading

**Freedom Court Reporting, Inc**                    3

1   questions, and that counsel for the

2   parties may make objections and

3   assign grounds at the time of the

4   trial, or at the time said deposition

5   is offered in evidence, or prior

6   thereto.

7           IT IS FURTHER STIPULATED

8   AND AGREED that notice of filing of

9   the deposition by the Commissioner is

10  waived.

11

12

13

14

15

16

17

18

19

20

21

22

23

**Freedom Court Reporting, Inc**                                      **4**

```
 1

 2                     I N D E X

 3

 4    EXAMINATION BY:            PAGE NO.

 5    Mr. Sheehan                   8

 6

 7

 8              E X H I B I T S

 9    PLAINTIFF'S EXHIBIT NO.     MARKED

10    (None offered.)

11

12    DEFENDANT'S EXHIBITS       MARKED

13    No. 1 - deponent's C.V.      18

14    No. 2 thru

15    No. 8 - typewritten notes    105

16    * No. 9 - handwritten notes

17         *(No. 9 mentioned as

18          being marked at Pg. 106,

19          but neither received

20          nor attached to the

21          transcript by the

22          court reporter.)

23
```

**Freedom Court Reporting, Inc**                    5

```
 1    BEFORE:    Karen Davis, CCR

 2               Commissioner

 3

 4

 5    APPEARING ON BEHALF OF THE PLAINTIFF:

 6         Mr. Gregory F. Yaghmai

 7         Rutledge & Yaghmai

 8         3800 Colonnade Parkway

 9         Suite 490

10         Birmingham, Alabama  35243

11         (205) 969-2868

12

13    APPEARING ON BEHALF OF THE DEFENDANT:

14         Mr. C. Winston Sheehan, Jr.

15         Ball, Ball, Matthews &

16         Novak, P.A.

17         2000 Interstate Park Drive

18         Suite 204

19         Montgomery, Alabama  36109

20         (334) 387-7680

21

22    Also Present:  Robbie Autery

23               Sheriff Kevin Davis
```

```
1              I, Karen Davis,

2    Certified Shorthand Reporter and

3    Commissioner, State of Alabama at

4    Large, acting as commissioner,

5    certify that on this date, in

6    accordance with Rule 30 of the

7    Alabama Rules of Civil Procedure and

8    the foregoing stipulations of

9    counsel, there came before me at the

10   Chilton County Courthouse, 200 2nd

11   Avenue North, Clanton, Alabama, on

12   the 16th day of May, 2008, SHANE

13   FULMER, Plaintiff in the above cause

14   for oral examination, whereupon the

15   following proceedings were had:

16

17        S H A N E    F U L M E R,

18   Having been duly sworn according to

19   law testifies as follows:

20

21   EXAMINATION BY MR. SHEEHAN:

22        Q.      Your full name, please.

23        A.      Jeremy Shane Fulmer.
```

1    Q.    And your date of birth?

2    A.    10/7/73.

3    Q.    And you were present

4  during the deposition of Mr. Autery?

5    A.    Yes, sir.

6    Q.    During the breaks that

7  were taken during Mr. Autery's

8  deposition, did you have any

9  discussion with him?

10    A.    Yes, sir.

11    Q.    About this lawsuit?

12    A.    No, sir.

13    Q.    You didn't discuss this

14  lawsuit while these two 15-minute

15  recesses were taken during his

16  deposition?

17    A.    No particulars of the

18  lawsuit, no, sir.

19    Q.    Did you discuss the

20  lawsuit?

21    A.    May have mentioned

22  something.  I'm not real sure exactly

23  what.

1      Q.      Are you on any kind of

2   medication that would affect your

3   ability to testify truthfully?

4      A.      Not that would affect my

5   ability, no, sir.

6      Q.      What medication are you

7   currently on, sir?

8      A.      I'm on Lexapro.

9      Q.      And who prescribed that?

10      A.      Dr. Ajay Patel.

11      Q.      And how long have you

12   been taking Lexapro?

13      A.      Probably a month now.  He

14   just swapped it to the Lexapro.

15      Q.      Swapped what, sir?

16      A.      He had me taking Paxil.

17      Q.      And how long have you

18   taken Paxil?

19      A.      Not consistent, but over

20   the course of a year.

21      Q.      And where do you have

22   your prescriptions filled?

23      A.      CVS Pharmacy here in

```
 1   Clanton.

 2        Q.     And how long have you

 3   used CVS in Clanton?

 4        A.     For the past three to

 5   four years.

 6        Q.     Where did you have your

 7   prescriptions filled before CVS in

 8   Clanton?

 9        A.     I want to say Rite-Aid.

10        Q.     And which one?

11        A.     Here in Clanton.

12        Q.     And when were you last

13   hospitalized?

14        A.     If I'm remembering

15   correctly, January of 1996.

16        Q.     And where was that, sir?

17        A.     I'm sorry, sir.  That's

18   not accurate.  I had an accident in

19   January of 1996 and over the course

20   of two years after that, I had a few

21   surgeries.  I don't recall the exact

22   dates.

23        Q.     So between January of '96
```

```
 1   and January of '98?

 2          A.      Yes, sir.

 3          Q.      And which hospital?

 4          A.      UAB.

 5          Q.      What's the last emergency

 6   room you've been to?

 7          A.      UAB.

 8          Q.      And when was that, sir?

 9          A.      January of '96.

10          Q.      Are you still being

11   treated as a result of that accident?

12          A.      No, sir.

13          Q.      When were you released?

14          A.      Released completely

15   sometime in 1998, I guess.

16          Q.      Which doctor released

17   you?

18          A.      I had two doctors.  One

19   was Dr. Lewis from UAB and another

20   ophthalmologist doctor was Dr. John

21   A. Long, L-O-N-G, from Alabama

22   Ophthalmology in Birmingham.

23          Q.      And what's the last
```

```
 1    healthcare provider you have seen?

 2         A.    Dr. Ajay Patel.

 3         Q.    And what did you see him

 4    for?

 5         A.    I don't recall exactly

 6    when I first went to him.  Probably

 7    spring of 2007.  Having problems

 8    sleeping.  Stress-related symptoms,

 9    as he put it.

10         Q.    Who had you seen before

11    Dr. Patel?

12         A.    I had been to an

13    orthopaedic doctor prior to that here

14    in Clanton.  I want to say his name

15    was Dr. Wolf.  I had also saw a

16    general physician, Dr. Funderburk,

17    just for casual cold or flu symptoms.

18         Q.    When did you see Dr.

19    Funderburk last?

20         A.    It's probably been four

21    or five years.

22         Q.    And where is his office?

23         A.    Chilton Medical
```

1    Associates here in Clanton.

2        Q.    What doctor had you seen

3    before Dr. Funderburk?

4        A.    Other than the physicians

5    as a result of the wreck in 1996, the

6    Dr. Lewis and Dr. Long, I don't

7    recall any other doctors.

8        Q.    Who was your physician

9    growing up?

10        A.    If I recall correctly,

11    Dr. Funderburk.

12        Q.    You were never

13    hospitalized here in Clanton?

14        A.    As a child, I had

15    pneumonia.  For four or five days

16    hospitalized here in Clanton.

17        Q.    Which facility?

18        A.    Pardon me, sir?

19        Q.    Which facility here in

20    Clanton?

21        A.    Clanton Hospital.

22        Q.    And who treated you for

23    the pneumonia?

```
 1        A.       There again, as I best

 2   recall, it was Dr. Funderburk.

 3        Q.       And who is your dentist?

 4        A.       Dr. Morgan here in

 5   Clanton.

 6        Q.       Have you now told me all

 7   of your healthcare providers?

 8        A.       To the best of my

 9   recollection, yes, sir.

10        Q.       And by whom are you

11   employed, sir?

12        A.       Jemison Police

13   Department.

14        Q.       When did you go to work

15   for Jemison Police Department?

16        A.       October 1st, 2007.

17        Q.       And who is your

18   supervisor?

19        A.       Immediate supervisor is

20   Sergeant Randy Morris, Jr.

21        Q.       And who hired you?

22        A.       Chief Brian Stilwell.

23        Q.       And what are your duties
```

```
 1    and responsibilities for the Jemison

 2    Police Department?

 3         A.    I'm a patrol officer, day

 4    shift, enforcing traffic and criminal

 5    laws, accident investigation, citizen

 6    complaints.

 7         Q.    And what hours do you

 8    normally work?

 9         A.    We're on 12-hour shifts.

10    I work every Wednesday, Thursday,

11    Friday and every other Saturday from

12    6 a.m. until 6 p.m.

13         Q.    And how long have you

14    been working that shift?

15         A.    Since I started.  October

16    1, 2007.

17         Q.    Have you been disciplined

18    in your position with the Jemison

19    Police Department?

20         A.    No, sir.

21         Q.    Have you been counseled

22    in any way while working for Jemison?

23         A.    No, sir.
```

1      Q.      Who did you work for

2  prior to Jemison Police Department?

3      A.      Chilton County Sheriff's

4  Department.

5      Q.      And when did you go to

6  work for the Chilton County Sheriff's

7  Department?

8      A.      January 19th, 1999.

9      Q.      When did you, or did you,

10 apply for any positions other than

11 the Jemison Police Department?

12     A.      Between my termination

13 and--- and employment with Jemison or

14 any time?

15     Q.      Even before your

16 termination.  After your father was

17 not elected sheriff.

18     A.      I have applied for a

19 special agent job with the state of

20 Alabama in the Finance Commission

21 Agency, and I have applied for an

22 investigations position with the

23 Alabama Power Company.

1    Q.    Have you made application

2  to any other employer?

3    A.    Soon after my termination

4  and prior to going to work with

5  Jemison, I went online with several

6  different departments, Blue Cross

7  Blue Shield, Progressive Car

8  Insurance, approximately five or six

9  departments along those same lines,

10  and posted my resume.  I also posted

11  my resume on Monster.com and

12  Careerbuilder.com.

13    Q.    I'm sorry, which five did

14  you apply with?

15    A.    I don't recall.  I'm

16  trying to think.  I know I applied

17  with Blue Cross Blue Shield,

18  Progressive Car Insurance.  I want to

19  say Liberty National--- excuse me.

20  Liberty Mutual, I think it was,

21  Insurance Company.  I don't recall

22  the others, sir.

23    Q.    What position did you

```
 1    apply for?

 2         A.       Investigations.

 3         Q.       Before you were

 4    terminated, with whom had you made

 5    application for employment?

 6         A.       I don't recall prior to

 7    termination making any application.

 8         Q.       When did you make your

 9    application with the--- I'm sorry,

10    you said Finance Commission?

11         A.       Yes, sir.

12         Q.       Where is the Finance

13    Commission?

14         A.       The state of Alabama.

15         Q.       Are you talking about the

16    Finance Department?

17         A.       It's actually referred to

18    as the Finance Commission.  It very

19    well may be Finance Department.

20         Q.       Why did you apply there?

21         A.       Needed a job.

22         Q.       I mean did someone direct

23    you to the Finance---
```

```
 1        A.      I had contacted some

 2   contacts of mine and, you know, told

 3   them if they had seen anything.

 4   Contacts I made over the years.  I

 5   got an e-mail from one of my

 6   contacts.

 7        Q.      What contacts did you---

 8        A.      Glenn Houlditch.  That's

 9   H-O-U-L-D-I-T-C-H, I think, with

10   ROCIC organization.

11        Q.      Anyone else?

12        A.      He forwarded me an e-mail

13   from one of the finance commission

14   agents simply advising him that they

15   were taking applications.  He knew I

16   was in search of a job, forwarded the

17   e-mail to me and then I applied for

18   it.  And one thing, prior to my

19   termination, I do recall the Alabama

20   Power Company.  I had applied for

21   that probably three years ago.

22        Q.      And why did you apply

23   there?
```

1      A.      Career enhancement.

2      Q.      What do you mean, career

3  enhancement?

4      A.      Well, just a lot better

5  job than--- than you're going to get

6  in law enforcement anywhere in the

7  state of Alabama, probably.  My

8  career goal is to succeed in the law

9  enforcement profession and that was a

10  goal of mine, was to establish and to

11  find a job along those lines with a

12  company like Southern Company and

13  their pay scale, and just a career

14  goal and a job enhancement.

15      Q.      Did you apply with

16  Alabama Power or did you apply with

17  the Southern Company or both?

18      A.      Both.

19      Q.      Where did you send your

20  application?

21      A.      Online.

22      Q.      Any other applications

23  that you submitted while working for

1    the Chilton County Sheriff's

2    Department?

3         A.      Not that I recall, sir.

4         Q.      And do you have a current

5    C.V. or resume?

6         A.      Yes, sir.

7         Q.      Could you provide us with

8    that?

9         A.      Yes, sir.

10        Q.      Where is that C.V. now?

11        A.      At my home.

12        Q.      On your computer?

13        A.      I have a copy in a binder

14   at my home in my computer desk.

15             MR. SHEEHAN:  We'll mark

16   that as Exhibit No. 1 to your

17   deposition.  Can you get that to us?

18        A.      Yes.

19             MR. YAGHMAI:  We'll just

20   mail a copy to the court reporter and

21   CC you.

22        Q.      What sort of computer do

23   you have, sir?

```
 1        A.      I have a desktop

 2   computer.  I'm not sure.  I'm just

 3   trying to remember what name brand.

 4   I'm not real sure, sir.

 5        Q.      How long have you had it?

 6        A.      Approximately six to

 7   eight months.

 8        Q.      What kind of computer did

 9   you have before that?

10        A.      I had a--- when I worked

11   with the Sheriff's Department, I had

12   a department-issued laptop.

13        Q.      Where is it now?

14        A.      I turned it in after

15   being fired.

16        Q.      So the computer you had

17   at home before the six to eight

18   months was what?

19        A.      The department-issued

20   computer that I had, I turned in

21   after I was fired September the 10th.

22   I turned it in with the rest of my

23   equipment.
```

1      Q.      Right.  At home, what did

2    you have in the way of a computer?

3      A.      Right after that?

4      Q.      No, sir.  You had a home

5    computer before six to eight months

6    ago.

7      A.      Yes, sir.  That was the

8    department-issued computer.

9      Q.      You took a department-

10   issued computer home?

11     A.      Yes, sir.

12     Q.      How long had you had a

13   department computer at your house?

14     A.      I don't recall exactly

15   when we got the computers, but we---

16   we--- we had twenty, twenty-five

17   computers that was purchased and I

18   want to say everybody there was

19   issued a computer.

20     Q.      How long had you had a

21   department-issued computer at your

22   home?

23     A.      I'm not sure when we

```
 1    bought them but probably two, three

 2    years, maybe.

 3         Q.      Where is that now?

 4         A.      I turned it in after

 5    termination.

 6         Q.      Did your family have a

 7    home computer?

 8         A.      Yes, sir.

 9         Q.      What kind?

10         A.      We had a desktop.   My

11    wife also had a laptop.

12         Q.      The one that you used at

13    home was what kind?

14         A.      The one I use now, sir?

15         Q.      No.   Six to eight months

16    ago.   Before then.

17         A.      The department-issued

18    laptop.

19         Q.      You used the department-

20    issued computer at home for personal

21    use?

22         A.      I had the department-

23    issued laptop.   We all were issued
```

1    department-issued laptops.  I had a

2    department-issued laptop that I done

3    my search warrants---

4         Q.    No, sir.  Simple

5    question:  Did you have a department-

6    issued computer at home that you used

7    for personal purposes.

8         A.    Probably did use some

9    personal use.  I typed up documents,

10   I'm sure.

11        Q.    And you turned that

12   computer in?

13        A.    Yes, sir.

14        Q.    When was that?

15        A.    I was fired September the

16   10th.  Within a week after that.

17        Q.    Have you spoken to

18   Sheriff Davis since your termination?

19        A.    Yes, sir.

20        Q.    What time of day or night

21   were you terminated?

22        A.    It was approximately 4:30

23   p.m. on September the 10th, 2007 on a

1    Monday evening.

2        Q.    And who was present?

3        A.    Myself, Mr. Davis,

4    Captain Steve Tate.

5        Q.    When did you first

6    realize you were going to be

7    terminated?

8        A.    I was at work that very

9    day, courthouse security, out front

10   at the metal detectors, when Sheriff

11   Davis approached me and asked me to

12   follow him, that we needed to talk.

13       Q.    And who was present?

14       A.    Myself, Mr. Davis walked

15   up, and my coworker, Shane Aldridge.

16       Q.    What did you say when the

17   Sheriff said he wanted to talk to

18   you?

19       A.    Yes, sir.

20       Q.    And what did you do?

21       A.    Followed Mr. Davis down

22   the hall and outside the courthouse.

23       Q.    And who was outside the

```
 1    courthouse?

 2         A.      I don't recall seeing

 3    anyone else there.

 4         Q.      What time was this?

 5         A.      Approximately 2 p.m.

 6         Q.      And how long were you

 7    outside?

 8         A.      We immediately--- I was

 9    instructed to get inside the

10    passenger side of his pickup truck

11    and we traveled two blocks down to

12    the county jail to Chief Deputy

13    Mayfield's office.

14         Q.      What did Sheriff Davis

15    tell you on the way?

16         A.      He said that we needed to

17    go down, that we needed to talk and

18    that we would go to Chief Mayfield's

19    office.  Due to the fact he was

20    working that day, we could utilize

21    his office.

22         Q.      What else did chief---

23    excuse me, did Sheriff Davis say on
```

1    the way to the office?

2        A.      That was it.

3        Q.      What did you say?

4        A.      Yes, sir.

5        Q.      Did you have any

6    conversation with Sheriff Davis on

7    the way?

8        A.      I don't recall any, sir.

9    All I recall is him making that one

10   statement and my reply.  And the best

11   of my recollection, that was it on

12   the way down.

13       Q.      Were you surprised that

14   you didn't have any conversation?

15       A.      No, sir.

16       Q.      How long had you known

17   that you were going to get fired?

18       A.      The speculation was there

19   since the first day he come into

20   office.

21       Q.      I'm sorry, when was that

22   first day that Sheriff Davis came

23   into office?

1    A.    January 2007.  Somewhere

2  in the neighborhood of the 18th,

3  19th, 20th; somewhere in that

4  neighborhood.

5    Q.    And who had speculated

6  with you that you were going to be

7  fired?

8    A.    Well, I mean it was--- it

9  was my own assumption that because of

10  who I was, that, you know, that that

11  possibility was certainly there.

12  And, you know---

13    Q.    Who else confided in you

14  that that was their suspicion also

15  when Sheriff Davis came on?

16    A.    At some point in time,

17  probably, and I had a good

18  relationship with most everybody

19  there, all the deputies there.  At

20  probably any given time, at least I

21  would not be surprised, and I don't

22  remember exactly, that each and every

23  one of them made the comment that,

1    you know, you'd better watch your

2    back, you know who you are.

3         Q.    When did they tell you

4    this?

5         A.    From the election of

6    November until basically my

7    termination date.

8         Q.    You mean November of

9    2006?

10        A.    Yes, sir.

11        Q.    So from November of 2006

12   until January the 18th of 2007,

13   people had been telling you that you

14   were going to get terminated?

15        A.    That they would not be

16   surprised, and it went from November

17   2006 until my termination on

18   September 10th, 2007.

19        Q.    And you didn't try to

20   seek employment after November of

21   2006 until after your termination in

22   September 2007?

23        A.    The best of my

1     recollection, the power company job

2     was only job that I had applied for

3     at that time.  No, sir, I did not.

4          Q.      When did you apply for

5     the power company job?

6          A.      The first time was

7     probably approximately two to three

8     years ago.

9          Q.      And when was the last

10    time?

11         A.      Three months ago.

12         Q.      So that I'm clear, in

13    November of 2006, everybody was

14    telling you you were going to get

15    fired and you didn't apply for a job?

16         A.      They wasn't telling me

17    specifically that I was going to get

18    fired, that it was a guarantee that I

19    was going to get fired.  It was

20    that---

21         Q.      But the question is, you

22    didn't apply for a job after you knew

23    that your father had not been

```
 1   re-elected Sheriff?

 2        A.     No, sir.

 3        Q.     I'm sorry.  No, sir,

 4   what?

 5        A.     I did not apply for a

 6   job.

 7        Q.     Why not?

 8        A.     We had the merit system.

 9   And I knew that regardless of who the

10   sheriff was, I was going to do my

11   job.  I had never been disciplined a

12   day in my career.  Never done

13   anything to be disciplined for.  And

14   I knew my work ethics that regardless

15   of who was in office, whether it was

16   Sheriff Davis or whomever it may be,

17   that I was going to do my job, do

18   what he asked of me and do my best on

19   a daily basis.  And because of that,

20   knowing how I would perform my job

21   and that I would not do and I had

22   never been involved in anything that

23   would jeopardize my job, and the fact
```

```
 1    of the merit system, you know, my

 2    assumption was that I was protected.

 3         Q.     When did you first hear

 4    that the merit system had never been

 5    empaneled?

 6         A.     The merit system was

 7    passed through the legislature and---

 8         Q.     When did you first learn

 9    that there was no merit system in

10    place?

11              MR. YAGHMAI:  I'm going

12    to object to the form.

13         A.     Nobody has actually told

14    me that the merit system does not

15    exist.

16         Q.     When did you first learn

17    that there was no merit system board

18    in place?

19         A.     Board?

20         Q.     Yes, sir.

21         A.     I--- several of the

22    deputies had come to me in the latter

23    part of 2006, even prior to the
```

```
 1    election and after the election,

 2    confiding in me, I guess, what I

 3    might know about the merit system,

 4    which wasn't much.

 5         Q.    Who are these people?

 6         A.    There again, I had a

 7    relationship with everyone there.

 8         Q.    Yes, sir.  Tell me who it

 9    is that came---

10         A.    I know specifically I

11    talked with Mike Poe about it.

12         Q.    Anyone else?

13         A.    Myself and Chief Deputy

14    Shane Mayfield discussed the merit

15    system.  Myself and Sherry Tate

16    discussed the merit system.  Kathy

17    Haygood, we discussed the merit

18    system.  I remember those names

19    specifically but it--- there again, I

20    probably discussed it with just about

21    everyone there.  Based on my reading

22    of the merit bill.

23         Q.    And when did you first
```

1    read the merit bill?

2         A.      Probably summer of 2002.

3         Q.      And how did you happen to

4    read it then?

5         A.      State legislature

6    website.

7         Q.      What did you tell Mike

8    Poe when he asked you about the merit

9    system?

10        A.      If I remember correctly,

11   he asked me if I thought we were

12   protected from any new sheriff coming

13   in and my response was I thought we

14   were, just based upon my reading of

15   the bill.

16        Q.      And what did he say?

17        A.      I don't recall exactly.

18        Q.      What did Chief Mayfield

19   say?

20        A.      I recall our

21   conversations pretty much along the

22   same lines.  He didn't have as much

23   to say about it other than the fact

```
 1    that he was--- in his reading of the

 2    merit bill, that it did not apply to

 3    him.

 4         Q.      What did you say?

 5         A.      I agreed with him.

 6         Q.      And what did he say?

 7         A.      As best I recall, that

 8    was pretty much it.

 9         Q.      What did you tell Sherry

10    Tate?

11         A.      There again, confiding in

12    me, maybe they thought I knew more

13    than I did.  There again, the

14    conversation was in my opinion that I

15    think that they would be protected.

16         Q.      What did you tell Sherry

17    Tate?

18         A.      In my opinion, I thought

19    they would be.

20         Q.      And what did Kathy

21    Haygood say?

22         A.      Same thing.

23         Q.      And this was in the
```

1    November of 2006 time period?

2        A.    Either before--- before

3    that, just before that or maybe even

4    after the election.  I know we

5    discussed it after the election as

6    well but---

7        Q.    Why did you discuss it

8    after the election?

9        A.    Well, everybody was

10   concerned that, you know, when a new

11   sheriff comes in, you know, everybody

12   would lose their job.

13       Q.    Did you know or had you

14   ever heard of the merit system board

15   members and who they were?

16       A.    I knew of Sheriff

17   Fulmer's selection.  Any other---

18       Q.    No, sir.  The question

19   is, who were the members of the

20   board.

21       A.    An official board, to my

22   knowledge, there was no members.

23       Q.    And why not?

```
 1        A.      I couldn't tell you, sir.

 2        Q.      You didn't ask your

 3   father?

 4        A.      No, sir.

 5        Q.      Have you asked your

 6   father since why there weren't three

 7   members of the merit system board?

 8        A.      We've--- we've talked

 9   about it.

10        Q.      And what has been his

11   explanation as to why there has been

12   no merit system board?

13        A.      That he consulted with

14   the Commission soon after the bill

15   was passed and that he had his

16   selection for the board.  It was the

17   Commission's responsibility to do

18   their part and that--- and if I'm

19   remembering correctly, his exact

20   words were he didn't know--- he

21   didn't know why it hadn't been done.

22        Q.      What efforts did your

23   father take to have the merit system
```

1    board empaneled?

2         A.      Beyond my knowledge of

3    knowing that he discussed it with

4    commissioners individually---

5         Q.      Which ones?

6         A.      I know for sure Aubrey

7    Wallace.

8         Q.      What other commissioners

9    would your father have discussed it

10   with?

11        A.      I don't recall the exact

12   ones other than Mr. Wallace.

13        Q.      Were you present when he

14   discussed it with Mr. Wallace?

15        A.      No, sir.

16        Q.      How do you know he talked

17   to Aubrey Wallace about appointment

18   to the merit system board?

19        A.      Mr. Wallace and myself in

20   general conversation had talked about

21   the merit system.

22        Q.      And when was that?

23        A.      He was the lobbyist for

```
 1   the merit system bill that was

 2   passed.  And, you know, we just, in

 3   passing, in general conversation,

 4   we've discussed the merit system.

 5        Q.     When was that?

 6        A.     Even times at some point

 7   before the bill was passed.  When the

 8   bill was being drafted.  And after

 9   the bill was passed, I'm sure we did.

10   I don't recall exactly.

11        Q.     When is the last time you

12   spoke with him about the merit

13   system?

14        A.     Probably summer of 2002.

15        Q.     Why didn't you talk to

16   him in November of 2006 after the

17   election?

18        A.     I didn't feel that I had

19   any need of consulting with him at

20   that point.

21        Q.     Have you attempted to

22   find out why the merit system board

23   was not empaneled?
```

```
 1        A.      I talked with

 2   Commissioner Caton concerning the

 3   merit system and merit board

 4   approximately two to three days prior

 5   to Mr. Davis firing me on September

 6   the 10th.

 7        Q.      How was it you happened

 8   to talk to him two or three days

 9   before your termination?

10        A.      I'm sorry, I missed you

11   again.  Can you repeat it?

12        Q.      How is it that you

13   happened to talk to him two or three

14   days before your termination?

15        A.      I had went and spoke with

16   the County Attorney, Mr. Hollis

17   Jackson, as a result of--- I had been

18   moved around in the department and in

19   my opinion, as a way to, I thought,

20   get me to leave.  I had been moved

21   around within the department that I

22   thought was unjust.  I hadn't made

23   any issues about it.  I went along
```

1    and done my job.  And then I was

2    hearing that I was about to be moved

3    again.  I thought maybe I was at the

4    bottom of the barrel, anyway.  But

5    now I'm hearing that I'm about to be

6    moved again.  So at that point in

7    time I made the decision that I would

8    go talk with Mr. Hollis Jackson.  I

9    went and spoke with Mr. Hollis

10   Jackson.  And as a result of our

11   conversation, in conclusion, he asked

12   me if I had--- if I knew any of the

13   commissioners well enough that I

14   could talk to them one-on-one

15   concerning the merit system and the

16   merit board.  And I said yes, sir, I

17   did.  I knew all of them.  In

18   particular, Mr. Allen Caton, that I

19   could talk to.  He recommended that I

20   go talk with Mr. Caton because the

21   Commission is a part of the

22   appointment of the board.  His exact

23   words were to get them to, quote, get

```
 1   the ball rolling, that it needed to

 2   be there, and I agreed with Mr.

 3   Jackson that he was absolutely

 4   correct.  And so based upon his

 5   advice, I met with Mr. Caton probably

 6   the--- I want to say the day after I

 7   talked with Mr. Jackson.

 8       Q.     So two days before your

 9   termination, approximately?

10       A.     Approximately.

11       Q.     Fair enough.  And tell me

12   about that discussion.

13       A.     I called Mr. Caton on his

14   cell phone and asked if I could meet

15   with him.  He--- he was--- had no

16   problem with us meeting.  We met

17   at--- he owns some rental property

18   here in town.  We met there.  He

19   asked me what was going on.  We

20   talked about my job.  One of his very

21   first questions was, you know, why

22   was I working courthouse security,

23   and I told him that that's where Mr.
```

1    Davis put me.  And he said well, you

2    know, haven't you worked

3    investigations and done all--- had

4    this work experience and, you know,

5    been in law enforcement for many

6    years, why would you--- why would it

7    benefit the department and the county

8    as a whole you working in the

9    courthouse security?  And I said,

10   well, sir, I'm not familiar with

11   that, I don't know his reasoning, the

12   fact of his reasoning, that is, but

13   that's where he put me.  We talked

14   about that a brief minute.  He asked

15   me what concerns I had.  I told him

16   that I had concerns of not only

17   myself but for the rest of the

18   employees of the Chilton County

19   Sheriff's Department that over the

20   course of eight to nine months,

21   whatever it was, that we had been

22   threatened, our jobs had been

23   threatened, because of the

1    nonexistence, in Mr. Davis's words,

2    of the merit system and the merit

3    board, that he could do whatever he

4    wanted to do, he was the sheriff,

5    when he wanted to do it and how he

6    wanted to do it, he could have fired

7    me a long time ago.  That I was

8    concerned of not just myself but, you

9    know, we had employees that were

10   being threatened to the point that

11   they dreaded getting up in the

12   morning going to work.  They cried at

13   night before going to work, or going

14   to bed to go to work the next

15   morning.  It was a constant, "I'll

16   fire you", and "I'll get rid of you".

17   And, you know, these people are

18   concerned about their jobs.

19        Q.     And this is what you're

20   telling Chairman Caton.

21        A.     That's correct.

22        Q.     What else did you tell

23   him?

```
 1        A.      He being the part of the
 2    governing entity of the county and
 3    I'm not real sure if he was the
 4    Chairman of the Commission at that
 5    time, very well could have been, I
 6    felt as though because they were a
 7    part of the merit system/board, that
 8    it was something--- the situation
 9    going on was something that they
10    needed to be aware of, one, and two,
11    that they could get this ball rolling
12    with this merit board.
13        Q.      What did he say?
14        A.      Well, toward the end of
15    my conversation, I---
16        Q.      Let's take it
17    chronologically.  What did he say
18    when you told him this is something
19    they needed to be aware of?
20        A.      He absolutely agreed.
21    And he apologized to me and told me
22    that he--- he apologized to me and
23    apologized to the rest of the Chilton
```

```
 1    County Sheriff's Department employees

 2    through me that the board wasn't in

 3    place and that he would do what he

 4    could to try to resolve the

 5    situation.

 6         Q.    What did he say was the

 7    reason the board was not in place?

 8         A.    He, the best of my

 9    recollection, he did not know.  He

10    wasn't a sitting commissioner when

11    the bill was passed.

12         Q.    Did you fill him in on

13    what had taken place?

14         A.    Pertaining to?

15         Q.    The board.

16         A.    As best I knew.

17         Q.    What did you tell him?

18    Was it during the afternoon, you

19    said?

20         A.    Yes.

21         Q.    Okay.

22         A.    I knew that, and I don't

23    recall the exact words I used.
```

1      Q.      Just in general, what did

2   you tell Mr. Caton there that

3   afternoon?

4      A.      I don't recall exactly if

5   we spoke about the--- my knowledge of

6   the board or the creation of the

7   board, other than what was read in

8   the bill, I didn't know nothing

9   else--- nothing no more to tell him.

10      Q.      Well, did you tell him

11   what was in the bill?  I mean here's

12   a fellow who didn't know, he wasn't

13   on the commission at the time.

14      A.      That is correct.

15      Q.      So did you help educate

16   him?

17      A.      I told him my

18   understanding of reading the bill,

19   that the board was to be established

20   by the sheriff's appointment of one

21   member, the commission's appointment

22   of one member, and the third member

23   would be appointed jointly by the

```
 1    Sheriff and the Commission.

 2         Q.      And what did he say?  Mr.

 3    Caton.

 4         A.      That they would

 5    definitely start their part, that

 6    they were a third of the appointment

 7    of the board and that that would

 8    definitely start immediately.

 9         Q.      What did you say?

10         A.      I explained to Mr. Caton

11    that one of my major concerns was

12    that back in March of 2007, that Mr.

13    Davis in one of my two to three

14    meetings that I had with him, told me

15    in March of 2007 that we did not have

16    a merit system, we did not have a

17    merit system, we did not have a merit

18    system, that there wasn't a board in

19    place, that Sheriff Fulmer thought he

20    was doing a good thing but didn't do

21    what he should have done, and he was

22    diligently working in March of 2007

23    to get this board in place and that I
```

1    was concerned because Mr. Davis told

2    me that in March of 2007 and here it

3    is September of 2007 and he had yet

4    to cooperate with the County

5    Commission in appointing his member

6    to the board.  And that other than,

7    you know, he--- in my opinion, he

8    just wasn't going to do it.

9         Q.    And what did Mr. Caton

10   say to that?

11        A.    That they had a meeting

12   coming up that following Monday and

13   that they would have their

14   appointment, their part of the board,

15   named in that meeting Monday and that

16   they would get with Sheriff Davis and

17   get him started on appointing his

18   part.

19        Q.    What did you say?

20        A.    I thanked him for his

21   consideration in trying to express my

22   appreciation of him trying to help

23   with the situation at hand.

1          Q.      And what did he say?

2          A.      If I recall correctly, he

3     thanked me again and apologized to me

4     again.

5          Q.      I'm sorry, why did he

6     apologize?

7          A.      For not having a board

8     there or for--- more so for what

9     several of the employees were going

10    through in being threatened by their

11    jobs and being threatened that they'd

12    be fired.

13         Q.      Who were these employees

14    that were threatened?

15         A.      Sherry Tate was one.

16    Myself.  Robbie Autery.  I know that

17    there were several others that---

18    that--

19         Q.      Who did you tell Mr.

20    Caton that was being threatened?

21         A.      Sherry Tate, myself,

22    Robbie Autery.  To be specific, I

23    know of those three.  I could have

1    told him maybe one or two more.  I

2    don't know.

3        Q.    Who could they have been?

4        A.    Possibly Warren Garris,

5    who if I recall correctly had already

6    been demoted.  And I--- if there was

7    anybody else, sir, I don't recall.

8        Q.    Well, who was it that he

9    was extending this apology to besides

10    you that he wanted you to apologize

11    for him?

12        A.    Just to the employees in

13    general that--- that were--- that---

14    and if I--- through his--- his words,

15    I guess, maybe through me regardless

16    if there was any specific person

17    mentioned to him, if there's anybody

18    within the department that are

19    experiencing these threats and that

20    are experiencing these hardships

21    because of it, express my apology.  I

22    apologize.

23        Q.    He specifically told you

```
 1    that.

 2         A.     Yes, sir.

 3         Q.     And you've now told me

 4    the names of the people that you felt

 5    that you may--- or that you may have

 6    told him about that had been

 7    threatened?

 8         A.     Yes, sir.

 9         Q.     Are there any other

10    people that you may have told him

11    about that were threatened?

12         A.     I don't recall.

13         Q.     Let me ask you this:  Did

14    you go and apologize to Sherry Tate

15    and Mr. Autery on behalf of Mr.

16    Caton?

17         A.     Yes, sir.

18         Q.     And did you apologize to

19    Warren Garris?

20         A.     Yes, sir.

21         Q.     And what did you tell Mr.

22    Warren Garris?

23         A.     Just that I had had a
```

```
 1    conversation with the County

 2    Commissioner and this is what he told

 3    me.

 4         Q.    That's what I'm asking

 5    you:  What did you tell Warren

 6    Garris?

 7         A.    That Commissioner Caton

 8    apologized to me and to others

 9    through me of any hardships that

10    anybody--- anyone may be having in

11    their daily jobs and that they would

12    certainly immediately start their

13    part in getting things corrected.

14         Q.    And that's what Mr. Caton

15    had told you to tell these people

16    that had been threatened.

17         A.    Yes, sir.

18         Q.    What did you tell Sherry

19    Tate that Mr. Caton had told you in

20    the way of an apology?

21         A.    That on--- I explained to

22    these individuals---

23         Q.    No, let's stick with
```

1    Sherry Tate.  What did you tell

2    Sherry Tate?

3         A.     Same thing I told Warren

4    Garris.

5         Q.     What did you tell Sherry

6    Tate?

7         A.     That Mr. Caton apologized

8    for any hardships that anyone was

9    having as a result of the situation

10   that was being created by Sheriff

11   Davis, and that they would

12   immediately do what they could and

13   get their part started in getting the

14   situation resolved.

15        Q.     And their part was what?

16        A.     Appointing their board

17   member.  And getting with the sheriff

18   in getting him to start his part so

19   that--- to get this thing put in

20   place.

21        Q.     And what day of the week

22   was this that you had your meeting

23   with Mr. Caton?

1          A.     I want to say Friday.  It

2    possibly could have been Saturday but

3    I'm thinking more along the lines of

4    Friday.

5          Q.     Okay.  And Mr. Caton

6    assured you that on Monday they would

7    take care of it?

8          A.     Assured me that on Monday

9    they would have their board

10   appointment and that they would

11   consult with the Sheriff in getting

12   things--- getting the ball rolling,

13   as he put it.

14         Q.     And why did he say it was

15   important to get the ball rolling?

16         A.     He and I both agreed that

17   it needed to be there and it was

18   important that it get done.

19         Q.     Why?

20         A.     So that---

21         Q.     What was the situation

22   there I guess at the sheriff's

23   office?

```
 1        A.      Well, if there was any,

 2   you know, the threatening of losing

 3   my job.  At this time I had not been

 4   fired yet but the continuous

 5   threatening of being fired, not only

 6   by myself but Deputy Autery and

 7   Sherry Tate, to be specific, if he

 8   come in on Tuesday morning at 9 a.m.

 9   and said okay, you're fired, who do I

10   file a grievance with?  That's why it

11   was important to me.

12        Q.      What was the situation

13   there at the Sheriff's Office at that

14   time?

15        A.      The threatening of losing

16   our jobs.  You're not going to, in

17   his words, go around all over town

18   talking about me, undermining my

19   department, my authority.

20        Q.      Who said that?

21        A.      Sheriff Davis.

22        Q.      Sheriff Davis said what

23   now?  You're not going to---
```

1     A.     You're not going to go

2  all over town talking about me.

3  Badmouthing me.  Undermining me or my

4  department.

5     Q.     Had you done any of that?

6     A.     No, sir.

7     Q.     Had you spoken critically

8  of Sheriff Davis?

9     A.     There were things said

10  and--- and I even told Sheriff Davis.

11  He asked me or told me that he knew

12  things that had been said, naturally,

13  before the election, after the

14  election.

15     Q.     So the question is, had

16  you badmouthed Sheriff Davis.

17          MR. YAGHMAI:  Object to

18  the form.  You can answer.

19     A.     Not to the extent that he

20  was insinuating.

21     Q.     In other words, you had

22  been critical of Sheriff Davis to

23  people on the street?

```
 1       A.      Not to the extent he was

 2   insinuating.

 3       Q.      Well, what if any

 4   criticisms had you expressed of

 5   Sheriff Davis before you were

 6   terminated?

 7       A.      That he was being

 8   vindictive to me.  I didn't

 9   appreciate it.  I took pride in my

10   job, in my career.

11       Q.      Who did you tell that to?

12       A.      I know I did to Deputy

13   Autery.

14       Q.      Who else did you talk to

15   about Sheriff Davis in a critical

16   vein?

17       A.      I'm expressing my

18   personal experiences.  I don't

19   consider them to be critical.

20       Q.      Had you complained to

21   anyone about Sheriff Davis before

22   your termination?

23       A.      Myself and Mike Poe
```

1   talked.  I was his supervisor.  We

2   talked on numerous occasions.  Myself

3   and Shane Mayfield talked.  Myself

4   and Captain Steve Tate talked.

5   Myself and at the time Captain Gerald

6   Purvis talked.  I remember those

7   specifically that I expressed my

8   personal concerns.

9        Q.    Did you talk to anyone

10  else other than these four

11  individuals?

12       A.    I'm sure I did, sir.

13  Specifically I don't recall who they

14  could have been.

15       Q.    Did you talk to any

16  county commissioner?

17       A.    Other than Mr. Caton two

18  or three days prior to my

19  termination, I don't recall.  I don't

20  recall talking to any of them.

21       Q.    Did you talk to any if

22  not county commissioner, any county

23  employee not associated or connected

# EXHIBIT 3
# (PART 2)

```
 1    with the Sheriff's Department of

 2    Chilton County?

 3         A.     If I did, sir, I don't

 4    recall.

 5         Q.     So that I'm clear then,

 6    you had not been critical of Sheriff

 7    Davis prior to your termination.

 8         A.     It could have been

 9    critical to others; within myself, I

10    was expressing my personal

11    experiences and my personal--- what

12    was being detrimental to me as a

13    person and to my career.

14         Q.     Okay.  And those

15    individuals that you expressed those

16    criticisms of Sheriff Davis were Mike

17    Poe, Shane Mayfield, Captain Tate and

18    Captain Purvis?

19              MR. YAGHMAI:  Object to

20    the form.  You can answer.

21         A.     That I remember.

22         Q.     Okay.  And what did you

23    tell Mike Poe of a critical nature
```

1    about Sheriff Davis before your

2    termination?

3        A.    There again, in my

4    personal appearance or opinion, it

5    wasn't anything critical in that we

6    had a conversation after I was moved

7    the first time, which was within the

8    first month of him taking office.

9    The conversation was sparked by Mike

10    Poe and that, you know, it doesn't

11    surprise me that, you know, I figured

12    this was coming, you know, who you

13    are, and, you know, if I was you, you

14    know, any conversations from here on

15    out that y'all may have or he may

16    call you in, you need to be recording

17    everything, and I've got lawyers with

18    PBA that you can talk to if you want

19    to.

20        Q.    Did you talk to any

21    lawyers?

22        A.    No, sir.

23        Q.    Did you record anything?

1          A.      No, sir.

2          Q.      Do you know of any

3    recordings?

4          A.      Not to my knowledge.

5          Q.      Okay.  And so Mike Poe is

6    telling you that you ought to record

7    all your conversations?

8          A.      That is correct.

9          Q.      And you didn't do it?

10         A.      No, sir.

11         Q.      Why not?

12         A.      I didn't think I needed

13   to.  I was hoping I wasn't going to

14   have to.  At that point in time when

15   that was mentioned, I was---

16         Q.      When was this that you

17   had this conversation in which you

18   were critical of Sheriff Davis with

19   Mike Poe?

20         A.      There again, I don't--- I

21   don't---

22         Q.      Just your best judgment.

23         A.      Well, it's not of my

1    experience that I was being critical.

2    I will express that again.  It was

3    expressing my personal experiences.

4    And I want to say the conversation

5    with Mike Poe was right after he---

6    within a week or two of Sheriff Davis

7    moving me from Commander of our Drug

8    and Violent Crime Task Force and

9    Investigations Supervisor, moving me

10   out of the Commander's position and

11   taking my vehicle away from me,

12   putting me in another vehicle, and

13   putting me into the Investigation

14   Office strictly there as a

15   Supervisor.

16        Q.     Did the Sheriff have a

17   conversation with you as to why he

18   had taken you out of that position?

19        A.     Yes, sir.

20        Q.     And what did he tell you

21   was the reason?

22        A.     There was probably three

23   or four different reasons he give me.

```
 1        Q.      What did he say and where

 2   was this conversation?

 3        A.      In the--- at the jail in

 4   the Chief Deputy's office.

 5        Q.      And who was present?

 6        A.      Myself, Sheriff Davis and

 7   I want to say if I remember correctly

 8   Chief Deputy Mayfield was there.

 9        Q.      Okay.  And what did the

10   Sheriff tell you?

11        A.      He called me on our

12   SouthernLINC Radio at approximately 3

13   or 3:30 that evening.  When I

14   answered him, he said where are you.

15   I said I'm at home.  There was

16   probably a two to three-minute break

17   there.  I beeped--- called him back

18   and said Sheriff, I'm available, I'm

19   not doing anything if you need me, do

20   you need me for anything.  He says

21   yeah, if you don't mind, come down to

22   the jail, I need to talk to you.  So

23   I got in my vehicle and I come to the
```

1    jail and I come to talk with the

2    Sheriff.  And as I said, I think I

3    recall Chief Deputy Mayfield being

4    there as well.

5        Q.    And what did the Sheriff

6    tell you?

7        A.    He said that, and I

8    would--- there again I've got notes

9    of all these meetings and I could

10   refer to them to give specific

11   wording because I think I pretty much

12   put most everything in there, but

13   what I recollect as I'm sitting here

14   is that he told me that it bothered

15   him that when he called me on the

16   radio that I was at home and that I

17   had at the time I think two other

18   investigators, maybe three, that were

19   all out in the county working on

20   something, doing something, and here

21   I am at home, that that bothered him.

22   And I said well, sir, prior to me

23   going home today, I went to each and

1    every investigator we had.  And now

2    that I'm remembering it, we did have

3    three.  Lieutenant John Shearon,

4    Sergeant Mike Poe and Investigator

5    Shane Lockhart.  I went to all three

6    investigators and I asked them have

7    y'all got anything going on, is there

8    anything major going on, you need

9    help with anything, anything I can do

10   for y'all.  Everybody's response to

11   me was no, nothing major going on, we

12   don't need anything.  I said okay,

13   I'm going to the house.  Sometime

14   prior to this, in a deputy's meeting,

15   a staff meeting, Sheriff Davis told

16   each and every one of us there that

17   there would not be no overtime, that

18   when he was the City of Maplesville

19   Chief of Police he cut out all

20   overtime and that he had planned on

21   doing that here.  When you had your

22   time in, you are to go home.  There's

23   no going beyond your quit time.  On

```
 1    the clock is overtime, when your time

 2    is in, you go home.  Well, I had

 3    acquired some overtime hours earlier

 4    in the week, or earlier in the pay

 5    period, okay?  Three o'clock this

 6    particular evening my time was done.

 7    My time was up.  I certainly didn't

 8    want any repercussions from getting

 9    into overtime.  So I go home.  So I

10    explained to the Sheriff that was my

11    reason for being home.

12         Q.      That's what you explained

13    to him there in the office of the

14    Chief Deputy.

15         A.      Correct.

16         Q.      And then what happened?

17         A.      The sheriff said it also

18    bothers me that, and I don't recall

19    the date, but that, and keep in mind

20    I was a commander of a drug and

21    violent crime task force, that prior

22    to this meeting we were having, my

23    task force agents were out doing a
```

1    search warrant and it bothered him

2    that I wasn't there.  And I said

3    well, sir, I'll explain that if I

4    can.  He said sure.  Well, my

5    explanation was that we had a

6    conversation between the two of I---

7    two of us, just a general

8    conversation prior to this date, and

9    he asked me, did I go on all the

10   search warrants and all that kind of

11   stuff and I told him then that not

12   only do I go on most all search

13   warrants, but I want to be there on

14   all of them, but that there would be

15   times that I wouldn't be there.  But

16   that--- my words were, if I remember

17   correctly, 90, 95 percent of the time

18   not only I wanted to be there, that I

19   would be there.  So back to the

20   meeting.  I told the Sheriff that he

21   was correct that I was not there but

22   that I had left, this was like on a

23   Saturday night or maybe even a Sunday

```
 1   night when this search warrant took

 2   place.  I had left out of town, out

 3   of county, the Friday prior.  I told

 4   the Sheriff that my task force agent

 5   guys had contacted me, I knew exactly

 6   what was going on, what steps were

 7   taken.  They were drafting search

 8   warrants, where they were going, who

 9   all was going, what they were there

10   to look for, all the circumstances

11   surrounding the search warrant I was

12   familiar with.  I was in a location

13   that I didn't have very good signal

14   in my SouthernLINC so at eleven

15   o'clock that night, I'm standing

16   underneath way back away from this

17   house I was at, holding my radio up

18   in the air trying to keep a signal so

19   that I could talk with the guys.  I

20   gave them instructions, they kept me

21   well updated on what was going on,

22   calling me on two-way asking me for

23   advice in the situation they were in.
```

1    I done that up until midnight that

2    night when the search warrant

3    concluded.   Then I went to bed.   And

4    I also referenced to the Sheriff that

5    with the Chief Deputy sitting there,

6    that he was, as I was Commander of

7    the Drug and Violent Crime Task

8    Force, he was Commander of Special

9    Operations and that they do high-risk

10   seach warrants and that kind of

11   thing, and that with him being

12   Commander of the Tact Team, that it

13   was very possible that I knew, I had

14   personal knowledge that he hadn't

15   been at every one of their callouts,

16   and that I was in the same boat he

17   was in, he was in the same boat I was

18   in.   We're not--- we're going to be

19   there and if we're not there, we're

20   going to want to be there.   But we're

21   not going to be able to be at each

22   and every instance.

23       Q.    And what did the sheriff

```
 1   say?  Sheriff Davis.

 2        A.     He said that--- the next

 3   thing he said was that, well, you're

 4   in an administration position.  I

 5   think my department now has too many

 6   administration positions, that I

 7   think me and the Chief Deputy should

 8   be the only two administrators in the

 9   Department.  You are an investigator,

10   you're a good investigator, you're

11   probably a better investigator than

12   I'll ever be.  I'm going to take you

13   out of the--- as Commander of the

14   Drug and Violent Crime Task Force,

15   and place you strictly in General

16   Investigations to remain as their

17   Supervisor.  I think you're an asset

18   to my department, the people of this

19   county and to me personally being

20   there in that position.  So that's as

21   of today, or I can't recall if he

22   give me a date, but that's where

23   you'll be.  In addition to that, I
```

```
 1   was driving a 2006, 2007 Ford

 2   Expedition, which the vehicle has

 3   never really been a big thing to me,

 4   but it just so happened that's what I

 5   was driving.  He says in addition to

 6   that, I'm taking your vehicle away

 7   from you, I'm going to take my

 8   vehicle, the vehicle he was driving,

 9   the sheriff was driving, and I'm

10   going to trade them in and I'm going

11   to give you something just like what

12   the other investigators are driving

13   so that y'all will all be alike.  I

14   said yes, sir, no problem, I don't

15   have a problem with that.  That was

16   part of my response.  My other

17   response was that that was completely

18   fine with me, that I had a lot of

19   responsibility as the Commander, and

20   as Supervisor of General

21   Investigations.  I enjoyed

22   investigations, didn't have a problem

23   with doing that at all, and that I
```

```
 1    would do my job in whatever he asked

 2    of me from that day forward.

 3         Q.     Had you told Mike Poe

 4    about this meeting that you had with

 5    Sheriff Davis?

 6         A.     I'm sure I did.  I don't

 7    recall a specific meeting with him

 8    but he was one of my investigators

 9    and, you know, not only are we

10    coworkers, we kind of knit as a

11    family as well so I'm sure I did talk

12    with him.

13              MR. YAGHMAI:  I don't

14    mean to cut you off, and this is off

15    the record.

16              (Off-record discussion)

17         Q.     So you had this

18    conversation--- how many

19    conversations did you have with Mike

20    Poe?

21         A.     I don't recall exactly.

22         Q.     Just your best judgment

23    as you sit here today, just
```

```
 1    approximately.

 2         A.      I mean we saw each other

 3    every single day.  I mean there were

 4    many, many conversations that---

 5         Q.      I mean about this

 6    situation with the department and the

 7    sheriff, and your concerns about the

 8    department.

 9         A.      I mean I don't recall an

10    exact number.

11         Q.      Just approximately, how

12    many would you say?

13         A.      I don't feel right about

14    even giving you an approximate

15    number.

16         Q.      Are we talking about

17    five?  Are we talking about ten?

18         A.      I'm sure five, could have

19    been ten.

20         Q.      Okay.  How many

21    conversations did you have with Shane

22    Mayfield regarding your concerns

23    about the Chilton County Sheriff's
```

1    Department?

2         A.    Approximately two to

3    three.

4         Q.    Okay.  How many with

5    Captain Steve Tate concerning the

6    status of the Chilton County

7    Sheriff's Department?

8         A.    Three, four, maybe.

9         Q.    How many conversations

10   with Captain Purvis concerning the

11   situation under Sheriff Davis?

12        A.    Maybe two or three.

13        Q.    How many times did you

14   meet with Sheriff Davis concerning

15   the situation there at Chilton County

16   Sheriff's Department?

17        A.    I never went to Sheriff

18   Davis and met with him about any

19   concerns I had with the Sheriff's

20   Department.

21        Q.    Why not?

22        A.    We talked about concerns

23   when he would call me in for a

1    meeting, when he would move me from

2    one place to the other.

3        Q.    But why didn't you go to

4    him and say Sheriff, I need to talk

5    to you about you moving me from one

6    place to another?

7        A.    Well, I mean we discussed

8    it and he give me his reasoning

9    during the meeting.  And when the

10   move was done---

11       Q.    How many meetings did you

12   have with him?

13       A.    Three.

14       Q.    You told us about the

15   first meeting; is that correct?

16       A.    That's correct.

17       Q.    When was the second

18   meeting?

19       A.    The jail.  Chief Deputy's

20   office.

21       Q.    What did that concern?

22       A.    He called me in, needed

23   to talk to me.  I recall walking in

```
 1    and his first words were, "What is it

 2    going to take to get me and you to

 3    work together".

 4         Q.     And who was present for

 5    that meeting?

 6         A.     Myself, Sheriff Davis and

 7    there again possibly Chief Deputy

 8    Mayfield.  I'm not real sure if he

 9    was there or not.

10         Q.     What happened in that

11    meeting?

12         A.     He told me that, you

13    know, everybody was coming to him

14    telling him that I'm going around

15    saying things about him, badmouthing

16    him out in public in all the

17    restaurants.

18         Q.     Had you been badmouthing

19    him in public?

20         A.     No, sir.

21         Q.     Had you badmouthed him in

22    any restaurants?

23         A.     No, sir.
```

1      Q.      Had you badmouthed him to

2    anybody with law enforcement?

3      A.      No, sir.

4      Q.      Okay.

5      A.      Not what I consider

6    badmouthing.  No, sir.

7      Q.      But you were talking

8    about Sheriff Davis.

9      A.      And there again,

10   reflecting on my personal experiences

11   from the way I was being singled out

12   and treated at the time, yes, sir.

13     Q.      So you were--- you were

14   the person that was being singled

15   out.  No one else in the department.

16     A.      At that particular time,

17   that's correct.

18     Q.      When did anyone else get

19   singled out?

20     A.      Well, I mean, you know,

21   it was--- the writing was on the wall

22   with the memo with the driving the

23   cars home directed, and this is my

1    personal opinion, toward Deputy

2    Autery.  That's all I recall.

3        Q.    And what do you mean,

4    "the writing was on the wall"?

5        A.    Well, I mean there was---

6    there was two deputies that lived

7    beyond that fifteen miles, and

8    certainly one of them was Deputy

9    Autery, and the other was a supporter

10   of Sheriff Fulmer as well.

11       Q.    And how is that singling

12   out Deputy Autery?

13       A.    He lived beyond the

14   fifteen miles.  He put---

15       Q.    Did---

16             MR. YAGHMAI:  Can you let

17   him finish?

18             MR. SHEEHAN:  You're

19   absolutely right.  I'm sorry.

20       A.    If you put a memo out

21   restricting vehicles and your

22   reasoning is for wear and tear on a

23   vehicle, and you do it up to a

1   five-mile limit, and you've got a

2   deputy that's an additional eight

3   miles beyond that---

4        Q.    Let me ask you this:  Why

5   was he singling out Mr. Autery?

6        A.    Well, he knew he was a

7   bonafide supporter of Sheriff Fulmer,

8   for one.  He was related by marriage

9   at one point in time to Sheriff

10  Fulmer.  He was vocal about his

11  support of Sheriff Fulmer.  The---

12  when I say the writing on the wall,

13  it's that everybody in the

14  department, you could ask anybody

15  there, the first thing they're going

16  to tell you is if anybody gets gone,

17  it's going to be you.

18       Q.    Mr. Autery?

19       A.    And myself.  I mean

20  that's--- that's, you know, that's

21  everybody.  I mean that's just---

22       Q.    That was from day one

23  when he took office?

```
 1          A.      Yes, sir.  Yes, sir.

 2          Q.      And he took office in

 3   January of 2007?

 4          A.      That's correct.

 5          Q.      Did Mr. Autery seek

 6   employment anywhere?

 7          A.      I don't recall.  I don't

 8   have any knowledge of that.

 9          Q.      Do you attend church?

10          A.      No, sir.

11          Q.      All right.  Have you---

12   did you contribute to your father's

13   campaign?

14          A.      Yes, sir.

15          Q.      And how much?

16          A.      You mean financially?

17          Q.      Please.

18          A.      No, sir.  If you want to

19   count gas money, yeah.

20          Q.      Did you campaign for your

21   father door to door as did Mr.

22   Autery?

23          A.      Yes, sir.
```

```
1        Q.      As I understand, you

2   talked to no other attorney other

3   than your current attorney here

4   today --

5        A.      That's correct.

6        Q.      -- about the situation.

7   And are you contending that your

8   sleep has been affected as a result

9   of this incident?

10       A.      Yes, sir.  Yes, sir.

11       Q.      And how has it been

12  affected?

13       A.      I haven't slept for a

14  year, other than with the assistance

15  of medication that I think is

16  helping.

17       Q.      Okay.  And what

18  medication is that?

19       A.      He first prescribed me

20  Klonopin, that I still--- I don't

21  take on a nightly basis.

22  Occasionally.  And this Lexapro,

23  according to him, is supposed to
```

```
 1    assist in that as well.

 2         Q.      Who prescribed the first

 3    medication?

 4         A.      Dr. Patel.

 5         Q.      And when was that?

 6         A.      I don't recall.

 7         Q.      Just your best judgment

 8    as you sit here today.

 9         A.      Late spring, early summer

10    of 2007 when I first went.

11         Q.      And you told him that you

12    couldn't sleep and he prescribed

13    medication for you at that time?

14         A.      It was part of it.  Yes,

15    sir.  I was having trouble sleeping.

16    Yes, sir.

17         Q.      What did you tell Dr.

18    Patel?

19         A.      That there were issues at

20    work that, you know, I was, you know,

21    I had always been real good

22    throughout my career at this line of

23    work with handling stress-related
```

1    stuff, and I thought I was having

2    trouble with handling that at this

3    time.   There was a lot of stress

4    going on at work.

5        Q.     Did he recommend that you

6    find other employment?

7        A.     I don't recall if he did

8    or not.

9        Q.     You haven't slept since

10   your termination or before your

11   termination?

12       A.     I mean there's nights

13   that I get some sleep.  Yes, sir.

14       Q.     What about your appetite;

15   do you contend your appetite has been

16   affected as a result of the incidents

17   for which you filed this lawsuit?

18       A.     No, sir.

19       Q.     Do you contend that

20   you've had a weight loss or weight

21   gain as a result of the incidents for

22   which you filed this lawsuit?

23       A.     Probably weight gain.

85

1          Q.      How much?

2          A.      I don't know.

3          Q.      Just your best judgment.

4          A.      I'm just guessing.  I

5     haven't--- I don't know what I

6     weighed prior and I don't really know

7     what I weigh now.  But I just feel

8     like I have, yeah.

9          Q.      Well, can you tell us as

10    you sit here today the approximate

11    amount of your weight begin that

12    you've had since you filed this

13    lawsuit?

14         A.      No, sir.

15         Q.      Have you had any problems

16    with your vision as a result of the

17    incident for which you filed in this

18    lawsuit?

19         A.      I've just been prescribed

20    glasses.

21         Q.      By whom?

22         A.      Dr. John A. Long.

23    Alabama Ophthalmology in Birmingham.

1    Q.    And did you tell Dr. Long

2  that it was as a result of this

3  incident?

4    A.    No, sir.

5    Q.    What did you tell Dr.

6  Long?

7    A.    Couldn't see.

8    Q.    Do you contend that your

9  taste has been affected as a result

10  of this incident for which you filed

11  this lawsuit?

12    A.    No, sir.

13    Q.    Do you contend your

14  hearing has been affected as a result

15  of the incident for which you filed

16  this lawsuit?

17    A.    No, sir.

18    Q.    Do you contend your

19  energy or stamina has been affected?

20    A.    I think energy.  Yes,

21  sir.

22    Q.    And how has it been

23  affected?

```
1        A.      Just no energy.  You

2    know, you don't get the appropriate

3    amount of sleep, you know, worry,

4    stress, you know, that's going to

5    affect your energy level.

6        Q.      Do you contend your

7    exercise has been affected?

8        A.      I guess that would be a

9    result of the lack of energy.

10       Q.      Okay.  So you do contend

11   your exercise has been affected.

12       A.      Yes, sir.

13       Q.      Do you contend that

14   you've had an illness or physical

15   problem as a result of this incident

16   for which you filed this lawsuit?

17       A.      No.

18       Q.      Do you contend you've had

19   nausea as a result of this incident

20   for which you filed this lawsuit?

21       A.      No, sir.

22       Q.      Have your reflexes been

23   affected?
```

1          A.        No, sir.

2          Q.        Have you had any pain,

3    shaking or tremors as a result of

4    this incident for which you filed

5    this lawsuit?

6          A.        I mean I have headaches

7    now that I normally never have gotten

8    and, you know, blood pressure is---

9    I've never had high blood pressure

10   ever in my life and the last two or

11   three times I've been to the doctor,

12   I've had high blood pressure.

13         Q.        And what did you tell the

14   doctor?

15         A.        He just--- I didn't know.

16   He just checked it and said that---

17         Q.        Which doctor did you---

18         A.        Patel.

19         Q.        He told you that your

20   blood pressure was as a result of

21   this incident for which you filed

22   this lawsuit?

23         A.        He didn't say that

```
 1   specifically, no, sir.

 2         Q.      But led you to believe

 3   that.

 4         A.      Just he--- he--- he

 5   didn't mention that it was in

 6   relation other than the fact that

 7   it--- it may be as a result of the

 8   stress and, you know, the things

 9   going on with my job and all that

10   kind of stuff.

11         Q.      What's going on with your

12   job now?

13         A.      Nothing now.

14         Q.      Is it a good job?

15         A.      Yes, sir.

16         Q.      Do you like where you

17   work?

18         A.      Yes, sir.

19         Q.      You like what you're

20   doing?

21         A.      I do, other than the fact

22   that I mean I--- I take a lot of

23   pride in my career and my profession
```

```
 1   and a lot of hard work, a lot of

 2   training to get to where I was a year

 3   ago.  And other than the fact I've

 4   now gone back to where I started my

 5   career, you know, other than that

 6   fact, I don't have no problems at

 7   all --

 8        Q.    Now, have you---

 9        A.    -- with my job.

10        Q.    You told me about the

11   first meeting with Sheriff Davis.

12   You told me about the second meeting

13   with Sheriff Davis and you said there

14   was a third meeting with Sheriff

15   Davis.

16        A.    The termination meeting.

17        Q.    And tell me what happened

18   in that termination meeting.  Where

19   was it?

20        A.    That--- that was the

21   meeting when I was at work at the

22   courthouse security and he--- he had

23   me follow him to his truck to the
```

```
 1   jail.

 2        Q.      And who was at that

 3   meeting, the jail?

 4        A.      Myself, and Captain Steve

 5   Tate come in toward the latter part

 6   as a request by Sheriff Davis.

 7        Q.      And what did the sheriff

 8   tell you in that meeting?

 9        A.      He wanted to know if I

10   had talked to any commissioners

11   lately.  My response was yes, sir.

12   I'm friends with several of the guys

13   and, you know, working courthouse

14   security, I see them.

15        Q.      Friends with whom?

16        A.      The county commissioners.

17        Q.      Which ones?

18        A.      Allen Caton, or not

19   necessarily friends, so to speak, but

20   acquaintances of all the

21   commissioners, all seven of them.

22        Q.      You told the sheriff you

23   were friends with the commissioners.
```

1    Which ones are you friends with?

2         A.    Well, I mean I referred

3    to them as a friend.  I mean I---

4         Q.    Caton.  Who else?

5         A.    My acquaintances with the

6    Commission would be Allen Caton.  I

7    speak to him when I see him.  I speak

8    with Allen Wyatt when I see him.  I

9    speak to Joe Headley when I see him.

10   I speak to Bobby Agee when I see him.

11   I speak to Heedy Hayes when I see

12   him.  I speak to Tim Mims when I see

13   him.  And I think that's all of them.

14        Q.    Which ones do you

15   consider friends of all the

16   commissioners?

17        A.    I mean I guess--- I don't

18   know if you consider them friends.  I

19   mean you may refer to them as a

20   friend but I would say I know on a---

21   I know Allen Caton.  I probably spoke

22   with him more than any of them, and

23   probably Allen Wyatt.  And Joe

1    Headley.  And I used to work for

2    Commissioner Tim Mims.

3         Q.    So you told the sheriff

4    that you were friends with several of

5    the commissioners --

6         A.    Mmm hmm.

7         Q.    -- during this meeting;

8    is that correct?

9         A.    That's correct.

10        Q.    And what did the sheriff

11   say when you told him that you were

12   friends with these county

13   commissioners?

14        A.    Well, I said that I was

15   friends with the county commissioners

16   and that I spoke with them--- spoke

17   to them when I saw them.

18        Q.    What did the sheriff say?

19        A.    "What did you say?".

20        Q.    What did you reply?

21        A.    And I said, what are you

22   referring to.  Well, when did you

23   speak to the county commissioners.

```
 1   Well, I can't recall the last time I

 2   spoke with county commissioners but

 3   referring to at the courthouse during

 4   my job is where we were at during

 5   that conversation, but that I speak

 6   to them when I see them.  He says

 7   have you specifically talked to any

 8   one commissioner lately.  And I said

 9   yes, sir.  He said who, and he said

10   have you spoken with Commissioner

11   Caton.  And I said yes, sir.  What

12   did y'all talk about.  And I said we

13   talked about my job, how things were

14   going.  He asked me about, there

15   again, why I was working courthouse

16   security and that kind of thing.  And

17   he said what else did you all talk

18   about.  I said well, you know, we

19   just talked.  And he said I want to

20   know specifically what y'all talked

21   about.  And I said well, sir, I said

22   I wasn't on your time clock, I wasn't

23   in your vehicle, I wasn't in your
```

1    uniform.  I had a conversation with

2    commissioner Allen Caton on a

3    personal basis and I think that's

4    between me and Mr. Caton.  Oh, so

5    you're not going to share--- Sheriff

6    Davis says, so you're not going to

7    tell me what you and Mr. Caton talked

8    about.  Well, I said, well, other

9    than specifically other than what I

10   already said, no, sir.  And then he

11   says well, what are you and Robbie

12   Autery up to.  I said sir, what are

13   you talking about.  About these

14   ethics, alleged ethics complaints

15   and, you know, what y'all got up your

16   sleeve with that.  I said sir, I

17   don't know what you're talking about.

18   Oh, so you're telling me you and

19   Robbie Autery don't talk.  I said

20   yes, sir, I've been knowing Robbie

21   all my life.  By marriage, he's my

22   first cousin.  We talk on a daily

23   basis.  Well, you're not going to

```
 1   tell me what y'all talked about about
 2   my involvement with any kind of
 3   ethics violations.  And I said no,
 4   sir.  Those discussions were between
 5   me and Robbie and that's--- no, I'm
 6   not going to say anything.
 7              And if I could elaborate
 8   a little bit, myself and Captain Tate
 9   was going to a security meeting at
10   Talladega and of course he and I were
11   in a vehicle together, we traveled
12   over.  Our trip got cut short because
13   of a crisis in my family.  I had to
14   turn around and come back.  During
15   that meeting, we talked the whole way
16   there and the whole way back.
17              Now, back to the meeting,
18   the third part of the meeting was
19   Sheriff Davis said well, what
20   conversations have you had with Steve
21   Tate about me and the Attorney
22   General's office and ethics
23   violations and things that I'm
```

1  supposed to be doing and all that

2  kind of stuff.  And I said well,

3  anything really amounting to anything

4  on my behalf, not much.  We talked

5  the whole way there and the whole way

6  back.  But, you know, as far as my

7  part, there wasn't nothing really

8  said to amount to anything.  Oh, so

9  you're not going to tell me what

10  y'all said.  And I said well, you

11  know, there again, as far as my part,

12  I didn't elaborate on a whole lot of

13  things.  It was him doing most of the

14  talking and I listened.  And so then

15  he called Steve Tate on the radio and

16  we sat there and we sat there and

17  quite a bit of time went by because

18  he wanted Steve Tate in the meeting

19  to confront Steve about what I

20  supposedly said during our travels.

21  And he was busy on a call so we had

22  to wait on him.  So we sat there and

23  we sat there.  And finally Captain

```
 1   Tate, Steve Tate, pulled up.  And the
 2   sheriff asked him, he says did you or
 3   did you not tell me that Shane said
 4   something, and I don't remember the
 5   exact words, but something related to
 6   the Attorney General's office and
 7   ethics violations.  And Steve Tate's
 8   response was, he was sitting beside
 9   me, is that not what I told you this
10   morning.  And the sheriff said yes.
11   And he said well, my story is not
12   going to change.  So, the sheriff
13   says you're not---
14        Q.     You said the story is not
15   going to change?
16        A.     Steve Tate.  Apparently
17   they had talked that morning and he
18   told him something I allegedly said.
19        Q.     What did he tell him that
20   you allegedly said?
21        A.     I don't--- I don't--- it
22   was in reference to the Attorney
23   General's office and ethics
```

```
 1   violations.  I don't know exactly

 2   what it was, but that's what it was

 3   in reference to.

 4        Q.      How do you know that that

 5   is what it was in reference to?

 6        A.      That's what he said.

 7        Q.      That's what the sheriff

 8   confronted Steve Tate with there in

 9   the meeting with you.

10        A.      Correct.  The sheriff

11   says you're not going to be truthful

12   with me about the talking with

13   Commissioner Caton, you're not going

14   to be truthful with what Robbie and

15   you and have got going with the

16   ethics violations, you're not going

17   to be truthful with me about having a

18   conversation with Steve Tate

19   pertaining to you telling him stuff

20   about the Attorney General's office

21   and ethics violations.  You've got a

22   choice.  Either you can resign or

23   you're fired.  And I told sheriff
```

```
 1   Davis that I had had a good career, a

 2   long career, a successful career,

 3   I've never been disciplined before a

 4   day in my career.  Never been written

 5   up, never been disciplined for

 6   anything, that I had always done my

 7   job, including since he had been

 8   there, or from my tell since he had

 9   been there, and I was not going to

10   resign from my job.  And he said

11   well, then your other option is

12   you're fired.  And he called another

13   deputy in---

14        Q.     Who was that?

15        A.     Lieutenant John Shearon,

16   to take me home.

17        Q.     And did he take you home?

18        A.     Yes, sir.

19        Q.     Okay.  And you haven't

20   spoken to the Sheriff since?

21        A.     No, sir.

22        Q.     Other than Commissioner

23   Caton, did you ever speak to any
```

```
 1    other commissioner about the

 2    situation at the Sheriff's Office?

 3         A.     Not that I recall.

 4         Q.     And how many times have

 5    you spoken to anyone at the Attorney

 6    General's office?

 7         A.     Two.

 8         Q.     When was the first time?

 9         A.     Whatever day it was

10    myself and Robbie went to the AG's

11    office.  I don't remember when that

12    was.

13         Q.     When was the second time

14    you had a conversation with anyone at

15    the Attorney General's office?

16         A.     I met with the

17    investigator six months ago.

18         Q.     And which investigator

19    did you meet with six months ago?

20         A.     The investigator with the

21    AG's office.

22         Q.     Which one?

23         A.     His last name was Sisson,
```

```
 1    I think.
 2         Q.      And where was that
 3    meeting?
 4         A.      At Exit 219.
 5         Q.      And what did you tell
 6    Investigator Sisson at Exit 219?
 7         A.      He had just been given
 8    the case apparently and was asking me
 9    basically what I knew in relations to
10    the initial e-mail that was sent in
11    by Robbie.
12         Q.      And what did you tell
13    him?
14         A.      That the only thing that
15    I knew was that I mean that, you
16    know, what the word was, and that,
17    you know, that I had no personal
18    knowledge, no facts, any of that kind
19    of thing, but that it was alleged
20    that the sheriff was doing business
21    with his wife's company, purchasing
22    dog equipment and purchasing dogs,
23    doing business at her or at their
```

```
 1    convenience store, that I had not

 2    seen anything that give me specifics

 3    on that, but that it was being talked

 4    and that it was around people in the

 5    county and other deputies that that

 6    was going on.   And that that was

 7    pretty much all I knew about it.

 8         Q.     And did he record that

 9    conversation?

10         A.     Not to my knowledge.

11         Q.     And as I understand,

12    you've got some notes of your

13    meetings with the sheriff.

14         A.     That's correct.

15         Q.     And how many pages of

16    notes?

17         A.     It may be five.

18         Q.     And were they prepared on

19    the computer?

20         A.     Yes, sir.

21         Q.     Which computer?

22         A.     My home computer.

23         Q.     And that's the--- what
```

```
 1    did you say the brand was?

 2         A.    I couldn't recall.  I

 3    don't know what this is, HP or a

 4    Dell?  I'm not sure.

 5         Q.    Were these notes prepared

 6    at or near the time of the event?

 7         A.    Yes, sir.

 8         Q.    And where are these notes

 9    now?

10         A.    I've got a copy with me

11    today.

12              MR. SHEEHAN:  Let's go

13    ahead and mark those.

14              MR. YAGHMAI:  I want to

15    look at them first.  Y'all haven't

16    made a request for them before.  I

17    need to talk to him and we need to

18    take a break.  We've been going an

19    hour and a half and I need to know

20    whether I'm going to object to

21    producing them or not.  I'm going to

22    talk to him for a minute and then

23    I'll let you know.
```

```
1                    (Recess)

2               MR. SHEEHAN:   Thank you

3    for your time.

4                    (Lunch recess)

5    BY MR. SHEEHAN:

6         Q.      Mr. Fulmer, it appears

7    that there are seven pages as opposed

8    to five pages of notes.

9         A.      Yes, sir.

10        Q.      And these notes you

11   prepared on a computer, you say?

12        A.      Handwritten and retyped

13   on a computer.  Yes, sir.

14        Q.      When did you--- where are

15   the handwritten notes?

16        A.      I've got them.

17        Q.      Have you got them with

18   you?

19        A.      Mmm hmm.

20              MR. SHEEHAN:   I want to

21   mark those, too.

22              MR. YAGHMAI:   Well, I

23   haven't taken a look at them.  I
```

1    don't know if there's any attorney-

2    client privilege.  I didn't

3    realize--- can we address it after we

4    finish the deposition of Sheriff

5    Davis?  That will give me a chance to

6    look at them.

7                MR. SHEEHAN:  We'll mark

8    that as composite Exhibit 9, the

9    handwritten notes.

10        Q.    The handwritten notes;

11    they were prepared at or near the

12    time of the event?

13        A.    Yes, sir.

14        Q.    So they would be a more

15    accurate record of what took place

16    based upon your knowledge at the

17    time?

18        A.    Yes.

19        Q.    Because Exhibits 2

20    through 8 to your deposition were

21    things that you went back and typed

22    up.

23        A.    Based on my handwritten

1    notes.  Yes, sir.

2              MR. SHEEHAN:  Thank you

3    very much for your time.

4              THE DEPONENT:  Thanks.

5         FURTHER THE DEPONENT SAITH NOT,

6         Deposition concluded 2:05 p.m.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

```
 1           C E R T I F I C A T E

 2   STATE OF ALABAMA

 3   COUNTY OF JEFFERSON

 4               I, Karen Davis, hereby

 5   certify that the above and foregoing

 6   deposition was taken down by me on

 7   Computerized Stenotype, and the

 8   questions and answers thereto were

 9   transcribed by me, and that the

10   foregoing represents a true and

11   correct transcript of the deposition

12   given by said witness upon said

13   hearing.

14               I further certify that I

15   am neither of counsel nor of kin to

16   the parties in the action, nor am I

17   anywise interested in the result of

18   said cause.

19

20   _____

21           KAREN DAVIS

22           COMMISSIONER

23
```



DEFENDANT'S
EXHIBIT

# Jeremy Shane Fulmer
115 County Rd. 941
Clanton, Alabama 35045
(205) 280-3649

**OBJECTIVE:**     Utilize my skills, knowledge, and experience to be more effective and successful
in the Law Enforcement/Investigation profession.

**QUALIFIED BY:**    \*   Over twelve years of Law Enforcement experience continuously increasing
responsibilities in investigations, supervising and performing
effective Law Enforcement.

\*   Proven ability to effectively apply my experience, knowledge, and
training in investigating cases and being successful in Law
Enforcement.

**EXPERIENCE:**

2007 - present     Jemison Police Department, Jemison, Alabama
Patrol officer

1999- 2007     Chilton County Sheriff's Department, Chilton County, Alabama
Narcotics Investigator / Lieutenant / Chief Investigator / Task Force Commander.
Worked as a case agent in undercover operations and investigating all
department narcotic cases. Re-assigned in Feb. 2001 to general investigations,
working cases that include murder, rape, robbery, burglary, theft, fraud, etc . . .
Promoted in July 2005 to the Chilton County Drug/Violent Crime Task Force as
the Commander and to remain as Chief Investigator for the Chilton County
Sheriff's Department's Investigative Division.

2004 - 2005     Worked alongside Alabama Power, Mississippi Power, and Georgia
Power Corporate Security conducting security details after hurricanes
Katrina, Ivan, and Dennis.    During Hurricane Katrina, while in
Hattiesburg, Mississippi, I was responsible for maintaining a schedule for
35 officers to cover security shifts. Worked approximately 200 hours.

1995-1999     Clanton Police Department, Clanton, Alabama
Patrol officer, member of a 28-officer squad, working patrol officer's duties.

| | |
|---|---|
| 1995 | Maplesville Police Department, Maplesville, Alabama |
| | Patrol officer working the community with patrol officer's responsibility. |
| | |
| 1994-1995 | Chilton County Sheriff's Department, Chilton County, Alabama |
| | Active in the Sheriff's Department as a reserve deputy working alongside the patrolman and with officer's of the narcotic's division. |

## EDUCATION:

| | |
|---|---|
| 1988-1992 | Selma High School, Selma, Alabama |
| | High School Graduate |
| | |
| 1994-1995 | University of Alabama, Tuscaloosa, Alabama |
| | Minimum Standards Police Academy |
| | 480 hours of police training, received POST certificate |
| | |
| 2000-2001 | Wallace Community College |
| | Clanton, Alabama |
| | Working toward degree in Criminal Justice (have completed six courses) |
| | |
| 2006 - present | Virginia College |
| | Working to complete my Criminal Justice degree |

## SPECIAL TRAINING:

| | |
|---|---|
| 1995 | The NRA Firearms Training (expert) |
| | |
| 1996 | University of Alabama |
| | Law update and officer survival |
| | |
| 1996 | University of Alabama |
| | Use of Force and Liability |
| | |
| 1997 | University of Alabama |
| | Domestic Violence |
| | |
| 1997 | University of Alabama |
| | Search and Seizure |
| | |
| 1998 | University of Alabama |
| | Legal issues and Defensive driving |

| 1999 | Firearms Training (expert) |
| 1999 | Regional Counterdrug Training Academy<br>Basic Narcotics Investigations (80 hrs) |
| 1999 | Public Agency Training Council<br>Drug / Narcotic Interdiction and Investigations |
| 1999 | Kinesic Interview Techniques   Phase I and II<br>Instructor Glen D. Foster (16 hrs) |
| 2000 | Regional Counterdrug Training Academy<br>Drug Team Supervision (40 hrs) |
| 2000 | Alabama Narcotic Officers Association<br>Drug Trends 2000 |
| 2001 | Sirchie Finger Print Laboratories<br>40 hours in Crime Scene Technology and Evidence Collection |
| 2002 | Regional Organized Crime Information Center (ROCIC)<br>Training Seminar (18 hours)<br>Cold Cases, Crime Scenes, and Shaken Baby investigations |
| 2003 | Regional Counterdrug Training Academy (40 hrs)<br>Interview and Interrogation |
| 2003 | Regional Organized Crime Information Center (ROCIC)<br>Training Seminar (28 hours)<br>Investigative Interviewing Techniques |
| 2004 | State of Alabama Department of Agriculture<br>Heavy Equipment Identification and Theft Prevention Techniques (8 hrs) |
| 2004 | Regional Counterdrug Training Academy (28 hrs)<br>Counter Terrorism for State and Local Law Enforcement |
| 2004 | Regional Organized Crime Information Center (ROCIC)<br>Investigative Interviewing Techniques<br>Statement Analysis (24 hours) |
| 2004 | Sirchie Finger Print Laboratories<br>Certification in the use of the Krimesite Imager (8 hrs)<br>(Reflective Ultra Violet Imaging System Technology) |

| 2004 | Institute for Criminal Justice Education<br>Law Enforcement Officers Flying Armed ( 2 hrs) |
| 2005 | Regional Organized Crime Information Center (ROCIC)<br>Narcotics Trafficking and Trends   ( 19 hrs ) |
| 2005 | Gulf Coast HIDTA<br>Forensic Training Services<br>Courtroom Testimony/Informant Handling ( 24 hrs ) |
| 2005 | Regional Counterdrug Training Academy<br>Meth & Other Clandestine Lab Safety (24 hrs) |
| 2006 | Regional Counterdrug Training Academy<br>Video Techniques for Law Enforcement (24 hrs) |
| 2006 | Public Agency Training Council<br>Equivocal Death and Cold Case Homicide Investigations (20 hrs.) |
| 2006 | Regional Counterdrug Training Academy<br>T-Cap/Criminal Patrol (40hrs) |

**References:**

Circuit Judge Sibley Reynolds
19th Judicial Circuit
Clanton, AL
(205) 755-0311

District Judge Rhonda Jones Hardesty
Chilton County District Court
Clanton, AL
(205) 755-1558

District Attorney Randall Houston
19th Judicial Circuit
Wetumpka, AL
(334) 567-2237

## 1st of January 2007

- Received notice of payroll change during 1st deputies meeting. I was currently in charge of doing our payroll and it never was brought to my attention that we needed to change it.

## January 24, 2007

Meeting with Sheriff Davis. Moved from Task Force as the Commander.
- Approx. 4pm called in by Sheriff Davis to the jail for a meeting w/ him and Mayfield. Sheriff advised me that it bothered him that when he called me at 4pm that I was at home and that all the other investigators where busy doing something. My response was that I went home at 3pm that day because I had my time in and that he had advised that there wouldn't be any overtime and when you had your time in that it was time to go in for the day. I also told Sheriff Davis that before I left I made it a point to speak with all the investigators and I ask them if they needed anything or any help before I left. They all indicated that they didn't need anything. Sheriff Davis also stated that on Sat. 1-20-07 the tact team executed a search warrant for the task force guys and that it bothered him that I wasn't there. My response was that I left that Friday before and was out of town until that Sunday. I also stated that I was in continuous contact with the Task Force guys via southern linc up until 11:00 pm that night getting updates and given instruction. I also advised Sheriff Davis that there was no way I could be at every search warrant that there would be times that I would either be out of town or would be engaged in other activities that would prohibit me from being there. I gave an example of Chief Mayfield as the commander of the tact team that he hadn't been and that there was no way he could be at every tact team call out for the same reasons. Sheriff Davis advised me that he was pulling me out of the Task Force as the commander and moving me back into general investigations. Sheriff Davis stated that I was a very good investigator and he thought I would be an asset to him and to the department by being strictly in investigations, working cases and being the supervisor. He said that he knew I had said some things during and since the election but that none of this was political. Sheriff Davis also advised me that he was taking my vehicle away and that he was going to trade mine and his truck in to Mckinnon motors. Both vehicles are still in the department.

## February 9, 2007

- Sheriff Davis came into my office, stood inside my door for approx. 10 – 15 minutes. I was engaged in conversation with ABI agent Matt Bowman and Karl Burnett. Sheriff Davis never spoke directly to me


DEFENDANT'S
EXHIBIT

nor inquired about anything pertaining to my job or about anything pertaining to general investigations.

- Received memo dated 2-3-07 from Sheriff Kevin Davis, ref. victim contacts. I received the memo the same time all other investigators did. No discussions were made with me as the general investigators supervisor about changes in operations.

### March 8, 2007

Sheriff Davis called me in the office. These are his comments and remarks:

- What is it going to take to get me and you on the same page
- I don't think you want to work for me.
- You've run all over town bad mouthing me and the department. Maybe it's because you're running for Sheriff in 4 years. You have the right but you're not doing it on my time.
- You've brought the moral of the investigators way down
- I'm going to show you that I am for real
- I'm moving you to courthouse security so you can prove you want to work for me
- I've had 20 people recently telling me stuff you're going around saying
- You've been to City Hall and all over the county saying bad things personal about me.
- I've tried and tried and tried to make things work with us
- I've talked with everybody and can work with everybody but you
- There is no Merit System. I could get rid of you and several more
- After you've worked the courthouse for a while, then maybe you can work your way back up to where you were

My responses and comments:

- I don't have a problem with you at all
- I told you in the beginning that I would do my job for you or whoever the Sheriff was
- I haven't been around anywhere bad mouthing you at all
- I come to work, do my job, and go home
- I don't set around talking to anyone about you or your department
- I don't set around restaurants or café's talking about you. I go home every day and eat lunch
- I wouldn't disrespect you or anybody else by going around bad mouthing you

DEFENDANT'S EXHIBIT

- When you moved me the first time, you told me that your department needed 4 investigators and that I would be an asset to you in investigations and as a supervisor.
- I've always considered you as a friend. I have no personal problem with you at all. I have no motivation to speak or to think bad of you

### Monday 3-12-07
Sgt. Jeff Harrell asks Sheriff Davis what the deal was with me. Sheriff Davis told Sgt. Harrell to treat me like the others that work for him. If he needed me to work the courtroom, the x-ray machine, do transports, or whatever he needed. When I'm not in court, I'll be out catching calls and serving papers like the others.

- The only thing Sheriff Davis told me period was that I am assigned to courthouse security.

### Thursday 3-22-07
A homicide occurred on the north end of the county. Two experienced investigators were in North Alabama at a school. Inv. Shane Lockhart, with less than 3 months experience, worked the case. His only help was Chief Deputy Shane Mayfield and Sheriff Davis. Sheriff Davis has never worked a homicide.

- I was patrolling the county, serving papers, and answering calls. I never got a call from anyone to assist Inv. Lockhart. I learned of the homicide the next day.

### Week of June 18-22, 2007
Sgt. Steve Tate was promoted to Captain. His duties are patrol supervisor and K-9 work. He works his own hours.

- This is an administration position, exactly what Sheriff Davis told me that he thought we had too many of when he moved me from Commander of the Task Force.

### Week of June 18-22, 2007
Captain Gerald Purvis was given the duty of supervisor over investigations. Replaced my supervisor slot. Captain Purvis has no experience in investigations at all and he referenced that to Sheriff Davis when he was put in that position.


DEFENDANT'S EXHIBIT

**Week of June 25-29, 2007**
Informed by Captain Gerald Purvis to clean my office out at the jail per
Sheriff Davis

**Friday 7-13-07**
We had a deputies meeting. Prior to the deputies meeting there was a
Captains meeting. In attendance were Sheriff Davis, Chief Mayfield, Capt.
Tate, Capt. Purvis, Capt. G. Mims, and Capt. C. Benson. I was not notified
of the meeting, therefore did not attend. During the deputies meeting, all
ranking officers were called on one by one by Sheriff Davis to see if they
had anything for the meeting. Sheriff Davis called on every ranking officer
but me.

**Monday 8-20-07**
I received word from one of the deputies that he had heard I was about to be
moved from the courthouse to the jail as a corrections officer.

**Tuesday 8-21-07**
Had a conversation with Captain Steve Tate. I asked Capt. Tate if he had
heard anything about me being moved from the courthouse to the jail. He
said yes that it had been discussed. He said that he was involved in a
conversation with Sheriff Davis and Chief Shane Mayfield. It was said that
they needed to do something with me because I was a threat and that being
at the courthouse; I was around too many politically influential people.
Capt. Tate said that the last thing that was said between Sheriff Davis and
Chief Mayfield was that they would wait to see if I was going to
Afghanistan and that if I was, then fine but if not they would discuss what to
do with me then.

**Thursday 8-23-08**
Conversation with Capt. Steve Tate
Myself and Capt. Tate traveled together to Talladega for a meeting. Our trip
was cut short in Childersburg; we turned around and went back to Clanton.
During our travels, Capt Tate, during the entire trip, vented about his
displeasure with the Sheriff and the Sheriff's department. Capt. Tate was
angry because he was being forced by Sheriff Davis to discipline deputies
when he didn't think he should. He was also angry because he said the
Sheriff had lied to him about getting him another K-9 dog and about his
involvement with the tact team. Capt. Tate went on talking about how he
didn't think it was right that the Sheriff was buying K-9 dogs and equipment

DEFENDANT'S
EXHIBIT

from his own business. Capt. Tate mentioned that he thought the Sheriff's actions could be an ethics violation. Just before Capt. Tate got out of my vehicle, I ask him if he thought I had made any remarks toward the Sheriff or the department that he thought would be harsh or offensive. Capt. Tate stated, "No, not at all".

- My only response to Capt. Tate was that I understood why he would be aggravated and I made the statement that if I were Sheriff and me and my wife owned a business like the Sheriff does, I would stay as far away from doing business with my company as I could, rather it was ethically wrong or not.

**Thursday 9-6-07**
Meeting with Hollis Jackson
Because of the continued speculation that I was hearing from other deputies of the fact that I was about to be transferred to the jail for no apparent reason, I went to the office of Hollis Jackson to discuss my situation with him and to ask for any advise. During our conversation, I advised Mr. Jackson of my job situation, what I'd been told about being transferred again and of the numerous threats that I had received from Sheriff Davis about that we didn't have a Merit System and that he would do whatever he wanted with me and anybody else. Mr. Jackson stated that, although he was saddened about my situation, his opinion was that because we didn't have a Merit Board in place, that he felt like I did work under the discretion of the Sheriff and that he could do what he wanted. At the end of our conversation, Mr. Jackson suggested that I go talk with Mr. Alan Caton, one of our County Commissioners, about the county working to get the Merit Board in place so that we would have the protection that we needed.

**Thursday, late evening, 9-6-07**
Meeting with Mr. Caton
Acting on the advice received by Mr. Hollis Jackson, I met personally with Mr. Alan Caton. I explained my situation to Mr. Caton about my job being transferred to different areas and about being told by Sheriff Davis on numerous occasions that we didn't have a **Merit System** and that he would do whatever he wanted with me and anybody else. I expressed my feelings to Mr. Caton that I didn't feel as though it was my fault, my downfall, or my hardship that I didn't have a Merit Board to turn to and that I felt like it was the County's responsibility and duty that we have a **Board**. Mr. Caton agreed wholeheartedly and apologized to me for not having a **Board** in place. I explained to Mr. Caton that in my March 2007 meeting, Sheriff

DEFENDANT'S EXHIBIT

Davis told me that he was diligently working to get the **Board** in place so that we would be protected. (It's September 2007 and nothing has been done) Mr. Caton advised me that this placement of the **Board** needed to have been done a long time ago and he assured me that he would get to work on it and that it would be addressed in the Monday, September 10, 2007 County Commission Meeting. I also told Mr. Caton that I was afraid that I would lose my job if Sheriff Davis knew that I had came in and talked with him.

### Monday September 10, 2007
Meeting with Sheriff Davis

At approximately 2 p.m., Sheriff Davis pulled me out of the courthouse and advised me to follow him. We go into his truck. Sheriff Davis advised me that he needed to speak with me and that we would go to the office at the jail. Sheriff Davis drove us to the jail. Sheriff Davis advised me that he was displeased with me, that I had underminded him and that he wanted to know what was going on. I responded to Sheriff Davis that I didn't have a clue what he was talking about. Sheriff Davis first wanted to know had I spoke with any of the County Commissioners. My response was that, yes, I had spoke with commissioners; that I speak to them when I see them. Sheriff Davis wanted to know if I had spoke to Mr. Alan Caton recently. I responded, yes. Sheriff wanted to know what specifics we spoke about. My response was we discussed me personally about my job situation. Sheriff stated that he didn't appreciate me underminding him by going to any commissioner and talking about his office. My response was that I didn't discuss his office, that I expressed my concern about me and my job situation and that I wanted the **Board** put in place. Sheriff Davis also asked me about any conversations that I may have had with Captain Steve Tate insinuating that I was downgrading him, his department, and that myself and Deputy Robbie Autery were out to get him on an ethics violation. My response was that there was nothing discussed with Capt. Tate that had any merit and that I said nothing out of the way and that I didn't say anything that I wouldn't say to him, personally. Sheriff Davis wanted to know, specifically, what Capt. Tate and I talked about. Sheriff Davis also asked me what me and Deputy Robbie Autery were trying to do to him, ethically. Sheriff Davis also stated that he knew that me and Deputy Autery were trying to get copies of documents to give to the Ethics people or to the AG's office. My response was that I had not seen or heard anything about any documents and that if anybody had inquired about any documents, that is their business and that I hadn't, personally, done any of the sort. Sheriff

Davis was real frustrated and started accusing me of being untruthful to him. Sheriff Davis, in the presence of Capt. Tate, advised me that because I had underminded him and that I wasn't going to be truthful with him about my conversations with Commissioner Caton, Capt. Tate, and Deputy Autery, he was giving me the option of resigning my position and if not he would fire me. I advised Sheriff Davis that I was not going to resign from my job, that I had never done nothing but worked hard for him and done my job. Sheriff Davis advised me that I was fired and immediately had another deputy take me home.



# EXHIBIT 4

## EXCERPTS FROM THE DEPOSITION OF SHANE FULMER

Q.    How long had you known that you were going to get fired?

A.    The speculation was there since the first day he come into office.

Q.    I'm sorry, when was that first day that Sheriff Davis came into office?

A.    January 2007.  Somewhere in the neighborhood of the 18th, 19th, 20th; somewhere in that neighborhood.

Q.    And who had speculated with you that you were going to be fired?

A.    Well, I mean it was--- it was my own assumption that because of who I was, that, you know, that that possibility was certainly there.  And, you know---

Q.    Who else confided in you that that was their suspicion also when Sheriff Davis came on?

A.    At some point in time, probably, and I had a good relationship with most everybody there, all the deputies there.  At probably any given time, at least I would not be surprised, and I don't remember exactly, that each and every one of them made the comment that, you know, you'd better watch your back, you know who you are.

Q.    When did they tell you this?

A.    From the election of November until basically my termination date.

Q.    You mean November of 2006?

A.    Yes, sir.

Q.    So from November of 2006 until January the 18th of 2007, people had been telling you that you were going to get terminated?

A.    That they would not be surprised, and it went from November 2006 until my termination on September 10th, 2007.

(Fulmer Depo., p. 27, l. 16 - p. 29, l. 18).

A.    I did not apply for a job.

Q.    Why not?

A.    We had the merit system.  And I knew that regardless of who the sheriff was, I was going to do my job.  I had never been disciplined a day in my career.  Never done anything to be disciplined for.  And I knew my work ethics that regardless of who was in office, whether it was Sheriff Davis or whomever it may be, that I was going to do my job, do what he asked of me and do my best on a daily basis.  And because of that, knowing how I would perform my job and that I would not do and I had never been involved in anything that would

1

jeopardize my job, and the fact of the merit system, you know, my assumption was that I was protected.

Q.    When did you first hear that the merit system had never been empaneled?

A.    The merit system was passed through the legislature and--

Q.    When did you first learn that there was no merit system in place?

MR. YAGHMAI: I'm going to object to the form.

A.    Nobody has actually told me that the merit system does not exist.

(Fulmer Depo., p. 31, l. 5 - p. 32, l. 15).

Q.    What did you tell Mike Poe when he asked you about the merit system?

A.    If I remember correctly, he asked me if I thought we were protected from any new sheriff coming in and my response was I thought we were, just based upon my reading of the bill.

(Fulmer Depo., p. ,34 ll. 7-15).

Q.    So two days before your termination, approximately?

A.    Approximately.

Q.    Fair enough. And tell me about that discussion.

A.    I called mr. Caton on his cell phone and asked if I could meet with him. He– he was– had no problem with us meeting. We met at– he owns some rental property here in town. We met there. He asked me what was going on. We talked about my job. One of his very first questions was, you know, why was I working courthouse security, and I told him that that's where Mr. Davis put me. And he said well, you know, haven't you worked investigations and done all– had this work experience and, you know, been in law enforcement for many years, why would you--- why would it benefit the department and the county as a whole you working in the courthouse security? And I said, well, sir, I'm not familiar with that, I don't know his reasoning, the fact of his reasoning, that is, but that's where he put me. We talked about that a brief minute. He asked me what concerns I had. I told him that I had concerns of not only myself but for the rest of the employees of the Chilton County Sheriff's Department that over the course of eight to nine months, whatever it was, that we had been threatened, our jobs had been threatened, because of the nonexistence, in Mr. Davis's words, of the merit system and the merit board, that he could do whatever he wanted to do, he was the sheriff, when he wanted

2

to do it and how he wanted to do it, he could have fired me a long time ago. That I was concerned of not just myself but, you know, we had employees that were being threatened to the point that they dreaded getting up in the morning going to work. They cried at night before going to work, or going to bed to go to work the next morning. It was a constant, "I'll fire you", and "I'll get rid of you". And, you know, these people are concerned about their jobs.

Q.    And this is what you're telling Chairman Caton.

A.    That's correct.

Q.    What else did you tell him?

A.    He being the part of the governing entity of the county and I'm not real sure if he was the Chairman of the Commission at that time, very well could have been, I felt as though because they were a part of the merit system/board, that it was something--- the situation going on was something that they needed to be aware of, one, and two, that they could get this ball rolling with this merit board.

(Fulmer Depo., p. 42, l. 8 - p. 45, l. 12).

Q.    So that I'm clear then, you had not been critical of Sheriff Davis prior to your termination.

A.    It could have been critical to others; within myself, I was expressing my personal experiences and my personal--- what was being detrimental to me as a person and to my career.

Q.    Okay. And those individuals that you expressed those criticisms of Sheriff Davis were Mike Poe, Shane Mayfield, Captain Tate and Captain Purvis?

A.    That I remember.

(Fulmer Depo., p. 60, ll. 5-21).

Q.    Had you been badmouthing him in public?

A.    No, sir.

Q.    Had you badmouthed him in any restaurants?

A.    No, sir.

Q.    Had you badmouthed him to anybody with law enforcement?

A.    No, sir.

(Fulmer Depo., p. 77, l. 18 - p. 78, l. 3).

3

Q.    Did you campaign for your father door to door as did Mr. Autery?
A.    Yes, sir.

(Fulmer Depo., p. 81, ll. 20-23).

Q.    You told me about the first meeting with Sheriff Davis. You told me about the
      second meeting with Sheriff Davis and you said there was a third meeting with
      Sheriff Davis.
A.    The termination meeting.
Q.    And tell me what happened in that termination meeting. Where was it?
A.    That--- that was the meeting when I was at work at the courthouse security and
      he--- he had me follow him to his truck to the jail.
Q.    And who was at that meeting, the jail?
A.    Myself, and Captain Steve Tate come in toward the latter part as a request by
      Sheriff Davis.
Q.    And what did the sheriff tell you in that meeting?
A.    He wanted to know if I had talked to any commissioners lately. My response
      was yes, sir. I'm friends with several of the guys and, you know, working
      courthouse security, I see them.
Q.    Friends with whom?
A.    The county commissioners.
Q.    Which ones?
A.    Allen Caton, or not necessarily friends, so to speak, but acquaintances of all
      the commissioners, all seven of them.
Q.    You told the sheriff you were friends with the commissioners. Which ones are
      you friends with?
A.    Well, I mean I referred to them as a friend. I mean I---
Q.    Caton. Who else?
A.    My acquaintances with the Commission would be Allen Caton. I speak to him
      when I see him. I speak with Allen Wyatt when I see him. I speak to Joe
      Headley when I see him. I speak to Bobby Agee when I see him. I speak to
      Heedy Hayes when I see him. I speak to Tim Mims when I see him. And I
      think that's all of them.
Q.    Which ones do you consider friends of all the commissioners?
A.    I mean I guess--- I don't know if you consider them friends. I mean you may
      refer to them as a friend but I would say I know on a--- I know Allen Caton.

4

I probably spoke with him more than any of them, and probably Allen Wyatt. And Joe Headley. And I used to work for Commissioner Tim Mims.

Q.    So you told the sheriff that you were friends with several of the commissioners --

A.    Mmm hmm.

Q.     -- during this meeting; is that correct?

A.    That's correct.

Q.    And what did the sheriff say when you told him that you were friends with these county commissioners?

A.    Well, I said that I was friends with the county commissioners and that I spoke with them--- spoke to them when I saw them.

Q.    What did the sheriff say?

A.     "What did you say?".

(Fulmer Depo., p. 90, l. 10 - p. 93, l. 19).

A.    And then he says well, what are you and Robbie Autery up to. I said sir, what are you talking about. About these ethics, alleged ethics complaints and, you know, what y'all got up your sleeve with that.

(Fulmer Depo., p. 95, ll. 10-16).

A.    Well, you're not going to tell me what y'all talked about about my involvement with any kind of ethics violations. And I said no, sir. Those discussions were between me and Robbie and that's--- no, I'm not going to say anything.

(Fulmer Depo., p. 95, l. 23 - p. 96, l. 6).

A.    Now, back to the meeting, the third part of the meeting was Sheriff Davis said well, what conversations have you had with Steve Tate about me and the Attorney General's office and ethics violations and things that I'm supposed to be doing and all that kind of stuff. And I said well, anything really amounting to anything on my behalf, not much. We talked the whole way there and the whole way back. But, you know, as far as my part, there wasn't nothing really said to amount to anything. Oh, so you're not going to tell me what y'all said. And I said well, you   know, there again, as far as my part, I didn't elaborate on a whole lot of things. It was him doing most of the talking and I listened.

And so then he called Steve Tate on the radio and we sat there and we sat there and quite a bit of time went by because he wanted Steve Tate in the meeting to confront Steve about what I supposedly said during our travels. And he was busy on a call so we had to wait on him. So we sat there and we sat there. And finally Captain Tate, Steve Tate, pulled up. And the sheriff asked him, he says did you or did you not tell me that Shane said something, and I don't remember the exact words, but something related to the Attorney General's office and ethics violations. And Steve Tate's response was, he was sitting beside me, is that not what I told you this morning. And the sheriff said yes. And he said well, my story is not going to change.

(Fulmer Depo., p. 96, l. 15 - p. 98, l. 12).

A.    Correct. The sheriff says you're not going to be truthful with me about the talking with Commissioner Caton, you're not going to be truthful with what Robbie and you and have got going with the ethics violations, you're not going to be truthful with me about having a conversation with Steve Tate pertaining to you telling him stuff about the Attorney General's office and ethics violations. You've got a choice. Either you can resign or you're fired. And I told sheriff Davis that I had had a good career, a long career, a successful career, I've never been disciplined before a day in my career. Never been written up, never been disciplined for anything, that I had always done my job, including since he had been there, or from my tell since he had been there, and I was not going to resign from my job. And he said well, then your other option is you're fired. And he called another deputy in---

Q.    Who was that?

A.    Lieutenant John Shearon, to take me home.

Q.    And did he take you home?

A.    Yes, sir.

Q.    Okay. And you haven't spoken to the Sheriff since?

A.    No, sir.

(Fulmer Depo., p. 99, l. 10 - p. 100, l. 21).

Q.    And how many times have you spoken to anyone at the Attorney General's office?

A.    Two.

6

(Fulmer Depo., p. 101, ll. 4-7).

# EXHIBIT 5

```
 1            IN THE CIRCUIT COURT OF
              CHILTON COUNTY, ALABAMA
 2       CIVIL ACTION NO.:  CV-2007-900130

 3   ROBBIE AUTERY and
     SHANE FULMER,
 4
           Plaintiffs,
 5
                 VS.
 6
     KEVIN DAVIS, in his
 7   official capacity as
     Sheriff of Chilton County,
 8   Alabama, and individually;

 9       Defendant.

10   _____

     IN THE UNITED STATES DISTRICT COURT
11    FOR THE MIDDLE DISTRICT OF ALABAMA
               NORTHERN DIVISION
12       CIVIL ACTION NO.:  2:08-CV-41-WC

13   ROBBIE AUTERY and
     SHANE FULMER,
14
           Plaintiffs,
15
                 VS.
16
     KEVIN DAVIS, in his
17   official capacity as
     Sheriff of Chilton County,
18   Alabama, and individually;

19       Defendant.

20
             DEPOSITION OF SHANE FULMER
21

22             STIPULATIONS

23             IT IS STIPULATED AND
```

1    AGREED, by and between the parties,

2    through their respective counsel,

3    that the deposition of SHANE FULMER

4    may be taken before Karen Davis, CCR,

5    Commissioner, State of Alabama at

6    Large, at the Chilton County

7    Courthouse, 200 2nd Avenue North,

8    Clanton, Alabama, on the 16th day of

9    May, 2008, commencing at or about

10   11:40 a.m.

11            IT IS FURTHER STIPULATED

12   AND AGREED that the reading and

13   signature to the deposition by the

14   witness is waived, said deposition to

15   have the same force and effect as if

16   full compliance had been had with all

17   laws and rules of court relating to

18   taking of depositions.

19            IT IS FURTHER STIPULATED

20   AND AGREED that it shall not be

21   necessary for any objections to be

22   made by counsel as to any questions,

23   except as to form or leading

1    questions, and that counsel for the

2    parties may make objections and

3    assign grounds at the time of the

4    trial, or at the time said deposition

5    is offered in evidence, or prior

6    thereto.

7                    IT IS FURTHER STIPULATED

8    AND AGREED that notice of filing of

9    the deposition by the Commissioner is

10   waived.

11

12

13

14

15

16

17

18

19

20

21

22

23

```
 1

 2                    I N D E X

 3

 4    EXAMINATION BY:              PAGE NO.

 5    Mr. Sheehan                    8

 6

 7

 8                E X H I B I T S

 9    PLAINTIFF'S EXHIBIT NO.      MARKED

10    (None offered.)

11

12    DEFENDANT'S EXHIBITS        MARKED

13    No. 1 - deponent's C.V.        18

14    No. 2 thru

15    No. 8 - typewritten notes    105

16    * No. 9 - handwritten notes

17        *(No. 9 mentioned as

18         being marked at Pg. 106,

19         but neither received

20         nor attached to the

21         transcript by the

22         court reporter.)

23
```

```
 1    BEFORE:    Karen Davis, CCR

 2               Commissioner

 3

 4

 5    APPEARING ON BEHALF OF THE PLAINTIFF:

 6         Mr. Gregory F. Yaghmai

 7         Rutledge & Yaghmai

 8         3800 Colonnade Parkway

 9         Suite 490

10         Birmingham, Alabama   35243

11         (205) 969-2868

12

13    APPEARING ON BEHALF OF THE DEFENDANT:

14         Mr. C. Winston Sheehan, Jr.

15         Ball, Ball, Matthews &

16         Novak, P.A.

17         2000 Interstate Park Drive

18         Suite 204

19         Montgomery, Alabama   36109

20         (334) 387-7680

21

22    Also Present:   Robbie Autery

23               Sheriff Kevin Davis
```

**Freedom Court Reporting, Inc**                                    6

1              I, Karen Davis,

2    Certified Shorthand Reporter and

3    Commissioner, State of Alabama at

4    Large, acting as commissioner,

5    certify that on this date, in

6    accordance with Rule 30 of the

7    Alabama Rules of Civil Procedure and

8    the foregoing stipulations of

9    counsel, there came before me at the

10   Chilton County Courthouse, 200 2nd

11   Avenue North, Clanton, Alabama, on

12   the 16th day of May, 2008, SHANE

13   FULMER, Plaintiff in the above cause

14   for oral examination, whereupon the

15   following proceedings were had:

16

17        S H A N E    F U L M E R,

18   Having been duly sworn according to

19   law testifies as follows:

20

21   EXAMINATION BY MR. SHEEHAN:

22        Q.    Your full name, please.

23        A.    Jeremy Shane Fulmer.

```
 1        Q.      And your date of birth?

 2        A.      10/7/73.

 3        Q.      And you were present

 4   during the deposition of Mr. Autery?

 5        A.      Yes, sir.

 6        Q.      During the breaks that

 7   were taken during Mr. Autery's

 8   deposition, did you have any

 9   discussion with him?

10        A.      Yes, sir.

11        Q.      About this lawsuit?

12        A.      No, sir.

13        Q.      You didn't discuss this

14   lawsuit while these two 15-minute

15   recesses were taken during his

16   deposition?

17        A.      No particulars of the

18   lawsuit, no, sir.

19        Q.      Did you discuss the

20   lawsuit?

21        A.      May have mentioned

22   something.  I'm not real sure exactly

23   what.
```

1      Q.      Are you on any kind of

2    medication that would affect your

3    ability to testify truthfully?

4      A.      Not that would affect my

5    ability, no, sir.

6      Q.      What medication are you

7    currently on, sir?

8      A.      I'm on Lexapro.

9      Q.      And who prescribed that?

10     A.      Dr. Ajay Patel.

11     Q.      And how long have you

12   been taking Lexapro?

13     A.      Probably a month now.  He

14   just swapped it to the Lexapro.

15     Q.      Swapped what, sir?

16     A.      He had me taking Paxil.

17     Q.      And how long have you

18   taken Paxil?

19     A.      Not consistent, but over

20   the course of a year.

21     Q.      And where do you have

22   your prescriptions filled?

23     A.      CVS Pharmacy here in

```
1    Clanton.

2         Q.     And how long have you

3    used CVS in Clanton?

4         A.     For the past three to

5    four years.

6         Q.     Where did you have your

7    prescriptions filled before CVS in

8    Clanton?

9         A.     I want to say Rite-Aid.

10        Q.     And which one?

11        A.     Here in Clanton.

12        Q.     And when were you last

13   hospitalized?

14        A.     If I'm remembering

15   correctly, January of 1996.

16        Q.     And where was that, sir?

17        A.     I'm sorry, sir.  That's

18   not accurate.  I had an accident in

19   January of 1996 and over the course

20   of two years after that, I had a few

21   surgeries.  I don't recall the exact

22   dates.

23        Q.     So between January of '96
```

```
 1    and January of '98?

 2         A.      Yes, sir.

 3         Q.      And which hospital?

 4         A.      UAB.

 5         Q.      What's the last emergency

 6    room you've been to?

 7         A.      UAB.

 8         Q.      And when was that, sir?

 9         A.      January of '96.

10         Q.      Are you still being

11    treated as a result of that accident?

12         A.      No, sir.

13         Q.      When were you released?

14         A.      Released completely

15    sometime in 1998, I guess.

16         Q.      Which doctor released

17    you?

18         A.      I had two doctors.  One

19    was Dr. Lewis from UAB and another

20    ophthalmologist doctor was Dr. John

21    A. Long, L-O-N-G, from Alabama

22    Ophthalmology in Birmingham.

23         Q.      And what's the last
```

```
1    healthcare provider you have seen?

2         A.     Dr. Ajay Patel.

3         Q.     And what did you see him

4    for?

5         A.     I don't recall exactly

6    when I first went to him.  Probably

7    spring of 2007.  Having problems

8    sleeping.  Stress-related symptoms,

9    as he put it.

10        Q.     Who had you seen before

11   Dr. Patel?

12        A.     I had been to an

13   orthopaedic doctor prior to that here

14   in Clanton.  I want to say his name

15   was Dr. Wolf.  I had also saw a

16   general physician, Dr. Funderburk,

17   just for casual cold or flu symptoms.

18        Q.     When did you see Dr.

19   Funderburk last?

20        A.     It's probably been four

21   or five years.

22        Q.     And where is his office?

23        A.     Chilton Medical
```

```
 1   Associates here in Clanton.

 2        Q.      What doctor had you seen

 3   before Dr. Funderburk?

 4        A.      Other than the physicians

 5   as a result of the wreck in 1996, the

 6   Dr. Lewis and Dr. Long, I don't

 7   recall any other doctors.

 8        Q.      Who was your physician

 9   growing up?

10        A.      If I recall correctly,

11   Dr. Funderburk.

12        Q.      You were never

13   hospitalized here in Clanton?

14        A.      As a child, I had

15   pneumonia.  For four or five days

16   hospitalized here in Clanton.

17        Q.      Which facility?

18        A.      Pardon me, sir?

19        Q.      Which facility here in

20   Clanton?

21        A.      Clanton Hospital.

22        Q.      And who treated you for

23   the pneumonia?
```

1        A.        There again, as I best

2    recall, it was Dr. Funderburk.

3        Q.        And who is your dentist?

4        A.        Dr. Morgan here in

5    Clanton.

6        Q.        Have you now told me all

7    of your healthcare providers?

8        A.        To the best of my

9    recollection, yes, sir.

10       Q.        And by whom are you

11   employed, sir?

12       A.        Jemison Police

13   Department.

14       Q.        When did you go to work

15   for Jemison Police Department?

16       A.        October 1st, 2007.

17       Q.        And who is your

18   supervisor?

19       A.        Immediate supervisor is

20   Sergeant Randy Morris, Jr.

21       Q.        And who hired you?

22       A.        Chief Brian Stilwell.

23       Q.        And what are your duties

```
 1    and responsibilities for the Jemison

 2    Police Department?

 3        A.    I'm a patrol officer, day

 4    shift, enforcing traffic and criminal

 5    laws, accident investigation, citizen

 6    complaints.

 7        Q.    And what hours do you

 8    normally work?

 9        A.    We're on 12-hour shifts.

10    I work every Wednesday, Thursday,

11    Friday and every other Saturday from

12    6 a.m. until 6 p.m.

13        Q.    And how long have you

14    been working that shift?

15        A.    Since I started.   October

16    1, 2007.

17        Q.    Have you been disciplined

18    in your position with the Jemison

19    Police Department?

20        A.    No, sir.

21        Q.    Have you been counseled

22    in any way while working for Jemison?

23        A.    No, sir.
```

1    Q.    Who did you work for

2    prior to Jemison Police Department?

3    A.    Chilton County Sheriff's

4    Department.

5    Q.    And when did you go to

6    work for the Chilton County Sheriff's

7    Department?

8    A.    January 19th, 1999.

9    Q.    When did you, or did you,

10   apply for any positions other than

11   the Jemison Police Department?

12   A.    Between my termination

13   and--- and employment with Jemison or

14   any time?

15   Q.    Even before your

16   termination.  After your father was

17   not elected sheriff.

18   A.    I have applied for a

19   special agent job with the state of

20   Alabama in the Finance Commission

21   Agency, and I have applied for an

22   investigations position with the

23   Alabama Power Company.

```
 1        Q.     Have you made application

 2   to any other employer?

 3        A.     Soon after my termination

 4   and prior to going to work with

 5   Jemison, I went online with several

 6   different departments, Blue Cross

 7   Blue Shield, Progressive Car

 8   Insurance, approximately five or six

 9   departments along those same lines,

10   and posted my resume.  I also posted

11   my resume on Monster.com and

12   Careerbuilder.com.

13        Q.     I'm sorry, which five did

14   you apply with?

15        A.     I don't recall.  I'm

16   trying to think.  I know I applied

17   with Blue Cross Blue Shield,

18   Progressive Car Insurance.  I want to

19   say Liberty National--- excuse me.

20   Liberty Mutual, I think it was,

21   Insurance Company.  I don't recall

22   the others, sir.

23        Q.     What position did you
```

1    apply for?

2          A.      Investigations.

3          Q.      Before you were

4    terminated, with whom had you made

5    application for employment?

6          A.     I don't recall prior to

7    termination making any application.

8          Q.      When did you make your

9    application with the--- I'm sorry,

10   you said Finance Commission?

11         A.      Yes, sir.

12         Q.      Where is the Finance

13   Commission?

14         A.      The state of Alabama.

15         Q.      Are you talking about the

16   Finance Department?

17         A.      It's actually referred to

18   as the Finance Commission.  It very

19   well may be Finance Department.

20         Q.      Why did you apply there?

21         A.      Needed a job.

22         Q.      I mean did someone direct

23   you to the Finance---

```
 1        A.      I had contacted some

 2   contacts of mine and, you know, told

 3   them if they had seen anything.

 4   Contacts I made over the years.   I

 5   got an e-mail from one of my

 6   contacts.

 7        Q.      What contacts did you---

 8        A.      Glenn Houlditch.   That's

 9   H-O-U-L-D-I-T-C-H, I think, with

10   ROCIC organization.

11        Q.      Anyone else?

12        A.      He forwarded me an e-mail

13   from one of the finance commission

14   agents simply advising him that they

15   were taking applications.  He knew I

16   was in search of a job, forwarded the

17   e-mail to me and then I applied for

18   it.  And one thing, prior to my

19   termination, I do recall the Alabama

20   Power Company.  I had applied for

21   that probably three years ago.

22        Q.      And why did you apply

23   there?
```

1        A.        Career enhancement.

2        Q.        What do you mean, career

3    enhancement?

4        A.        Well, just a lot better

5    job than--- than you're going to get

6    in law enforcement anywhere in the

7    state of Alabama, probably.  My

8    career goal is to succeed in the law

9    enforcement profession and that was a

10    goal of mine, was to establish and to

11    find a job along those lines with a

12    company like Southern Company and

13    their pay scale, and just a career

14    goal and a job enhancement.

15        Q.        Did you apply with

16    Alabama Power or did you apply with

17    the Southern Company or both?

18        A.        Both.

19        Q.        Where did you send your

20    application?

21        A.        Online.

22        Q.        Any other applications

23    that you submitted while working for

```
 1   the Chilton County Sheriff's

 2   Department?

 3        A.    Not that I recall, sir.

 4        Q.    And do you have a current

 5   C.V. or resume?

 6        A.    Yes, sir.

 7        Q.    Could you provide us with

 8   that?

 9        A.    Yes, sir.

10        Q.    Where is that C.V. now?

11        A.    At my home.

12        Q.    On your computer?

13        A.    I have a copy in a binder

14   at my home in my computer desk.

15             MR. SHEEHAN:  We'll mark

16   that as Exhibit No. 1 to your

17   deposition.  Can you get that to us?

18        A.    Yes.

19             MR. YAGHMAI:  We'll just

20   mail a copy to the court reporter and

21   CC you.

22        Q.    What sort of computer do

23   you have, sir?
```

```
 1        A.     I have a desktop

 2   computer.  I'm not sure.  I'm just

 3   trying to remember what name brand.

 4   I'm not real sure, sir.

 5        Q.     How long have you had it?

 6        A.     Approximately six to

 7   eight months.

 8        Q.     What kind of computer did

 9   you have before that?

10        A.     I had a--- when I worked

11   with the Sheriff's Department, I had

12   a department-issued laptop.

13        Q.     Where is it now?

14        A.     I turned it in after

15   being fired.

16        Q.     So the computer you had

17   at home before the six to eight

18   months was what?

19        A.     The department-issued

20   computer that I had, I turned in

21   after I was fired September the 10th.

22   I turned it in with the rest of my

23   equipment.
```

1       Q.      Right.  At home, what did

2    you have in the way of a computer?

3       A.      Right after that?

4       Q.      No, sir.  You had a home

5    computer before six to eight months

6    ago.

7       A.      Yes, sir.  That was the

8    department-issued computer.

9       Q.      You took a department-

10   issued computer home?

11      A.      Yes, sir.

12      Q.      How long had you had a

13   department computer at your house?

14      A.      I don't recall exactly

15   when we got the computers, but we---

16   we--- we had twenty, twenty-five

17   computers that was purchased and I

18   want to say everybody there was

19   issued a computer.

20      Q.      How long had you had a

21   department-issued computer at your

22   home?

23      A.      I'm not sure when we

1    bought them but probably two, three

2    years, maybe.

3        Q.    Where is that now?

4        A.    I turned it in after

5    termination.

6        Q.    Did your family have a

7    home computer?

8        A.    Yes, sir.

9        Q.    What kind?

10        A.    We had a desktop.  My

11    wife also had a laptop.

12        Q.    The one that you used at

13    home was what kind?

14        A.    The one I use now, sir?

15        Q.    No.  Six to eight months

16    ago.  Before then.

17        A.    The department-issued

18    laptop.

19        Q.    You used the department-

20    issued computer at home for personal

21    use?

22        A.    I had the department-

23    issued laptop.  We all were issued

```
 1    department-issued laptops.  I had a

 2    department-issued laptop that I done

 3    my search warrants---

 4         Q.    No, sir.  Simple

 5    question:  Did you have a department-

 6    issued computer at home that you used

 7    for personal purposes.

 8         A.    Probably did use some

 9    personal use.  I typed up documents,

10    I'm sure.

11         Q.    And you turned that

12    computer in?

13         A.    Yes, sir.

14         Q.    When was that?

15         A.    I was fired September the

16    10th.  Within a week after that.

17         Q.    Have you spoken to

18    Sheriff Davis since your termination?

19         A.    Yes, sir.

20         Q.    What time of day or night

21    were you terminated?

22         A.    It was approximately 4:30

23    p.m. on September the 10th, 2007 on a
```

```
 1   Monday evening.

 2        Q.      And who was present?

 3        A.      Myself, Mr. Davis,

 4   Captain Steve Tate.

 5        Q.      When did you first

 6   realize you were going to be

 7   terminated?

 8        A.      I was at work that very

 9   day, courthouse security, out front

10   at the metal detectors, when Sheriff

11   Davis approached me and asked me to

12   follow him, that we needed to talk.

13        Q.      And who was present?

14        A.      Myself, Mr. Davis walked

15   up, and my coworker, Shane Aldridge.

16        Q.      What did you say when the

17   Sheriff said he wanted to talk to

18   you?

19        A.      Yes, sir.

20        Q.      And what did you do?

21        A.      Followed Mr. Davis down

22   the hall and outside the courthouse.

23        Q.      And who was outside the
```

```
 1   courthouse?

 2        A.    I don't recall seeing

 3   anyone else there.

 4        Q.    What time was this?

 5        A.    Approximately 2 p.m.

 6        Q.    And how long were you

 7   outside?

 8        A.    We immediately--- I was

 9   instructed to get inside the

10   passenger side of his pickup truck

11   and we traveled two blocks down to

12   the county jail to Chief Deputy

13   Mayfield's office.

14        Q.    What did Sheriff Davis

15   tell you on the way?

16        A.    He said that we needed to

17   go down, that we needed to talk and

18   that we would go to Chief Mayfield's

19   office.  Due to the fact he was

20   working that day, we could utilize

21   his office.

22        Q.    What else did chief---

23   excuse me, did Sheriff Davis say on
```

1    the way to the office?

2         A.      That was it.

3         Q.      What did you say?

4         A.      Yes, sir.

5         Q.      Did you have any

6    conversation with Sheriff Davis on

7    the way?

8         A.      I don't recall any, sir.

9    All I recall is him making that one

10   statement and my reply.  And the best

11   of my recollection, that was it on

12   the way down.

13        Q.      Were you surprised that

14   you didn't have any conversation?

15        A.      No, sir.

16        Q.      How long had you known

17   that you were going to get fired?

18        A.      The speculation was there

19   since the first day he come into

20   office.

21        Q.      I'm sorry, when was that

22   first day that Sheriff Davis came

23   into office?

```
 1        A.      January 2007.  Somewhere

 2   in the neighborhood of the 18th,

 3   19th, 20th; somewhere in that

 4   neighborhood.

 5        Q.      And who had speculated

 6   with you that you were going to be

 7   fired?

 8        A.      Well, I mean it was--- it

 9   was my own assumption that because of

10   who I was, that, you know, that that

11   possibility was certainly there.

12   And, you know---

13        Q.      Who else confided in you

14   that that was their suspicion also

15   when Sheriff Davis came on?

16        A.      At some point in time,

17   probably, and I had a good

18   relationship with most everybody

19   there, all the deputies there.  At

20   probably any given time, at least I

21   would not be surprised, and I don't

22   remember exactly, that each and every

23   one of them made the comment that,
```

```
 1    you know, you'd better watch your

 2    back, you know who you are.

 3         Q.     When did they tell you

 4    this?

 5         A.     From the election of

 6    November until basically my

 7    termination date.

 8         Q.     You mean November of

 9    2006?

10         A.     Yes, sir.

11         Q.     So from November of 2006

12    until January the 18th of 2007,

13    people had been telling you that you

14    were going to get terminated?

15         A.     That they would not be

16    surprised, and it went from November

17    2006 until my termination on

18    September 10th, 2007.

19         Q.     And you didn't try to

20    seek employment after November of

21    2006 until after your termination in

22    September 2007?

23         A.     The best of my
```

```
 1   recollection, the power company job

 2   was only job that I had applied for

 3   at that time.  No, sir, I did not.

 4        Q.     When did you apply for

 5   the power company job?

 6        A.     The first time was

 7   probably approximately two to three

 8   years ago.

 9        Q.     And when was the last

10   time?

11        A.     Three months ago.

12        Q.     So that I'm clear, in

13   November of 2006, everybody was

14   telling you you were going to get

15   fired and you didn't apply for a job?

16        A.     They wasn't telling me

17   specifically that I was going to get

18   fired, that it was a guarantee that I

19   was going to get fired.  It was

20   that---

21        Q.     But the question is, you

22   didn't apply for a job after you knew

23   that your father had not been
```

1    re-elected Sheriff?

2          A.      No, sir.

3          Q.      I'm sorry.  No, sir,

4    what?

5          A.      I did not apply for a

6    job.

7          Q.      Why not?

8          A.      We had the merit system.

9    And I knew that regardless of who the

10   sheriff was, I was going to do my

11   job.  I had never been disciplined a

12   day in my career.  Never done

13   anything to be disciplined for.  And

14   I knew my work ethics that regardless

15   of who was in office, whether it was

16   Sheriff Davis or whomever it may be,

17   that I was going to do my job, do

18   what he asked of me and do my best on

19   a daily basis.  And because of that,

20   knowing how I would perform my job

21   and that I would not do and I had

22   never been involved in anything that

23   would jeopardize my job, and the fact

1    of the merit system, you know, my

2    assumption was that I was protected.

3        Q.    When did you first hear

4    that the merit system had never been

5    empaneled?

6        A.    The merit system was

7    passed through the legislature and---

8        Q.    When did you first learn

9    that there was no merit system in

10   place?

11            MR. YAGHMAI:  I'm going

12   to object to the form.

13       A.    Nobody has actually told

14   me that the merit system does not

15   exist.

16       Q.    When did you first learn

17   that there was no merit system board

18   in place?

19       A.    Board?

20       Q.    Yes, sir.

21       A.    I--- several of the

22   deputies had come to me in the latter

23   part of 2006, even prior to the

```
 1    election and after the election,

 2    confiding in me, I guess, what I

 3    might know about the merit system,

 4    which wasn't much.

 5         Q.    Who are these people?

 6         A.    There again, I had a

 7    relationship with everyone there.

 8         Q.    Yes, sir.  Tell me who it

 9    is that came---

10         A.    I know specifically I

11    talked with Mike Poe about it.

12         Q.    Anyone else?

13         A.    Myself and Chief Deputy

14    Shane Mayfield discussed the merit

15    system.  Myself and Sherry Tate

16    discussed the merit system.  Kathy

17    Haygood, we discussed the merit

18    system.  I remember those names

19    specifically but it--- there again, I

20    probably discussed it with just about

21    everyone there.  Based on my reading

22    of the merit bill.

23         Q.    And when did you first
```

1    read the merit bill?

2         A.      Probably summer of 2002.

3         Q.      And how did you happen to

4    read it then?

5         A.      State legislature

6    website.

7         Q.      What did you tell Mike

8    Poe when he asked you about the merit

9    system?

10        A.      If I remember correctly,

11   he asked me if I thought we were

12   protected from any new sheriff coming

13   in and my response was I thought we

14   were, just based upon my reading of

15   the bill.

16        Q.      And what did he say?

17        A.      I don't recall exactly.

18        Q.      What did Chief Mayfield

19   say?

20        A.      I recall our

21   conversations pretty much along the

22   same lines.  He didn't have as much

23   to say about it other than the fact

1    that he was--- in his reading of the

2    merit bill, that it did not apply to

3    him.

4        Q.    What did you say?

5        A.    I agreed with him.

6        Q.    And what did he say?

7        A.    As best I recall, that

8    was pretty much it.

9        Q.    What did you tell Sherry

10   Tate?

11       A.    There again, confiding in

12   me, maybe they thought I knew more

13   than I did.  There again, the

14   conversation was in my opinion that I

15   think that they would be protected.

16       Q.    What did you tell Sherry

17   Tate?

18       A.    In my opinion, I thought

19   they would be.

20       Q.    And what did Kathy

21   Haygood say?

22       A.    Same thing.

23       Q.    And this was in the

```
 1   November of 2006 time period?

 2        A.     Either before--- before

 3   that, just before that or maybe even

 4   after the election.  I know we

 5   discussed it after the election as

 6   well but---

 7        Q.     Why did you discuss it

 8   after the election?

 9        A.     Well, everybody was

10   concerned that, you know, when a new

11   sheriff comes in, you know, everybody

12   would lose their job.

13        Q.     Did you know or had you

14   ever heard of the merit system board

15   members and who they were?

16        A.     I knew of Sheriff

17   Fulmer's selection.  Any other---

18        Q.     No, sir.  The question

19   is, who were the members of the

20   board.

21        A.     An official board, to my

22   knowledge, there was no members.

23        Q.     And why not?
```

```
 1        A.      I couldn't tell you, sir.

 2        Q.      You didn't ask your

 3   father?

 4        A.      No, sir.

 5        Q.      Have you asked your

 6   father since why there weren't three

 7   members of the merit system board?

 8        A.      We've--- we've talked

 9   about it.

10        Q.      And what has been his

11   explanation as to why there has been

12   no merit system board?

13        A.      That he consulted with

14   the Commission soon after the bill

15   was passed and that he had his

16   selection for the board.  It was the

17   Commission's responsibility to do

18   their part and that--- and if I'm

19   remembering correctly, his exact

20   words were he didn't know--- he

21   didn't know why it hadn't been done.

22        Q.      What efforts did your

23   father take to have the merit system
```

```
 1   board empaneled?

 2        A.     Beyond my knowledge of

 3   knowing that he discussed it with

 4   commissioners individually---

 5        Q.     Which ones?

 6        A.     I know for sure Aubrey

 7   Wallace.

 8        Q.     What other commissioners

 9   would your father have discussed it

10   with?

11        A.     I don't recall the exact

12   ones other than Mr. Wallace.

13        Q.     Were you present when he

14   discussed it with Mr. Wallace?

15        A.     No, sir.

16        Q.     How do you know he talked

17   to Aubrey Wallace about appointment

18   to the merit system board?

19        A.     Mr. Wallace and myself in

20   general conversation had talked about

21   the merit system.

22        Q.     And when was that?

23        A.     He was the lobbyist for
```

1    the merit system bill that was

2    passed.  And, you know, we just, in

3    passing, in general conversation,

4    we've discussed the merit system.

5         Q.     When was that?

6         A.     Even times at some point

7    before the bill was passed.  When the

8    bill was being drafted.  And after

9    the bill was passed, I'm sure we did.

10   I don't recall exactly.

11        Q.     When is the last time you

12   spoke with him about the merit

13   system?

14        A.     Probably summer of 2002.

15        Q.     Why didn't you talk to

16   him in November of 2006 after the

17   election?

18        A.     I didn't feel that I had

19   any need of consulting with him at

20   that point.

21        Q.     Have you attempted to

22   find out why the merit system board

23   was not empaneled?

1        A.      I talked with

2    Commissioner Caton concerning the

3    merit system and merit board

4    approximately two to three days prior

5    to Mr. Davis firing me on September

6    the 10th.

7        Q.      How was it you happened

8    to talk to him two or three days

9    before your termination?

10       A.      I'm sorry, I missed you

11   again.  Can you repeat it?

12       Q.      How is it that you

13   happened to talk to him two or three

14   days before your termination?

15       A.      I had went and spoke with

16   the County Attorney, Mr. Hollis

17   Jackson, as a result of--- I had been

18   moved around in the department and in

19   my opinion, as a way to, I thought,

20   get me to leave.  I had been moved

21   around within the department that I

22   thought was unjust.  I hadn't made

23   any issues about it.  I went along

```
 1   and done my job.  And then I was

 2   hearing that I was about to be moved

 3   again.  I thought maybe I was at the

 4   bottom of the barrel, anyway.  But

 5   now I'm hearing that I'm about to be

 6   moved again.  So at that point in

 7   time I made the decision that I would

 8   go talk with Mr. Hollis Jackson.  I

 9   went and spoke with Mr. Hollis

10   Jackson.  And as a result of our

11   conversation, in conclusion, he asked

12   me if I had--- if I knew any of the

13   commissioners well enough that I

14   could talk to them one-on-one

15   concerning the merit system and the

16   merit board.  And I said yes, sir, I

17   did.  I knew all of them.  In

18   particular, Mr. Allen Caton, that I

19   could talk to.  He recommended that I

20   go talk with Mr. Caton because the

21   Commission is a part of the

22   appointment of the board.  His exact

23   words were to get them to, quote, get
```

```
 1    the ball rolling, that it needed to

 2    be there, and I agreed with Mr.

 3    Jackson that he was absolutely

 4    correct.  And so based upon his

 5    advice, I met with Mr. Caton probably

 6    the--- I want to say the day after I

 7    talked with Mr. Jackson.

 8         Q.     So two days before your

 9    termination, approximately?

10         A.     Approximately.

11         Q.     Fair enough.  And tell me

12    about that discussion.

13         A.     I called Mr. Caton on his

14    cell phone and asked if I could meet

15    with him.  He--- he was--- had no

16    problem with us meeting.  We met

17    at--- he owns some rental property

18    here in town.  We met there.  He

19    asked me what was going on.  We

20    talked about my job.  One of his very

21    first questions was, you know, why

22    was I working courthouse security,

23    and I told him that that's where Mr.
```

1    Davis put me.  And he said well, you

2    know, haven't you worked

3    investigations and done all--- had

4    this work experience and, you know,

5    been in law enforcement for many

6    years, why would you--- why would it

7    benefit the department and the county

8    as a whole you working in the

9    courthouse security?  And I said,

10   well, sir, I'm not familiar with

11   that, I don't know his reasoning, the

12   fact of his reasoning, that is, but

13   that's where he put me.  We talked

14   about that a brief minute.  He asked

15   me what concerns I had.  I told him

16   that I had concerns of not only

17   myself but for the rest of the

18   employees of the Chilton County

19   Sheriff's Department that over the

20   course of eight to nine months,

21   whatever it was, that we had been

22   threatened, our jobs had been

23   threatened, because of the

```
 1    nonexistence, in Mr. Davis's words,

 2    of the merit system and the merit

 3    board, that he could do whatever he

 4    wanted to do, he was the sheriff,

 5    when he wanted to do it and how he

 6    wanted to do it, he could have fired

 7    me a long time ago.  That I was

 8    concerned of not just myself but, you

 9    know, we had employees that were

10    being threatened to the point that

11    they dreaded getting up in the

12    morning going to work.  They cried at

13    night before going to work, or going

14    to bed to go to work the next

15    morning.  It was a constant, "I'll

16    fire you", and "I'll get rid of you".

17    And, you know, these people are

18    concerned about their jobs.

19        Q.    And this is what you're

20    telling Chairman Caton.

21        A.    That's correct.

22        Q.    What else did you tell

23    him?
```

```
 1        A.      He being the part of the

 2   governing entity of the county and

 3   I'm not real sure if he was the

 4   Chairman of the Commission at that

 5   time, very well could have been, I

 6   felt as though because they were a

 7   part of the merit system/board, that

 8   it was something--- the situation

 9   going on was something that they

10   needed to be aware of, one, and two,

11   that they could get this ball rolling

12   with this merit board.

13        Q.      What did he say?

14        A.      Well, toward the end of

15   my conversation, I---

16        Q.      Let's take it

17   chronologically.  What did he say

18   when you told him this is something

19   they needed to be aware of?

20        A.      He absolutely agreed.

21   And he apologized to me and told me

22   that he--- he apologized to me and

23   apologized to the rest of the Chilton
```

```
 1    County Sheriff's Department employees

 2    through me that the board wasn't in

 3    place and that he would do what he

 4    could to try to resolve the

 5    situation.

 6         Q.     What did he say was the

 7    reason the board was not in place?

 8         A.     He, the best of my

 9    recollection, he did not know.  He

10    wasn't a sitting commissioner when

11    the bill was passed.

12         Q.     Did you fill him in on

13    what had taken place?

14         A.     Pertaining to?

15         Q.     The board.

16         A.     As best I knew.

17         Q.     What did you tell him?

18    Was it during the afternoon, you

19    said?

20         A.     Yes.

21         Q.     Okay.

22         A.     I knew that, and I don't

23    recall the exact words I used.
```

```
 1        Q.     Just in general, what did
 2    you tell Mr. Caton there that
 3    afternoon?
 4        A.     I don't recall exactly if
 5    we spoke about the--- my knowledge of
 6    the board or the creation of the
 7    board, other than what was read in
 8    the bill, I didn't know nothing
 9    else--- nothing no more to tell him.
10        Q.     Well, did you tell him
11    what was in the bill?  I mean here's
12    a fellow who didn't know, he wasn't
13    on the commission at the time.
14        A.     That is correct.
15        Q.     So did you help educate
16    him?
17        A.     I told him my
18    understanding of reading the bill,
19    that the board was to be established
20    by the sheriff's appointment of one
21    member, the commission's appointment
22    of one member, and the third member
23    would be appointed jointly by the
```

```
 1   Sheriff and the Commission.

 2        Q.     And what did he say?  Mr.

 3   Caton.

 4        A.     That they would

 5   definitely start their part, that

 6   they were a third of the appointment

 7   of the board and that that would

 8   definitely start immediately.

 9        Q.     What did you say?

10        A.     I explained to Mr. Caton

11   that one of my major concerns was

12   that back in March of 2007, that Mr.

13   Davis in one of my two to three

14   meetings that I had with him, told me

15   in March of 2007 that we did not have

16   a merit system, we did not have a

17   merit system, we did not have a merit

18   system, that there wasn't a board in

19   place, that Sheriff Fulmer thought he

20   was doing a good thing but didn't do

21   what he should have done, and he was

22   diligently working in March of 2007

23   to get this board in place and that I
```

1    was concerned because Mr. Davis told

2    me that in March of 2007 and here it

3    is September of 2007 and he had yet

4    to cooperate with the County

5    Commission in appointing his member

6    to the board.  And that other than,

7    you know, he--- in my opinion, he

8    just wasn't going to do it.

9         Q.    And what did Mr. Caton

10   say to that?

11        A.    That they had a meeting

12   coming up that following Monday and

13   that they would have their

14   appointment, their part of the board,

15   named in that meeting Monday and that

16   they would get with Sheriff Davis and

17   get him started on appointing his

18   part.

19        Q.    What did you say?

20        A.    I thanked him for his

21   consideration in trying to express my

22   appreciation of him trying to help

23   with the situation at hand.

```
1       Q.      And what did he say?

2       A.      If I recall correctly, he

3  thanked me again and apologized to me

4  again.

5       Q.      I'm sorry, why did he

6  apologize?

7       A.      For not having a board

8  there or for--- more so for what

9  several of the employees were going

10 through in being threatened by their

11 jobs and being threatened that they'd

12 be fired.

13      Q.      Who were these employees

14 that were threatened?

15      A.      Sherry Tate was one.

16 Myself.  Robbie Autery.  I know that

17 there were several others that---

18 that--

19      Q.      Who did you tell Mr.

20 Caton that was being threatened?

21      A.      Sherry Tate, myself,

22 Robbie Autery.  To be specific, I

23 know of those three.  I could have
```

```
 1   told him maybe one or two more.  I

 2   don't know.

 3        Q.    Who could they have been?

 4        A.    Possibly Warren Garris,

 5   who if I recall correctly had already

 6   been demoted.  And I--- if there was

 7   anybody else, sir, I don't recall.

 8        Q.    Well, who was it that he

 9   was extending this apology to besides

10   you that he wanted you to apologize

11   for him?

12        A.    Just to the employees in

13   general that--- that were--- that---

14   and if I--- through his--- his words,

15   I guess, maybe through me regardless

16   if there was any specific person

17   mentioned to him, if there's anybody

18   within the department that are

19   experiencing these threats and that

20   are experiencing these hardships

21   because of it, express my apology.  I

22   apologize.

23        Q.    He specifically told you
```

```
 1    that.

 2         A.      Yes, sir.

 3         Q.      And you've now told me

 4    the names of the people that you felt

 5    that you may--- or that you may have

 6    told him about that had been

 7    threatened?

 8         A.      Yes, sir.

 9         Q.      Are there any other

10    people that you may have told him

11    about that were threatened?

12         A.      I don't recall.

13         Q.      Let me ask you this:  Did

14    you go and apologize to Sherry Tate

15    and Mr. Autery on behalf of Mr.

16    Caton?

17         A.      Yes, sir.

18         Q.      And did you apologize to

19    Warren Garris?

20         A.      Yes, sir.

21         Q.      And what did you tell Mr.

22    Warren Garris?

23         A.      Just that I had had a
```

| | |
|---|---|
| 1 | conversation with the County |
| 2 | Commissioner and this is what he told |
| 3 | me. |
| 4 | Q.    That's what I'm asking |
| 5 | you:  What did you tell Warren |
| 6 | Garris? |
| 7 | A.    That Commissioner Caton |
| 8 | apologized to me and to others |
| 9 | through me of any hardships that |
| 10 | anybody--- anyone may be having in |
| 11 | their daily jobs and that they would |
| 12 | certainly immediately start their |
| 13 | part in getting things corrected. |
| 14 | Q.    And that's what Mr. Caton |
| 15 | had told you to tell these people |
| 16 | that had been threatened. |
| 17 | A.    Yes, sir. |
| 18 | Q.    What did you tell Sherry |
| 19 | Tate that Mr. Caton had told you in |
| 20 | the way of an apology? |
| 21 | A.    That on--- I explained to |
| 22 | these individuals--- |
| 23 | Q.    No, let's stick with |

1   Sherry Tate.   What did you tell

2   Sherry Tate?

3        A.      Same thing I told Warren

4   Garris.

5        Q.      What did you tell Sherry

6   Tate?

7        A.      That Mr. Caton apologized

8   for any hardships that anyone was

9   having as a result of the situation

10  that was being created by Sheriff

11  Davis, and that they would

12  immediately do what they could and

13  get their part started in getting the

14  situation resolved.

15       Q.      And their part was what?

16       A.      Appointing their board

17  member.  And getting with the sheriff

18  in getting him to start his part so

19  that--- to get this thing put in

20  place.

21       Q.      And what day of the week

22  was this that you had your meeting

23  with Mr. Caton?

```
 1        A.      I want to say Friday.  It

 2   possibly could have been Saturday but

 3   I'm thinking more along the lines of

 4   Friday.

 5        Q.      Okay.  And Mr. Caton

 6   assured you that on Monday they would

 7   take care of it?

 8        A.      Assured me that on Monday

 9   they would have their board

10   appointment and that they would

11   consult with the Sheriff in getting

12   things--- getting the ball rolling,

13   as he put it.

14        Q.      And why did he say it was

15   important to get the ball rolling?

16        A.      He and I both agreed that

17   it needed to be there and it was

18   important that it get done.

19        Q.      Why?

20        A.      So that---

21        Q.      What was the situation

22   there I guess at the sheriff's

23   office?
```

1      A.      Well, if there was any,

2   you know, the threatening of losing

3   my job.  At this time I had not been

4   fired yet but the continuous

5   threatening of being fired, not only

6   by myself but Deputy Autery and

7   Sherry Tate, to be specific, if he

8   come in on Tuesday morning at 9 a.m.

9   and said okay, you're fired, who do I

10  file a grievance with?  That's why it

11  was important to me.

12      Q.      What was the situation

13  there at the Sheriff's Office at that

14  time?

15      A.      The threatening of losing

16  our jobs.  You're not going to, in

17  his words, go around all over town

18  talking about me, undermining my

19  department, my authority.

20      Q.      Who said that?

21      A.      Sheriff Davis.

22      Q.      Sheriff Davis said what

23  now?  You're not going to---

# EXHIBIT 5
# (PART 2)

**Freedom Court Reporting, Inc**                           **57**

```
 1        A.      You're not going to go

 2   all over town talking about me.

 3   Badmouthing me.   Undermining me or my

 4   department.

 5        Q.      Had you done any of that?

 6        A.      No, sir.

 7        Q.      Had you spoken critically

 8   of Sheriff Davis?

 9        A.      There were things said

10   and--- and I even told Sheriff Davis.

11   He asked me or told me that he knew

12   things that had been said, naturally,

13   before the election, after the

14   election.

15        Q.      So the question is, had

16   you badmouthed Sheriff Davis.

17              MR. YAGHMAI:  Object to

18   the form.   You can answer.

19        A.      Not to the extent that he

20   was insinuating.

21        Q.      In other words, you had

22   been critical of Sheriff Davis to

23   people on the street?
```

```
 1        A.      Not to the extent he was

 2   insinuating.

 3        Q.      Well, what if any

 4   criticisms had you expressed of

 5   Sheriff Davis before you were

 6   terminated?

 7        A.      That he was being

 8   vindictive to me.  I didn't

 9   appreciate it.  I took pride in my

10   job, in my career.

11        Q.      Who did you tell that to?

12        A.      I know I did to Deputy

13   Autery.

14        Q.      Who else did you talk to

15   about Sheriff Davis in a critical

16   vein?

17        A.      I'm expressing my

18   personal experiences.  I don't

19   consider them to be critical.

20        Q.      Had you complained to

21   anyone about Sheriff Davis before

22   your termination?

23        A.      Myself and Mike Poe
```

| | |
|---|---|
| 1 | talked.  I was his supervisor.  We |
| 2 | talked on numerous occasions.  Myself |
| 3 | and Shane Mayfield talked.  Myself |
| 4 | and Captain Steve Tate talked. |
| 5 | Myself and at the time Captain Gerald |
| 6 | Purvis talked.  I remember those |
| 7 | specifically that I expressed my |
| 8 | personal concerns. |
| 9 | Q.    Did you talk to anyone |
| 10 | else other than these four |
| 11 | individuals? |
| 12 | A.    I'm sure I did, sir. |
| 13 | Specifically I don't recall who they |
| 14 | could have been. |
| 15 | Q.    Did you talk to any |
| 16 | county commissioner? |
| 17 | A.    Other than Mr. Caton two |
| 18 | or three days prior to my |
| 19 | termination, I don't recall.  I don't |
| 20 | recall talking to any of them. |
| 21 | Q.    Did you talk to any if |
| 22 | not county commissioner, any county |
| 23 | employee not associated or connected |

```
 1    with the Sheriff's Department of

 2    Chilton County?

 3         A.    If I did, sir, I don't

 4    recall.

 5         Q.    So that I'm clear then,

 6    you had not been critical of Sheriff

 7    Davis prior to your termination.

 8         A.    It could have been

 9    critical to others; within myself, I

10    was expressing my personal

11    experiences and my personal--- what

12    was being detrimental to me as a

13    person and to my career.

14         Q.    Okay.  And those

15    individuals that you expressed those

16    criticisms of Sheriff Davis were Mike

17    Poe, Shane Mayfield, Captain Tate and

18    Captain Purvis?

19              MR. YAGHMAI:  Object to

20    the form.  You can answer.

21         A.    That I remember.

22         Q.    Okay.  And what did you

23    tell Mike Poe of a critical nature
```

```
 1   about Sheriff Davis before your

 2   termination?

 3        A.      There again, in my

 4   personal appearance or opinion, it

 5   wasn't anything critical in that we

 6   had a conversation after I was moved

 7   the first time, which was within the

 8   first month of him taking office.

 9   The conversation was sparked by Mike

10   Poe and that, you know, it doesn't

11   surprise me that, you know, I figured

12   this was coming, you know, who you

13   are, and, you know, if I was you, you

14   know, any conversations from here on

15   out that y'all may have or he may

16   call you in, you need to be recording

17   everything, and I've got lawyers with

18   PBA that you can talk to if you want

19   to.

20        Q.      Did you talk to any

21   lawyers?

22        A.      No, sir.

23        Q.      Did you record anything?
```

| | |
|---|---|
| 1 | A.      No, sir. |
| 2 | Q.      Do you know of any |
| 3 | recordings? |
| 4 | A.      Not to my knowledge. |
| 5 | Q.      Okay.  And so Mike Poe is |
| 6 | telling you that you ought to record |
| 7 | all your conversations? |
| 8 | A.      That is correct. |
| 9 | Q.      And you didn't do it? |
| 10 | A.      No, sir. |
| 11 | Q.      Why not? |
| 12 | A.      I didn't think I needed |
| 13 | to.  I was hoping I wasn't going to |
| 14 | have to.  At that point in time when |
| 15 | that was mentioned, I was--- |
| 16 | Q.      When was this that you |
| 17 | had this conversation in which you |
| 18 | were critical of Sheriff Davis with |
| 19 | Mike Poe? |
| 20 | A.      There again, I don't--- I |
| 21 | don't--- |
| 22 | Q.      Just your best judgment. |
| 23 | A.      Well, it's not of my |

1    experience that I was being critical.

2    I will express that again.  It was

3    expressing my personal experiences.

4    And I want to say the conversation

5    with Mike Poe was right after he---

6    within a week or two of Sheriff Davis

7    moving me from Commander of our Drug

8    and Violent Crime Task Force and

9    Investigations Supervisor, moving me

10   out of the Commander's position and

11   taking my vehicle away from me,

12   putting me in another vehicle, and

13   putting me into the Investigation

14   Office strictly there as a

15   Supervisor.

16        Q.     Did the Sheriff have a

17   conversation with you as to why he

18   had taken you out of that position?

19        A.     Yes, sir.

20        Q.     And what did he tell you

21   was the reason?

22        A.     There was probably three

23   or four different reasons he give me.

1      Q.      What did he say and where

2  was this conversation?

3      A.      In the--- at the jail in

4  the Chief Deputy's office.

5      Q.      And who was present?

6      A.      Myself, Sheriff Davis and

7  I want to say if I remember correctly

8  Chief Deputy Mayfield was there.

9      Q.      Okay.  And what did the

10 Sheriff tell you?

11     A.      He called me on our

12 SouthernLINC Radio at approximately 3

13 or 3:30 that evening.  When I

14 answered him, he said where are you.

15 I said I'm at home.  There was

16 probably a two to three-minute break

17 there.  I beeped--- called him back

18 and said Sheriff, I'm available, I'm

19 not doing anything if you need me, do

20 you need me for anything.  He says

21 yeah, if you don't mind, come down to

22 the jail, I need to talk to you.  So

23 I got in my vehicle and I come to the

```
 1   jail and I come to talk with the

 2   Sheriff.  And as I said, I think I

 3   recall Chief Deputy Mayfield being

 4   there as well.

 5        Q.     And what did the Sheriff

 6   tell you?

 7        A.     He said that, and I

 8   would--- there again I've got notes

 9   of all these meetings and I could

10   refer to them to give specific

11   wording because I think I pretty much

12   put most everything in there, but

13   what I recollect as I'm sitting here

14   is that he told me that it bothered

15   him that when he called me on the

16   radio that I was at home and that I

17   had at the time I think two other

18   investigators, maybe three, that were

19   all out in the county working on

20   something, doing something, and here

21   I am at home, that that bothered him.

22   And I said well, sir, prior to me

23   going home today, I went to each and
```

```
 1   every investigator we had.  And now

 2   that I'm remembering it, we did have

 3   three.  Lieutenant John Shearon,

 4   Sergeant Mike Poe and Investigator

 5   Shane Lockhart.  I went to all three

 6   investigators and I asked them have

 7   y'all got anything going on, is there

 8   anything major going on, you need

 9   help with anything, anything I can do

10   for y'all.  Everybody's response to

11   me was no, nothing major going on, we

12   don't need anything.  I said okay,

13   I'm going to the house.  Sometime

14   prior to this, in a deputy's meeting,

15   a staff meeting, Sheriff Davis told

16   each and every one of us there that

17   there would not be no overtime, that

18   when he was the City of Maplesville

19   Chief of Police he cut out all

20   overtime and that he had planned on

21   doing that here.  When you had your

22   time in, you are to go home.  There's

23   no going beyond your quit time.  On
```

```
 1    the clock is overtime, when your time

 2    is in, you go home.  Well, I had

 3    acquired some overtime hours earlier

 4    in the week, or earlier in the pay

 5    period, okay?  Three o'clock this

 6    particular evening my time was done.

 7    My time was up.  I certainly didn't

 8    want any repercussions from getting

 9    into overtime.  So I go home.  So I

10    explained to the Sheriff that was my

11    reason for being home.

12        Q.      That's what you explained

13    to him there in the office of the

14    Chief Deputy.

15        A.      Correct.

16        Q.      And then what happened?

17        A.      The sheriff said it also

18    bothers me that, and I don't recall

19    the date, but that, and keep in mind

20    I was a commander of a drug and

21    violent crime task force, that prior

22    to this meeting we were having, my

23    task force agents were out doing a
```

1    search warrant and it bothered him

2    that I wasn't there.  And I said

3    well, sir, I'll explain that if I

4    can.  He said sure.  Well, my

5    explanation was that we had a

6    conversation between the two of I---

7    two of us, just a general

8    conversation prior to this date, and

9    he asked me, did I go on all the

10   search warrants and all that kind of

11   stuff and I told him then that not

12   only do I go on most all search

13   warrants, but I want to be there on

14   all of them, but that there would be

15   times that I wouldn't be there.  But

16   that--- my words were, if I remember

17   correctly, 90, 95 percent of the time

18   not only I wanted to be there, that I

19   would be there.  So back to the

20   meeting.  I told the Sheriff that he

21   was correct that I was not there but

22   that I had left, this was like on a

23   Saturday night or maybe even a Sunday

1    night when this search warrant took

2    place.  I had left out of town, out

3    of county, the Friday prior.  I told

4    the Sheriff that my task force agent

5    guys had contacted me, I knew exactly

6    what was going on, what steps were

7    taken.  They were drafting search

8    warrants, where they were going, who

9    all was going, what they were there

10    to look for, all the circumstances

11    surrounding the search warrant I was

12    familiar with.  I was in a location

13    that I didn't have very good signal

14    in my SouthernLINC so at eleven

15    o'clock that night, I'm standing

16    underneath way back away from this

17    house I was at, holding my radio up

18    in the air trying to keep a signal so

19    that I could talk with the guys.  I

20    gave them instructions, they kept me

21    well updated on what was going on,

22    calling me on two-way asking me for

23    advice in the situation they were in.

```
 1    I done that up until midnight that

 2    night when the search warrant

 3    concluded.  Then I went to bed.  And

 4    I also referenced to the Sheriff that

 5    with the Chief Deputy sitting there,

 6    that he was, as I was Commander of

 7    the Drug and Violent Crime Task

 8    Force, he was Commander of Special

 9    Operations and that they do high-risk

10    seach warrants and that kind of

11    thing, and that with him being

12    Commander of the Tact Team, that it

13    was very possible that I knew, I had

14    personal knowledge that he hadn't

15    been at every one of their callouts,

16    and that I was in the same boat he

17    was in, he was in the same boat I was

18    in.  We're not--- we're going to be

19    there and if we're not there, we're

20    going to want to be there.  But we're

21    not going to be able to be at each

22    and every instance.

23         Q.     And what did the sheriff
```

1    say?  Sheriff Davis.

2         A.      He said that--- the next

3    thing he said was that, well, you're

4    in an administration position.  I

5    think my department now has too many

6    administration positions, that I

7    think me and the Chief Deputy should

8    be the only two administrators in the

9    Department.  You are an investigator,

10   you're a good investigator, you're

11   probably a better investigator than

12   I'll ever be.  I'm going to take you

13   out of the--- as Commander of the

14   Drug and Violent Crime Task Force,

15   and place you strictly in General

16   Investigations to remain as their

17   Supervisor.  I think you're an asset

18   to my department, the people of this

19   county and to me personally being

20   there in that position.  So that's as

21   of today, or I can't recall if he

22   give me a date, but that's where

23   you'll be.  In addition to that, I

| 1 | was driving a 2006, 2007 Ford |
|---|---|
| 2 | Expedition, which the vehicle has |
| 3 | never really been a big thing to me, |
| 4 | but it just so happened that's what I |
| 5 | was driving.  He says in addition to |
| 6 | that, I'm taking your vehicle away |
| 7 | from you, I'm going to take my |
| 8 | vehicle, the vehicle he was driving, |
| 9 | the sheriff was driving, and I'm |
| 10 | going to trade them in and I'm going |
| 11 | to give you something just like what |
| 12 | the other investigators are driving |
| 13 | so that y'all will all be alike.  I |
| 14 | said yes, sir, no problem, I don't |
| 15 | have a problem with that.  That was |
| 16 | part of my response.  My other |
| 17 | response was that that was completely |
| 18 | fine with me, that I had a lot of |
| 19 | responsibility as the Commander, and |
| 20 | as Supervisor of General |
| 21 | Investigations.  I enjoyed |
| 22 | investigations, didn't have a problem |
| 23 | with doing that at all, and that I |

```
 1    would do my job in whatever he asked

 2    of me from that day forward.

 3        Q.    Had you told Mike Poe

 4    about this meeting that you had with

 5    Sheriff Davis?

 6        A.    I'm sure I did.  I don't

 7    recall a specific meeting with him

 8    but he was one of my investigators

 9    and, you know, not only are we

10    coworkers, we kind of knit as a

11    family as well so I'm sure I did talk

12    with him.

13            MR. YAGHMAI:  I don't

14    mean to cut you off, and this is off

15    the record.

16            (Off-record discussion)

17        Q.    So you had this

18    conversation--- how many

19    conversations did you have with Mike

20    Poe?

21        A.    I don't recall exactly.

22        Q.    Just your best judgment

23    as you sit here today, just
```

1    approximately.

2         A.     I mean we saw each other

3    every single day.  I mean there were

4    many, many conversations that---

5         Q.     I mean about this

6    situation with the department and the

7    sheriff, and your concerns about the

8    department.

9         A.     I mean I don't recall an

10   exact number.

11        Q.     Just approximately, how

12   many would you say?

13        A.     I don't feel right about

14   even giving you an approximate

15   number.

16        Q.     Are we talking about

17   five?  Are we talking about ten?

18        A.     I'm sure five, could have

19   been ten.

20        Q.     Okay.  How many

21   conversations did you have with Shane

22   Mayfield regarding your concerns

23   about the Chilton County Sheriff's

```
 1   Department?

 2       A.      Approximately two to

 3   three.

 4       Q.      Okay.  How many with

 5   Captain Steve Tate concerning the

 6   status of the Chilton County

 7   Sheriff's Department?

 8       A.      Three, four, maybe.

 9       Q.      How many conversations

10   with Captain Purvis concerning the

11   situation under Sheriff Davis?

12       A.      Maybe two or three.

13       Q.      How many times did you

14   meet with Sheriff Davis concerning

15   the situation there at Chilton County

16   Sheriff's Department?

17       A.      I never went to Sheriff

18   Davis and met with him about any

19   concerns I had with the Sheriff's

20   Department.

21       Q.      Why not?

22       A.      We talked about concerns

23   when he would call me in for a
```

```
 1    meeting, when he would move me from

 2    one place to the other.

 3         Q.    But why didn't you go to

 4    him and say Sheriff, I need to talk

 5    to you about you moving me from one

 6    place to another?

 7         A.    Well, I mean we discussed

 8    it and he give me his reasoning

 9    during the meeting.  And when the

10    move was done---

11         Q.    How many meetings did you

12    have with him?

13         A.    Three.

14         Q.    You told us about the

15    first meeting; is that correct?

16         A.    That's correct.

17         Q.    When was the second

18    meeting?

19         A.    The jail.  Chief Deputy's

20    office.

21         Q.    What did that concern?

22         A.    He called me in, needed

23    to talk to me.  I recall walking in
```

```
 1   and his first words were, "What is it

 2   going to take to get me and you to

 3   work together".

 4        Q.     And who was present for

 5   that meeting?

 6        A.     Myself, Sheriff Davis and

 7   there again possibly Chief Deputy

 8   Mayfield.  I'm not real sure if he

 9   was there or not.

10        Q.     What happened in that

11   meeting?

12        A.     He told me that, you

13   know, everybody was coming to him

14   telling him that I'm going around

15   saying things about him, badmouthing

16   him out in public in all the

17   restaurants.

18        Q.     Had you been badmouthing

19   him in public?

20        A.     No, sir.

21        Q.     Had you badmouthed him in

22   any restaurants?

23        A.     No, sir.
```

1      Q.      Had you badmouthed him to

2    anybody with law enforcement?

3      A.      No, sir.

4      Q.      Okay.

5      A.      Not what I consider

6    badmouthing.  No, sir.

7      Q.      But you were talking

8    about Sheriff Davis.

9      A.      And there again,

10   reflecting on my personal experiences

11   from the way I was being singled out

12   and treated at the time, yes, sir.

13     Q.      So you were--- you were

14   the person that was being singled

15   out.  No one else in the department.

16     A.      At that particular time,

17   that's correct.

18     Q.      When did anyone else get

19   singled out?

20     A.      Well, I mean, you know,

21   it was--- the writing was on the wall

22   with the memo with the driving the

23   cars home directed, and this is my

```
 1   personal opinion, toward Deputy

 2   Autery.  That's all I recall.

 3       Q.     And what do you mean,

 4   "the writing was on the wall"?

 5       A.     Well, I mean there was---

 6   there was two deputies that lived

 7   beyond that fifteen miles, and

 8   certainly one of them was Deputy

 9   Autery, and the other was a supporter

10   of Sheriff Fulmer as well.

11       Q.     And how is that singling

12   out Deputy Autery?

13       A.     He lived beyond the

14   fifteen miles.  He put---

15       Q.     Did---

16           MR. YAGHMAI:  Can you let

17   him finish?

18           MR. SHEEHAN:  You're

19   absolutely right.  I'm sorry.

20       A.     If you put a memo out

21   restricting vehicles and your

22   reasoning is for wear and tear on a

23   vehicle, and you do it up to a
```

```
 1   five-mile limit, and you've got a

 2   deputy that's an additional eight

 3   miles beyond that---

 4        Q.    Let me ask you this:  Why

 5   was he singling out Mr. Autery?

 6        A.    Well, he knew he was a

 7   bonafide supporter of Sheriff Fulmer,

 8   for one.  He was related by marriage

 9   at one point in time to Sheriff

10   Fulmer.  He was vocal about his

11   support of Sheriff Fulmer.  The---

12   when I say the writing on the wall,

13   it's that everybody in the

14   department, you could ask anybody

15   there, the first thing they're going

16   to tell you is if anybody gets gone,

17   it's going to be you.

18        Q.    Mr. Autery?

19        A.    And myself.  I mean

20   that's--- that's, you know, that's

21   everybody.  I mean that's just---

22        Q.    That was from day one

23   when he took office?
```

```
 1        A.       Yes, sir.  Yes, sir.

 2        Q.       And he took office in

 3   January of 2007?

 4        A.       That's correct.

 5        Q.       Did Mr. Autery seek

 6   employment anywhere?

 7        A.       I don't recall.  I don't

 8   have any knowledge of that.

 9        Q.       Do you attend church?

10        A.       No, sir.

11        Q.       All right.  Have you---

12   did you contribute to your father's

13   campaign?

14        A.       Yes, sir.

15        Q.       And how much?

16        A.       You mean financially?

17        Q.       Please.

18        A.       No, sir.  If you want to

19   count gas money, yeah.

20        Q.       Did you campaign for your

21   father door to door as did Mr.

22   Autery?

23        A.       Yes, sir.
```

```
 1        Q.     As I understand, you

 2   talked to no other attorney other

 3   than your current attorney here

 4   today --

 5        A.     That's correct.

 6        Q.     -- about the situation.

 7   And are you contending that your

 8   sleep has been affected as a result

 9   of this incident?

10        A.     Yes, sir.  Yes, sir.

11        Q.     And how has it been

12   affected?

13        A.     I haven't slept for a

14   year, other than with the assistance

15   of medication that I think is

16   helping.

17        Q.     Okay.  And what

18   medication is that?

19        A.     He first prescribed me

20   Klonopin, that I still--- I don't

21   take on a nightly basis.

22   Occasionally.  And this Lexapro,

23   according to him, is supposed to
```

```
 1   assist in that as well.

 2        Q.     Who prescribed the first

 3   medication?

 4        A.     Dr. Patel.

 5        Q.     And when was that?

 6        A.     I don't recall.

 7        Q.     Just your best judgment

 8   as you sit here today.

 9        A.     Late spring, early summer

10   of 2007 when I first went.

11        Q.     And you told him that you

12   couldn't sleep and he prescribed

13   medication for you at that time?

14        A.     It was part of it.  Yes,

15   sir.  I was having trouble sleeping.

16   Yes, sir.

17        Q.     What did you tell Dr.

18   Patel?

19        A.     That there were issues at

20   work that, you know, I was, you know,

21   I had always been real good

22   throughout my career at this line of

23   work with handling stress-related
```

1    stuff, and I thought I was having

2    trouble with handling that at this

3    time.  There was a lot of stress

4    going on at work.

5         Q.    Did he recommend that you

6    find other employment?

7         A.    I don't recall if he did

8    or not.

9         Q.    You haven't slept since

10   your termination or before your

11   termination?

12        A.    I mean there's nights

13   that I get some sleep.  Yes, sir.

14        Q.    What about your appetite;

15   do you contend your appetite has been

16   affected as a result of the incidents

17   for which you filed this lawsuit?

18        A.    No, sir.

19        Q.    Do you contend that

20   you've had a weight loss or weight

21   gain as a result of the incidents for

22   which you filed this lawsuit?

23        A.    Probably weight gain.

1      Q.      How much?

2      A.      I don't know.

3      Q.      Just your best judgment.

4      A.      I'm just guessing.  I

5   haven't--- I don't know what I

6   weighed prior and I don't really know

7   what I weigh now.  But I just feel

8   like I have, yeah.

9      Q.      Well, can you tell us as

10  you sit here today the approximate

11  amount of your weight begin that

12  you've had since you filed this

13  lawsuit?

14     A.      No, sir.

15     Q.      Have you had any problems

16  with your vision as a result of the

17  incident for which you filed in this

18  lawsuit?

19     A.      I've just been prescribed

20  glasses.

21     Q.      By whom?

22     A.      Dr. John A. Long.

23  Alabama Ophthalmology in Birmingham.

1      Q.     And did you tell Dr. Long

2   that it was as a result of this

3   incident?

4      A.     No, sir.

5      Q.     What did you tell Dr.

6   Long?

7      A.     Couldn't see.

8      Q.     Do you contend that your

9   taste has been affected as a result

10  of this incident for which you filed

11  this lawsuit?

12     A.     No, sir.

13     Q.     Do you contend your

14  hearing has been affected as a result

15  of the incident for which you filed

16  this lawsuit?

17     A.     No, sir.

18     Q.     Do you contend your

19  energy or stamina has been affected?

20     A.     I think energy.  Yes,

21  sir.

22     Q.     And how has it been

23  affected?

1    A.    Just no energy.  You

2  know, you don't get the appropriate

3  amount of sleep, you know, worry,

4  stress, you know, that's going to

5  affect your energy level.

6    Q.    Do you contend your

7  exercise has been affected?

8    A.    I guess that would be a

9  result of the lack of energy.

10    Q.    Okay.  So you do contend

11  your exercise has been affected.

12    A.    Yes, sir.

13    Q.    Do you contend that

14  you've had an illness or physical

15  problem as a result of this incident

16  for which you filed this lawsuit?

17    A.    No.

18    Q.    Do you contend you've had

19  nausea as a result of this incident

20  for which you filed this lawsuit?

21    A.    No, sir.

22    Q.    Have your reflexes been

23  affected?

```
 1        A.      No, sir.

 2        Q.      Have you had any pain,

 3  shaking or tremors as a result of

 4  this incident for which you filed

 5  this lawsuit?

 6        A.      I mean I have headaches

 7  now that I normally never have gotten

 8  and, you know, blood pressure is---

 9  I've never had high blood pressure

10  ever in my life and the last two or

11  three times I've been to the doctor,

12  I've had high blood pressure.

13        Q.      And what did you tell the

14  doctor?

15        A.      He just--- I didn't know.

16  He just checked it and said that---

17        Q.      Which doctor did you---

18        A.      Patel.

19        Q.      He told you that your

20  blood pressure was as a result of

21  this incident for which you filed

22  this lawsuit?

23        A.      He didn't say that
```

```
 1  specifically, no, sir.

 2        Q.      But led you to believe

 3  that.

 4        A.      Just he--- he--- he

 5  didn't mention that it was in

 6  relation other than the fact that

 7  it--- it may be as a result of the

 8  stress and, you know, the things

 9  going on with my job and all that

10  kind of stuff.

11        Q.      What's going on with your

12  job now?

13        A.      Nothing now.

14        Q.      Is it a good job?

15        A.      Yes, sir.

16        Q.      Do you like where you

17  work?

18        A.      Yes, sir.

19        Q.      You like what you're

20  doing?

21        A.      I do, other than the fact

22  that I mean I--- I take a lot of

23  pride in my career and my profession
```

```
 1   and a lot of hard work, a lot of

 2   training to get to where I was a year

 3   ago.  And other than the fact I've

 4   now gone back to where I started my

 5   career, you know, other than that

 6   fact, I don't have no problems at

 7   all --

 8        Q.     Now, have you---

 9        A.     -- with my job.

10        Q.     You told me about the

11   first meeting with Sheriff Davis.

12   You told me about the second meeting

13   with Sheriff Davis and you said there

14   was a third meeting with Sheriff

15   Davis.

16        A.     The termination meeting.

17        Q.     And tell me what happened

18   in that termination meeting.  Where

19   was it?

20        A.     That--- that was the

21   meeting when I was at work at the

22   courthouse security and he--- he had

23   me follow him to his truck to the
```

```
 1   jail.
 2        Q.      And who was at that
 3   meeting, the jail?
 4        A.      Myself, and Captain Steve
 5   Tate come in toward the latter part
 6   as a request by Sheriff Davis.
 7        Q.      And what did the sheriff
 8   tell you in that meeting?
 9        A.      He wanted to know if I
10   had talked to any commissioners
11   lately.  My response was yes, sir.
12   I'm friends with several of the guys
13   and, you know, working courthouse
14   security, I see them.
15        Q.      Friends with whom?
16        A.      The county commissioners.
17        Q.      Which ones?
18        A.      Allen Caton, or not
19   necessarily friends, so to speak, but
20   acquaintances of all the
21   commissioners, all seven of them.
22        Q.      You told the sheriff you
23   were friends with the commissioners.
```

1    Which ones are you friends with?

2         A.      Well, I mean I referred

3    to them as a friend.  I mean I---

4         Q.      Caton.  Who else?

5         A.      My acquaintances with the

6    Commission would be Allen Caton.  I

7    speak to him when I see him.  I speak

8    with Allen Wyatt when I see him.  I

9    speak to Joe Headley when I see him.

10   I speak to Bobby Agee when I see him.

11   I speak to Heedy Hayes when I see

12   him.  I speak to Tim Mims when I see

13   him.  And I think that's all of them.

14        Q.      Which ones do you

15   consider friends of all the

16   commissioners?

17        A.      I mean I guess--- I don't

18   know if you consider them friends.  I

19   mean you may refer to them as a

20   friend but I would say I know on a---

21   I know Allen Caton.  I probably spoke

22   with him more than any of them, and

23   probably Allen Wyatt.  And Joe

1    Headley.   And I used to work for

2    Commissioner Tim Mims.

3         Q.      So you told the sheriff

4    that you were friends with several of

5    the commissioners --

6         A.      Mmm hmm.

7         Q.      -- during this meeting;

8    is that correct?

9         A.      That's correct.

10        Q.      And what did the sheriff

11   say when you told him that you were

12   friends with these county

13   commissioners?

14        A.      Well, I said that I was

15   friends with the county commissioners

16   and that I spoke with them--- spoke

17   to them when I saw them.

18        Q.      What did the sheriff say?

19        A.      "What did you say?".

20        Q.      What did you reply?

21        A.      And I said, what are you

22   referring to.  Well, when did you

23   speak to the county commissioners.

1    Well, I can't recall the last time I

2    spoke with county commissioners but

3    referring to at the courthouse during

4    my job is where we were at during

5    that conversation, but that I speak

6    to them when I see them.  He says

7    have you specifically talked to any

8    one commissioner lately.  And I said

9    yes, sir.  He said who, and he said

10   have you spoken with Commissioner

11   Caton.  And I said yes, sir.  What

12   did y'all talk about.  And I said we

13   talked about my job, how things were

14   going.  He asked me about, there

15   again, why I was working courthouse

16   security and that kind of thing.  And

17   he said what else did you all talk

18   about.  I said well, you know, we

19   just talked.  And he said I want to

20   know specifically what y'all talked

21   about.  And I said well, sir, I said

22   I wasn't on your time clock, I wasn't

23   in your vehicle, I wasn't in your

1  uniform.  I had a conversation with

2  commissioner Allen Caton on a

3  personal basis and I think that's

4  between me and Mr. Caton.  Oh, so

5  you're not going to share--- Sheriff

6  Davis says, so you're not going to

7  tell me what you and Mr. Caton talked

8  about.  Well, I said, well, other

9  than specifically other than what I

10  already said, no, sir.  And then he

11  says well, what are you and Robbie

12  Autery up to.  I said sir, what are

13  you talking about.  About these

14  ethics, alleged ethics complaints

15  and, you know, what y'all got up your

16  sleeve with that.  I said sir, I

17  don't know what you're talking about.

18  Oh, so you're telling me you and

19  Robbie Autery don't talk.  I said

20  yes, sir, I've been knowing Robbie

21  all my life.  By marriage, he's my

22  first cousin.  We talk on a daily

23  basis.  Well, you're not going to

```
 1   tell me what y'all talked about about

 2   my involvement with any kind of

 3   ethics violations.  And I said no,

 4   sir.  Those discussions were between

 5   me and Robbie and that's--- no, I'm

 6   not going to say anything.

 7               And if I could elaborate

 8   a little bit, myself and Captain Tate

 9   was going to a security meeting at

10   Talladega and of course he and I were

11   in a vehicle together, we traveled

12   over.  Our trip got cut short because

13   of a crisis in my family.  I had to

14   turn around and come back.  During

15   that meeting, we talked the whole way

16   there and the whole way back.

17               Now, back to the meeting,

18   the third part of the meeting was

19   Sheriff Davis said well, what

20   conversations have you had with Steve

21   Tate about me and the Attorney

22   General's office and ethics

23   violations and things that I'm
```

1    supposed to be doing and all that

2    kind of stuff. And I said well,

3    anything really amounting to anything

4    on my behalf, not much. We talked

5    the whole way there and the whole way

6    back. But, you know, as far as my

7    part, there wasn't nothing really

8    said to amount to anything. Oh, so

9    you're not going to tell me what

10    y'all said. And I said well, you

11    know, there again, as far as my part,

12    I didn't elaborate on a whole lot of

13    things. It was him doing most of the

14    talking and I listened. And so then

15    he called Steve Tate on the radio and

16    we sat there and we sat there and

17    quite a bit of time went by because

18    he wanted Steve Tate in the meeting

19    to confront Steve about what I

20    supposedly said during our travels.

21    And he was busy on a call so we had

22    to wait on him. So we sat there and

23    we sat there. And finally Captain

```
 1    Tate, Steve Tate, pulled up.  And the

 2    sheriff asked him, he says did you or

 3    did you not tell me that Shane said

 4    something, and I don't remember the

 5    exact words, but something related to

 6    the Attorney General's office and

 7    ethics violations.  And Steve Tate's

 8    response was, he was sitting beside

 9    me, is that not what I told you this

10    morning.  And the sheriff said yes.

11    And he said well, my story is not

12    going to change.  So, the sheriff

13    says you're not---

14         Q.     You said the story is not

15    going to change?

16         A.     Steve Tate.  Apparently

17    they had talked that morning and he

18    told him something I allegedly said.

19         Q.     What did he tell him that

20    you allegedly said?

21         A.     I don't--- I don't--- it

22    was in reference to the Attorney

23    General's office and ethics
```

```
 1   violations.  I don't know exactly

 2   what it was, but that's what it was

 3   in reference to.

 4        Q.     How do you know that that

 5   is what it was in reference to?

 6        A.     That's what he said.

 7        Q.     That's what the sheriff

 8   confronted Steve Tate with there in

 9   the meeting with you.

10        A.     Correct.  The sheriff

11   says you're not going to be truthful

12   with me about the talking with

13   Commissioner Caton, you're not going

14   to be truthful with what Robbie and

15   you and have got going with the

16   ethics violations, you're not going

17   to be truthful with me about having a

18   conversation with Steve Tate

19   pertaining to you telling him stuff

20   about the Attorney General's office

21   and ethics violations.  You've got a

22   choice.  Either you can resign or

23   you're fired.  And I told sheriff
```

1    Davis that I had had a good career, a

2    long career, a successful career,

3    I've never been disciplined before a

4    day in my career.  Never been written

5    up, never been disciplined for

6    anything, that I had always done my

7    job, including since he had been

8    there, or from my tell since he had

9    been there, and I was not going to

10   resign from my job.  And he said

11   well, then your other option is

12   you're fired.  And he called another

13   deputy in---

14        Q.    Who was that?

15        A.    Lieutenant John Shearon,

16   to take me home.

17        Q.    And did he take you home?

18        A.    Yes, sir.

19        Q.    Okay.  And you haven't

20   spoken to the Sheriff since?

21        A.    No, sir.

22        Q.    Other than Commissioner

23   Caton, did you ever speak to any

```
 1    other commissioner about the

 2    situation at the Sheriff's Office?

 3         A.    Not that I recall.

 4         Q.    And how many times have

 5    you spoken to anyone at the Attorney

 6    General's office?

 7         A.    Two.

 8         Q.    When was the first time?

 9         A.    Whatever day it was

10    myself and Robbie went to the AG's

11    office.  I don't remember when that

12    was.

13         Q.    When was the second time

14    you had a conversation with anyone at

15    the Attorney General's office?

16         A.    I met with the

17    investigator six months ago.

18         Q.    And which investigator

19    did you meet with six months ago?

20         A.    The investigator with the

21    AG's office.

22         Q.    Which one?

23         A.    His last name was Sisson,
```

1    I think.

2        Q.    And where was that

3    meeting?

4        A.    At Exit 219.

5        Q.    And what did you tell

6    Investigator Sisson at Exit 219?

7        A.    He had just been given

8    the case apparently and was asking me

9    basically what I knew in relations to

10    the initial e-mail that was sent in

11    by Robbie.

12        Q.    And what did you tell

13    him?

14        A.    That the only thing that

15    I knew was that I mean that, you

16    know, what the word was, and that,

17    you know, that I had no personal

18    knowledge, no facts, any of that kind

19    of thing, but that it was alleged

20    that the sheriff was doing business

21    with his wife's company, purchasing

22    dog equipment and purchasing dogs,

23    doing business at her or at their

```
 1    convenience store, that I had not

 2    seen anything that give me specifics

 3    on that, but that it was being talked

 4    and that it was around people in the

 5    county and other deputies that that

 6    was going on.  And that that was

 7    pretty much all I knew about it.

 8         Q.    And did he record that

 9    conversation?

10         A.    Not to my knowledge.

11         Q.    And as I understand,

12    you've got some notes of your

13    meetings with the sheriff.

14         A.    That's correct.

15         Q.    And how many pages of

16    notes?

17         A.    It may be five.

18         Q.    And were they prepared on

19    the computer?

20         A.    Yes, sir.

21         Q.    Which computer?

22         A.    My home computer.

23         Q.    And that's the--- what
```

```
 1  did you say the brand was?

 2       A.     I couldn't recall.  I

 3  don't know what this is, HP or a

 4  Dell?  I'm not sure.

 5       Q.     Were these notes prepared

 6  at or near the time of the event?

 7       A.     Yes, sir.

 8       Q.     And where are these notes

 9  now?

10       A.     I've got a copy with me

11  today.

12             MR. SHEEHAN:  Let's go

13  ahead and mark those.

14             MR. YAGHMAI:  I want to

15  look at them first.  Y'all haven't

16  made a request for them before.  I

17  need to talk to him and we need to

18  take a break.  We've been going an

19  hour and a half and I need to know

20  whether I'm going to object to

21  producing them or not.  I'm going to

22  talk to him for a minute and then

23  I'll let you know.
```

```
 1                 (Recess)

 2                 MR. SHEEHAN:   Thank you

 3    for your time.

 4                 (Lunch recess)

 5    BY MR. SHEEHAN:

 6         Q.      Mr. Fulmer, it appears

 7    that there are seven pages as opposed

 8    to five pages of notes.

 9         A.      Yes, sir.

10         Q.      And these notes you

11    prepared on a computer, you say?

12         A.      Handwritten and retyped

13    on a computer.  Yes, sir.

14         Q.      When did you--- where are

15    the handwritten notes?

16         A.      I've got them.

17         Q.      Have you got them with

18    you?

19         A.      Mmm hmm.

20                 MR. SHEEHAN:   I want to

21    mark those, too.

22                 MR. YAGHMAI:  Well, I

23    haven't taken a look at them.  I
```

```
 1    don't know if there's any attorney-

 2    client privilege.  I didn't

 3    realize--- can we address it after we

 4    finish the deposition of Sheriff

 5    Davis?  That will give me a chance to

 6    look at them.

 7              MR. SHEEHAN:  We'll mark

 8    that as composite Exhibit 9, the

 9    handwritten notes.

10        Q.    The handwritten notes;

11    they were prepared at or near the

12    time of the event?

13        A.    Yes, sir.

14        Q.    So they would be a more

15    accurate record of what took place

16    based upon your knowledge at the

17    time?

18        A.    Yes.

19        Q.    Because Exhibits 2

20    through 8 to your deposition were

21    things that you went back and typed

22    up.

23        A.    Based on my handwritten
```

```
1   notes.   Yes, sir.

2              MR. SHEEHAN:   Thank you

3   very much for your time.

4              THE DEPONENT:   Thanks.

5       FURTHER THE DEPONENT SAITH NOT,

6       Deposition concluded 2:05 p.m.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23
```

```
 1            C E R T I F I C A T E

 2   STATE OF ALABAMA

 3   COUNTY OF JEFFERSON

 4            I, Karen Davis, hereby

 5   certify that the above and foregoing

 6   deposition was taken down by me on

 7   Computerized Stenotype, and the

 8   questions and answers thereto were

 9   transcribed by me, and that the

10   foregoing represents a true and

11   correct transcript of the deposition

12   given by said witness upon said

13   hearing.

14            I further certify that I

15   am neither of counsel nor of kin to

16   the parties in the action, nor am I

17   anywise interested in the result of

18   said cause.

19

20            _____

21            KAREN DAVIS

22            COMMISSIONER

23
```

1    HB69

2    39947-2

3    By Representative Martin (N & P)

4    RFD: Local Legislation

5    First Read: 08-JAN-2002

6    PFD 01/07/2002



HB69

1

2    Enrolled, An Act,

3            Relating to Chilton County; providing for a civil

4    service merit system for certain employees of the office of

5    the sheriff.

6    BE IT ENACTED BY THE LEGISLATURE OF ALABAMA:

7            Section 1. This act shall apply only in Chilton

8    County.

9            Section 2. As used in this act, the following words

10   have the following meanings:

11           (a) BOARD. The merit system board created by this

12   act.

13           (b) COUNTY. Chilton County.

14           (c) EMPLOYEE. Any law enforcement officer, radio

15   operator, jailer, and law enforcement support personnel, not

16   excepted by Section 3 of this act, who is employed by the

17   sheriff.

18           (d) MERIT EMPLOYEE. Any employee who shall have

19   completed one year of probationary employment.

20           Section 3. This act applies to all law enforcement

21   officials and employees employed by the Office of Sheriff of

22   Chilton County except the chief deputy.

23           Section 4. All employees to whom this act applies

24   shall be governed by merit system rules and regulations

25   governing dismissals, suspensions, lay-offs, and terminations,

HB69

1    adopted and administered by the board. Presently employed
2    persons shall remain in their respective employments, but
3    nothing herein shall be construed to prevent or preclude the
4    removal of an employee for cause as provided herein.

5              Section 5. (a) There is created a merit system board
6    for the Office of the Sheriff of Chilton County, which shall
7    become effective upon passage of this act and shall be
8    composed of three members appointed as follows:

9              (1) One member appointed by the Chilton County
10   Commission.

11             (2) One member appointed by the Chilton County
12   Sheriff.

13             (3) One member appointed by agreement of the Chilton
14   County Commission and the Chilton County Sheriff.

15             (b) The original members shall serve for terms of
16   one, two, and four years, as determined by the drawing of
17   lots. Thereafter, all members shall serve for a period of four
18   years. No person shall be appointed to the board unless he or
19   she is a resident and qualified elector of Chilton County and
20   over the age of 21 years.

21             (c) Members of the board shall take the
22   constitutional oath of office, which shall be filed in the
23   office of the probate judge. Vacancies on the board shall be
24   filled for the unexpired term of the vacant position in the
25   same manner as original appointments. The members of the board

HB69

1    shall elect a chair and secretary from among their members.
2    Any member of the board who becomes a candidate for, or is
3    elected or appointed to, another public office of profit must
4    vacate his or her office as a member of the board. No board
5    member shall be an elected official, appointed employee, or
6    employee of the county or any municipal government.
7             (d). Each member of the board shall serve without
8    pay.
9             Section 6. (a) The board shall fix the times for its
10   regular meetings and it may hold special, adjourned, or called
11   meetings at any time. A majority of the members of the board
12   shall constitute a quorum for the transaction of business. All
13   meetings of the board shall be held in the Chilton County
14   Courthouse. The board may prescribe rules governing its
15   procedure provided the rules are not inconsistent with this
16   act.
17            (b) The board shall keep minutes of its meetings and
18   a record of all business transacted by it. Its records, except
19   those which the rules of the board require to be held
20   confidential for reasons of public policy, shall be open for
21   inspection by any resident of the county at all reasonable
22   times.
23            Section 7. The Chilton County Commission shall
24   provide the board with materials and secretarial help when
25   needed during meetings and shall assign an area from time to

HB69

1    time for the board meetings. It shall also provide filing

2    cabinets and storage space for the board and shall pay all

3    expenses incurred by the board from the general fund of the

4    county, when a claim therefor is submitted and approved by the

5    Chilton County Commission.

6    Section 8. All appointments of employees to which

7    this act applies, other than temporary appointments, shall be

8    probationary for one year from the date of appointment. A

9    probationary employee may be discharged by the sheriff at his

10   or her pleasure at any time before the expiration of one year

11   from his or her appointment. After the employee has served for

12   one year in the position to which he or she was originally

13   appointed or employed, the employee shall become a merit

14   employee.

15   Section 9. Whenever a new sheriff is elected or

16   appointed, he or she may appoint any person as his or her

17   chief deputy sheriff, provided the person meets the minimum

18   standards for law enforcement officers as prescribed by the

19   general laws of the state. The person holding the position of

20   chief deputy sheriff immediately preceding the appointment of

21   a chief deputy may be terminated without benefit of the

22   provisions of this act.

23   Section 10. The sheriff may suspend, without pay, a

24   merit employee for any personal misconduct or fact affecting

25   or concerning his or her fitness or ability to perform his or

HB69

1    her duties in the public interest. In the event a merit
2    employee is suspended without pay for more than 10 days in any
3    one year, he or she shall be entitled to a public hearing by
4    the board upon written demand filed within five days from the
5    date of the order of suspension. If, after hearing, the board
6    determines that the action of the appointing authority was not
7    with good cause, the suspension shall be revoked.

8         Section 11. (a) The sheriff may remove, discharge or
9    demote any merit employee who is directly under the sheriff,
10   provided that within five days a report in writing of the
11   action is made to the board, giving the reason for the
12   removal, discharge, or demotion. The employee shall have 10
13   days which to appeal to the board from the time of his or her
14   notification of removal, discharge, or demotion. If an appeal
15   is filed, the board shall thereupon order the charges or
16   complaint to be filed forthwith in writing, if not already
17   filed, and shall hold a hearing de novo on the charges. No
18   merit employee shall be removed, discharged, or demoted except
19   for some personal misconduct or fact rendering his or her
20   further tenure harmful to the public interest, or for some
21   cause affecting or concerning his or her fitness or ability.
22   If the employee's removal, discharge, or demotion is appealed
23   to the board, then the same will become final only upon
24   affirmation by the board after a hearing where the employee
25   has been given an opportunity to face his or her accusers and

HB69

1    be heard in his or her own defense. Pending a hearing, the

2    affected employee may be suspended and after the hearing the

3    board may order the employee reinstated, demoted, removed,

4    discharged, or suspended, or take any other disciplinary

5    action as in their judgment is warranted by the evidence and

6    under the law. In all cases, the decision of the board shall

7    be reduced to writing and entered in the record of the case

8    and shall include the board's findings of facts upon which its

9    decision is based.

10        (b) The board may administer oaths, take

11   depositions, certify official acts, and issue subpoenas to

12   compel the attendance of witnesses and production of papers

13   necessary as evidence in connection with any hearing,

14   investigation, or proceeding within the purview of this act.

15   The sheriff or some other law enforcement officer of the

16   county shall serve all processes of the board. In the case a

17   person refuses to obey a subpoena, the board may invoke the

18   aid of the Circuit Court of Chilton County, to order that the

19   testimony or evidence be produced. Upon proper showing, the

20   court shall issue a subpoena or order requiring the person to

21   appear before the board and produce all evidence and give all

22   testimony relating to the matter in issue. A person who fails

23   to obey a subpoena or order may be punished by the court for

24   contempt. The fees of witnesses for attendance and travel

25   shall be the same as fees for witnesses in the Circuit Court

HB69

1    of Chilton County, and the fees shall be paid from the

2    treasury or the county in a case involving an employee of the

3    sheriff's department.

4          (c) In all proceedings before the board, the board

5    may employ an attorney to appear before the board and

6    prosecute all charges instituted by the sheriff when requested

7    or directed to do so and to give any legal advice and legal

8    assistance to the board as may be requested. The county

9    attorney of Chilton County or the attorney for the appointing

10   authority that is removing, discharging, demoting, or firing

11   the employee may serve in this capacity.

12         (d) Any person aggrieved by a decision of the board

13   may appeal that decision to the Circuit Court of Chilton

14   County within 30 days from the rendition of the decision by

15   the board. Review by the Circuit Court shall be without a jury

16   and be confined to the record and a determination of the

17   questions of law presented. The board's findings of fact shall

18   be final and conclusive.

19         Section 12. Each employee may exercise his or her

20   right as a citizen to express his or her opinion and to cast

21   his or her vote. No employee shall receive any appointment or

22   advancement as a reward for his or her support of a candidate

23   for office of a political party nor shall he or she be

24   dismissed, suspended, or reduced in rank or pay as punishment

HB69

1    for his or her failure to support any candidate for political

2    office.

3            Section 13. Any merit employee who willfully

4    violates any provision of this act, or any rule or regulation

5    issued in pursuance hereof, shall be dismissed from service

6    under the system and shall not be appointed or reemployed for

7    two years.

8            Section 14. All employees to which this act applies

9    shall be covered by the merit system within one year from the

10   effective date of this act.

11           Section 15. The provisions of this act are

12   severable. If any part of this act is declared invalid or

13   unconstitutional, that declaration shall not affect the part

14   which remains.

15           Section 16. All laws or parts of laws which conflict

16   with this act are repealed.

17           Section 17. This act shall become effective upon the

18   adoption of a local constitutional amendment to the

19   Constitution of Alabama of 1901, relating to Chilton County

20   and authorizing a civil service merit system for employees in

21   the Office of Sheriff.

HB69

1

2



3
4
Speaker of the House of Representatives

5
6
President and Presiding Officer of the Senate

7     House of Representatives

8     I hereby certify that the within Act originated in
9     and was passed by the House 15-JAN-2002.
10
11        Greg Pappas
12        Clerk
13

14
15
16   Senate            19-FEB-2002              Passed
17



Page 9

# EXHIBIT 6

## EXCERPTS FROM THE DEPOSITION OF KEVIN DAVIS

Q.    How many people were employed with the Chilton County Sheriff's Department when you had this meeting with Chief Deputy Mayfield?

A.    Around twenty-five.

(Davis Depo., p. 30, ll. 11-16).

A.    No, sir.  I knew the quality of Robbie's work for myself.

Q.    So it was good quality,  correct?

A.    Yes.

(Davis Depo., p. 32, ll. 1-5).

Q.    You knew, obviously, that Shane had campaigned for his dad during the election, correct?

A.    No doubt.

Q.    Pardon me?

A.    No doubt.

Q.    And also Robbie?

A.    Yes, sir.

Q.    You knew that because of the kinship, correct?

A.    Right.

(Davis Depo., p. 44, ll. 8-18).

Q.    During any of that time frame, did you ever talk to him and say you're not carrying your case load?

A.    Not until we had the meeting.

Q.    Not until you had what meeting?

A.    Our--- the meeting where we put him--- took him from Task Force and put him just in General Investigations.

Q.    When did that meeting occur?

A.    Within the first couple of months of me being in office.

(Davis Depo., p. 48, ll. 1-16).

1

Q.    And did you do anything to verify what Mayfield had told you from that December-January meeting until a couple months later when you met with Shane?

A.    No, sir. I was taking information the Chief gave me.

Q.    You just took it at face value and that was it.

A.    Right.

(Davis Depo., p. 49, l. 18 - p. 50, l. 4).

Q.    What did Shane say when you came to him and said we're taking you from being on both the criminal investigation task force and putting you just on criminal investigation?

A.    He didn't like it. He felt like I was doing him wrong.

(Davis Depo., p. 50, ll. 9-15).

Q.    Who all had agents on the Task Force?

A.    At that time the Sheriff's Office, the City of Clanton, Jemison, and that may have been it.

Q.    So Shane was a supervisor of that Task Force before you removed him from it, correct?

A.    Right.

Q.    Did you have any complaints from the City of Clanton about Shane's job as the head of the Task Force?

A.    No, I didn't.

Q.    Did you have any complaints from Jemison about Shane and his job as the head of the Task Force?

A.    No, I didn't.

Q.    Did you have any complaints from any other governmental entity about Shane's heading the Task Force other than Mayfield?

A.    No.

Q.    Did you consult with the city, the City of Clanton or Jemison, to see whether they wanted you to remove Shane as the head of the Task Force?

A.    No.

(Davis Depo., p. 52, l. 9 - p. 53, l. 17).

Q.    But was there complaints that he wasn't working his forty hours a week?

A.    I don't remember that complaint.

2

Q.   All right. And there wasn't complaints that he was submitting time that he wasn't actually working, correct?

A.   I have not heard that.

Q.   So it would be an accurate statement to say if Shane Fulmer, when he was the head of the Task Force, went on every single search warrant, he would be working overtime, correct?

A.   It was up to them to work when they needed to work.

(Davis Depo., p. 61, l. 5 - p. 62, l. 1).

Q.   And there wasn't any complaints about once you moved Shane to General Investigations about the he did his job as a police officer, was there?

A.   As a police officer?

Q.   Yes, sir.

A.   No, sir.

(Davis Depo., p. 67, l. 23 - p. 68, l. 7).

Q.   So when you removed him from the Task Force, he was still the head of General Investigations, correct?

A.   That's right.

Q.   He was the supervisor, correct?

A.   Right.

Q.   So not only did he have to worry about his case load, he had--- part of his job duties was to ensure that the other investigators were doing their job properly.

A.   Right.

(Davis Depo., p. 76, ll. 4-17).

Q.   All right. So let me ask you this: What is your firing procedure right now? It doesn't have to be written. It doesn't have to be anything. What's your procedures?

A.   I give everybody a fair chance.

Q.   And that fair chance is determined wholly by you, correct?

A.   At this time.

Q.   All right. Did you ever tell people that there was no merit system and you're not bound by it?

A.   I may have said that.

Q.   All right. You've told Shane Fulmer that before you terminated him, correct?

3

A.    I don't recall if I told Shane or not.

Q.    You heard him testify to that. You don't have any reason to dispute that; do you?

A.    No.

Q.    And you heard Robbie Autery testify that you made that statement to him before, too. You don't have any reason to dispute that; do you?

A.    Ask the question again.

Q.    You don't have any reason to dispute Robbie's testimony that you told him that there was no merit system, right?

A.    Right.

(Davis Depo., p. 93, l. 5 - p. 94, l. 21).

Q.    And did anybody say, oh, that's a good idea, we need to get together, we being the County Commission, we need to appoint somebody and get this thing moving?

A.    It was generally agreed among all of us that yeah, we need to do something. It's been out there since '02 and we need to appoint our board.

Q.    And so after you left that meeting, did you follow up and try to do anything to appoint a board member?

A.    No, sir.

Q.    Why not?

A.    I didn't feel like me appointing my member would accomplish the board being put in place.

Q.    Well, wouldn't--- you understood that one of your duties as the Sheriff was to comply with this law and appoint somebody, correct?

A.    No, I didn't understand that as being one of my duties.

(Davis Depo., p. 119, l. 8 - p. 120, l. 11).

Q.    So after that fifteen or thirty minute meeting, you never took any steps further to try to appoint somebody to this board, correct?

A.    That's correct.

Q.    You never brought it up again, did you?

A.    No, I didn't.

Q.    And never brought it up to the County Attorney, correct, after this meeting?

A.    After meeting, no, sir.

Q.    Never brought it up again to another County Commissioner, correct?

4

A.   Not to my knowledge.
Q.   And why is that?
A.   I felt like I had done went and asked.

(Davis Depo., p. 125, l. 7 - p. 126, l. 4).

Q.   Well, in your mind you had the authority to fire anybody you wanted to at this point; didn't you?
A.   Yes, sir.

(Davis Depo., p. 128, ll. 12-15).

Q.   If you were a sheriff's deputy, you would want that merit bill passed; wouldn't you?
A.   Now? No.
Q.   Now you wouldn't?
A.   No.
Q.   You would want the sheriff to come in and do whatever he wanted to and fire you?
A.   It's better than this bill.
Q.   You wouldn't want--- if you were a sheriff's deputy, you wouldn't want any protection of somebody new coming in and firing you?

(Davis Depo., p. 129, l. 21 - p. 132, l. 12).

Q.   Do you understand that the County Commission appointed Aubrey Wallace?
A.   I have seen that.
Q.   And he was appointed actually in September of '07, correct?
A.   I don't know when.
Q.   How did you find out that Aubrey Wallace was appointed by the County Commission?
A.   I want to say they sent a letter.  I heard one of the commissioners or two or three of them  saying that they did.
Q.   So at that point why didn't you appoint somebody?
A.   Because at the time that I found out that they had appointed somebody, this situation had alreadytook place.
Q.   Well, you found out about it, that they had appointed somebody,  right before you fired Shane and Robbie, correct?
A.   No, I didn't know that.

5

(Davis Depo., p. 139, l. 15 - p. 140, l. 17).

Q.    So if somebody testified that they had informed you that the County was about to appoint this board member before firing Shane and Robbie, that would be--- are you denying that or are you saying you just don't know one way or the other?

A.    I don't know. I don't remember it.

Q.    But it could be that way.

A.    I don't know that it could or couldn't be that way.

(Davis Depo., p. 144, l. 4 - p. 145, l. 4).

Q.    Did you contact any of the County Commissioners once you received the letter about appointing somebody to the merit board?

A.    No, sir.

Q.    Did you do anything in response to it?

A.    No, sir.

Q.    Did you take any affirmative actions to appoint the person to the merit board?

A.    No, sir.

Q.    Why?

A.    Because this was in process.

Q.    What is this?

A.    The allegations.

Q.    The lawsuit?

A.    Yes, sir.

(Davis Depo., p. 148, l. 23 - p. 149, l. 18).

Q.    Have you fired anybody else besides Robbie Autery and Shane Fulmer since you were sworn in in January of '07?

A.    Yes, sir.

Q.    Who is that?

A.    Just drawing a blank. He was a part-time deputy and I fired him for drinking and driving.

Q.    He got arrested for a DUI?

A.    No, he just got stopped.

Q.    Anybody else?

A.    No, sir.

(Davis Depo., p. 163, ll. 2-15).

Q.   Well, you had some knowledge that Robbie had gone to the AG's office because you discussed that with him when you fired him, correct?

A.   I don't remember that conversation.

Q.   So when he testified earlier that you specifically made reference to him going to the AG's office, are you denying that ever happened or are you just saying you don't know one way or the other?

A.   I don't remember us ever discussing the AG's office on the 10th.

Q.   Do you remember ever discussing with Robbie about the AG's office ever?

A.   I don't remember ever me and Robbie ever discussing the AG's office.

Q.   Or do you--- and I'm trying to clarify the record:  Are you saying it didn't happen or you just don't remember one way or the other?

A.   I'm not saying it didn't happen.  I just don't remember me and Robbie ever talking about the AG's office.

(Davis Depo., p. 178, l. 18 - p. 180, l. 2).

Q.   Do you remember asking Robbie Autery about whether he had gotten any, or Shane Fulmer, whether he had gotten any documents to show where you had purchased these canines?

A.   I don't remember asking.

Q.   Again, you're not denying it; you just don't remember one way or the other?

A.   Right.  I just don't remember.

(Davis Depo., p. 185, l. 23 - p. 186, l. 11).

7